UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
UNITED STATES OF AMERICA,         )  Criminal Action
                                  )  No. 21-197
vs.                               )
                                  )
RACHEL MARIE POWELL,              )  February 11, 2021
                                  )  2:17 p.m.
              Defendant.          )  Washington, D.C.
                                  )
 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

**TRANSCRIPT OF MOTION HEARING**
**BEFORE THE HONORABLE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT CHIEF JUDGE**

<u>**APPEARANCES**</u>:

```
FOR THE GOVERNMENT: ELIZABETH ALOI
                    U.S. Attorney's Office
                    District of Columbia
                    555 4th Street, NW
                    Washington, DC 20003
                    (202) 252-7212
                    Email:  elizabeth.aloi@usdoj.gov


FOR THE DEFENDANT:  MICHAEL J. ENGLE
                    Armstrong Teasdale LLP
                    2005 Market Street, 29th Floor
                    One Commerce Square
                    Philadelphia, PA 19103
                    (267) 780-2063
                    Email:  mengle@atllp.com


ALSO PRESENT:       CHRISTINE SCHUCK, Pretrial Officer


Court Reporter:     Elizabeth SaintLoth, RPR, FCRR
                    Official Court Reporter
```

Proceedings reported by machine shorthand, transcript
produced by computer-aided transcription.

1               **P R O C E E D I N G S**

2               THE DEPUTY:  The United States District Court for

3      the District of Columbia is now in session.  Chief Judge

4      Beryl A. Howell presiding.

5               Matter before the Court, Magistrate Case

6      No. 21-197, United States of America versus Rachel Marie

7      Powell.

8               Your Honor, for the record, Ms. Christine Schuck

9      from pretrial is present on the phone.

10              Counsel, please state your names for the record,

11     starting with the Government.

12              MS. ALOI:  Good afternoon, Your Honor.

13     Elizabeth Aloi for the United States.

14              THE COURT:  Yes.  Good afternoon, Ms. Aloi.

15              MR. ENGLE:  Good afternoon, Your Honor.

16     Michael Engle for Ms. Powell.

17              THE COURT:  All right.  Good afternoon, Mr. Engle.

18              Good afternoon, Ms. Powell.

19              Are you having any difficulty hearing, or can you

20     hear everything?

21              THE DEFENDANT:  I can hear everything.

22              THE COURT:  All right.  Good.

23              So this hearing is being held remotely with

24     counsel for both sides, the Government and the defendant,

25     participating via video conference, and Ms. Powell also

1    participating via video conference.

2              Ms. Powell, do you agree, after consultation with

3    your counsel --

4              THE DEFENDANT:  Yes.

5              THE COURT:  -- to participate in this hearing

6    remotely rather than being physically present in the

7    courtroom today?

8              THE DEFENDANT:  Yes.

9              THE COURT:  I would like to remind anyone who is

10   listening to this hearing over the public teleconference

11   line that, under my standing order 20-20, recording and

12   rebroadcasting of court proceedings, including those held by

13   video conference, is strictly prohibited.

14             Violation of these prohibitions may result in

15   sanctions including removal of court-issued media

16   credentials, restricted entry to future hearings, denial of

17   entry to future hearings, and any other sanctions deemed

18   necessary by the presiding judge.

19             All right.  So let's begin with the Government's

20   pending motion which is an appeal of the magistrate judge's

21   release order.

22             I have reviewed, in connection with this hearing,

23   the Government's motion and attached memo, and the complaint

24   underlying the charges in the case.  I have also reviewed

25   the defendant's opposition memo which was very promptly

1    filed even before I had seen the Government's.

2              I have also looked at the transcript of

3    proceedings that the Government supplied before the

4    magistrate judge in the Western District of Pennsylvania,

5    and that magistrate judge's order setting conditions of

6    release, and the Pretrial Services Report from the Western

7    District of Pennsylvania.

8              I also did review, earlier today, two exhibits:  A

9    PowerPoint presentation on a CD, and a DVD with some video

10   footage that the Government supplied.

11             I take it, Mr. Engle, you have been privy to all

12   of that information?

13             MR. ENGLE:  I have, Your Honor.

14             THE COURT:  Okay.  Good.

15             All right.  So it's the Government's motion, so I

16   will give you the floor, Ms. Aloi.

17             How do you say your name?

18             MS. ALOI:  Aloi.

19             THE COURT:  Aloi?

20             MS. ALOI:  Yes, Your Honor.  It's Ms. Aloi.

21             THE COURT:  Aloi, okay.  So correct me if I

22   mispronounce it.  I apologize if I do.

23             MS. ALOI:  Thank you.

24             Your Honor, on January 6th, the defendant picked

25   up a large pipe and used it as a battering ram to break into

1    the U.S. Capitol.  Then, amplified by a bullhorn, she

2    corralled her fellow rioters and gave instructions on how to

3    take the Capitol, including instructions that I believe you

4    indicated you saw in the video, that seemed to suggest an

5    operative knowledge of the interior layout of the Capitol.

6              THE COURT:  I know that that's one of the --

7    excuse me.

8              I know that that's one of the suggestions that the

9    Government had made, that she had some preplanning knowledge

10   of the Capitol's layout, which is -- given what occurred and

11   how close members of Congress and staff and other people

12   came to -- mobs walking through the Capitol floors, you

13   know, it was a little bit concerning -- quite concerning.

14             But having looked at that video, does it indicate

15   that she had, sort of, a floor plan?  Or does it indicate

16   that she had at some point been inside the Capitol, through

17   that broken window perhaps, and then hopped back outside?

18   Because she was only giving directions -- not about the full

19   layout of the floor but, sort of, the layout of that office

20   where the broken window was.

21             MS. ALOI:  Your Honor, I think the former is

22   currently under investigation.

23             I think the latter is quite clear; that she did,

24   in fact, enter the Capitol, assessed the situation, exited,

25   and then gave direction to the fellow rioters on how best to

```
 1    accomplish their goal of interrupting the proceedings.

 2              She seems to indicate that there is a place where

 3    you might be able to drop down.  I don't think that is

 4    immediately obvious to individuals who may be looking in

 5    that window; but we're still evaluating what -- or

 6    investigating what information she may have had in advance

 7    of the riot that day.

 8              We do know that she was in touch with at least one

 9    other militia member whom she traveled to the Capitol with.

10    This is --

11              (Simultaneous speaking.)

12              THE COURT:  This is the Mr. Kevin Lynn; is that

13    right?

14              Excuse me.  That's Kevin Lynn.

15              MS. ALOI:  That's right, Your Honor.

16              THE COURT:  Well, that's -- I mean, the only

17    reason I know that name is from The New Yorker article you

18    attached to your briefing.

19              Has -- have the investigators, the FBI, gotten any

20    further information from Mr. Lynn?

21              MS. ALOI:  Your Honor, I am not prepared to

22    proffer today any additional information on that.

23              THE COURT:  Okay.

24              So, I mean, we have both the defendant's statement

25    at the window saying:  Here is what you are going to find in
```

1    that other room, two doors -- some other stuff.

2              But, also, there seems to be an Exhibit 10 that

3    the Government produced in connection with this PowerPoint.

4    It appears to show the defendant inside the Capitol.  But

5    was that before or after she was standing outside with the

6    bullhorn; do you know?

7              MS. ALOI:  Your Honor, I can show some additional

8    video footage that may shed a little bit more light on that.

9              The crowd with the bullhorn -- the crowd following

10   the battering ram -- there appears to be a wave moving into

11   the Capitol; and there is additional footage that you see of

12   her inside holding a cell phone in a tunnel.  I believe that

13   happened subsequent to the battering ram and bullhorn into

14   the room incident, and it was taken later in time.

15             THE COURT:  Okay.  And the video -- the video that

16   you showed me, what was the source of that?

17             MS. ALOI:  So the FBI has been pulling videos from

18   the United States Capitol Police's cameras that were all

19   over the complex that day.

20             I have two videos I'm prepared to show you; the

21   first one, I believe, is pulled from that footage.  The

22   second one is actually one we just received yesterday,

23   although I did provide it to defense counsel in advance of

24   this; and it is actually from a Twitter feed that appears to

25   be pulled from the footage that other people had taken.  And

1    we are currently piecing together how to show that from the

2    official footage.  But it does show the defendant fighting

3    at the police line, at the police barricade.  And so it

4    lends more explanation to what happened that day -- in the

5    complex that day.

