**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 1:21-cr-00179-RCL** |
| **RACHEL MARIE POWELL,** | |
| **Defendant.** | |

**UNITED STATES' RESPONSE IN OPPOSITION TO**
**MOTION TO MODIFY CONDITIONS OF RELEASE**

NOW COMES the United States of America, through undersigned counsel, and respectfully submits that defendant Rachel Marie Powell's Motion To Modify Conditions Of Release, ECF 67, should be denied.  Evidence against the defendant reflects her tolerance for and participation in acts of violence and destruction, as well as a willingness to dispense with ties to her home and family when convenient.  In this context, the release conditions of home detention and location monitoring that the defendant objects to are entirely reasonable and should be maintained.  The defendant's stated reasons for modification do not withstand scrutiny as explained below, and do not warrant the relief she seeks.

BACKGROUND

Even before January 6, 2021, the defendant, at a minimum, showed an inclination towards violence.  On October 14, 2020, for example, the defendant posted a comment on Facebook that included the following remarks:

> I agree with the possibility of civil war happening.  I can see that too. Unfortunately, the only way this is probably capable of being fixed is bloodshed because I'm not so sure our government can be fixed the political way anymore either.

In a message from November 11, 2020, the defendant described her surveillance of a public official's home, and questioned how to confirm, without entering a courthouse to seek records, that she had the official's correct address. She received a response stating "i [sic] am afraid to ask why you are surveilling it." On social media, the defendant posted pictures of herself at a gun range shooting firearms. She saved targets marked with comments that "Guns don't kill people. I do"; and "Prayer is a good way to meet the Lord but trespassing is faster!"

The defendant resides in western Pennsylvania. In 2021, she shared custody of six minor children with her ex-husband. When the defendant left for Washington, D.C. to attend the events of January 6, 2021, she left her minor children at home, unattended.

On January 6, 2021, at approximately 12:52 p.m.,[1] the defendant appeared, in a video livestreamed to Facebook, near the Peace Circle monument wearing a pink hat and fur-lined hood, recorded in the lower right corner of Exhibit 1 below:

---

[1] Roughly three seconds before the defendant appears, the video's narrator remarks, "eight minutes until they vote, okay." By law, Congress' joint session to certify the Electoral College vote begins at 1:00 p.m. 3 U.S.C. § 15.



*Exhibit 1*

The Capitol and its grounds were closed to the public at this time.  Temporary and permanent barricades manned by U.S. Capitol Police restricted public access to the Capitol building and its grounds.  The barricades included fencing with signs placed at regular intervals that warned, with red letters against a white background, that the area was closed by orders of the United States Capitol Police.  ECF 1-1.

Within 20 seconds of the defendant's arrival depicted in the screenshot above, members of the crowd violently confronted officers, breached the first barrier on the Capitol grounds, and forced officers to engage in a sequential retreat until they regrouped behind additional bicycle-rack style barriers in front of the Capitol Building's western exterior.  The crowd from the Peace Circle monument surged past the vandalized barriers and formed a mob outside the Capitol's western front, which officers tried to disperse with vocal commands, tear gas, and rubber bullets.  The

breach was visible to the video's narrator, who described it from the same area where the defendant is briefly seen in Exhibit 1.

After that breach, the defendant also entered the restricted Capitol grounds and joined the crowd at the Capitol's west front, confronting officers at the bike rack barriers and engaging in physical confrontations where she pushed directly against the barriers (and officers) in a forceful effort to continue the intrusion into the Capitol. An officer's body-worn camera captured one such confrontation occurring at approximately 1:37 p.m., shown below in Exhibit 2.  The defendant appears on the left in Exhibit 2 in sunglasses and a fur-lined hood with her hand on a barrier.  The same recording shows that after pausing for approximately one minute, the defendant turns and uses her back to push against the barrier.  An open-source video, Exhibit 3 below, provides a different example of the defendant from the front as she shouts and uses her back to push against the police line.



*Exhibit 2*



*Exhibit 3*

The defendant did not respond to police commands or other efforts to disperse the crowd. She remained in the Capitol's west plaza for at least an additional hour, with indifference to acts of violence in her presence, such as the attack against a U.S. Capitol Police officer shown below in Exhibit 4, where the defendant stands in the right side of the frame:



*Exhibit 4*

As the attack forced the officer to the ground, his body-worn camera captured the following image,

shown in Exhibit 5, of the defendant indifferently watching the attack:



*Exhibit 5*

After witnessing the attack on the officer, the defendant proceeded to the area of the Capitol's lower west terrace, where she remained from approximately 2:40 p.m. until approximately 5:00 p.m.  She entered the archway used during inauguration ceremonies that leads into the building. After observing, and apparently recording, a rioter strike at police with a pole, the defendant pushed forward towards the police line and the front of the crowd, putting herself in position to at least observe other physical confrontations with police and their efforts to eject the mob.  The defendant resisted these efforts for at least 20 minutes.

