Case 1:21-mj-00297-RCL Document 6-1 Filed 02/16/22 Page 1 of 80
Case 2:21-mj-00295-RCL Document 69-1 Filed 02/06/22 Page 1 of 80

1

```
 1              IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3   UNITED STATES OF AMERICA,

 4          Plaintiff,
                                       Criminal Action
 5       vs.
                                       No. 21-257
 6   RACHEL POWELL,

 7          Defendant.
     _____
 8

 9

10      Transcript of DETENTION HEARING Proceedings on
     February 9, 2021, United States District Court, Pittsburgh,
11   Pennsylvania, before The Hon. Lisa Pupo Lenihan, United
     States Magistrate Judge.
12

13

14   APPEARANCES:

15   For the Government:     Jessica Lieber Smolar, Esq.

16
     For the Defendant:      Michael J. Engle, Esq.
17

18

19   Court Reporter:         Amanda M. Williamson, RMR, CRR
                             6260 Joseph F. Weis Jr. US Courthouse
20                           Pittsburgh, PA  15219
                             (412) 600-6607
21

22
     Proceedings recorded by mechanical stenography; transcript
23   produced by computer-aided transcription

24

25
```

```
1                    P R O C E E D I N G S

2            (Proceedings held via Zoom; February 9, 2021.)

3                 THE COURT:  Good afternoon.  This is Judge

4     Lenihan.  Court is now in session in the matter of the

5     United States of America versus Rachel Powell, Case

6     No. 21-257 in our court.  Now, Ms. Powell, do I have your

7     permission to proceed with this hearing via video

8     conference?

9                 THE DEFENDANT:  Is there any chance I could speak

10    to my lawyer for just a moment beforehand or not?

11                THE COURT:  Absolutely.  Mr. Banas, can we put

12    Mr. Engle and Ms. Powell in a private room?

13                THE DEPUTY CLERK:  Absolutely.

14                MR. ENGLE:  Thank you, Your Honor.

15         (Recess taken.)

16                THE COURT:  All right.  I see that the defendant

17    and her attorney have rejoined us.  Ms. Powell, I'm sorry.

18    Did you answer my question if I can proceed with this

19    hearing via video conference?

20                THE DEFENDANT:  Sure.  Go ahead.

21                THE COURT:  Okay.  Thank you.  We are scheduled

22    for a detention hearing.  Michael Engle is representing the

23    defendant.  Jessica Smolar is representing the government.

24    Before we begin the detention hearing, I have a couple of

25    housekeeping items, Mr. Engle, that I need to review.
```

1              MR. ENGLE:  Yes, Your Honor.

2              THE COURT:  At the initial appearance, I believe

3    you indicated that you wanted to retain the defendant's

4    right to a preliminary examination in the charging district,

5    in the District of Columbia.  Is that still your position?

6              MR. ENGLE:  Yes, Your Honor.

7              THE COURT:  Okay.  And what about the identity

8    hearing?  Are you going to waive the identity hearing, or do

9    you want to retain that, as well?

10             MR. ENGLE:  Yes, Your Honor.  I've discussed that

11   issue with Ms. Powell, and at this time, we're prepared to

12   waive the identity hearing.

13             THE COURT:  All right.  And, Ms. Powell, is that

14   accurate?

15             THE DEFENDANT:  Yes.

16             THE COURT:  Okay.  May I sign, Ms. Powell, on your

17   behalf the waiver of the identity hearing?

18             THE DEFENDANT:  Yes.

19             THE COURT:  And, Mr. Engle, may I sign for you, as

20   well?

21             MR. ENGLE:  Yes, Your Honor.  Thank you.

22             THE COURT:  On the document I am filing, which is

23   entitled "Waiver of Rule 5 and 5.1 Hearings," I will

24   indicate that any preliminary hearing to which she may be

25   entitled will be held at a time set in the charging

C. Fontanez - Direct

 1 | district.  Now, obviously, if they indict, then that will
 2 | change that situation.  But I don't know, Ms. Smolar, do you
 3 | know if the government has issued an indictment yet?
 4 |         MS. SMOLAR:  I don't believe so at this time,
 5 | Your Honor.
 6 |         THE COURT:  Okay.  Wonderful.  Then that's it.
 7 | Thank you for that.  Let's proceed then with the hearing on
 8 | the government's request for detention.
 9 |         MS. SMOLAR:  Thank you, Your Honor.  At this time,
10 | I would call FBI Special Agent Carlos Fontanez.
11 |         THE DEPUTY CLERK:  Sir, can you kindly state and
12 | spell your name for the record, please.
13 |         MR. FONTANEZ:  My name is Carlos Fontanez,
14 | C-A-R-L-O-S, F-O-N-T-A-N-E-Z.
15 |         THE DEPUTY CLERK:  Raise your right hand, please.
16 |    CARLOS FONTANEZ, a witness herein, having been first
17 | duly sworn, was examined and testified as follows:
18 |         THE DEPUTY CLERK:  Thank you.
19 |                 DIRECT EXAMINATION
20 | BY MS. SMOLAR:
21 | Q.  Special Agent Fontanez, how are you currently employed?
22 | A.  I'm a Special Agent with the FBI.  I've been an agent
23 | since 2015.
24 | Q.  And where are you located?
25 | A.  Washington, D.C.

C. Fontanez - Direct

1  Q.  So you're with the FBI in the Washington field office?

2  A.  Yes, ma'am, I'm assigned to a Washington field office.

3  Q.  And within the FBI, what areas do you investigate?

4  A.  So currently, I'm assigned to a criminal squad that

5  investigates violent crimes, violent gangs.  I've always

6  worked cyber matters, drug trafficking cases.

7  Q.  Have you reviewed the complaint and the affidavit in

8  support of the complaint in this matter?

9  A.  Yes, ma'am.

10  Q.  And was it you who swore the affidavit in this case?

11  A.  Yes, ma'am.

12  Q.  Did you prepare the images that are a part of the

13  affidavit in this case?

14  A.  Yes, ma'am.

15  Q.  All right.  And where did those exhibits come from?

16  A.  It's a combination of videos and images collected from

17  social media platforms.  We also collected video and images

18  from MPD and U.S. Capitol police and from tips provided to

19  the FBI.

20  Q.  And did you prepare the exhibits that will be used today

21  in this detention hearing, as well, from those same sources?

22  A.  Yes, ma'am.

23  Q.  Are you familiar with the investigation of

24  Rachel Powell?

25  A.  Yes.

C. Fontanez - Direct

 1  Q.  Okay.  Obviously, the Court is likely very familiar with
 2  the events of January 6.  But for summary sake,
 3  Special Agent, could you explain to the Court what happened
 4  on January 6 that formed the basis of this investigation?
 5  A.  So January 6, 2021, shortly after 2:00 p.m., there was a
 6  large group of individuals who violently forced entry into
 7  the U.S. Capitol.  As a result, the U.S. Capitol was
 8  evacuated.
 9      Over 100 officers were assaulted that day, including one
10  officer who died protecting the U.S. Capitol.  In total,
11  over five people were killed that day.  I was actually one
12  of the agents -- one of the many agents that responded to
13  the U.S. Capitol to protect the U.S. Capitol.
14      It was quite something when I got there.  There was
15  smoke everywhere, broken doors and windows.  I even saw
16  certain parts there was blood on the floor.  It was
17  definitely more like a crime scene rather than the
18  U.S. Capitol.
19  Q.  Thank you.  The FBI was able to obtain video images and
20  still images of the events on January 6, both inside and
21  outside the Capitol; correct?
22  A.  Yes, ma'am.
23  Q.  And you've reviewed those images and videos for purposes
24  of today; correct?
25  A.  Yes.

C. Fontanez - Direct

1  Q.  Okay.  Did those images and videos depict Rachel Powell?

2  A.  Yes, ma'am.

3  Q.  And what was Ms. Powell wearing that day?

4  A.  January 6, she was wearing a pink hat.  She also had a

5  black jacket with a fur-lined hoodie.  She had very unique

6  black gloves with a white label on the gloves.  She also had

7  earmuffs, the same type of earmuffs that you would use for a

8  gun range.

9  Q.  Okay.  So we're not talking about earmuffs that keep

10  your ears warm?  We're talking noise-canceling earmuffs;

11  correct?

12  A.  Correct.

13        MS. SMOLAR:  Your Honor, I request permission to

14  share my screen.

15        THE COURT:  Yes.  We will set that up.  Mr. Banas.

16        THE DEPUTY CLERK:  I just made you a co-host.

17        MS. SMOLAR:  Thank you.  Your Honor, can you see

18  the exhibits?

19        THE COURT:  Yes, I can.

20        MS. SMOLAR:  Okay.  Or at least the screen of

21  exhibits.

22  BY MS. SMOLAR:

23  Q.  Special Agent Fontanez, I'm going to show you what has

24  been marked for identification as Government's Exhibit 1.

25  Can you identify this photograph, please.

C. Fontanez - Direct

1  A.  So these two photos were provided to the FBI by MPD.

2  They come from officer body cameras.  These two photos, you

3  see the defendant wearing the pink hat, sunglasses, black

4  jacket that I described earlier.

5  Q.  What's "MPD"?

6  A.  Metropolitan Police Department.

7  Q.  Okay.  And these were taken from body cams of the

8  Metropolitan police officers on January 6 outside the

9  U.S. Capitol?

10  A.  Yes, ma'am.

11          MS. SMOLAR:  I would ask that Government's

12  Exhibit 1 be admitted.

13          THE COURT:  Mr. Engle, do you have any objections

14  to any of the exhibits?

15          MR. ENGLE:  For purposes of this hearing,

16  Your Honor, no, I do not.

17          THE COURT:  Okay.  Then 1 is admitted.

18  BY MS. SMOLAR:

19  Q.  Special Agent, can you identify Government's Exhibit 2,

20  please.

21  A.  This is a photo carved from a video that was collected

22  from social media platforms.  You can find the defendant

23  within the red box.  She is right next to one of the key

24  access points into the U.S. Capitol where we saw a lot of

25  violence, a lot of assaults on police officers.