6              (Simultaneous speaking.)

7              THE COURT:  Okay.  And the video -- the video that

8    you collected yesterday that you are prepared to show today

9    was not on the DVD that you provided to me that I have

10   looked at already?

11             MS. ALOI:  That's correct, Your Honor.

12             We provided you with a DVD of the exhibits from

13   the underlying proceeding.

14             This would be a new video --

15             THE COURT:  Okay.  Sure.

16             MS. ALOI:  -- although it has been provided to

17   defense --

18             (Simultaneous speaking.)

19             THE COURT:  And I am looking forward to seeing

20   that.

21             I just want to get a couple of other, sort of,

22   niggling questions that I have to resolve.

23             The defendant's memo says, as a legal matter, that

24   the criminal charges filed against Ms. Powell cannot trigger

25   the rebuttal presumption that no conditions of release can

1    adequately assure her attendance at trial.  He says that in

2    the defendant's memo at page 2.

3              Does the Government agree with that statement?

4              MS. ALOI:  The defendant has been charged with a

5    crime of violence, 18 U.S.C. 1361, which I think permits the

6    hold for the purposes of this hearing.

7              My understanding is that we would have to prove

8    dangerousness or flight risk by a preponderance, and clear

9    and convincing evidence, respectively; and then you would

10   have to find that there are no conditions of release that

11   are -- that can reasonably assure the safety of the

12   community or the appearance of the defendant in court.

13             THE COURT:  No.  I think the -- I think Mr. Engle

14   is talking about the rebuttable presumption advanced under

15   18 U.S.C. Section 3142(e)(3).

16             Aren't you, Mr. Engle?

17             To interrupt you for just a second.

18             MR. ENGLE:  Yes, Your Honor.

19             This is not one of those cases where the nature of

20   the charge creates a presumption of intention that the

21   defendant would then need to rebut.

22             The burden here, as counsel for the Government has

23   stated, rests with the Government in this particular

24   analysis, Your Honor.

25             THE COURT:  Well, that's where I was a little bit

1    puzzled because the rebuttable presumption as, Mr. Engle,

2    you pointed out, is a pretty important consideration at a

3    detention hearing and whether or not this is the type of

4    case -- the type of charges where the rebuttable presumption

5    applies; this is a pretty important factor for a judge to

6    look at.

7         And the defendant is charged with a violation of

8    18 U.S.C. Section 1361, which makes it a crime to willfully

9    injure or commit any depredation against any property of the

10   United States.  And, here, the defendant is charged with

11   damage to the Capitol window in excess of $1,000.  So that's

12   a felony that carries a maximum term of imprisonment of ten

13   years.

14        Isn't that correct, Ms. Aloi?

15        MS. ALOI:  Aloi.  Yes, that's correct.

16        THE COURT:  Aloi.  Why I have trouble with your

17   name, I don't know.

18        MS. ALOI:  Aloi.

19        THE COURT:  Well -- so the problem, as I see it,

20   is the rebuttable presumption in 18 U.S.C. Section

21   3142(e)(3)(C) applies to an offense that's listed in

22   18 U.S.C. Section 2332(b)(g)(5)(B) -- which is a long list

23   of enumerated offenses -- for which a maximum term of

24   imprisonment of ten years or more is prescribed.

25        So I will ask the Government, isn't 18 U.S.C.

1    Section 1361, relating to Government property or contracts,

2    which is charged as a felony because the property damage

3    exceeded $1,000 among the listed offenses in 18 U.S.C.

4    Section 2332(b)(g)(5)(B), so that the rebuttable

5    presumption, under 18 U.S.C. Section 3142(e)(3)(C), does

6    apply here, contrary to the defense memo?

7            MS. ALOI:  Your Honor, I do not disagree with your

8    analysis.

9            THE COURT:  Okay.  Well, I can't -- I shouldn't be

10   the only person in the courtroom looking at the statute

11   books; but that's how I read it, unless I hear otherwise.

12           But the defendant said this in the memo, I don't

13   think it was addressed --

14           MR. ENGLE:  Right.

15           THE COURT:  -- or, if it was addressed, I think

16   everybody assumed, at the hearing before the magistrate

17   judge in the Western District of Pennsylvania, this is not a

18   rebuttable presumption case.  My reading of the statute is

19   that it is a rebuttable presumption case.

20           I am not sure it's going to change the parties'

21   arguments; but I think the rebuttable presumption applies

22   here clearly under the applicable statutes.

23           One of the things that the magistrate judge in

24   Pennsylvania said was that the defendant, if released -- as

25   a release condition was not to have any guns at her house.

1          As I read the hearing transcript, the defendant

2   gave her guns to some unnamed friend.  So has the Government

3   been able to secure those guns -- figured out where those

4   guns are -- in order to secure them to make sure that, if

5   the defendant is released, she can't go back and pick up her

6   Glock, or whatever other kind of gun she had?  She had a

7   couple.

8          MS. ALOI:  Your Honor, I think this actually

9   speaks to one of the considerations which is the defendant's

10  history and characteristics.  I think it's poor judgment to

11  take the firearms and simply hand them off.  Yes, law

12  enforcement is working in Pennsylvania to secure the

13  weapons.

14         I don't have an up-to-the-minute update on that.

15  I know they were about to do so when they were looking into

16  it yesterday.

17         THE COURT:  But the location of those firearms was

18  ultimately disclosed, even though not made part of the

19  record of the hearing that was provided to this Court?

20         MS. ALOI:  Yes, I believe -- that's my

21  understanding.  I can confirm that with the Court if it is

22  necessary.

23         MR. ENGLE:  If I may, Your Honor, on that point.

24         Obviously the issue with respect to whenever an

25  individual might be released back to their community, back

1    to their home, they would not be permitted to have firearms

2    in that house.

3            I instructed my client to have those firearms

4    removed to a place where -- if she was released after the

5    hearing in the Western District, that law enforcement could

6    pick those up at a location that would not be her home,

7    where she would not have access to them.  And what the judge

8    had indicated was she wanted them turned over to either

9    local law enforcement or federal law enforcement, which --

10   we were prepared to make those arrangements if the matter

11   had not been appealed.

12           THE COURT:  Okay.  So, right now, those guns are

13   sort of, floating around somewhere?  Okay.

14           All right.  So I am going to return to Ms. Aloi.

15           I think I got it right that time --

16           MS. ALOI:  Thank you.

17           THE COURT:  -- to proceed with whatever new

18   evidence you want to present that I haven't seen yet.

19           MS. ALOI:  Yes, Your Honor.  Let me go ahead and

20   pull up the video.

21           There are two videos; one video that shows the

22   battering ram incident, which I believe -- which I am happy

23   to show you, although I believe you are familiar -- it

24   sounds as if you are familiar with those facts and I would

25   like to show you if the opportunity comes up.  And, then,

1     the other one is the new one that I referenced just a few

2     moments ago.

3                    (Whereupon, a video was played.)

4                    MS. ALOI:  You will see the defendant wearing a

5     pink hat.

6                    THE COURT:  Actually, I am not seeing anything.

7                    MS. ALOI:  It says that I am screen sharing.

8                    Let me pause.

9                    My screen is telling me that I am screen sharing.

10                   (Proceeding pauses.)

11                   THE COURT:  Mr. Engle, could you see that

12    videotape?

13                   MR. ENGLE:  No, Your Honor.  I could not.

14                   I saw the screen of the computer, but not the

15    video.

16                   THE COURT:  Right.  All we could see was the

17    directory, Ms. Aloi, but not the actually played video.

18                   MS. ALOI:  All right.  Let me -- let me try this

19    again.

20                   THE COURT:  Okay.  Now, we can see it -- or at

21    least I can see it.

22                   Mr. Engle, are you able to see it?

23                   MR. ENGLE:  Yes.  I see what looks like the video

24    image now.

25                   MS. ALOI:  Okay.  Let me rewind it a bit here.

1         As I noted a moment ago, the defendant is wearing

2    the pink hat.

3         (Whereupon, a video was played.)