While outside of the archway at a nearby broken window, the defendant used a bullhorn to address others already inside the Capitol about its floor plan, explaining that she had already been inside and stating that the people she addressed should "coordinate together if you're going to take this building."  She also instructed the group inside that they "have another window to break."  The defendant crawled through the already-broken window and entered office space near the archway. And consistently with her remark about having another window to break, when outside of the

7

building, the defendant used an ice-axe and a large pipe to break a window, as shown in Exhibits

6 and 7 below:



*Exhibit 6*



*Exhibit 7.*

On January 7, 2021, the defendant commented on Facebook that "we have been patient and tried to go the legal route.  It isn't working and the government isn't hearing us.  It's time to rise."  On January 8, 2021, she posted a comment acknowledging that "they" did not allow the events of January 6 and that "it was a fight."

On January 16, 2021, the FBI published a notice to "Be On The Look-Out" (BOLO) for the defendant.[2]  By the end of January, 2021, the defendant's location was unknown.  On or about January 30, 2021, she unexpectedly left her children with her ex-husband without explanation and no indication of when she would return.[3]  Although the defendant agreed to a telephone interview with a reporter for *The New Yorker* magazine, she did so from "an undisclosed location" and the

---

[2]Testimony of FBI Special Agent Carlos Fontanez, Case No. 2:21-mj-00257-PLD (W.D. Pa. Feb. 9, 2021)(ECF 15:18).
[3] *Id*., ECF 15:20-21.

resulting article published on February 1, 2021 described the defendant as a fugitive.  An attorney representing the defendant in a custody dispute terminated the representation because of inability to contact the defendant from January 16, 2021 (the date of the FBI's wanted poster).[4]

A defense attorney contacted prosecutors on behalf of the defendant on February 3, 2021. Prosecutors contacted that attorney on February 4, 2021 to advise that warrants had been issued for the defendant's arrest and a search of her property; the attorney stated then that he did not know the defendant's location.  Later, that day, the attorney reported that the defendant was near Harrisburg, Pennsylvania, but would not give a more precise location.  Her attorney and ex-husband were able to contact the defendant by phone, and the defendant eventually turned herself in to law enforcement.  When she did, however, she no longer had her phone.

Agents executing the search warrant for the defendant's residence discovered several smashed cellular telephones, so-called "go bags," gun paraphernalia and ammunition, Ninja knives, and other weapons.  They also found the hooded coat that the defendant wore on January 6, 2021.

## PROCEDURAL BACKGROUND

On February 3, 2021, a criminal complaint arising from the defendant's breach of the U.S. Capitol and its grounds on January 6, 2021 charged the defendant with obstruction of justice, in violation of 18 U.S.C. § 1512(c); depredation of government property, in violation of  18 U.S.C. § 1361; with the following offenses subject to the penalty provisions of 18 U.S.C. § 1752 (b)(1)(A) for using and carrying a deadly or dangerous weapon: entering or remaining in a restricted  building or grounds, in violation of 18 U.S.C. § 1752(a)(1), engaging in disorderly or disruptive conduct, in or within such proximity to, any restricted building or grounds, when or so that such conduct,

---

[4] *Id*., ECF 15:22.

in fact, impedes or disrupts the orderly conduct of Government business or official functions, in violation of 18 U.S.C. § 1752(a)(2), and engaging in any act of physical violence, in violation of 18 U.S.C. § 1752(a)(4); and with the additional offenses of disorderly conduct in a Capitol building, in violation of 40 U.S.C § 5104(e)(2)(D); physical violence in the Capitol grounds or buildings, in violation of 40 U.S.C. § 5104(e)(2)(F), and parading or demonstrating or picketing in a Capitol building in violation of 40 U.S.C. § 5104(e)(2)(G).  ECF 1.  The defendant has been indicted for these charges.  ECF No. 12.

Pursuant to a warrant issued with the complaint, the defendant was arrested in the Western District of Pennsylvania on February 4, 2021.  On February 9, 2021, a magistrate judge in that district ordered the defendant's release. Although the magistrate judge found that the defendant was a danger to the community,[5] she ruled that there were conditions that could reasonably assure the safety of the community. These conditions of release included the defendant's home detention and location monitoring. Case No. 2:21-mj-00257-PLD (W.D. Pa. Feb. 9, 2021)(ECF 13:2).[6] When questioned by the magistrate judge, the defendant affirmed that she was willing to abide by those and other release conditions.  *Id.* at 78.

The United States obtained an order, ECF 8, staying the defendant's release until February 10, 2021, and pursued an appeal of the magistrate judge's release order, which was heard in this district. *See* ECF 7:2.  At the conclusion of that hearing, Chief Judge Beryl A. Howell agreed that there were conditions which could mitigate any danger the defendant presented to the community. ECF 11:52.  Those conditions once again included home detention and location monitoring.  ECF 11:54-55.

---

[5] *Id.* at 76.
[6] While arguing against pretrial detention, it was the defense that urged the magistrate judge in Pennsylvania to impose these conditions.  *Id*. at 72.

The defendant now seeks removal of the conditions which form the primary safeguards for the community during her release pending trial.  As a purported basis for their removal, the defendant claims the conditions she agreed to and has complied with[7] are burdensome; however, such a contention is not a sufficient ground for modification.