C. Fontanez - Direct

```
 1              THE COURT:  Do you think you can click on these
 2   and have them -- the exhibit, itself, be on the screen
 3   instead of the whole PowerPoint?  It just would be easier.
 4   I mean, I've reviewed them in advance, but it would be
 5   easier for me to see.
 6              MS. SMOLAR:  I'm not quite sure how to do that,
 7   Your Honor.
 8              THE COURT:  In other words, you're not showing me
 9   a PowerPoint, necessarily.  If you double click on the
10   exhibit, itself, nothing?
11              MS. SMOLAR:  No.
12              THE COURT:  Okay.  That's fine.
13              MS. SMOLAR:  I apologize.  I did provide them in
14   advance to both counsel and to the Court so that you can
15   look at them a little more closely.  We'll learn how to do
16   that.  This has been admitted then, I guess, Your Honor.  I
17   won't ask for each exhibit.
18              THE COURT:  For the sake of the record, all of the
19   government exhibits that were provided in advance are
20   admitted.
21              MS. SMOLAR:  Okay.  I might be able to --
22              THE COURT:  You know, it's fine.
23              MS. SMOLAR:  Okay.  I'm sorry.  I don't want to
24   waste anybody's time trying to figure that out right now.
25              THE COURT:  Right.
```

C. Fontanez - Direct

1  BY MS. SMOLAR:
2  Q.  Special Agent, can you please identify Government's
3  Exhibit 3, which has been admitted.
4  A.  This is another photo carved from video collected from
5  social media platforms.  You can see the defendant
6  identified by the red box wearing the same clothing items I
7  mentioned earlier.  And this is on the right side of this
8  particular access point that I mentioned where there was a
9  lot of violence, a lot of attacks on officers.
10 Q.  Can you please explain what we are seeing here in
11 Government Exhibit 4.
12 A.  Photo on the left, again, is a photo carved from a video
13 that we collected from social media platforms.  You see the
14 defendant with the pink hat, the black jacket.  You can also
15 see the earmuffs on her chest area.  On the right side, this
16 is a screen shot from the defendant's Facebook account.  The
17 account was publicly available, and so this particular video
18 clip showed her at the range wearing similar earmuffs as the
19 one used on January 6.
20 Q.  So can you explain to the Court how the FBI went about
21 identifying Ms. Powell from all of these photographs that
22 we've already seen?
23 A.  So as part of our investigation, we collected a lot of
24 photos, a lot of videos.  We generated BOLO, which stands
25 for "Be on the Lookout."  It was a poster.  It was labeled

C. Fontanez - Direct

 1   BOLO 110.  That was published on our Web site, and it was
 2   also shared via other platforms.
 3       We received a unanimous tip that Rachel Powell was, in
 4   fact, the individual depicted on BOLO No. 110.  The tip also
 5   included a Facebook account.  And from there, we continued
 6   our investigation to corroborate the investigation.  Later,
 7   on February 2, there was an article in the New Yorker where
 8   Rachel Powell was interviewed and provided some statements
 9   that confirmed a lot of our findings.
10   Q.  Specifically, those statements confirmed that she was
11   the individual wearing the pink hat depicted in the pictures
12   that we have just described?
13   A.  Yes, ma'am.
14   Q.  Okay.  What did your investigation reveal about the
15   conduct of Ms. Powell on January 6 at the Capitol?
16   A.  So based on our investigation, the defendant was
17   definitely one of the individuals using -- essentially
18   forcing entry into the U.S. Capitol.  There's a video where
19   we can see the defendant using a large pipe along with
20   another individual ramming one of the windows that's right
21   next to one of the key access points into the Capitol.
22       In addition to that, there's another video of the
23   defendant where she is using a bullhorn to provide guidance,
24   providing details in regards to the layout of the Capitol
25   and motivating individuals to further penetrate the

C. Fontanez - Direct

1    U.S. Capitol.

2    Q.  I'm going to show you what has been marked as

3    Government's Exhibit 5.  What is that a still photo of?

4    A.  So this is a photo carved from a video that we collected

5    from social media platforms.  This is a video that

6    corresponds to what I just described.  The defendant is

7    using a bullhorn and providing details of the layout of the

8    Capitol.  Two of the individuals are already inside the

9    Capitol and providing -- motivating them to further

10   penetrate the building.

11   Q.  And without getting into specific quotes, can you

12   summarize for us before we see the video what Ms. Powell is

13   instructing the people inside to do?

14   A.  So essentially, she's letting them know she has been in

15   the Capitol before.  She provides details as to where the

16   doors are and pretty much tells them in order to further

17   gain access into the Capitol to take over the building, for

18   people to coordinate and further move in.

19   Q.  Does she tell them that they have another window to

20   break?

21   A.  Yes, ma'am.

22   Q.  Does she tell them the things they need to do to take

23   the Capitol?

24   A.  Yes.

25   Q.  Okay.  Special Agent, I'm now going to show the video,

C. Fontanez - Direct

1  which is marked and admitted as Government's Exhibit 6.

2  Before I do, is this the video you just described?

3  A.  Yes, ma'am.

4      (Played video.)

5  BY MS. SMOLAR:

6  Q.  Special Agent, is that what we see in that video?  Do we

7  see Ms. Powell instructing these other individuals to go do

8  damage inside of the Capitol Building?

9  A.  Yes, ma'am.

10  Q.  And do they follow her instructions?

11  A.  They continue to push forward.  They don't retreat.

12  Q.  In addition to the conduct with the bullhorn and giving

13  instructions to the individuals that we just saw, what else

14  do we see Ms. Powell doing on January 6 at the Capitol

15  Building?  And I'm going to ask you to describe Exhibit 7,

16  please.

17  A.  So this particular photo is also carved from video that

18  we collected from social media platforms.  You can see the

19  defendant depicted by the red box.  She is using a large

20  pipe as a ramming device along with another individual, and

21  they're violently hitting the window to breach the

22  U.S. Capitol.

23  Q.  And you stated earlier that this window was located near

24  an access point where several officers were injured?

25  A.  Correct.  This window is to the right of one of the key

C. Fontanez - Direct

1    access point entrances into the U.S. Capitol where we saw a

2    lot of violence.  A lot of officers were assaulted at that

3    location.

4    Q.  I'm going to show you now a video that has been marked

5    as Government's Exhibit 8.  Before we do, can you just

6    describe what we'll be seeing in this video?

7    A.  So in this video, you're going to see the defendant,

8    along with another individual, ramming a very large pipe and

9    violently using that pipe as a ramming device trying to

10   breach one of the windows in the U.S. Capitol.

11        (Played video.)

12   BY MS. SMOLAR:

13   Q.  In that video, do you see the defendant reach some kind

14   of agreement with the person that she is using the battering

15   ram to break the window with?  Do you see her nod her head?

16            MR. ENGLE:  Objection, Your Honor.  Calls for

17   speculation.

18            MS. SMOLAR:  I'm only asking what he saw.

19            THE COURT:  You can answer as to what you saw,

20   Agent.

21            THE WITNESS:  So in the video, you can clearly see

22   the defendant, along with another individual, working as a

23   team to use that large pipe as a ramming device.

24   BY MS. SMOLAR:

25   Q.  The window -- was that window ultimately broken by that

C. Fontanez - Direct

1   ramming device?

2   A.  Yes, ma'am.

3   Q.  And was the window valued in excess of $1,000?

4   A.  Yes, ma'am.

5   Q.  And how do you know that?

6   A.  That information was provided to us by the U.S. Capitol

7   Police.

8   Q.  I'm going to show you another exhibit, Exhibit 9,

9   Government's Exhibit 9.  And can you describe what we are

10  seeing here?

11  A.  So this is a photo from --

12  Q.  This is actually a video.

13  A.  Oh, so this is the actual video.  This is the key access

14  point that I've been referring to.  There's a lot of

15  violence that takes place here.  On the left-hand side of

16  that particular entrance, you'll see the defendant with the

17  pink hat, she is within that group.  After some time, she

18  heads over to the window that's on the left.  And you can

19  later see her climbing over a broken window into the

20  U.S. Capitol.

21  Q.  So you see her actually climbing inside the window to

22  get inside; correct?

23  A.  Yes, ma'am.

24  Q.  And in all of these photos, isn't it correct that we see

25  Rachel Powell in the front lines of this insurrection?

C. Fontanez - Direct

 1  Correct?

 2  A.  Correct.

 3      (Played video.)

 4  BY MS. SMOLAR:

 5  Q.  Special Agent, where did this video come from?

 6  A.  This was collected from social media platforms, YouTube,

 7  Twitter.

 8  Q.  And at the beginning of the video, Ms. Powell is

 9  climbing through a broken window; correct?

10  A.  Yes, ma'am.

11  Q.  And then at the end, you see her back outside ramming

12  the battering ram into the window.  Can you explain that

13  time frame?

14  A.  So basically, the video does not have time stamps.

15  However, based on this particular video, it seems to be a

16  compiled video.  It's not clear if she was using the ramming

17  device before or after she actually went inside.

18  Q.  Okay.  But when she was instructing with the bullhorn,

19  she indicated she had been inside previously; correct?

20  A.  Correct.

21  Q.  And we know -- do you know that Ms. Powell did make it

22  inside of the U.S. Capitol?

23  A.  Yes, ma'am.

24  Q.  I'm showing you what has been marked as Government's

25  Exhibit 10.  Can you please identify what this exhibit shows

C. Fontanez - Direct

```
 1  us?
 2  A.  These are photos carved from the video that the FBI
 3  collected, and it shows the defendant once inside the
 4  building.
 5  Q.  And what -- I think we're going to see the video next.
 6  But what's happening in the video that we see?
 7  A.  So there are a lot of individuals inside.  The defendant
 8  is one of them, and she's celebrating along with other
 9  individuals on the inside of the Capitol.
10  Q.  I'm going to show you what has been marked as Government
11  Exhibit 11 and admitted as Government's Exhibit 11.  This is
12  the video you just described; correct?
13  A.  Yes, ma'am.
14      (Played video.)
15  BY MS. SMOLAR:
16  Q.  Was Ms. Powell depicted in that video?
17  A.  Yes, ma'am.
18  Q.  Where did that video come from?
19  A.  That was collected from a particular feed that was
20  provided to the FBI.
21  Q.  You mentioned earlier in your testimony that the FBI
22  created a BOLO or basically a wanted poster; correct?
23  A.  Yes, ma'am.
24  Q.  And they did that with regard to a number of the
25  individuals that were seen committing violence at the
```

C. Fontanez - Direct

1   U.S. Capitol on January 6; correct?

2   A.  Yes, ma'am.

3   Q.  And one of those individuals, as depicted here, is that

4   Ms. Powell?

5   A.  Yes, ma'am.

6   Q.  So she's Photographs No. 110?

7   A.  Yes.

8   Q.  And when was this wanted poster issued to the public?

9   A.  This one was published on January 16.

10  Q.  January 16.  So ten days after the insurrection;

11  correct?

12  A.  Yes, ma'am.

13  Q.  When I asked whether it was made public, how does the

14  FBI go about putting this out there?

15  A.  So this was posted on our FBI Web site, and it was also

16  sent out via Twitter, a Twitter feed.

17  Q.  Okay.  At any point on January 16 or at any time from

18  January 16 until she was charged formally on February 4, did

19  the FBI hear from Ms. Powell?

20  A.  No, ma'am.

21  Q.  I'm going to show you what has been marked as Exhibit 13

22  and admitted.  It's a page from the New Yorker magazine.

23  Can you explain to the Court what this is and what you saw

24  when you saw this?

25  A.  So this is a screen shot from an article from the

C. Fontanez - Direct

1  New Yorker.  This came out on February 1, 2021.  And it's
2  essentially an interview of the defendant.  There were also
3  multiple statements included, and it's essentially
4  statements from the defendant confirming a lot of our
5  findings.
6  Q.  And can you give us some specifics as to the things that
7  she confirmed?  Specifically, her identity, did she confirm
8  that?
9  A.  She did.  She did say that she was the person depicted
10  on the videos, known as the "bullhorn lady" with the pink
11  hat.
12  Q.  And this article was published on February 1; correct?
13  A.  Yes, ma'am.
14  Q.  And at any time on or before February 1, did Ms. Powell
15  contact the FBI to turn herself in?
16  A.  No, ma'am.
17  Q.  This article also contained a copy of the FBI wanted
18  poster, didn't it?
19  A.  It did.
20  Q.  Okay.  At some point, did the FBI become aware of
21  Ms. Powell's whereabouts?
22  A.  Yes, ma'am.  February 4.
23  Q.  February 4?
24  A.  Yes.
25  Q.  Did you have an opportunity to speak to Ms. Powell's

C. Fontanez - Direct

1  ex-husband, Richard Powell?

2  A.  Yes, ma'am.

3  Q.  And what did Richard Powell tell you about what took

4  place on January 30 of 2021?

5  A.  So Mr. Powell indicated that on January 30, he received

6  a call from the defendant from the same number that she has

7  been using for some time.  So she indicated to him that she

8  was going to leave for some time, she had to take care of a

9  few things, and for him to take care of the kids.