4         MS. ALOI:  I share this because there was a

5    suggestion at the detention hearing that the defendant was

6    not involved in other violent conduct beyond the battering

7    ram at the Capitol window incident.  But here you can see

8    she's involved in pushing up against the police line and

9    forcing -- pushing possibly past it.

10        And here.

11        That's the entirety of the clip.  I think now --

12   it's now back on the main screen.

13        THE COURT:  Was part of that at the -- there was a

14   little piece of that -- was that at the doorway where the

15   one officer had been squeezed between the two doors and was

16   yelling in pain -- a videotape we have all seen a number of

17   times on the news?

18        MS. ALOI:  Your Honor, I think -- I don't want

19   to --

20        (Simultaneous speaking.)

21        THE COURT:  It looked like a similar doorway.

22        MS. ALOI:  Your Honor, I'd agree it looks like a

23   similar doorway.

24        I have been to the Capitol and I have seen the

25   doorway -- where the window was broken and where they went

1    through.  We are in the process of confirming precisely at

2    what moment in time and where this occurred.  As I

3    indicated, we did pull the video off of Twitter; and now we

4    have to go back and match it against the official footage.

5         I think -- even if it were not the precise place

6    where the police officer was pushed up against the door in

7    the clip that I think you are referring to that's been

8    widely circulated, it does show her involvement in

9    reaching -- or in breaching the police line and physically

10   engaging with law enforcement.

11        The other video -- while we're screen sharing, let

12   me go ahead and show the other one.

13        I think I know how to do this now.  Bear with me a

14   moment, please.  I have to open up the video in order to --

15   I know how to do it.

16        Okay.  Are you able to see this?

17        THE COURT:  Yes.  We're able to see this.

18        (Whereupon, a video was played.)

19        MS. ALOI:  I think that video is particularly

20   instructive not only because it shows her taking a battering

21   ram to the United States Capitol but, also, because she

22   appears to be directing the individuals around there and

23   seeking their assistance in what's going on.

24        Obviously, we can't hear what she's saying over

25   the crowd; but her body language and actions -- it seems to

1    indicate that she is corralling other rioters to assist with

2    the battering ram.

3              And I show you these because the magistrate in

4    Pennsylvania made a finding that the defendant is dangerous

5    and, certainly, the Government supports that finding, and

6    thinks that it is correct.

7              I can speak to -- I know you had some questions.

8    I am happy to continue or address any other questions that

9    you may have.

10             I did want to take a moment to address --

11             (Simultaneous speaking.)

12             THE COURT:  Well, I mean, I think -- let me

13   just -- I will just tell you the things that give me some

14   concern here.

15             And I fully appreciate the Government's position

16   that using a battering ram to bash down windows in the

17   Capitol is dangerous; I think the magistrate judge in

18   Pennsylvania recognized that.  But that was a tool that she

19   didn't carry with her from Pennsylvania to D.C. to do harm.

20   She likely found that on the grounds of the Capitol where

21   she wasn't supposed to be anyway; and she used that

22   battering ram to hurt property.

23             And there is -- as defense counsel has pointed

24   out, there is no evidence that -- unlike other defendants

25   that I have in front of me -- that she was carrying a gun --

1    you know, stun guns, batons, other kinds of weapons with

2    her.

3           Of course, I have seen the evidence that she was

4    carrying a backpack, and the Government doesn't know what

5    she had in that backpack.  So it might be, when the

6    investigation continues, you will find out what it actually

7    was; but at this point you don't have that proffer to make.

8           Am I correct in that?

9           MS. ALOI:  Yes, Your Honor.

10          Well, we know she was carrying earmuffs designed

11   to muffle gunfire, and that her jacket may have been

12   designed to conceal a firearm -- a conceal-carry jacket, if

13   you will.

14          Do I know whether or not she was carrying a

15   firearm on that day?  No, I do not.  I just know that she

16   certainly has access to them.

17          And when law enforcement searched her residence

18   they found firearm paraphernalia.  And they also found

19   smashed cell phones that had their SIM cards removed from

20   that, which indicates to me that --

21          (Simultaneous speaking.)

22          THE COURT:  Where did they -- and where did they

23   find those items?

24          I know defense counsel made the argument at the

25   hearing, well, she has got all of these kids; maybe the kids

1   decided they didn't want to be connected anymore and smashed

2   up their phones, which would be unusual.  But where were the

3   phones found in these bags with creepy items in them, you

4   know, these knives and such?

5           MS. ALOI:  The phones were found in a hallway; and

6   so I don't think there is anything specifically tying them

7   to the children.

8           Also, I can represent to the Court that the

9   children's father was concerned about their lack of

10  electronic devices because he wanted to make sure that they

11  could engage with virtual school.  And when the children

12  were left with him, their, I guess, iPads, or whatever it

13  is -- their computers were not brought.  So there was no

14  foresight to make sure that the kids were able to connect

15  with their schooling when they were left with the father.  I

16  think that is being sorted out.  I think he's made

17  arrangements to make sure that they have the computer

18  technology that they need.

19          At least one bag appeared -- my understanding is

20  that at least one of these -- what law enforcement has

21  described, as you read from the hearing provided yesterday,

22  as a "go bag" was in her room -- so her bedroom, and then

23  the phones were in a hallway.

24          THE COURT:  All right.  So --

25          MS. ALOI:  Sorry.  I don't --

1          THE COURT:  I'm sorry.  Were you saying something

2     else?

3          MS. ALOI:  You know, I don't have additional

4     representations as to what she actually had on her person

5     that day beyond the jacket and the earmuffs designed to

6     muffle gunfire.

7          It may be that she was opportunistic in her taking

8     of the battering ram and engaging others to assist in that

9     violent behavior.

10         But I do want to reiterate that that wasn't her

11    only violent activity that day.  She also was involved in

12    breaching the police line as you just saw from that video.

13         And she made a point to try to tell her

14    colleagues -- "colleagues" is obviously not the right

15    word -- the other rioters who were inside the Capitol, when

16    she was reaching in with the bullhorn -- she told them that

17    they still had another window that they needed to break to

18    facilitate entry; so her plotting was methodical there.  She

19    went in, assessed the scene, came out, took up a bullhorn

20    and gave very clear directions, including the need to break

21    an additional window.

22         THE COURT:  The Government doesn't have any

23    evidence that she actually brought that bullhorn with her to

24    be a leader of this insurrection.  Do you have any evidence

25    that she had -- this was her bullhorn?

 1                 MS. ALOI:  So we are still investigating the

 2      origin of the bullhorn.

 3                 THE COURT:  I see.

 4                 MS. ALOI:  We have seen her it take out on the

 5      Capitol grounds.  We don't see her actually take it out,

 6      correct.  She is seen with it on the Capitol grounds.  We

 7      don't know whether or not she took it from her backpack or

 8      picked it up from the ground.

 9                 We think it's at least possible that the battering

10      ram was from the construction that was related to the

11      inauguration.  I don't have -- I don't have any evidence

12      that the bullhorn was part of that construction.

13                 In addition, there is information in the

14      possession of law enforcement that she has had a bullhorn

15      with her at another event; so that at least on one other

16      occasion she has been seen at a rally with a bullhorn.

17                 THE COURT:  But certainly no bullhorn was

18      recovered from her house or her car?

19                 MS. ALOI:  Correct.  That's correct.

20                 THE COURT:  All right.  Well, I know the

21      defendant's memorandum says that the Government has

22      characterized the defendant as a leading participant in the

23      violent insurrection at the Capitol; and I'm quoting the

24      defendant's memo there.  And I think that's -- it's probably

25      a fair characterization of how the Government is viewing

1      this defendant.  Is he correct in that?

2                MS. ALOI:  Yes, Your Honor.

3                When we see the footage from January 6, we see the

4      defendant in a leading role.  I think, you know, her

5      relationship to the other rioters is still being

6      investigated.  But we certainly see her leading other

7      rioters on that day, both with the bullhorn, with the

8      battering ram, at the very front of the police line in the

9      footage that you just saw.  She is front and center in the

10     incursion.

11               THE COURT:  All right.  Well, I mean, having

12     looked at that -- I mean, she is using the bullhorn; she is

13     giving directions.  You know, there are other people in the

14     video also talking, saying:  Get more people.