ARGUMENT

The defendant argues that because she has chosen living arrangements without enough space for all of her children, this Court should end her home detention, a condition imposed to protect the community.  According to the defendant, she cannot supervise her minor sons at night while they are in an efficiency apartment near, but out of monitoring range, from her current residence.  This residence is not same property where the defendant lived following her arrest.  After her release pending trial, the defendant sought and obtained approval from PreTrial Services to move to her current address, despite its alleged lack of space for all of her children.

Notably, however, according to the PreTrial Services Officer conducting the courtesy supervision of the defendant, the defendant does not have full custody of her children.  The primary residence for the defendant's children is with their father.  According to the supervising officer, her children visit the defendant.  Thus, the circumstances she complains of are intermittent and temporary.

---

[7] Compliance with court-imposed release conditions is not a basis for modification.  *United States v. Henry*, 314 F.Supp.3d 130, 133 (D.D.C. 2018)(even model compliance does not warrant modification of pretrial release conditions); *see also United States v. Kube*, No. 1:19-cr-00257-NONE-SKO, 2020 WL 1984178 *5 (E.D. Cal. Apr. 27, 2020)( "It is presumed that the defendant will abide by the conditions imposed and his demonstrated ability to do so is what allows him to remain on pretrial release. The fact that Defendant has complied with his conditions of release is what allows him to remain out of custody and is not new information that has a material bearing on his conditions to reopen the detention hearing"); *United States v. Gay*, No. 4:20-cr-40026-JES-JES, 2020 WL 5983880 at *3 (C.D. Ill. Oct. 7, 2020)(same).

Moreover, the burden that any release condition or even pretrial detention places on a defendant is not a relevant factor under the Bail Reform Act, 18 U.S.C. § 3142 *et seq. See United States v. Lee*, 451 F.Supp.3d 1, 7 (D.D.C. 2020)(opinion by Ketanji Brown Jackson)("the relevant statutory inquiry is *not* the benefits the defendant's release would bring about (however significant) or the harms that his incarceration would cause (however substantial)) (original emphasis); *United States v. Peguero*, 2021 WL 4811315 at *3 (W.D. Ky. Oct. 14, 2021) (court's choice of least restrictive release conditions to ensure a defendant's appearance and protect the community do not focus on how such conditions impact the defendant); *United States v. Gay*, No. 4:20-cr-40026-JES-JES, 2020 WL 5983880 at *3 (C.D. Ill. Oct. 7, 2020)(impact that release conditions cause for defendant is not sufficient cause for modifying conditions).

In her motion, the defendant only addresses the inconvenience of her release conditions which, as noted above, is not a sufficient or relevant justification for modification.  A certified fitness instructor, ECF 6-4:2, the defendant complains that her GPS ankle-monitoring bracelet is "heavy." ECF 67:1.  She protests that she cannot supervise her sons where she has chosen to house them or drive her children to extracurricular activities or attend other family events, *id.* at 1-2. Even if credible, given that her children reside with their father and visit the defendant, none of these objections apply to the statute's only relevant consideration of protection for the community after an unchallenged finding that the defendant is dangerous.[8]

---

[8] In her motion, the defendant argues that she is not a flight risk but ignores judicial findings that she is dangerous, which are the basis for the conditions she disputes.  The defense asserts that a conversation with the prosecution identified flight risk as the source of objection to removal of the home detention and monitoring conditions.  In this conversation, however, the prosecution also objected to such modification because of the defendant's dangerousness, noting among other observations that the defendant had an ice-axe at the Capitol that she used to damage property.

The defendant also fails to explain how the only solution for her complaints is the removal of conditions that a magistrate judge and this district's Chief Judge found appropriate, necessary, and among the least restrictive options for protecting the community.  Other responses to her complaints are available, including but not limited to assistance with childcare from other family members or friends. At most, the hours the defendant can leave home can be adjusted as determined by PreTrial Services to accommodate the defendant's working hours or visits from her children.  The order of release currently provides for home confinement with an exception "for other activities approved in advance by the pretrial services office or supervising officer[.]"  ECF 9:2.   Thus, any modification of conditions that are working effectively is unnecessary.

CONCLUSION

This Court should deny the motion to modify release conditions the defendant explicitly understood and accepted in order to secure release.  The defendant has acted violently and called for violence.  Twice, the defendant has been determined to be dangerous.  When faced with evidence that a defendant poses an articulable threat, this Court has the power to disable that threat. *See United States v. Neefe*, No. 21-cr-567 (RCL), 2022 WL 703999 at *8 (D.D.C. Mar. 9, 2022). In this case, the Court has chosen to do so through home detention and location monitoring. In her current motion, the defendant has failed to identify legally appropriate, relevant, or persuasive reasons for modification.  She has failed to justify relief.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

*/s/ Karen Rochlin*
KAREN ROCHLIN
DC Bar No. 394447
Assistant U. S. Attorney Detailee
U.S. Attorney's Office
Southern District of Florida
99 N.E. 4th Street
Miami, Florida  33132
(786) 972-9045
Karen.Rochlin@usdoj.gov