10  Q.  Okay.  So let's go back a bit.  How many children does

11  Ms. Powell have?

12  A.  Eight children.

13  Q.  Okay.  And did Mr. Powell tell you what Mrs. Powell did

14  with the eight children when she came to the U.S. Capitol on

15  January 6 of 2021?

16  A.  He did.  He said that the kids stayed home by themselves

17  while she was there in D.C.

18  Q.  And there are two of the children that are over the age

19  of 17; correct?

20  A.  Yes, ma'am.

21  Q.  But there were no adults in the house over the age of

22  18, were there?

23  A.  Not according to Mr. Powell.

24  Q.  All right.  Then on January 30, Mr. Powell said she

25  dropped the kids off with him.  Did she tell him where she

C. Fontanez - Direct

```
 1  was going?
 2  A.  No.
 3  Q.  Did she leave him a forwarding address?
 4  A.  No.
 5  Q.  And did he see her again at any point after January 30?
 6  A.  No, ma'am.
 7  Q.  And is he currently caring for the children?
 8  A.  Yes.
 9  Q.  And what is the status of their custody situation?
10  A.  So the children are currently with the father.
11  Q.  And did Mr. Powell tell you anything about Ms. Powell's
12  custody attorney in that custody matter?
13  A.  So apparently they have a custody issue, and the
14  attorney that she had is no longer with her; and there's a
15  dispute they're trying to figure out.
16  Q.  And why did that attorney withdraw, if you know?
17          MR. ENGLE:  Objection.  Calls for speculation.
18  BY MS. SMOLAR:
19  Q.  Did Mr. Powell tell you why that attorney withdrew?
20  A.  He did mention --
21          MR. ENGLE:  Objection, Your Honor.  It's double
22  speculation.  Now we're asking --
23          THE COURT:  It's not speculation.  She's asking if
24  he told him.  There may be double hearsay.
25          MR. ENGLE:  Well, we also have to establish
```

C. Fontanez - Direct

1  whether or not Mr. Powell has a basis of knowledge to know

2  why an attorney representing my client was doing something.

3          MS. SMOLAR:  Your Honor, my understanding is that

4  Mr. Powell was privy to a pleading in which that attorney

5  specifically said why he was withdrawing, and it's relevant

6  to detention.

7          THE COURT:  Why is it relevant?

8          MS. SMOLAR:  I can proffer it, Your Honor, if that

9  helps.  It's relevant because he withdrew because he said he

10 could not reach his client since January 16.

11         THE COURT:  So it has to do with flight risk?

12         MS. SMOLAR:  That is correct.

13         THE COURT:  All right.  I'll allow it.

14 BY MS. SMOLAR:

15 Q.  Special Agent Fontanez, is that what Mr. Powell told you

16 about why Ms. Powell's custody attorney withdrew?

17 A.  Yes, ma'am.

18 Q.  So Mr. Powell told you he had not seen or spoken to

19 Ms. Powell after January 30 until February 4; correct?

20 A.  That's correct.

21 Q.  And when she called him on February -- did she call him

22 on February 4?

23 A.  She did.  She called via the telegram application that's

24 an encrypted application and pretty much told him that she

25 was going to be arrested that day or the following day.

C. Fontanez - Direct

 1 | Q.  Was an arrest warrant issued for Ms. Powell on
 2 | February 4?
 3 | A.  Yes, ma'am.
 4 | Q.  And did FBI execute a federal search warrant at her
 5 | residence on that same day?
 6 | A.  Yes.
 7 | Q.  Did you have an opportunity to review photographs taken
 8 | at the search of her Sandy Lake residence?
 9 | A.  Yes, ma'am.
10 | Q.  Was Ms. Powell at her Sandy Lake residence at the time
11 | of the search?
12 | A.  No.
13 | Q.  And does the FBI know where she was?
14 | A.  She was approximately four hours away from the house
15 | near Harrisburg, Pennsylvania.
16 | Q.  And do you know the exact location where she was in
17 | Harrisburg, Pennsylvania?
18 | A.  No, ma'am.
19 | Q.  And did the FBI request that information at any time
20 | from Ms. Powell or from her counsel?
21 | A.  That was asked.
22 | Q.  And was that information ever provided?
23 | A.  No.
24 |         MR. ENGLE:  Objection.  That's factually
25 | inaccurate, Your Honor.  I provided the FBI and the

C. Fontanez - Direct

 1  U.S. Attorney's office in D.C. with my client's location as
 2  soon as I was provided it.  That's how we arranged for her
 3  voluntary surrender to FBI Agent Jordan holding the warrant
 4  in Western Pennsylvania.
 5          MS. SMOLAR:  That is absolutely false, Your Honor.
 6  At no time did the FBI have her exact location.
 7          MR. ENGLE:  Your Honor, having someone's exact
 8  location in terms of -- you know, I don't have a GPS chip on
 9  my client.  But I provided the information that my client
10  provided to me, which was that she was somewhat west and
11  north of Harrisburg heading back in the direction of home.
12  That information was provided to the FBI.
13          They were then going to make a decision about
14  whether my client should turn around, head back towards
15  Harrisburg and surrender to FBI in Harrisburg, or whether
16  she should continue to Western Pennsylvania and surrender
17  herself in New Castle to FBI Agent Jordan.  Upon Agent
18  Jordan's direct instructions to me, I instructed Ms. Powell
19  to drive to his office and surrender herself, which is
20  exactly what she did.
21          THE COURT:  Thank you for the clarification,
22  Mr. Engle.  You may continue, Ms. Smolar.
23          MS. SMOLAR:  Your Honor, I will just respond that
24  according to the AUSA who spoke with Mr. Engle, that is not
25  correct.  He said he did not know where she was.  We'll move

C. Fontanez - Direct

1  on.

2  BY MS. SMOLAR:

3  Q.  Special Agent Fontanez, I'm showing you what has been

4  marked as Government's Exhibit 14.  Is this a photograph

5  taken from the search of Ms. Powell's residence?

6  A.  Yes, ma'am.

7  Q.  And can you describe for us what we're seeing here?

8  A.  These are phones, cell phones, that have been broken,

9  SIM cards removed, severely damaged to the point that you

10  could barely extract data from it.

11  Q.  Based on your experience as a federal agent, what do

12  broken cell phones mean to you?

13          MR. ENGLE:  Objection, Your Honor.  Again, this is

14  pure speculation.  We don't know whose phones these are.

15  The government hasn't laid a foundation for when they were

16  broken, who had access to them.  It's irrelevant.

17          THE COURT:  I'm going to sustain that unless you

18  can lay a better foundation for that question.

19  BY MS. SMOLAR:

20  Q.  Special Agent Fontanez, in your investigation of crimes

21  with the FBI for the number of years that you've been doing

22  that, have you seen any -- have you seen broken cell phones

23  being used to hide someone's location?

24          MR. ENGLE:  Objection, Your Honor.  Again,

25  irrelevant.  My client had a fully-functioning phone on her.

C. Fontanez - Direct

```
 1  That's how she was communicating with me and with her
 2  husband and with other individuals in order to surrender
 3  herself.  So whether or not there were broken cell phones in
 4  the home seized during a search warrant when my client
 5  wasn't present is completely irrelevant.
 6           THE COURT:  And I'm going to sustain that because
 7  she was not the only resident of the home.  There were, I
 8  think somebody said, six children or five.  And certainly
 9  having had children, myself, I know we had a lot of broken
10  cell phones.
11  BY MS. SMOLAR:
12  Q.  Special Agent Fontanez, when Ms. Powell appeared at the
13  FBI on the evening of February 4, did she have a cell phone
14  with her?
15  A.  She did not.
16  Q.  I'm going to show you what has been marked as
17  Exhibit 15.  Can you describe what we're seeing in this
18  photograph, and was this taken at the residence, as well?
19  A.  Yes, ma'am.  This is a go-bag.  You have some ammunition
20  here, rope, essentially a bag people prepare in case they
21  have to leave the house very quickly, they can take that
22  with them.
23  Q.  You said a "go-bag"?
24  A.  Go-bag, prepper bag, bug-out bag.
25  Q.  What type of things were in this bag?
```

C. Fontanez - Direct

1  A.  There's rope, duct tape, ammunition.

2  Q.  I'm now showing you what has been marked as Exhibit 16.

3  Was this also a go-bag found in the house?

4  A.  Yes, ma'am.

5  Q.  And what was found in this particular bag?

6  A.  This one, there were multiple knives.

7  Q.  Multiple knives.  And what are these star-looking

8  things?

9  A.  Ninja knives.  They're blades, as well.

10  Q.  They're blades.  And these are lighters?

11  A.  Lighters.

12  Q.  During your investigation of Ms. Powell, did you come to

13  learn also that she had guns, any weapons?

14  A.  Yes, ma'am.

15  Q.  And did you come to learn that she goes to a shooting

16  range?

17  A.  Yes.

18  Q.  I'm showing you what has been marked as Government's

19  Exhibit 17.  Can you tell us what this is?

20  A.  These are used targets that were located at the home

21  with writing on them.  The first one on the left says, "Guns

22  don't kill people.  I do."  The other one says, "Better shot

23  than my ex."  And the one on the right, "Prayer is a good

24  way to meet the Lord, but trespassing is faster."

25  Q.  And these were found in the home?

C. Fontanez - Direct

 1  A.  Yes, ma'am.

 2  Q.  And were these similar targets seen on the defendant's

 3  Facebook that you reviewed?

 4  A.  Yes, ma'am.

 5  Q.  During the course of the search, do you know whether the

 6  agents found any of the clothing items worn by Ms. Powell at

 7  the Capitol on January 6?

 8  A.  Yes, ma'am.  They did find a black jacket with a

 9  fur-lined hoodie that correlates to the jacket that she used

10  on January 6.

11  Q.  I'm showing you what has been marked as Government's

12  Exhibit 18.  Can you identify that for us, please.

13  A.  Yes, ma'am.  That's the photo taken during the search

14  warrant depicting the black jacket with the fur-lined

15  hoodie.

16  Q.  Can you tell the Court at what time Ms. Powell's counsel

17  was advised that there was a warrant out for her arrest on

18  February 4?

19  A.  Approximately 7:00 in the morning.

20  Q.  In the morning?

21  A.  Yes.

22  Q.  And what time did Ms. Powell appear at the FBI in

23  New Castle?

24  A.  Approximately 6:45 p.m. that evening.

25  Q.  How many hours is that?

C. Fontanez - Direct

1   A.  Many hours after.  A whole day.

2   Q.  A whole day.  When she appeared at the FBI in

3   New Castle, was her vehicle seized?

4   A.  Yes, ma'am.

5   Q.  And a search warrant was obtained for her vehicle;

6   correct?

7   A.  Yes.

8   Q.  And after showing you what has been marked as

9   Government's Exhibit 19, can you please describe to the

10  Court what we're seeing in this exhibit?

11  A.  So this receipt was located in the vehicle.  What's

12  important here is the time stamp.  So February 4,

13  12:37 p.m., around lunchtime, and the location.  So this

14  particular address is very close to Harrisburg,

15  Pennsylvania, which is almost four hours away from her

16  residence.

17  Q.  Okay.  So this is at 12:37 p.m., several hours after

18  notification was made to her counsel that there was an

19  arrest warrant for her, she stopped for lunch at Sheetz?

20  A.  Yes, ma'am.

21  Q.  And that was several hours away from New Castle;

22  correct?

23  A.  Correct.

24  Q.  In addition, I'm showing you what has been marked as

25  Government's Exhibit 20.  Were these items found inside

C. Fontanez - Direct

1  Ms. Powell's vehicle?

2  A.  Yes, ma'am.

3  Q.  Can you describe for us what we are seeing in

4  Government's Exhibit 20?

5  A.  So this is another type of go-bag.  This was inside the

6  vehicle.  This was a more complete go-bag with tarp, zip

7  ties, water bottle.  What's unique here, there were two

8  AK-47 magazines loaded.  However, no weapons were.

9  Q.  I'm showing you what has been marked as Government

10  Exhibit 21, also taken from inside the vehicle.  What is

11  this?