15               You know, it's hard to say in a mob that's all

16     focused on one goal of disrupting a constitutional process

17     which one was a leader of the other.

18               I do -- in terms of assessing dangerousness, let

19     me just say that that's clearly one of the things I have

20     been doing this in a number of these appeals and in a number

21     of the cases that have been assigned to me.

22               I have been a bit puzzled.  And I hope this is --

23     I don't mean to be unfair if this is not your case.

24               But I have, for example, a case against two

25     defendants, last name of Ochs and DeCarlo, they have been

1    indicted for felonies as well as misdemeanors; they were

2    both affiliated with the Proud Boys.  They had planning --

3    planning before January 6th for what they were going to do

4    when they got here.  They raised money.  They were online

5    all over the place talking about what they were going to do

6    here.  They wrote on top of the Memorial Door in the Capitol

7    building:  MURDER THE MEDIA.  And I think they're charged

8    with a 371 conspiracy because they were really working

9    together, leading others to get them to come to the Capitol

10   for this insurrection; and the Government hasn't asked for

11   pretrial detention for both of those Proud Boys.

12           So I look -- I look at that situation, and I am

13   concerned about equitable treatment of all of these

14   defendants in what is a very difficult circumstance of

15   figuring out who is in charge of what, who is doing what,

16   and figuring out levels of dangerousness.

17           One could say that every single person on this

18   Capitol grounds posed a danger to this democracy; it was so

19   unpatriotic it makes my straight hair curl.  But on the

20   other hand, under the statute, I am looking at whether or

21   not there are conditions or a combination of conditions that

22   could mitigate those risks of both flight and dangerousness

23   to other persons and the community; and that's -- so, you

24   know, that has to be my focus.

25           What makes this defendant more dangerous than

1    these other two defendant Proud Boys who had a lot more

2    clear planning -- the Government's proffer is much more

3    planning, also facing felonies?

4              MS. ALOI:  Well --

5              THE COURT:  But, like this defendant, I think they

6    didn't have weapons, firearms, stun guns, batons -- other

7    kinds of weapons inside the Capitol when they were in there

8    doing their damage to property; and their murder-the-media

9    inscription on the historical door of the Capitol that

10   apparently can be fixed for under a thousand dollars, unlike

11   this defendant whose breaking of the window is going to cost

12   a lot more, making her subject to a felony that also

13   triggers the rebuttable presumption.

14             What makes her so different that she needs

15   pretrial detention because of her dangerousness rather than

16   the two Proud Boys where the Government is not even asking

17   for pretrial detention?

18             MS. ALOI:  Your Honor, I am not in a position

19   right now to speak to what the Government will or may ask

20   for in that case, nor do I want to get into the specific

21   facts of that matter for a number of reasons, not least of

22   which I am not as well versed as the people handling that

23   matter.

24             What I can say is the Government is deeply

25   troubled by the erratic nature of this defendant's conduct,

1    and that this particular defendant's irreverence towards the

2    aims of law enforcement, her treatment of firearms, her

3    abandonment of her children on multiple occasions, give us

4    grave concern about her inclination to comply with

5    conditions of release.  So we did --

6                    (Simultaneous speaking.)

7             THE COURT:  Well, is it because -- you mean her --

8    you are saying her abandonment of her children.  I mean, I

9    have to say I do think that's a little bit of a strong term

10   when she left them with their father, right?  Isn't that

11   what she did?

12            MS. ALOI:  She -- her father -- the children's

13   father was not aware that this was coming in advance, was

14   not told how long they would be there, and was not given

15   contact information with which to reach the defendant.  She

16   showed up --

17            THE COURT:  So let's make sure we're both clear.

18            On January 6th, when she came to Washington, D.C.,

19   she left her children at home alone.

20            On January 30th, when she dropped her children off

21   and then left without a forwarding address or contact

22   information, are you saying that both January 6th and

23   January 3rd -- January 30th through the 4th -- both were

24   incidents of abandonment of her children?

25            MS. ALOI:  I think they're incidents of concern.

1          I think leaving children alone -- I can't speak to

2     whether or not it's appropriate for the children to have

3     been left alone without any adult on January 6th.

4          I can say I don't think it's appropriate, but I

5     understand that one of the children was 17.  Perhaps -- you

6     know, perhaps she was told to take good care of her

7     siblings; I don't know at this point.

8          But I do know that on January 30th, immediately

9     before or contemporaneous with speaking to *The New Yorker,*

10    the defendant did the same.  She left -- she appeared to

11    anticipate a longer -- a longer departure, and left the

12    children with her ex -- her soon to be ex-husband with no

13    warning.  And I do think that she abandoned them to him, and

14    they are fine; and he is prepared and willing to watch them

15    or to be their guardian for as long as he needs to.

16         But she did not, in any way, indicate what was

17    going on; she didn't give a reason.  She simply left.  And I

18    think "abandonment" is an appropriate characterization of --

19              THE COURT:  I see.

20         And one of the things that is concerning to the

21    Government about that, that leaving of her children on

22    January 30th and essentially, sort of, leaving without any

23    forwarding information or telling them where she was going,

24    or whatever -- is it the Government's -- I want you to

25    articulate why is that so suspicious?

1       Are you -- do you think she was starting to flee

2  then?  I mean, put it in words.

3       What's the inference that you are asking to be

4  drawn from that circumstance?

5       MS. ALOI:  Yes, Your Honor.

6       As I understand -- I think you can draw an

7  inference from the fact that she was about to get caught

8  because she had given an interview or was about to give an

9  interview to *The New Yorker*; the article was going to be

10  published the next day.  She was aware of the fact at this

11  time that there was a be-on-the-lookout before it was

12  published, seeking -- because law enforcement was seeking

13  her whereabouts.  And she made -- she didn't appear to take

14  any -- to take the steps necessary to make sure her children

15  could attend school, for example.

16       So it appeared as if she was about to be caught.

17  She knew the article was about to become public, that the

18  Internet was about to know her identity; and she made a snap

19  judgment to take off.

20       Now I don't know where she was on January 30th --

21       THE COURT:  So you -- you're raising the suspicion

22  that she was taking off based on the timing on January 30th

23  of her leave-taking and the publication of *The New Yorker*

24  article; do I understand that right?

25       Because the BOLO advertisement with her picture by

1    the FBI -- basically a poster for a person of interest --

2    that was published like two weeks earlier.

3              So, you know, it couldn't have been --

4              MS. ALOI:  That's right.

5              THE COURT:  You know, if the BOLO was posted on

6    January 16th, and she left January 16th or the 17th, I could

7    see how you could draw the inference that perhaps she knew

8    it was just a matter of time before the FBI was going to

9    recognize her and she wanted to evade law enforcement, and

10   she took off.  But that's not the timing here.

11             MS. ALOI:  That's right, Your Honor.

12             The BOLO was posted, and law enforcement received

13   a host of tips that they were investigating as to her

14   identity; but she confirmed her identity to the media, not

15   to law enforcement -- but to the media on the weekend of

16   January 30th.  And so right as that -- her identity was

17   about to be made public -- and the confirmation of her

18   identity, I should add -- the FBI had received tips prior to

19   that; but they were in the process of confirming it using

20   law enforcement tools to -- and in the intervening time she

21   went and talked to Ronan Farrow who published the article

22   with her identity in it.  So it was the confirmation of her

23   identity that was about to be made at the same time that she

24   took off.

25             THE COURT:  Well, I mean --

1            (Simultaneous speaking.)

2            THE COURT:  I think the defendant -- the defense

3    counsel makes two good points about using that -- the

4    January 30th leave-taking as evidence of an intent to flee.

5    And one of those points is:  If you really want to evade law

6    enforcement and not be recognized, why talk to *The*

7    *New Yorker*?

8            I mean, no matter how charming that reporter might

9    be, I mean, why do that?  That really is not easy to

10   reconcile with that; that's number one.

11           And number two, the biggest sticking point I think

12   that you have on risk of flight and also, in some ways, to

13   dangerousness and helps the defendant rebut the presumption

14   is that:  If you are a person with an intent to flee, why do

15   you hire an attorney to negotiate your surrender, -- and

16   then actually surrender when you are told -- on the same day

17   you are told there are charges pending against you and the

18   FBI wants you?  It's -- that's --

19           (Simultaneous speaking.)