12  A.  These are Glock magazines with ammunition.  They were

13  loaded, as well.  No Glock was seized that day.

14  Q.  Special Agent, you indicated that when she appeared

15  finally in the evening of February 4, she did not have a

16  cell phone with her; correct?

17  A.  That's correct.

18  Q.  Did she have anything written on her?

19  A.  She did.  She had notes with directions to the FBI

20  building.

21  Q.  Where were they written?

22  A.  They were written on a piece of paper.

23  Q.  Okay.  Did she write anything on her arm, to your

24  knowledge?

25  A.  I understand she might have had something on her arm

C. Fontanez - Direct

1    written, as well.

2    Q.  Phone numbers on her arm, do you know?

3    A.  I don't recall.

4    Q.  Okay.  But no phone?

5    A.  No phone.  There was a box recovered from the vehicle

6    matching an Apple iPhone.  The IMEI matches the phone number

7    that we know she was using both the January 6 time frame all

8    the way through February.

9    Q.  And is it your understanding based on your investigation

10   that she did have a phone at some point along the ride on

11   February 4 because she made calls?

12   A.  Yes, ma'am.  At some point, the communications ended

13   around 1:00, 1:45.

14   Q.  And you don't know what she did with her phone, do you?

15   A.  No, ma'am.

16              MS. SMOLAR:  No further questions for this

17   witness.

18              THE COURT:  Cross-examine, Mr. Engle.

19              MR. ENGLE:  Thank you.  Ms. Smolar, can I indulge

20   you to keep the PowerPoint up and put up the exhibits if I

21   need them?

22              MS. SMOLAR:  That's fine.

23              MR. ENGLE:  Thank you.

24                         CROSS-EXAMINATION

25   BY MR. ENGLE:

C. Fontanez - Cross

1  Q.  Agent Fontanez, good afternoon.

2  A.  Good afternoon, sir.

3  Q.  You indicated that part of the investigation in this

4  matter involved the review of numerous videos and images

5  from social media, the Capitol police, and other sources; is

6  that correct?

7  A.  That's correct.

8  Q.  All right.  And you testified that unfortunately on

9  January 6, 2021, there were many officers, I think you said

10  over 100 officers, who were assaulted during these events.

11  Is that also correct, Agent?

12  A.  Yes, sir.

13  Q.  All right.  Fair to say that my client is not charged

14  with assaulting any of those officers?  Correct?

15  A.  At this point, no.

16  Q.  Okay.  And you haven't reviewed any video or seen any

17  other information that depicts Rachel Powell physically

18  assaulting any officer at the Capitol on January 6, 2021.

19  Isn't that also right?

20  A.  As of today, that's correct.

21  Q.  And you've been conducting a pretty thorough

22  investigation in this matter, isn't that right,

23  Agent Fontanez?

24  A.  Yes, sir.

25  Q.  You put together a very detailed Affidavit of Probable

C. Fontanez - Cross

1  Cause, which I believe is 14 pages in length, in connection
2  with this case; correct?
3  A.  Correct.
4  Q.  And nowhere in that Affidavit of Probable Cause does it
5  provide any information or make any allegation that
6  Rachel Powell assaulted anyone, let alone, a law enforcement
7  officer.  Isn't that also correct?
8  A.  That is correct.
9  Q.  Okay.  Now, you were shown a picture earlier on, I
10  believe --
11         MR. ENGLE:  Ms. Smolar, can we go to the beginning
12  slides, please.
13         THE COURT:  Which one do you want?
14         MR. ENGLE:  If I may have Slide 5, please.  Thank
15  you.
16  BY MR. ENGLE:
17  Q.  Agent Fontanez, you made reference to the fact that
18  there was an indication that my client had earmuffs, the
19  type that you would use at a shooting range; correct?
20  A.  That's correct.
21  Q.  And that's what we see here in Exhibit 4 where it
22  appears that there are earmuffs that look like they're
23  Beretta brand?
24  A.  That's correct.
25  Q.  Okay.  Based upon the video that I've seen, it certainly

C. Fontanez - Cross

1  appeared like there were a large number of people gathered
2  at the Capitol on the 6th.  Is that correct?
3  A.  Yes, sir.
4  Q.  And it was very loud there, wasn't it?
5  A.  It was loud.
6  Q.  And there were people using megaphones and other things
7  to amplify noise; isn't that correct?
8  A.  That's correct.  Bullhorns were used, as well.
9  Q.  Okay.  And while my client may have had earmuffs that
10 would help deal with noise issues, there's no evidence that
11 you've uncovered in your investigation at this point that
12 indicates that Ms. Powell was armed with any type of weapon;
13 is that correct?
14 A.  As of today, that's correct.
15 Q.  All right.  And we see in Exhibit 4 that Ms. Powell has
16 what appears to be a Glock handgun in her right hand and
17 shooting at targets similar to the other exhibit that we
18 reviewed not that long ago; is that correct, Agent?
19 A.  Yes, sir.
20 Q.  And are you aware that Ms. Powell lawfully purchased
21 that Glock G43X in Pennsylvania?
22 A.  I don't have that information, sir.
23 Q.  Are you aware that upon purchasing the firearm, that she
24 made application to her county sheriff's office to obtain a
25 concealed carry permit?

C. Fontanez - Cross

1  A.  I do not have that information, sir.

2  Q.  Are you aware that she obtained a concealed carry permit

3  and then went for training to learn how to properly use and

4  handle that firearm?

5  A.  Again, I did not know that, sir.

6  Q.  Would you agree with me that a responsible gun owner

7  would get training if they were unfamiliar with the use of

8  firearms?

9          MS. SMOLAR:  Objection, Your Honor.  Irrelevant.

10          THE COURT:  Sustained.

11 BY MR. ENGLE:

12 Q.  Agent Fontanez, if we could go to Exhibit 1, please.

13 Agent Fontanez, you indicated that the images from Exhibit 1

14 were taken from Metropolitan Police Department officers'

15 body cameras; is that correct?

16 A.  That's correct.

17 Q.  That would seem to indicate that law enforcement

18 officers were in proximity of Ms. Powell when these images

19 were obtained; is that correct?

20 A.  That's correct.

21 Q.  Any information from any of the officers whose body

22 cameras produced these images that Ms. Powell threatened

23 them with any form of violence or attacked them or assaulted

24 them in any way?

25 A.  Not at this point, sir.

Case 1:21-cr-00297-RLD Document 951 Filed 06/06/22 Page 36 of 80

C. Fontanez - Cross

1   Q.  Have you had the opportunity to talk to any of them?

2   A.  They have not been interviewed yet.

3   Q.  To your knowledge, have any allegations been raised by

4   any of the officers of an assault by Ms. Powell?

5   A.  There were hundreds of people that day.  Again, I don't

6   have any specific reports from the officers that day in

7   reference to your defendant.

8   Q.  Any images from the officers' body cam showing that

9   Ms. Powell was acting in a menacing or violent way towards

10  those police officers?

11  A.  None identified at this point.

12  Q.  Okay.  If we could look at Exhibit 2, please.  Agent

13  Fontanez, you see that it appears to depict Ms. Powell

14  standing outside of the window that we've seen in a number

15  of other exhibits; is that correct?

16  A.  Yes, sir.

17  Q.  There doesn't appear to be anything in her hands, does

18  there?

19  A.  So in this particular image, it's hard to say.  However,

20  this came from a video.  And you can see her movements in

21  that video.

22  Q.  But based upon what you see here, you don't see her

23  holding any kind of weapon or using any kind of object to

24  assault anyone in that picture, do you?

25  A.  In this particular image, no.

C. Fontanez - Cross

1  Q.  Could we go to Exhibit 3, please.  Again, in this image,

2  Agent Fontanez, you don't see anything in her hands that

3  would indicate that my client had a weapon there?

4  A.  This particular image, no.

5  Q.  And she's not engaging in any assaultive behavior?

6  A.  On her way to using a large pipe as a ramming device,

7  violently using it to breach the U.S. Capitol.

8  Q.  That wasn't my question, Agent.  My question is --

9          MS. SMOLAR:  Objection, Your Honor.  Asked and

10 answered.

11         THE COURT:  Overruled.  Go ahead, Mr. Engle.

12         MR. ENGLE:  Thank you.

13 BY MR. ENGLE:

14 Q.  Agent Fontanez, this image depicted in Exhibit 3, my

15 client doesn't have any weapons in her hand, nor is she

16 engaging in any assaultive behavior that you can see;

17 correct?

18 A.  That's correct.

19         MS. SMOLAR:  Objection, Your Honor.  I don't think

20 you can even see her hand in this picture.

21         THE COURT:  Overruled.

22 BY MR. ENGLE:

23 Q.  Agent Fontanez, you indicated that obviously we've seen

24 other imagery, both video and still photo depictions of what

25 appears to be my client holding a large pipe; correct?

C. Fontanez - Cross

1    A.  That's correct.

2    Q.  And that pipe was used to damage a window; is that

3    correct?

4    A.  Yes, to break a window, breach the window.

5    Q.  All right.  You did not see my client use that pipe to

6    strike any individual; correct?

7    A.  From the videos available, no.

8    Q.  So the pipe was used to damage property, not a person.

9    Would you agree with me?

10   A.  Not necessarily damage property, but rather breach a

11   window to gain access into the building.

12   Q.  Well, in order to do that, you would agree that the

13   property was damaged; is that right?

14   A.  The property was damaged, that's correct.

15   Q.  Right.  So you have a pipe being used to break a window;

16   correct?

17   A.  Yes.

18   Q.  All right.  Now, you indicated that in some of the

19   images, the entry point to the right of where that window

20   was located was an area where there were individuals who

21   were engaged in some acts of violence; is that correct?

22   A.  That's correct.

23   Q.  To your knowledge, and based upon the evidence that

24   you've recovered, any indication that there were any acts of

25   violence of people that were behind the window that was

C. Fontanez - Cross

1  breached when people went in?

2  A.  I don't know at this point.

3  Q.  We looked at a video of what was transpiring when you

4  had pictures of my client with a bullhorn in her hand.  Do

5  you remember that video?

6  A.  Yes, sir.

7  Q.  My client wasn't telling anyone to go assault or harm

8  people; is that correct?

9  A.  She was providing details of the layout of the

10  U.S. Capitol and encouraging them to coordinate so that they

11  could take over the building.

12  Q.  Again, Agent Fontanez, my question was, did you hear

13  Ms. Powell at that stage telling anyone to go engage in acts

14  of violence or to harm another human being?

15  A.  That specifically, no.

16  Q.  At any point in time, do you have any piece of video or

17  audio that establishes that my client was saying that she or

18  others should go physically assault or otherwise harm

19  another person?

20  A.  No, sir.

21  Q.  Right.  So you don't have any of that evidence.  Okay.

22  Now, you indicate in your Affidavit of Probable Cause that

23  you retrieved cell tower information as part of your

24  investigation that indicated that my client's cell phone hit

25  off of towers in the Washington, D.C. area on the 6th.  Is

C. Fontanez - Cross

 1 | that correct?

 2 | A.  That's correct.

 3 | Q.  Any evidence that her cell phone pinged off of towers in

 4 | the Washington, D.C. area on the 5th of January 2021?

 5 | A.  That analysis has not been completed at this point.

 6 | However, we do know that on the 6th, that device was in D.C.

 7 | Q.  So in other words, you don't have any evidence that my

 8 | client was in Washington on the 5th?