20           MS. ALOI:  Your Honor --

21           THE COURT:  Maybe she thought better of it about

22   fleeing?  Or -- but even if -- you know, no matter what her

23   original intent was, she decided against it.  But if she

24   decided against it, that's -- that is a nail in the coffin

25   on the risk of flight proffer by the Government, isn't it?

1          MS. ALOI:  Your Honor, I would like to speak to

2     that because I think the defense has not accurately

3     released -- we disagree with the way in which they convey

4     the facts here.

5          We never accepted a self-surrender of her.  She

6     got caught, and so she was going to be arrested; but she was

7     in her car.  And the defense proffered to us that he didn't

8     know -- I don't know if that is true or not -- her precise

9     location.

10          And so to set the time frame here, as you are no

11     doubt aware, the law enforcement -- the FBI, in particular,

12     had some serious concerns about engaging with somebody who

13     they believed was engaged in erratic behavior right on the

14     heels of the absolute tragedy that happened in Florida and

15     really wanted to see if they could peacefully take her into

16     custody.

17          And so the -- I notified the defense attorney at

18     7:00 a.m. on the day that she was arrested.  Eleven hours

19     later she drove to FBI -- a resident agency.  I can't speak

20     to precisely what happened in between.  I know at some point

21     there were representations made that she was four hours

22     away.  She didn't show up four hours later; she showed up

23     some time after that.  In the intervening time she appeared

24     to have disposed of the phone that she had on her person at

25     some point that day.

1          I am not in her head.  I can't pretend to know

2    what she was thinking or what guidance she had been given.

3    But I do think you can infer from that erratic behavior that

4    she may be a flight risk because she, at least that day,

5    appears to have spent 11 hours in the car, and at some point

6    the decision was made to drive to the FBI field office.  But

7    I would present that that was because she got caught and was

8    going to be arrested, not because she was in some way

9    self-surrendering.

10          If you read *The New Yorker* article, you will find

11    that she did not express remorse in that article.  There

12    were people who were at the Capitol --

13          (Simultaneous speaking.)

14          THE COURT:  I noticed.

15          MS. ALOI:  Yeah.  There were people at the Capitol

16    who got caught up in the heat of the moment and who

17    afterwards threw up their hands and said, oh, I made a

18    mistake.  Right?

19          They -- this is not that case.  Right?

20          This is not a case in which somebody got caught up

21    in the heat of the moment and then apologized to *Newsweek* or

22    apologized to the media.

23          This is a case where a self-serving interview was

24    given to *The New Yorker* to try to frame the conduct, I

25    guess.  I can't say why it was done.  But I don't see in

1    that article any indication that the defendant feels bad

2    about what she did or that she is not inclined to do it

3    again.

4          And I think there are a number of things that

5    would indicate that she's at least contemplated, including

6    the destruction of the cell phones, the go bags, the lack of

7    her discernible whereabouts for the 11 hours when her

8    attorney was contacted and when she ultimately was taken

9    into custody.  And so I think there's many inferences that

10   can be drawn from that, I take it.

11         THE COURT:  With respect to these "go bags" --

12   when I read the hearing, I thought the go bags were -- you

13   know, a bag that's ready to pick up and go if you wanted to

14   flee somewhere.  I was expecting to see toothbrushes, you

15   know, things like that.  That's not what was in these bags.

16         MS. ALOI:  Yeah.

17         THE COURT:  Why are they called "go bags"?

18         MS. ALOI:  As best I have been able to discern,

19   they're survivalist bags.  You know, they were not grabbed

20   by her because they remained in the house.  I think it's

21   still a matter that's under investigation, what precisely

22   they were for.

23         THE COURT:  Okay.  All right.

24         I will turn to Mr. Engle.

25         MR. ENGLE:  Thank you, Your Honor.

1          Your Honor, I will try to address the various

2     issues that you have discussed with the Government.

3          First, with respect to the issue of risk of

4     flight, Your Honor, I can tell you that certainly -- if you

5     are interested in keeping your identity a secret and hiding

6     out and considering becoming a fugitive, you certainly don't

7     give an interview like the one my client gave to *The*

8     *New Yorker*.

9          There was nothing about the BOLO -- as Your Honor

10    had pointed out, it had been out for a while -- that either

11    required my client to go to the FBI or indicated that she

12    had been charged with a crime.

13         As soon as she knew she had been charged with a

14    crime, all she indicated to me was:  Where should I be going

15    to turn myself in?  You don't hire an attorney and ask that

16    attorney to negotiate a voluntary surrender and then want to

17    flee.  That's what Ms. Powell did.  She engaged me for the

18    purpose of finding out whether there were charges pending

19    against her and/or arrange for her voluntary surrender to

20    deal with them if that was the case.

21         I emailed the U.S. Attorney's Office on the 3rd to

22    ask whether or not there were charges pending and offering a

23    voluntary surrender of my client in the District of

24    Columbia.  I heard back from the Government at 7:00 a.m. on

25    the 4th.  I tried calling my client a number of times during

 1      the course of that morning and got voicemail.

 2                As soon as I was able to get her on the phone,

 3      which was around midday, I gave her instructions.  I was

 4      simultaneously taking calls from FBI Special Agent Jordan,

 5      who was the agent in New Castle, Pennsylvania holding the

 6      warrant for Ms. Powell.  It was his preference that

 7      Ms. Powell surrender to him as opposed to randomly driving

 8      to Harrisburg and surrendering to agents that didn't know

 9      anything about the case or have any paperwork on it.

10                Ms. Powell agreed that she would drive to western

11      Pennsylvania.  We know that at 12:37 p.m., from the hearing

12      notes, that --

13                I'm sorry.  Your Honor, my screen froze.  Can you

14      still hear me?

15                THE COURT:  Yes.

16                MR. ENGLE:  Okay.  Sorry.

17                -- that she stopped at a Sheetz about 45 minutes,

18      an hour or so, outside of Harrisburg in order to get

19      something to eat.  She was instructed to obviously take her

20      time driving and not to speed because there was a warrant

21      for her at that point in time.  And she made it back to

22      western Pennsylvania and, per the instructions of Agent

23      Jordan, surrendered herself to him at his office.  That's

24      not the conduct of an individual who has a desire to flee.

25                She has eight children, Your Honor; five of whom

1    are home schooled by her that live with her primarily;

2    although, of course, they see their father and they spend

3    time with their father as well.  She home schools a 4-year

4    old, a 10-year old, a 12-year old, a 15-year old, and a

5    17-year old.  She also has a 19-year old, a 21-year old, and

6    a 23-year old -- adult children who live nearby where she

7    lives.  The argument that she would want to flee and leave

8    those children behind I submit to you does not have merit,

9    Your Honor.

10           In addition, the pretrial services report I think

11   makes substantially clear that Ms. Powell does not have the

12   financial wherewithal to be able to flee from anywhere.  And

13   so the risk of flight issue --

14           THE COURT:  But she was able to absent herself

15   between January 30th and February 4th somewhere, even though

16   you say she did not run nor did she hide during that period;

17   but what was she doing during that period?

18           She wasn't at home, right?  She certainly didn't

19   have her children.  So she must have had the wherewithal to

20   be somewhere between January 30th and February 4th.  What's

21   that?

22           MR. ENGLE:  Certainly, Your Honor.

23           THE COURT:  What was she doing?

24           MR. ENGLE:  I don't --

25           THE COURT:  Remember, you have got a rebuttable

1    presumption here.  What's your rebuttal to rebut the

2    presumption that she was fleeing at that point?

3              MR. ENGLE:  Well, Your Honor, first of all, she's

4    not fleeing from anything at that point because there were

5    no charges at that point, so she is not fleeing from the

6    law.  And that's the issue -- is whether she would be

7    considered a fugitive or a flight risk.

8              The issue is when you know you have a legal

9    obligation to turn yourself in, do you?  The answer to that

10   in this case is that she did.

11             Wherever she was, we know that she wasn't doing

12   anything illegal or improper.  Obviously one of the things

13   that she was doing during that time period was trying to

14   find an attorney to represent her.  She was dealing with

15   that particular issue, seeking referrals and talking to

16   people that she knew about trying to engage counsel which

17   she then ultimately did.

18             So there is --

19             (Simultaneous speaking.)