 9 | A.  Again, based on my affidavit, I'm focused on the 6th,

10 | the date of the insurrection that your client was in

11 | Washington, D.C.

12 | Q.  I'll ask it again.  Do you have any cell tower

13 | information at this stage of your investigation to indicate

14 | my client was in Washington on January 5?

15 |          MS. SMOLAR:  Objection.  It has been asked and

16 | answered.

17 |          THE COURT:  Can you answer, Agent?

18 |          THE WITNESS:  At this point, I do not have that.

19 | However, the analysis is not complete.  We do have the data

20 | for those dates.  It's a matter of completing the analysis.

21 | BY MR. ENGLE:

22 | Q.  Agent Fontanez, have you interviewed any witness that

23 | has indicated that they gave my client a tour of the Capitol

24 | so that she would have any advanced knowledge of the layout

25 | of the Capitol?

C. Fontanez - Cross

```
 1  A.  No, sir.
 2  Q.  Do you know whether or not my client has ever visited
 3  the U.S. Capitol before in her lifetime?
 4  A.  From my understanding, she has not.
 5  Q.  Okay.  And what is that understanding based on?
 6  A.  We ran her name, provided her name to U.S. Capitol
 7  police to do an initial search to see if there were any
 8  records associated with her name.
 9  Q.  Understood.  Thank you, Agent.  If we could take a look
10  at Exhibit 8, please.  Agent Fontanez, here, again, we see a
11  number of people that appear to be manipulating this pole
12  that is striking the window.  Is that fair?
13  A.  That's fair.
14  Q.  Does it appear that there's an individual wearing a
15  helmet to the immediate left of a person that looks like
16  they have a purple and white baseball cap on?
17  A.  A helmet?
18  Q.  Yeah.  It looks like a black helmet with white writing
19  on the back of it.
20  A.  Yes, sir.
21  Q.  Do you see that?
22  A.  Yes.
23  Q.  And in the video that we saw, did you see that
24  individual, as well?
25  A.  From this particular video?
```

C. Fontanez - Cross

1  Q.  Yeah.  The video that exists in connection with this

2  photo, did you take a look at that individual with the

3  helmet on?

4  A.  That's one of the many individuals that are in there.

5  However, I have not focused any attention on this particular

6  individual.

7          MR. ENGLE:  May we please play the video.

8          MS. SMOLAR:  Sure.

9          MR. ENGLE:  Stop it right there.

10          THE COURT:  Can you pause it?

11  BY MR. ENGLE:

12  Q.  All right.  Well, Agent Fontanez, in looking at that,

13  did you see "U.S. Capitol Police" written on the back of

14  that helmet?

15  A.  Yes, sir.

16  Q.  Did you identify that U.S. Capitol police officer from

17  this video?

18  A.  Negative.  That doesn't appear to be a U.S. Capitol

19  police officer, and I can tell that because U.S. Capitol

20  police are observed to the left inside the entry point

21  protecting the U.S. Capitol while people are assaulting

22  them.

23  Q.  Do you know for a fact whether or not the individual in

24  the helmet is or is not a U.S. Capitol police officer?

25  A.  Again, based on my analysis and view of the video, that

C. Fontanez - Cross

 1   helmet appears to be taken from a U.S. Capitol police

 2   officer.  U.S. Capitol police were protecting that

 3   particular entryway, which you can see in the video, while

 4   they were being brutally assaulted.  So it would be very

 5   unlikely for a U.S. Capitol police officer to be by himself

 6   outside of the safety zone.

 7   Q.  What about the individual that's to the left of the

 8   individual in the pink hat, do you know whether or not

 9   that's a lawful officer?

10   A.  Negative, sir.  Again, like I mentioned, law enforcement

11   were protecting the U.S. Capitol.  You can see that in the

12   video very clearly.  The people that are outside, there's no

13   way these individuals could be U.S. Capitol police.  It

14   would make no sense, no logical sense.

15   Q.  So all the video that I've seen on the news of the

16   Capitol police officers who are outside during aspects of

17   what occurred on the 6th, are you suggesting that didn't

18   happen, Agent Fontanez?

19   A.  There were officers outside holding the line; but at

20   this point in the video, that line was taken over.  I mean,

21   it's very clear on the video, they were no longer outside.

22   Q.  Okay.  And when this access point is breached by that

23   pipe, again, no individual reports being injured or

24   otherwise assaulted as a result of those actions; is that

25   correct?

C. Fontanez - Cross

 1  A.  As of today, no.

 2  Q.  Okay.  And that pipe -- you testified that you saw

 3  images and video of my client inside the Capitol after this

 4  occurs.  She and/or others, to your knowledge, did not bring

 5  that pipe or pole, whatever you want to call it, into the

 6  Capitol Building?

 7  A.  Based on the video I've reviewed, so far, I have not

 8  seen that pipe inside the building.

 9          MR. ENGLE:  Okay.  Can we go to Exhibit 11,

10  please.  Could we play that video.

11      (Played video.)

12  BY MR. ENGLE:

13  Q.  Agent Fontanez, did you hear some individual on that

14  video saying, "Fight for Trump"?

15  A.  Yes, sir.

16  Q.  Did you identify anything that my client was saying on

17  that video?

18  A.  No.

19          MR. ENGLE:  Okay.  Could we go to Exhibit 12,

20  please.

21  BY MR. ENGLE:

22  Q.  Now, Agent Fontanez, this is a BOLO that was put out; is

23  that correct?

24  A.  That's correct.

25  Q.  All right.  And basically, that BOLO on the Web site,

C. Fontanez - Cross

1   when I previously looked at it, it indicated that the

2   pictures and the individuals depicted in it were persons of

3   interest in the FBI's investigation into the events of

4   January 6 at the Capitol.  Is that correct, sir?

5   A.  That's correct.

6   Q.  As of the date January 16 that you indicated that this

7   information was posted on the FBI's Web site and other

8   places, there was no arrest warrant or charges filed against

9   Rachel Powell at that time; correct?

10  A.  That's correct.

11  Q.  Okay.  You were asked whether or not you heard from

12  Ms. Powell between the time that that went up on the Web

13  site, January 16, to the date, February 4, when she

14  surrendered herself to Agent Jordan in New Castle,

15  Pennsylvania.  Do you remember that?

16  A.  Yes, sir.

17  Q.  Did anyone in law enforcement contact Ms. Powell to say

18  that there were charges that had been filed against her and

19  she needed to turn herself in prior to February 4, 2021?

20  A.  No.

21          MS. SMOLAR:  Objection.  There were no charges

22  until February 4, Your Honor.  It's misleading.

23  BY MR. ENGLE:

24  Q.  Agent Fontanez, it would have been impossible for my

25  client to know that there were charges that she needed to

C. Fontanez - Cross

1  surrender herself on prior to February 4, 2021, because

2  there were no charges against her prior to February 4, 2021;

3  correct?

4  A.  That's correct.  However, we had a BOLO seeking

5  information on this particular individual.  She could also

6  call the FBI and pretty much identify what happened that day

7  from her viewpoint.

8  Q.  You would agree that as a citizen of the United States

9  of America, she has a Fifth Amendment right not to do that

10 and doesn't have any obligation to contact you because of a

11 BOLO; correct?

12 A.  That's correct.

13 Q.  What she did have an obligation to do is surrender

14 herself when charges were filed against her; right?

15 A.  Yes, sir.

16 Q.  Charges were filed on February 4, 2021; correct?

17 A.  I believe -- so the 4th was the search warrant.  If I'm

18 not mistaken, the 3rd, that's when the warrant was actually

19 sworn up.

20 Q.  Do you know when the first time was that the government

21 informed me, as Ms. Powell's counsel, that there was a

22 warrant for her arrest?

23 A.  So it would be February 4 at 7:00 in the morning when

24 the AUSA contacted you.  The warrant we got February 3 in

25 the afternoon, if I'm not mistaken.

C. Fontanez - Cross

1  Q.  Okay.  And, obviously, you don't know when it was, at
2  what time of day I was able to first reach my client by
3  phone; correct?
4  A.  That's correct.
5  Q.  And you're aware that I represented to the government
6  that Ms. Powell was in the Harrisburg area, that's what she
7  had indicated to me; correct?
8  A.  Yes, sir.  I --
9          MS. SMOLAR:  Objection, Your Honor.
10          THE COURT:  Hold on a minute.  What's the
11  objection?
12          MS. SMOLAR:  I'll withdraw it.  I'll let him
13  answer.
14          THE COURT:  Okay.
15  BY MR. ENGLE:
16  Q.  Agent Fontanez, are you aware that I represented to the
17  government that my client was in or about the area of
18  Harrisburg, Pennsylvania?
19  A.  Yes, sir.  From my understanding, it was around
20  lunchtime, noon that day, that information made it to us.
21  Q.  And we see that in the government exhibit, which is the
22  receipt that shows, in fact, that my client was just outside
23  of the Harrisburg area, slightly west and slightly north of
24  Harrisburg, at the Sheetz purchasing food at 12:37 p.m. that
25  day; is that right?

C. Fontanez - Cross

1   A.  That's correct.

2   Q.  And you're aware that FBI Agent Jordan of the New Castle

3   FBI office in Western Pennsylvania gave me the instruction

4   to pass along to Ms. Powell that she was to drive to his

5   office and surrender herself; is that correct?

6   A.  I don't know specifically what your conversation was

7   with Agent Jordan.

8   Q.  Were you aware that my client was given instructions to

9   go to the New Castle FBI office?

10  A.  I was informed later that day that she was driving over

11  to the FBI in New Castle.  She was already on the road.

12  Q.  She was already on the road.  Understood.  If I told you

13  that those, in fact, were the discussions I had with

14  Agent Jordan, do you have any indication or evidence to

15  establish otherwise?

16  A.  No, sir.

17  Q.  Okay.  And, in fact, my client did turn herself in to

18  Agent Jordan at that office on the 4th?

19  A.  That's correct.  She was arrested that evening at that

20  location.

21  Q.  Same day that we learn for the first time there were

22  charges against her; right?

23  A.  That's correct.

24  Q.  Okay.  Obviously, my client had a vehicle because she

25  drove from Harrisburg area back to New Castle, Pennsylvania.

C. Fontanez - Cross

1  Fair to say?

2  A.  Yes, sir.

3  Q.  Same vehicle that you ultimately searched with a search

4  warrant later?

5  A.  That's correct.

6  Q.  All right.  And you indicated that in one of -- I think

7  it's Exhibit 20, that there was a bag with various items in

8  that vehicle.  Is that right?

9  A.  That's correct.

10         MR. ENGLE:  Okay.  Can we go to 20 just briefly.

11  BY MR. ENGLE:

12  Q.  Agent Fontanez, do you have any idea how long that bag

13  was in the vehicle that you searched prior to the time that

14  you actually seized it or that other agents seized it?

15  A.  No, sir.  The bag was found in the vehicle.  We don't

16  know if it was in there a week or a few days.

17  Q.  Okay.  And do you see in the bottom of that picture,

18  there appears to be a yellow box that depicts gopher traps?

19  A.  Yes, sir.

20  Q.  And there appears to be a box on the right-hand side,

21  middle that appears to be a plastic box that you could put

22  items in?