20             THE COURT:  Yes.  But I would be hesitant,

21   Mr. Engle, to push the principle that she doesn't -- based

22   on her financials she doesn't have the wherewithal to flee

23   when she was certainly able to flee between January 30th and

24   February 4th suspicious minds would proffer.

25             MR. ENGLE:  Respectfully, Your Honor, there is no

 1    indication that she fled anywhere.

 2              Leaving her children with her soon to be

 3    ex-husband, the children's father, was not an unusual thing

 4    in the sense that he would see them, care for them, and was

 5    part of their lives.  There is no indication she even left

 6    the Commonwealth of Pennsylvania, Your Honor.

 7              And what I am suggesting is that as a flight risk

 8    you would have to have the means and the ability to get out

 9    of the country and to someplace where you were beyond

10    extradition.

11              One, that is not her intention.  You don't hire a

12    lawyer to say:  I want to surrender myself if there are

13    charges against me -- if that's what you intend to do.  She

14    has made absolutely no move to do anything like that.  So

15    the argument that Ms. Powell is a flight risk does not seem

16    to be based upon any facts or evidence, Your Honor.

17              Moreover, as Your Honor said -- that you were

18    grappling with the issue of conditions or a combination of

19    conditions that can overcome these issues and reasonably

20    assure her appearance and the safety of the community, I

21    respectfully submit that the conditions that were set forth

22    by the magistrate judge in the Western District that confine

23    her to her home, that put her on electronic monitoring,

24    restrict her travel --

25              THE COURT:  And what is the curfew?  What was the

1    curfew that was imposed?  There is home detention and -- but

2    no curfew, or just home detention all the time except for

3    discussions with her attorney or medical issues?

4          MR. ENGLE:  Home detention for all time but for

5    anything that would be approved by pretrial services, Your

6    Honor; that's, I believe, what Judge Lenihan ordered, if I

7    am not mistaken.

8          So those circumstances which -- certainly given

9    someone who cares for that many children and who home

10   schools them, she has every reason to be at home.  She would

11   be under monitoring so that we'd know where she is if she

12   attempted to do something in violation or contravention of

13   those release conditions.  And it's circumstances where

14   pretrial services and/or the Court, Your Honor, would have

15   to approve any form of travel outside of the home for a

16   legitimate purpose.

17         And under those circumstances -- under those

18   conditions, I respectfully submit that those conditions

19   allow for both the appearance of the defendant when

20   necessary and the ability to assure that she's not going to

21   be a flight risk; and it also helps with the safety issue as

22   well, Your Honor.

23         THE COURT:  Was there a mask mandate imposed on

24   this defendant by the Western District of Pennsylvania

25   magistrate judge so that she would not pose a risk to the

1    health and safety of the community when she left her house

2    for any reason?

3              MR. ENGLE:  That was not addressed, Your Honor.

4              MS. ALOI:  No.

5              MR. ENGLE:  It never came up during the course of

6    the hearing.

7              THE COURT:  Because from the pictures I have seen

8    from January 6th -- I don't think she's wearing a mask in

9    any of those pictures in that crowd of people.

10             MR. ENGLE:  Your Honor, I would submit to the

11   Court that I don't believe that my client would have any

12   problem with a mandate that would be related to having to

13   wear a mask.  If that was one of the conditions of her

14   release, I would submit to you that Ms. Powell wants to

15   follow every single condition that this Court would impose

16   upon her.

17             THE COURT:  How about the safety of her own

18   children to keep them from being effected with COVID?  Does

19   she have a concern about those children?

20             MR. ENGLE:  Your Honor, obviously, if she's at

21   home with the children and she is not going anywhere, people

22   in the same households don't wear masks around each other,

23   and they don't pose a risk to them.  The children are home

24   schooled, and she is on home confinement --

25             THE COURT:  Yes.  But my understanding is -- from

1    both *The New Yorker* article, and from seeing the pictures of

2    her on January 6 -- even though she has children at home and

3    she home schools them, she goes out in public without a

4    mask --

5                MR. ENGLE:  Well --

6                THE COURT:  -- posing a significant risk to

7    bringing infection home to children.

8                MR. ENGLE:  Respectfully, Your Honor -- first of

9    all, her children have not contracted COVID to my knowledge.

10               But, second, that risk is mitigated very easily by

11   making a condition of release that if she is permitted to go

12   outside the home for any reason that pretrial services deems

13   appropriate or is Court authorized, that she would be

14   mandated to wear a mask; so I believe that that condition

15   can be satisfied very easily, Your Honor.

16               THE COURT:  All right.  I will hear -- are you

17   done, Mr. Engle?

18               MR. ENGLE:  Your Honor, I would just also point

19   out the fact that -- there is no indication that my client

20   had ever been to the Capitol before.

21               The allegations that perhaps some people had been

22   given tours of the Capitol on the day before or that they

23   had prior knowledge from visiting the Capitol in advance of

24   the 6th in order to gain intelligence about the interior of

25   the property -- Your Honor, the testimony from the agent at

1       the detention hearing was pretty clear that there is no

2       evidence whatsoever that Rachel Powell had ever been to the

3       Capitol before that day, which I would respectfully submit

4       belies the argument or the thought that she was some kind of

5       organizer or leader with respect to this.

6                  Much of what is argued by the Government is based

7       upon speculation at this point and not evidence, Your Honor;

8       and, therefore, I am respectfully asking the Court to impose

9       those conditions or combination of conditions that you deem

10      appropriate to safeguard the community.

11                 Similarly, I believe that they can be similar to

12      what has previously been ordered with whatever other

13      additional modifications the Court would deem appropriate

14      for this circumstance.

15                 But I respectfully ask that the Court allow

16      Ms. Powell to return to her children and give her the

17      opportunity to follow the rules and abide by the Court's

18      order.  And I submit to you that she certainly will have

19      counsel that would be instructing her to do all of those

20      things; and I submit to you that she will follow the rules

21      if she's given that opportunity.

22                 THE COURT:  Ms. Aloi.

23                 MS. ALOI:  Your Honor, there is nothing in the

24      record to suggest that this defendant is interested at all

25      in following rules.

1          On the point that the defendant just made about --

2     I'm sorry -- defense counsel just made about not visiting

3     the Capitol beforehand, I will just note that in her own

4     words she's indicated that -- the necessity of banding

5     together or being banded together with folks who are

6     like-minded, aligned in fighting law enforcement on a

7     variety of issues.  I think in that particular instance, on

8     the banding together, it was particularly to fight the mask

9     mandates that have been imposed.  And so I think she's been

10    a very adamant -- adamantly opposed to wearing a mask.  In

11    fact, I understand from -- that she was actually fired from

12    a job for failing to wear a mask.

13          And I would also just would question who was home

14    schooling her children on January 6th.  I mean, it's clear

15    now that the children are -- their father has made

16    arrangements for their schooling.  But who was home

17    schooling the children the first week in February?  The fact

18    that she had obligations to educate her children and then

19    made decisions not to speak to her irreverence for rules

20    that might be imposed on her behavior or restrictions that

21    might be imposed on her behavior.

22          THE COURT:  All right.  The Court is ready to rule

23    on the Government's motion regarding the magistrate judge's

24    decision to release the defendant pending trial.

25          At the outset, a review of the applicable law is

1     appropriate here since -- particularly in this case where

2     the appropriate burdens have been somewhat confused between

3     the parties under the Bail Reform Act, 18 U.S.C. Section

4     3142(e)(3)(C), in a case where, "There is probable cause to

5     believe that the defendant committed an offense listed in

6     18 U.S.C. Section 2332(b)(g)(5)(B)," involving a federal

7     crime of terrorism for which a maximum term of imprisonment

8     of ten years or more is prescribed, such as the charge

9     against this defendant under 18 U.S.C. Section 1361, the

10    Court must presume, unless the defendant rebuts the

11    presumption that no condition or combination of conditions

12    will reasonably assure the appearance of the defendant as

13    required and the safety of the community.  See 18 U.S.C.

14    Section 3142(e)(3) and Federal Rule of Criminal Procedure

15    46(a).

16            Once the presumption is triggered it imposes on

17    the defendant, at a minimum, a burden of production to offer

18    some credible evidence that rebuts it.  Importantly, the

19    burden of persuasion remains with the Government throughout.