23  A.  Yes, sir.

24  Q.  And it appears to be a blue tarp?

25  A.  Yes.

C. Fontanez - Cross

1  Q.  And what looks like to be a green bottle that you could
2  fill potentially with water or some other type of liquid?
3  A.  That's correct.
4  Q.  Okay.  And you said that there were two magazines and
5  some ammunition for what appeared to be an AK-47; is that
6  right?
7  A.  That's correct.
8  Q.  Are you aware that there's a lawfully owned and
9  registered AK-47 in my client's name that she purchased?
10 A.  No, sir, not at this point.
11 Q.  Okay.  Were you aware that she has a lawfully owned and
12 purchased Glock 9-millimeter handgun?
13 A.  No, sir.  I believe you mentioned this earlier, though.
14 Q.  Okay.  And if you look at the last exhibit that we have,
15 Exhibit 21, I believe it is, those would be magazines for a
16 9-millimeter Glock G43X handgun; correct?
17 A.  That's correct.
18 Q.  All right.  And that would be consistent with the
19 pictures that we saw with Ms. Powell at the shooting range,
20 a Glock handgun?
21 A.  It's consistent, yes, sir.
22 Q.  All right.  Are you aware of the fact that it was
23 reported that my client provided those firearms to a friend
24 of hers so that there would be no firearms in her home
25 should she be released on conditions of release by this

C. Fontanez - Cross

 1  court?

 2  A.  That information was never provided to us.

 3  Q.  Okay.  Now, if we could take a look at Exhibit 15,

 4  please.  Agent Fontanez, you described this bag and its

 5  contents as a bug-out bag or a go-bag or something of that

 6  nature; is that right?

 7  A.  That's correct.

 8  Q.  This was not in my client's vehicle at the time it was

 9  searched?

10  A.  That's correct.  That was seized at the residence.

11  Q.  Okay.  And you're aware of the fact that Ms. Powell has

12  eight children; correct?

13  A.  That's correct.

14  Q.  And an adult son who is 21 years old that used to reside

15  there that now resides in the area of where she lives?

16  A.  I don't know the details about her older son, but I do

17  know she has eight kids.

18  Q.  Are you aware that she also has a 15-year-old son?

19  A.  Again, I don't recall the specific ages of all the

20  children, but I know there are eight.

21  Q.  And this bag that's depicted there, there's no

22  indication that my client had that with her on her drive

23  from Harrisburg or on January 6 at the Capitol?

24  A.  That's correct.

25          MR. ENGLE:  Okay.  Can we go to Exhibit 16.

C. Fontanez - Cross

 1  BY MR. ENGLE:
 2  Q.  The bag that you see depicted here, Agent Fontanez,
 3  again, that was found inside the residence; correct?
 4  A.  That's correct.
 5  Q.  That was not in my client's car?
 6  A.  Correct.
 7  Q.  No indication that she had that with her on her way from
 8  the Harrisburg area back to Western Pennsylvania?
 9  A.  No.  It was at the house.
10  Q.  And no indication from the videos and other still photos
11  that we've seen that she had that bag or any of its contents
12  at the Capitol on January 6?
13  A.  At this point, no.  However, we know from the videos
14  that she actually had a black backpack on January 6 at the
15  U.S. Capitol.
16  Q.  Right.  Would you agree with me, if you take a look at
17  Exhibit 16, and now we take a look at Exhibit 1 --
18          MS. SMOLAR:  Are you asking me to go to Exhibit 1?
19          MR. ENGLE:  Yes, if you could, Ms. Smolar.  Thank
20  you.  I apologize.
21          MS. SMOLAR:  That's fine.
22  BY MR. ENGLE:
23  Q.  Agent Fontanez, would you agree that that bag is much
24  larger than the one that we just saw in the previous
25  exhibit?

C. Fontanez - Cross

1  A.  So this particular picture, I can't really see the
2  backpack.  It's another photo.
3  Q.  But you can't say that they're the same bags; right?
4  A.  I can't say that.  The only thing I can say is that she
5  had a black backpack in D.C. on January 6.  Whether it's
6  that backpack or not, I can't say that at this point.
7  Q.  Okay.  Now, you indicated that when my client
8  surrendered herself to Agent Jordan at the New Castle FBI
9  office, she did not have her cell phone on her; correct?
10 A.  That's correct.
11 Q.  Did you have a search warrant for that phone at that
12 time?
13 A.  We had a search warrant for the vehicle and for the
14 home.  That included electronic devices.  However, we did
15 not have a specific search warrant for that specific device.
16 Q.  And are you aware of the fact that no one made any
17 specific demand or request that we provide that phone when
18 she surrendered herself?
19 A.  To my knowledge, that was not conveyed.  However,
20 usually when people are arrested, they have their
21 belongings, including their wallet or cell phone.
22 Q.  Unless they have an experienced attorney who advises
23 them that whatever they bring there with them is going to be
24 confiscated by the government?
25 A.  I can't say --

C. Fontanez - Redirect

```
 1              MS. SMOLAR:  Objection, Your Honor.

 2              THE COURT:  He already answered he couldn't speak

 3    to it, so I think we can move on.

 4              MR. ENGLE:  Understood.

 5    BY MR. ENGLE:

 6    Q.  Are you aware, Agent Fontanez, that my client did,

 7    however, bring her U.S. passport and provide that to the FBI

 8    at the time of her surrender?

 9    A.  Yes, sir.

10              MR. ENGLE:  Very well.  Your Honor, I have no

11    further questions at this time.  Thank you.

12              THE COURT:  Redirect, Ms. Smolar?

13              MS. SMOLAR:  Yes, Your Honor.  Briefly.

14                        REDIRECT EXAMINATION

15    BY MS. SMOLAR:

16    Q.  Agent Fontanez, is it your understanding that Counsel

17    Engle was advised that there was an arrest warrant for his

18    client at 7:00 a.m. on February 4?

19    A.  Yes, ma'am.

20    Q.  And is it your understanding that it took 11 and a half

21    hours for her to report to the FBI to be arrested?

22    A.  Yes, ma'am.

23    Q.  And at that time, she did not have a cell phone;

24    correct?

25    A.  That's correct.
```

C. Fontanez - Redirect

1   Q.  But during the ride, she did have her cell phone?

2   A.  For a portion of that day, she definitely had the phone.

3   It seems after almost 2:00, approximately, that phone

4   disappeared.

5   Q.  And during the course of that ride, that was the first

6   time she contacted her ex-husband who was taking care of the

7   eight children on February 4 since January 30; correct?

8   A.  That's correct.

9   Q.  So she dropped the kids off on January 30 without any

10  forwarding information for the person taking care of those

11  children; correct?

12  A.  That's correct.

13  Q.  Let's talk a little bit about the investigation.  There

14  are lots of cases that have developed as a result of this

15  insurrection and the violence that occurred on January 6 at

16  the Capitol; correct?

17  A.  Yes, ma'am.

18  Q.  And a number of cases have been brought, and you and

19  your colleagues are reviewing many images and videos

20  provided to the FBI; correct?

21  A.  That's correct.

22  Q.  Is your investigation with regard to Ms. Powell ongoing?

23  A.  Yes, ma'am.

24  Q.  And do you still have additional images and videos to

25  review for purposes of the ultimate charges in this case?

C. Fontanez - Redirect

```
 1   A.  That's correct.
 2   Q.  We do know, however, that she used a bullhorn to
 3   instruct individuals how to take the U.S. Capitol; correct?
 4   A.  Yes, ma'am.
 5   Q.  And her use of the bullhorn was loud; correct?
 6   A.  It was very loud.
 7   Q.  And she brought with her to the U.S. Capitol
 8   noise-canceling headphones; correct?
 9   A.  Yes, ma'am.
10   Q.  She also used the dangerous weapon of that large pipe
11   that we saw to breach the U.S. Capitol and gain access?
12   A.  That's correct.
13   Q.  And we also saw her climbing in the broken windows to
14   gain access to the U.S. Capitol?
15   A.  That's correct.
16   Q.  What's your understanding of the purpose of why somebody
17   like Rachel Powell was trying to breach the U.S. Capitol on
18   January 6?
19              MR. ENGLE:  Objection.  Calls for speculation.
20              THE COURT:  Sustained.
21   BY MS. SMOLAR:
22   Q.  Was congress in session at 2:00 on January 6?
23   A.  Yes, ma'am.
24   Q.  And what happened inside the U.S. Capitol at the time
25   that it was breached?
```

C. Fontanez - Redirect

```
 1              THE COURT:  I think we all know this.
 2              MS. SMOLAR:  Let me just ask this, Your Honor.
 3   BY MS. SMOLAR:
 4   Q.  Special Agent Fontanez, can you describe what you saw
 5   when you went to assist on January 6?
 6   A.  So I've never seen anything like it.  It was chaos.  It
 7   was a scary sight.  Something big was happening that day.
 8   Q.  Did you see people who were injured?
 9   A.  I didn't see specifically individuals injured, but I
10   could see the commotion, a lot of smoke.  We were trying to
11   just move around the Capitol to secure it.
12   Q.  And based on your investigation of the people who were
13   attempting to breach the Capitol, did you see any of them
14   wearing army uniforms or helmets or any other type of gear
15   of that kind?
16   A.  Yes, ma'am.  Many individuals were wearing tactical gear
17   that day.
18   Q.  And with regard to the wanted poster, when you issue a
19   poster like that, do people ever report themselves to the
20   FBI?
21   A.  In my experience, I've never seen it, but I guess it
22   depends.  We did get a lot of tips by use of these posters.
23   Q.  But that poster indicated that you were trying to
24   determine who the woman in the pink hat was; correct?
25   A.  Correct.
```

C. Fontanez - Recross

1  Q.  And subsequent to that wanted poster, Ms. Powell went to

2  the New Yorker magazine to indicate that that was her in the

3  pictures?

4  A.  That's correct.

5          MS. SMOLAR:  No further questions.

6          THE COURT:  Anything else, Mr. Engle?

7          MR. ENGLE:  Very briefly, Your Honor.

8                        RECROSS-EXAMINATION

9  BY MR. ENGLE:

10  Q.  Agent Fontanez, you would agree that my client wasn't

11  wearing an army uniform or tactical gear; correct?

12  A.  That's correct, she did not have tactical gear on.

13  Q.  No indication that she had pepper spray?

14  A.  At this point of the investigation, I don't have any

15  information suggesting she did.

16  Q.  Taser?

17  A.  Same answer.

18  Q.  Okay.  And you would agree with me that you have no idea

19  at what time on February 4, 2021 that I was first able to

20  speak to my client by phone to advise her of the existence

21  of the arrest warrant; correct?

22  A.  That's correct.

23  Q.  So you know that I knew at 7:00 a.m., but you don't know

24  what time I told my client about that; correct?

25  A.  That's correct.  I don't know if you called her at 8:00

C. Fontanez - Recross

 1 | or at 11:00.
 2 | Q.  And if I wasn't able to get in touch with her until
 3 | later than that and proximate to the time that she got on
 4 | the road to head to Western Pennsylvania per the
 5 | instructions, you don't have any knowledge of that either,
 6 | do you?
 7 | A.  That's correct.
 8 |         MR. ENGLE:  I have nothing further, Your Honor.
 9 |         THE COURT:  Ms. Smolar?
10 |         MS. SMOLAR:  No further witnesses, Your Honor.
11 |         THE COURT:  Thank you.  Mr. Engle, anything from
12 | the defendant as far as testimony or other evidence?
13 |         MR. ENGLE:  Your Honor, the only thing that I
14 | would ask to present based upon the presentation of the --
15 |         THE COURT:  Excuse me.  Just a minute.  I'm just
16 | looking at my screen.  Who is James Santelli, and why are we
17 | looking at a video of the television?  It's really annoying.
18 | Whoever that is, can you black that out?  I don't understand
19 | the point of that.  It looks like the impeachment trial,
20 | which is even furtherly objectionable to me.  Mr. Banas, as
21 | the host, can you block videos?  I'm not watching.  I don't
22 | want to have that on here.
23 |         THE DEPUTY CLERK:  Sorry, Judge.  I don't see the
24 | video that you're talking about.
25 |         THE COURT:  Am I the only one that's seeing it?