20            In assessing whether a defendant has successfully

21    rebutted the presumption, the Court must take into account

22    the available information concerning the four factors set

23    out in 18 U.S.C. Section 3142(g).  These factors are:  The

24    nature and circumstances of the offense charged; the weight

25    of the evidence against the person; the history and

1    characteristics of the person, including the person's

2    character, physical and mental condition, family ties,

3    employment, financial resources, length of residence in the

4    community, community ties, past conduct, history relating to

5    drug or alcohol abuse, criminal history, and record

6    concerning appearance in court proceedings; and then,

7    finally, the Court has to consider the nature and

8    seriousness of the danger to any person or the community

9    that would be posed by the person's release.

10            On an appeal from a magistrate judge's order of

11   pretrial release, the district court must conduct a *de novo*

12   review.

13            In conducting this review, the Court examines the

14   available information that touches upon the four statutory

15   factors that I just listed; and I will discuss each of those

16   factors starting with the nature and circumstances of the

17   offense charged.

18            These -- this consideration, this factor, nature

19   and circumstances of the offenses charged, weigh strongly in

20   favor of a finding that no condition or combination of

21   conditions will reasonably assure this defendant's

22   appearance.

23            She has been charged with three serious felony

24   offenses.  The first offense:  Obstructing, influencing, or

25   impeding any official proceeding, or attempting to do so, in

1   violation of 18 U.S.C. Section 1512(c)(2), for violently

2   entering the Capitol building during the certification of

3   the vote of the Electoral College in the 2020 Presidential

4   Election through a broken window; providing instructions to

5   others about how to penetrate the Capitol and disrupt the

6   proceedings; forcing her way through police lines and

7   barricades, as we saw from the video shown today -- this

8   offense is very serious.  It carries a penalty of up to 20

9   years' imprisonment.

10         The defendant is next charged with willfully

11  entering or committing depredation against any property of

12  the United States, in violation of 18 U.S.C. Section 1361,

13  for using a large pipe -- and when I say "large," I mean

14  really long and large -- as a battering ram that was heavy

15  enough to work -- it did; it broke through a window of the

16  Capitol building.  The value of the window damaged by the

17  defendant is more than a thousand dollars, and so this

18  offense carries up to ten years' imprisonment.  In addition,

19  this offense triggers the rebuttable presumption in favor of

20  pretrial detention.

21         Finally, the defendant is charged with knowingly

22  entering or remaining in any restricted building or grounds

23  without lawful authority, knowingly engaging in any act of

24  physical violence against any property in any restricted

25  building of the Capitol grounds while carrying a dangerous

1    weapon, in violation of 18 U.S.C. Section 1752(a)(1),

2    (a)(2), (a)(4), and (b)(1)(A), for entering the Capitol

3    grounds with a large pipe and using that pipe as a battering

4    ram to damage a window of the Capitol building.  This

5    offense also carries up to ten years' imprisonment.

6           She's also charged with misdemeanor offenses; I

7    don't even have to get into those.

8           On January 6th, she actively participated in this

9    assault on the U.S. Capitol during this joint session of

10   Congress.  During this assault, scores of individuals forced

11   entry into the Capitol by breaking windows, pushing through

12   the Capitol's doors, breaching closed areas, assaulting

13   members of the Capitol Police -- all intended to disrupt the

14   constitutional function of Congress necessary to the

15   presidential transition and to the functioning of our

16   democracy.  It was intended to disrupt the peaceful

17   transition of power to a new administration as designed

18   under our U.S. Constitution.

19          As we all know, members of Congress, staff, media,

20   Vice President Pence were all forced to flee from their

21   normal constitutional tasks; many of them afraid for their

22   lives.  The Government has presented overwhelming evidence

23   that this defendant not only was present at the U.S. Capitol

24   for these events, but enthusiastically participated in the

25   assault on the Capitol, even providing guidance and

1    encouragement to others in this mob, encouraging them with a

2    bullhorn to coordinate together in order to take this

3    building.

4            The Government has presented evidence of videos

5    and photos that show the defendant violently using this

6    large pipe as the battering ram, and then standing outside

7    of that broken window speaking through the bullhorn, giving

8    some instructions about what she had seen when she was

9    inside -- two doors further in -- ways to further penetrate

10   the Capitol.  And as the Government has pointed out, she

11   also talked about wanting to coordinate together if we're

12   going to take the building.

13           In these pictures and videos, the defendant is

14   seen wearing a distinctive pink hat.  And as if this wasn't

15   enough, used a bullhorn to gain attention for herself there,

16   perhaps to find and claim a leadership role.  Whether she

17   actually had one or not is not particularly clear, but she

18   certainly tried to with her bullhorn.

19           But even in the aftermath of this terrible day of

20   January 6th, in the wake of the tragic deaths, hundreds of

21   police officers injured, the defendant tried to garner even

22   more attention to herself, sitting down for an interview

23   with *The New Yorker* in which she admitted her involvement in

24   the Capitol assault to disrupt our constitutional democracy.

25           As the Government has pointed out --

1          And where is the Government?  I have lost her

2     picture.  Is she listening?  Is she here?

3          MR. ENGLE:  I am not sure, Your Honor.  I have

4     lost her as well.

5          THE DEPUTY:  She is not here.

6          THE COURT:  I just noticed that.

7          THE DEPUTY:  She is not here.

8          THE COURT:  Would you tell her -- send her an

9     email to rejoin?  Just tell her to call in.

10         (Whereupon, the proceeding pauses.)

11         THE DEPUTY:  Ms. Aloi, are you joining us via

12    phone?

13         MS. ALOI:  Yes, my apologies.  My computer lost

14    the signal -- (unintelligible).

15         I'm sorry.  I just joined by phone.

16         THE COURT:  Okay.  That's fine, you are joining by

17    phone then.

18         I just started on *The New Yorker* article.

19         As the Government pointed out, what strikes me

20    about that article and the interview is that this defendant

21    had no apology, no remorse, no embarrassment.

22         Instead, she's quoted as saying:  Listen, if

23    somebody doesn't help and direct people then do more people

24    die?  That article is just downright offensive.  She doesn't

25    appear to even understand the gravity of her actions and her

1    offense -- that is, her felony offenses.

2         The tragic deaths that occurred on January 6th

3    were entirely unnecessary and preventable, not by giving

4    detailed or some instructions to the mobs surrounding her

5    but, instead, by respecting the democratic processes and

6    institutions of our Government, respect that the defendant

7    clearly lacks.

8         At the same time, this defendant didn't cause

9    injury specifically to people, there is no evidence that she

10   brought with her a weapon, although that evidence might be

11   developed during the course of the investigation of her

12   actions that day; but based on the proffer in front of me, I

13   do take note of the fact that she doesn't appear to have an

14   actual gun, stun gun, zip ties, other kinds of things to

15   pose injury to actual individuals inside.

16        Nonetheless, the nature and circumstances of the

17   offenses, felony offenses, clearly weigh in favor of

18   pretrial detention.

19        The weight of the evidence against the defendant,

20   the second factor, is overwhelming.  The Government has

21   videos, photos of the defendant from the assault on the

22   Capitol.  The pictures in the videos clearly show the

23   defendant in her little pink hat; no mask in this crowd;

24   using a pipe to break a window; climbing -- going into --

25   going inside the building; giving instructions through a

1    bullhorn.

2         In addition, the Government has cell tower data

3    confirming that the defendant's cell phone was connected to

4    towers in Washington, D.C. on January 6th; and then the

5    defendant herself just admitted it to *The New Yorker* when

6    she -- perhaps in a way to garner more notoriety, fame; who

7    knows?  She talked to *The New Yorker.*  The weight of the

8    evidence weighs heavily in favor of pretrial detention.

9         As to the defendant's history and characteristics,

10   she has no criminal history.  She also has very strong ties

11   to the area where she resides.

12        As the magistrate judge who granted pretrial

13   release noted, she's lived in the same Pennsylvania area

14   since she was about 15 years old.  She is in the course of

15   getting a divorce from her husband.  She's raising five

16   children who live with her, ranging in age from 4 to 17,

17   whom she home schools.  She also has three adult children

18   living nearby.  So her ties to the area are deep, and

19   certainly raises some confidence that she's going to stay

20   there and not flee.