1          MS. SMOLAR:  I see it, Your Honor.

2          MR. ENGLE:  I see it.

3          THE DEPUTY CLERK:  Okay.  He was on another page.

4          THE COURT:  It says, "James Santelli."  I have no

5     idea who that is.  Thank you very much.  All right.  I'm

6     sorry, Mr. Engle.  Go ahead.

7          MR. ENGLE:  Your Honor, based upon the

8     government's admission of -- if I may just have a moment to

9     find the exhibit, Exhibit 17.  Exhibit 17 depicted some

10    targets that had some writing on it, Your Honor.  I simply

11    wanted to present -- obviously, I don't have the ability to

12    do it other than just to show it to you.

13         But the saying on the first target to the left that

14    was written there, that relates to a well-known quote on a

15    shirt from the movie, Happy Gilmore.  I was able to find it

16    online.  And what it indicates is, "Guns don't kill people.

17    I kill people."  And it says, "You can look just like

18    Mr. Larson as seen in the 1996 movie, Happy Gilmore."  So

19    the source of that quote or saying, I wanted to at least

20    present that to the Court.

21         MS. SMOLAR:  Your Honor, I have no reason to know

22    if that is correct or incorrect or if it matters.  So --

23         THE COURT:  Understood.  Anything else, Mr. Engle?

24         MR. ENGLE:  No, Your Honor.  Just argument.

25         THE COURT:  All right.  So, Ms. Smolar, just so

1  we're all on the same page here, it's my understanding that

2  the government is requesting detention on both danger and

3  risk of flight, and the defendant is charged with a crime of

4  violence; so I can consider danger to the community in my

5  rulings.  Correct?

6          MS. SMOLAR:  You are correct, Your Honor.  The

7  defendant is charged with specifically Title 18 United

8  States Code 1361, which is a crime of violence in that a

9  dangerous weapon was used and the value of the property

10  damage was over $1,000.

11          THE COURT:  All right.  Thank you for that

12  clarification.  The burden rests with the government, so you

13  may make argument.

14          MS. SMOLAR:  Thank you, Your Honor.  Simply put,

15  this defendant used a bullhorn and a battering ram and

16  instructed numerous rioters inside the U.S. Capitol on

17  January 6 to take the Capitol and to break the windows and

18  damage property to accomplish that.  In the process of

19  attempting to take the Capitol, at least 5 people died, over

20  100 people were injured, and untold damage was caused to the

21  Capitol Building.

22          We saw the images and videos of what happened that

23  day, the violence that was caused by people like

24  Rachel Powell and the damage that was caused inside.  You

25  saw the people listening to what she was telling them to do,

1  to break more windows, to go downstairs into a different

2  office area where she had previously been; and you see them

3  actually then walking into office space and damaging that

4  property and causing untold injuries.

5          Lawmakers on that day were forced to hide and flee

6  from their offices, and all of this was done to stop the

7  certification in the United States Congress of the valid,

8  true results of the election.

9          The defendant in this case's specific conduct

10 aggravated the chaos and the danger.  It was designed to

11 intimidate members of the congress and instigate fear across

12 the country.

13         This is not a mere property damage.  You have seen

14 other cases before the court where we are just talking about

15 unlawful entry, people walking inside.  Rachel Powell did

16 not do that.  She was a leader.  She instructed with a

17 bullhorn others to cause damage while inside.  She

18 physically took a battering ram to the windows of the

19 U.S. Capitol so that they could breach the Capitol and get

20 inside.  And once inside, we all know what happened.  People

21 were hurt.  People died.

22         She came armed to the U.S. Capitol with

23 sound-canceling earmuffs that she used in her own shooting

24 range practice, a bullhorn; and then she found a large pipe

25 and then breached those windows.

1      With regard to the danger and risk, I think it's

2 evident from the videos in this case, Your Honor, she took

3 specific action to cause damage and injury; and it's not

4 just to property.  By breaching the U.S. Capitol, people

5 were hurt and died.

6      The charges in this case are extraordinary, and we

7 are only at the complaint stage.  The defendant participated

8 in a violent riot that resulted and was designed to prevent

9 the congress from certifying the election.

10      She was not a mere onlooker.  She can be heard

11 telling insurrectionists to coordinate together if you are

12 going to take this building.  She used a battering ram.  She

13 prepared for loud noises such as gun fire by bringing those

14 noise-canceling earmuffs, and she used a bullhorn to direct

15 others.

16      The weight of this evidence is extraordinary, even

17 at this early stage in the case.  She is captured on video

18 and images committing all of the crimes.  Her sentencing

19 exposure is significant in this case, as well.  The charge

20 of 18 United States Code 1512 carries a maximum penalty of

21 20 years in jail.  So she has certainly an interest in

22 fleeing.

23      She admitted committing the majority of these

24 crimes to the New Yorker magazine.  Instead of going to the

25 FBI, she chose to give a two-hour interview to the

1  New Yorker indicating her involvement in these atrocities.

2  These are felony charges that have been brought against her,

3  not misdemeanors, as I said, containing a maximum penalty of

4  20 years in prison.

5          It's the government's position that she did attempt

6  to flee.  On January 30, she dropped her six children with

7  her ex-husband, told him she had business to attend to, and

8  left.  She did not tell him where she was going.  She did

9  not leave a forwarding number.  She did not contact him

10  again until February 4.  And when she did that, she used an

11  encrypted app to do so.  She destroyed cell phones in her

12  house that were found during the search of this case.

13          Likewise, on January 6, she went to the

14  U.S. Capitol, leaving these eight children at home alone and

15  did not return until she was done committing the violence at

16  the Capitol.

17          At this time, the children are safe and secured

18  with her ex-husband, and he is content to retain custody

19  indefinitely.  And it is my understanding also from hearing

20  Special Agent Fontanez's conversation with her ex-husband

21  that her custody lawyer withdrew because he was unable to

22  reach her since January 16.

23          It's really difficult to fathom a more serious

24  danger to the community, to the District of Columbia, to our

25  federal courts, to the federal buildings, to the country, or

1    to the fabric of American democracy than one posed by armed

2    insurrectionists, including the defendant, who joined in the

3    occupation of the United States Capitol on January 6.

4            Every single person who was present was present

5    without authority and contributed to the chaos that day and

6    the danger posed to law enforcement, the vice president, the

7    members of congress, and the peaceful transfer of power.

8    This defendant's specific conduct aggravated the chaos and

9    the danger and was designed to intimidate and cause fear.

10           The defendant took 11 hours to go to law

11   enforcement on February 4 after learning that she -- that

12   there was an arrest warrant for her.  She had every

13   opportunity somewhere along the way, in Harrisburg,

14   Pennsylvania or somewhere along the way to stop at law

15   enforcement; and she did not do that.  When she arrived, she

16   did not have her cell phone with her despite knowing there

17   was an arrest warrant for her.

18           And finally, Your Honor, the defendant has been

19   charged with a crime of violence in this case and a very

20   serious crime of violence.  And detention is appropriate

21   based on her conduct that we saw in the images and videos on

22   that day.

23           THE COURT:  Thank you, Ms. Smolar.  Mr. Engle.

24           MR. ENGLE:  Thank you, Your Honor.  Your Honor, my

25   client is a 40-year-old single mother who is responsible for

the homeschooling and raising of five individuals, her
children, that are ranging in ages from 4 to 17.

      She also has additional older children who are
adults, some of whom live outside the home now.  She has
long-standing ties to her community.  She certainly has not
indicated that she is willing to try to flee and never see
her children again.

      More importantly, Your Honor, we also know that she
simply does not have the financial means or wherewithal to
do that.  The Pretrial Services report makes clear that my
client does not have the type of money or resources that
would even allow her to flee.

      More importantly, Your Honor, my client chose to
engage counsel in order to find out whether there were
charges against her.  I endeavored to do that by contacting
the U.S. Attorney's office in the District of Columbia on
February 3.  I then heard back from them at 7:00 a.m. on
February 4.  That was the first time I was made aware of any
charges.

      I was able to eventually reach my client by phone
later that day.  And as soon as I advised her of the
charges, she asked whether she should go to Harrisburg or go
home.  I had communications with the agent holding the
arrest warrant for her in New Castle, Pennsylvania.  Upon
his instructions to me, I instructed Ms. Powell to drive to

Western Pennsylvania to surrender herself to Agent Jordan.
And that's exactly what she did.

So it didn't take 11 and a half hours. That's not
how long she knew there were charges. She also didn't know
at any time prior to this that there was an arrest warrant
for her. And rarely do I see individuals who are interested
in fleeing the jurisdiction and going on the run who bother
to engage counsel, ask them to contact the government to
determine if there are charges, and then the same day they
learn of those charges, they surrender themselves peacefully
to law enforcement. That's what happened here, Your Honor.
Those are the circumstances.

That is inconsistent with an individual who would
be a flight risk. It's inconceivable that she would want to
flee for some extended period of time. It also doesn't make
sense that Ms. Powell would even think about fleeing when
she gave an interview to the New Yorker. The government
makes a big deal about the fact that she talked to the
New Yorker. Well, she identified herself as the individual
in the photos. She made it known. You don't do that if
you're thinking about going off the grid or trying to
secrete yourself from law enforcement.

All of Ms. Powell's activities have suggested that
she wants to confront the charges head-on and that she is
not a flight risk. Moreover, we're talking about a person

1  who has never been convicted of a criminal offense before.

2  She's not an individual who is a danger to the community.

3  She is not an individual who poses a threat to the

4  community.

5          She is an individual who, yes, while charged -- and

6  I'm not diminishing the seriousness of any of the charges in

7  the case, Your Honor, but there are crimes of violence and

8  crimes against persons that establish danger.  This was not

9  a crime against persons.  This was not an assault on

10  persons.

11          What happened here is damage to property, to the

12  destruction of the congressional process, to trespass on the

13  Capitol grounds.  There's no evidence, none, that has been

14  presented to this Court by way of the affidavit or

15  Agent Fontanez's testimony that my client engaged in an act

16  of violence towards another person on January 6 of 2021 or

17  at any other point in her life.

18          There's no indication she was armed with any form

19  of weapon.  And, yes, I understand that she and others

20  appear to be depicted with this pole or whatever that device

21  is that was very long that was seen smashing a window.  But

22  no one was wielding that device against any individual.

23          She didn't assault any officers.  She didn't spray

24  anyone with pepper spray.  There's no indication that she

25  had a taser or zip ties to try to take people into custody.

1    At no time on any of the videos is she seen or heard

2    suggesting that people should engage in violence towards an

3    individual within the Capitol, unlike other people that

4    we've seen who were making statements like, "We need to find

5    Nancy Pelosi and shoot her in the brain.  We need to find

6    Mike Pence and hang him."  There were people there with that

7    type of intent that day and who made such statements.  There

8    were people who were there that day that posted on social

9    media that they were proud that they had assaulted people

10   while at the Capitol grounds or inside the Capitol.

11          No such evidence exists with respect to Ms. Powell.

12   No such statements have been made by Ms. Powell.  And the

13   idea that she is some kind of ring leader or that

14   orchestrated all of this, what we know is she brought

15   earmuffs because it was bound to be a loud environment.

16   There were a lot of people going there that day.

17          I didn't hear any testimony that she brought a

18   bullhorn.  Agent Fontanez never testified that there was

19   evidence that she had brought the bullhorn to the scene.

20   There's no evidence that she brought that pole or rod,

21   whatever it was, to the Capitol.

22           This is not -- there's no evidence to establish

23   that my client is a leader of some organization, and the

24   government points to her statements in the New Yorker

25   article in one sense to say, well, they demonstrate that

1    she's a danger and a risk of flight and should be detained.