21        Of course, her whereabouts in the period between

22   January 30th and February 4th raises questions about whether

23   she was trying to attempt to evade arrest, flee, avoid the

24   consequence of her conduct, felonious conduct, on

25   January 6th.  But to counteract that, the defendant did hire

1   an attorney, asked that attorney to find out if she were

2   charged; and she ultimately did voluntarily surrender on the

3   same day she was told by her attorney she had been charged

4   with a crime.

5           When the defendant learned the FBI was executing

6   an arrest warrant and search warrant at her home, on

7   February 4th, she made arrangements to return to western

8   Pennsylvania.  She turned herself in.  She followed the

9   instructions of the FBI agent who held the warrant for her

10   arrest.

11           She willingly provided the FBI with her passport.

12   She made arrangements to remove her legally owned firearms

13   from her home.  And all of this is important information, as

14   I've already mentioned during the course of this hearing, in

15   rebutting a presumption about her being a risk of flight and

16   that reasonable conditions, such as home detention with

17   location monitoring, can be imposed to assure her appearance

18   at future court proceedings, so this factor weighs in favor

19   of release.

20           As to the last factor, the nature and seriousness

21   of the danger to any person or the community posed by this

22   defendant's release, it was clear that -- based on the

23   proffer of the evidence, the photos, the videos, defendant's

24   own admissions in *The New Yorker* article, she was actively

25   involved in the assault on the Capitol on January 6th.

1          She is however accused only of destruction to

2     property, not of causing harm to people, even with her

3     pushing and shoving the police line.  Moreover, she has no

4     criminal record.  She surrendered herself to law

5     enforcement, removed the firearms from her home.

6          And despite the fact that we don't really know

7     what she was doing between January 30th and February 4th,

8     there is nothing that we know about that that suggests she

9     poses a danger to the community or that no condition or

10    combination of conditions will assure her appearance as

11    required or compliance with release conditions intended to

12    mitigate risks of danger to the community that she poses.

13         The Government calls her a leader in this

14    insurrection; it's not clear to me that that's correct.  She

15    may just be a follower -- one of the people following the

16    mob.  And there is no evidence in the proffer that's been

17    given based on her social media, even her admissions to

18    *The New Yorker,* that she was part of a larger group of

19    people whose mission is disruption.  So, for that, I do find

20    that there are conditions of release that could mitigate the

21    seriousness of any danger or risks she poses a danger to the

22    community.

23         So upon consideration of the proffered evidence

24    presented, the factors set forth in 18 U.S.C. Section

25    3142(g), the possible release conditions set forth in

1     Section 3142(c), the Court finds the statutory factors --

2     some of them do weigh in favor of pretrial detention and

3     others weigh in favor of pretrial release, and that the

4     Government hasn't met its burden completely of establishing

5     that there are no conditions or combination of conditions

6     that would reasonably assure her appearance or clear and

7     convincing evidence that she poses such a danger to the

8     community that there are no conditions of release that could

9     assure the safety of the community or other persons.

10              The Government's motion is therefore denied.

11              The magistrate judge's pretrial detention ruling

12    is affirmed.

13              The defendant will be released pending trial

14    subject to the following conditions:

15              She must report to pretrial services by phone.

16              And I think she's going to be supervised in

17    pretrial services in the Western District of Pennsylvania.

18              Ms. Schuck, are you still on the line?  Is that

19    correct?

20              MS. SCHUCK:  Yes, Your Honor.

21              We will be requesting her to seek supervision from

22    the Western District of Pennsylvania.

23              THE COURT:  Thank you.

24              She will be required to report to pretrial

25    services weekly by phone.  She must verify her address with

1    pretrial services.

2            She's already surrendered her passport.  She must

3    not obtain another passport or international travel

4    document.  Her travel is restricted to the Western District

5    of Pennsylvania; and she may only come to the District of

6    Columbia for court purposes.

7            The defendant must avoid all contact, directly or

8    indirectly, with any person who is or may be a victim or a

9    witness in the investigation or the prosecution.

10            She must not possess a firearm, destructive

11    device, or other weapon.  And since the FBI has seized all

12    of those materials, including weird knives and such, from

13    her house -- I take it that those are gone from her house.

14    She is not to possess those kinds of weapons.

15            She must not use or unlawfully possess a narcotic

16    drug or other controlled substance defined in 21(b)(1)(C)

17    Section 802, unless prescribed by a licensed medical

18    practitioner.

19            The defendant is placed on home detention.  She

20    will be restricted to her residence at all times except for

21    employment, medical, substance abuse or mental health

22    treatment, attorney visits, court appearances, or

23    court-ordered obligations, or other activities approved in

24    advance by pretrial services.

25            She must submit to location monitoring as directed

 1    by the pretrial services officer or supervising officer, and

 2    comply with all program requirements and instructions

 3    provided, and must pay all or part of the cost of the

 4    program based on her ability to pay.

 5              Should she leave her residence with the

 6    approved -- under the terms of this order or as approved by

 7    pretrial services, she is required to wear a mask.

 8              The defendant must report to pretrial services, by

 9    phone, any contact she has with law enforcement as soon as

10    possible after such contact, including arrests, questioning,

11    and traffic stops.

12              She must also report as soon as possible to

13    pretrial services any change in address, telephone, or

14    employment status.

15              The Court is to be notified of any violations of

16    this order.

17              Ms. Powell, I want to remind you that your

18    presence is required in court, and that you will be advised

19    when next to appear; so keep in close touch with your

20    counsel to make sure you know when that is.

21              I am required to caution you about your conduct

22    during your release pending trial and certain penalties that

23    could apply to you.

24              First, failing to appear in court as required is a

25    crime for which you can be sentenced to imprisonment.

1          Second, if you violate any condition of your

2     release, a warrant for your arrest may be issued and you may

3     be jailed until trial.  You may also be prosecuted for

4     contempt of court.

5          Third, committing a crime while on release may

6     lead to more severe punishment than you would receive for

7     committing the crime at any other time.

8          Finally, it is a crime to try to influence a

9     juror, to threaten or attempt to bribe a witness or other

10    person who may have information about this case, to

11    retaliate against anyone for providing information about the

12    case, or to otherwise obstruct the administration of

13    justice.

14         Ms. Schuck, is there anything else that you would

15    recommend that I give her directions on because she's going

16    to be supervised in the Western District of Pennsylvania?

17         MS. SCHUCK:  Just -- we'd request that she report

18    to the Western District of Pennsylvania as directed versus

19    weekly by phone, which extends it to the Western District of

20    Pennsylvania to allow her to come in in person or by phone;

21    however they deem appropriate.

22         THE COURT:  All right.  I will make that change in

23    the modification.

24         So you will get your direction, Ms. Powell, from

25    the Western District of Pennsylvania pretrial services

1    office as they are going to be supervising you.  I don't

2    want to give additional instructions to them that is not in

3    accord with their normal practices there.

4            All right.  Is there anything further today from

5    the Government?

6            MS. ALOI:  No, Your Honor.

7            THE COURT:  Mr. Engle?

8            MR. ENGLE:  No, Your Honor.  Thank you.

9            THE COURT:  All right.  You are all excused.

10           MR. ENGLE:  Have a good day, Your Honor.

11           THE COURT:  You too.

12           (Whereupon, the proceeding concludes, 3:41 p.m.)

13                          **CERTIFICATE**

14           I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby
     certify that the foregoing constitutes a true and accurate
15   transcript of my stenographic notes, and is a full, true,
     and complete transcript of the proceedings to the best of my
16   ability.

17           PLEASE NOTE:  This hearing was held in compliance
     with the COVID-19 pandemic stay-safer-at-home orders and is
18   therefore subject to the limitations associated with the use
     of technology, including but not limited to telephone signal
19   interference, static, signal interruptions, and other
     restrictions and limitations associated with remote court
20   reporting via telephone, speakerphone, and/or
     videoconferencing capabilities.
21
             This certificate shall be considered null and void
22   if the transcript is disassembled in any manner by any party
     without authorization of the signatory below.
23
         Dated this 23rd day of February, 2021
24
         /s/ Elizabeth Saint-Loth, RPR, FCRR
25       Official Court Reporter