2    But at the same time, they ignore the things that she said,

3    which contradict their position with respect to detention,

4    where she said, "I'm not part of some organization.  I

5    wasn't there leading people.  This was not something that we

6    planned before I got there." In fact, she says she only

7    traveled to the Capitol with one other individual in that

8    article, not that she was part of some masked group or

9    conspiracy.

10          Moreover, for the government to suggest that

11   Rachel Powell is personally responsible for the injuries and

12   assaults on law enforcement and, unfortunately, the death of

13   a law enforcement officer is inappropriate because they

14   haven't charged her with any of that, Your Honor.  She's not

15   charged as a co-conspirator with other people in assaulting

16   anyone, let alone killing someone.

17          But they want to extend this beyond she broke a

18   window and she crawled inside the Capitol and she was

19   yelling out instructions about where you should go or what

20   you should do.  That's a far cry from assaulting another

21   human being.

22          She was not encouraging people to engage in that

23   type of behavior.  She was not saying that she wanted to

24   engage in that type of behavior.  And there's no evidence

25   that she was armed with any device in order to accomplish

1    any of those tasks.

2         I'm not suggesting that what happened at the

3    Capitol was right or proper.  I think we're all shocked and

4    appalled by what occurred there that day.  But respectfully,

5    Your Honor, a person with no history of violence, who even

6    though there's evidence that she had lawfully owned weapons,

7    she will no longer have access to those weapons, they would

8    have to be -- first of all, they're not in her custody

9    anymore, as reported in the Pretrial Services Report; but

10   they can easily be turned over to law enforcement for

11   safekeeping.

12        This is a situation where my client needs to get

13   back to her children.  They need her to get back to

14   homeschooling them.  She's in a prison with COVID

15   conditions, where she is susceptible to, you know, becoming

16   infected with COVID-19.  You know, these prison areas are

17   Petri dishes, exposing people to a very deadly and dangerous

18   virus.

19        So I respectfully submit to the Court the

20   government has not met their burden by clear and convincing

21   evidence or preponderance of the evidence, depending upon

22   whether we're talking about flight or risk of danger to the

23   community.

24        This is not a presumption case, Your Honor.  And I

25   respectfully submit that as Pretrial Services points out,

 1   there are conditions that can ensure that Ms. Powell will

 2   attend every court appearance, that she will not flee the

 3   jurisdiction, and that she will not pose any danger to the

 4   community.

 5          They've made their recommendations for an OR bond

 6   and other conditions.  Obviously, if the Court saw fit to

 7   impose home detention with electronic monitoring so that we

 8   would know where she is or any condition that would make the

 9   Court feel comfortable, I respectfully submit there are

10   conditions that can be fashioned that protect the interests

11   of the community and the safety of the community and will

12   ensure that Ms. Powell will be present for every one of her

13   court appearances.  Thank you, Your Honor.

14          THE COURT:  Thank you.  This matter comes before

15   the Court on the request of the government to detain the

16   defendant, Rachel Powell, pending the trial of this case.

17   In considering that request, I am guided by several general

18   principles:  First, at all times, the defendant is entitled

19   to the presumption of innocence, and nothing that takes

20   place during this hearing or that I set forth in my findings

21   is intended or should be construed to affect that

22   presumption.  The purpose of this hearing is to determine

23   whether, notwithstanding that presumption of innocence, the

24   defendant should be detained pending trial.

25          Second, under the Bail Reform Act, pretrial

```
 1   detention is an exceptional step; and under the act, a
 2   defendant must be released unless a judicial officer finds
 3   that no conditions or combination of conditions exist which
 4   will reasonably assure the safety of the community or
 5   reasonably assure the appearance of the defendant.
 6           In this case, the defendant has been charged with a
 7   crime of violence, and that entitles the government to a
 8   hearing on detention, as does risk of flight.  However, the
 9   burden rests with the government to establish that the
10   defendant should be detained and there are no conditions
11   which can be imposed which would either assure her
12   appearance or reasonably assure the community that she would
13   not be a danger.
14           So in order for me to make that decision, I must
15   look to the Bail Reform Act as required by congress.  There
16   are four specific factors that I am instructed to review.
17   The first is the nature and circumstance of the alleged
18   offense.
19           The crimes which Ms. Powell has been charged with
20   constitute crimes against our democracy.  They put our
21   elected officials in fear of their lives and led to five
22   deaths.  Certainly, the charge is very serious.
23           One of the charges that she is -- one of the crimes
24   that she is charged with is a crime of violence, but I will
25   note that there is no allegation that Ms. Powell assaulted
```

1    any officers in her efforts to breach the Capitol Building.

2         The second factor is the weight of the evidence

3    against the defendant.  The evidence is strong.  I don't

4    think anyone can contest that.  Along with another person,

5    she used a large pipe to ram a window to gain entrance into

6    the Capitol and allow others to do so.

7         She used a bullhorn to motivate people to breach

8    the Capitol, provided details regarding the layout of the

9    Capitol to those inside, and how to gain further access.

10   And, indeed, the video of this was very disturbing.  She

11   also apparently admitted her involvement to the New Yorker,

12   so I would say the weight of the evidence is exceedingly

13   strong.

14        The next factor is the history and characteristics

15   of the defendant.  Ms. Powell has been in the Western

16   District of Pennsylvania since, I think, she was 15 years of

17   age.  She has absolutely no criminal record.  She has some

18   employment.  Although, given that she has eight children, I

19   would not expect a significant employment history.  She does

20   have eight children, I think five of whom are still under

21   age, at least several age 4 to 17.

22        She has no history of drug or alcohol abuse.  She

23   does have some gun ownership; but, again, no information has

24   been presented to me that the possession of those guns was

25   illegal.  And I would finally note that Pretrial has

1    recommended that she be released.

2            So that leads me to the last prong, which is the

3    nature and seriousness of the danger to others or the

4    community.  And I also want to talk about risk of flight.

5    It has been argued by the government that there was this

6    BOLO, which was not, in fact, a wanted poster, however.  It

7    was a poster requesting information.  And I think as

8    Mr. Engle argued, the constitution provides every citizen

9    with a Fifth Amendment right.  So there was no obligation

10   for the defendant to cooperate with the FBI.

11           Testimony was that the warrant for her arrest was

12   issued on February 4 and there were no charges prior to that

13   time.  The testimony further was that, albeit much, much

14   later in the day, the defendant did turn herself into the

15   FBI after consulting with counsel.

16           Admittedly, she was somewhere in the Harrisburg

17   area.  We don't know.  No one knows where she was, how long

18   she was there.  I know that the government is making an

19   argument as to risk of flight.  But I think that given that

20   Ms. Powell turned herself in and she has eight children

21   living in this area, reasonable conditions can be imposed

22   that would assure her appearance at any future court

23   proceedings.  And, frankly, I don't find that her actions on

24   February 4 or in the days immediately preceding are enough

25   for me to make a finding that she is a risk of flight.

            Danger to the community:  So, certainly,
Ms. Powell, you are an active actor in this Capitol
invasion.  You actively rammed a window to break in.  You
guided people into the Capitol with a bullhorn.  Personally,
I'm appalled and disgusted by what happened on January 6 and
by what I saw in the videos that the government presented
here today.

            However, that is not why we are here today.  We are
not here to punish you for your actions.  That is for
another judge on another day.  The purpose of today's
hearing is to determine if there are conditions -- well,
first to determine if you are a danger to the community.
And I do think that based upon what I saw here, vis-a-vis,
the evidence, that you are a danger to the community.  But
that doesn't resolve the questioning for what I am supposed
to do.

            I am supposed to determine, pursuant to the Bail
Reform Act, whether there are conditions that will
reasonably assure the safety of persons in the community.
There was circumstantial evidence of all kinds presented
here today; bags in your home that were called "go-bags."  I
have no idea to whom those bags belong or what they're for.
Guns and ammunition, again, which are legal for you to own
at this point.  No guns in your possession either at the
Capitol or when you turned yourself in that we know of.  A

1 bag, again, in your vehicle, but that bag could have been

2 there for months.  I don't know why that bag was there.

3        So given all of those things, I think conditions

4 can be imposed that would reasonably assure the safety of

5 the community, as well as your appearance, even though I

6 didn't specifically find that you're a risk of flight.

7        So I am going to release you on the following

8 conditions:  $10,000 unsecured bond.  That means you don't

9 have to post bond in order to be released today, but you are

10 binding yourself to the United States in that amount should

11 you fail to appear for any future court proceedings.

12        You are not to violate any federal, state, or local

13 laws while you are on release.  You will be supervised by

14 Pretrial Services.  You will surrender any passport to

15 Pretrial Services.  You are not to obtain any other passport

16 or international travel document.  Your travel is restricted

17 to the Western District of Pennsylvania, and you may go to

18 the District of Columbia; but that is for court purposes

19 only.

20        You are not to possess a firearm or any other

21 destructive weapons.  I'm not comfortable with your friend

22 having your firearm, and I want to make some kind of other

23 arrangements for the firearms to be turned over to maybe

24 local police.  And I'm hoping that between Pretrial and

25 counsel, some arrangements can be made of that nature.

1    You are not to use or unlawfully possess any

2  narcotics.  And I am going to place you on home detention

3  with electronic monitoring.  So that means you're restricted

4  to your residence, but you will be allowed to leave for

5  certain things that are precleared by Pretrial Services such

6  as employment, meeting with your lawyers, church, anything

7  that is approved in advance by Pretrial Services.  You are

8  to report to Pretrial any contact you may have with law

9  enforcement and report to Pretrial any change in your

10  address or your telephone.

11    I want to impress upon you that it's very serious

12  that you not violate any of these conditions, because if you

13  do, I guarantee you that the government will be back and

14  will be requesting that you be detained until trial.  And at

15  that point, the standard will be much different.  Are you

16  willing to abide by these conditions?

17    THE DEFENDANT:  Yes.

18    THE COURT:  Mr. Banas, if you would administer the

19  oath to Ms. Powell, please.

20    THE DEPUTY CLERK:  Ms. Powell, would you please

21  raise your right hand.

22    (The defendant was sworn.)

23    THE DEPUTY CLERK:  Thank you.

24    THE COURT:  Ms. Powell, may I sign your name

25  indicating that you were advised of the conditions of the

1  release?

2          THE DEFENDANT:  Yes.

3          THE COURT:  All right.  Anything else from the

4  government?

5          MS. SMOLAR:  Yes, Your Honor.  The government

6  would request a stay pending appeal of this decision.

7          THE COURT:  I will stay my decision until

8  5:00 p.m. tomorrow.  Anything else from defendant?

9          MR. ENGLE:  Your Honor, only that the passport is

10  currently in the possession of the FBI.  So I would just

11  make note of that, that my client does not have it.  And I

12  can try to help make arrangements to get that from the FBI

13  to Pretrial, but Pretrial certainly can contact them.

14          MS. SMOLAR:  We'll take care of it.

15          THE COURT:  As long as it's not in her possession,

16  that's fine.

17          MR. ENGLE:  Thank you, Your Honor.

18          THE COURT:  All right.  Thank you, everyone.

19  Court is adjourned.

20      (Court was adjourned.)

21

22

23

24

25

```
 1                          I N D E X

 2    WITNESS              DIRECT   CROSS   REDIRECT   RECROSS

 3    For the Government:

 4    Carlos Fontanez         4       31       54         58

 5

 6

 7

 8                      C E R T I F I C A T E

 9         I, Amanda M. Williamson, certify that the foregoing

10    is a correct transcript from the record of proceedings in

11    the above-titled matter.

12    S/Amanda M. Williamson   _____

13

14

15

16

17

18

19

20

21

22

23

24

25
```