UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 1:21-cr-00179-RCL |
| | : | |
| RACHEL POWELL, | : | |
| | : | |
| Defendant. | : | |

**MOTION IN LIMINE REGARDING
<u>AUTHENTICATION OF VIDEO EVIDENCE</u>**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits the following motion *in limine* regarding the authentication of video evidence at trial.

**BACKGROUND**

The riot at, and attack on, the United States Capitol Building was an event of unparalleled size and scope. Much of the event was recorded on video: on surveillance footage captured by the U.S. Capitol Police ("USCP") cameras; on Metropolitan Police Department ("MPD") body-worn cameras; on cameras carried by journalists; and on cameras, and phones, held by members of the mob, including the defendant, Rachel Powell. The government's case at trial will rely heavily on such evidence to explain the defendant's specific conduct, to contextualize through other contemporaneous events, and to give the jury a sense of the riot as a whole. This memorandum outlines the types of exhibits the government plans to use and seeks a pretrial ruling on their authenticity.

Under Federal Rule of Evidence 901(a), "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a

finding that the item is what the proponent claims it is." Rule 901(b) provides a non-exhaustive list of examples of evidence that satisfies this requirement. As relevant here, those examples include:

> (1) *Testimony of a Witness with Knowledge*. Testimony that an item is what it is claimed to be.
> . . .
> (3) *Comparison by an Expert Witness or the Trier of Fact*. A comparison with an authenticated specimen by an expert witness or the trier of fact.
> (4) *Distinctive Characteristics and the Like*. The appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances.
> . . .
> (9) *Evidence About a Process or System*. Evidence describing a process or system and showing that it produces an accurate result.

Fed. R. Evid. 901(b)(1), (3), (4), (9).

As a general matter, establishing an item's authenticity is not "a particularly high hurdle." *United States v. Ortiz*, 966 F.2d 707, 716 (1st Cir. 1992). *See also United States v. Vidacak*, 553 F.3d 344, 349 (4th Cir. 2009) ("The burden to authenticate under Rule 901 is not high"); *Link v. Mercedes-Benz of N. Am., Inc.*, 788 F.2d 918, 927 (3d Cir. 1986) ("The burden of proof for authentication is slight."); *United States v. Hassanshahi*, 195 F. Supp. 3d 35, 48 (D.D.C. 2016) ("The threshold for the Court's determination of authenticity is not high, . . . and the proponent's burden of proof for authentication is slight[.]") (citation and quotation marks omitted). Rule 901 "requires only a prima facie showing of genuineness and leaves it to the jury to decide the true authenticity and probative value of the evidence." *United States v. Harvey*, 117 F.3d 1044, 1049 (7th Cir. 1997) (citing cases). *See also, e.g.*, *United States v. Belfast*, 611 F.3d 783, 819 (11th Cir. 2010) ("[A]uthentication itself is 'merely . . . the process of presenting sufficient evidence to make out a prima facie case that the proffered evidence is what it purports to be.'") (quoting *United States v. Caldwell*, 776 F.2d 989, 1002 (11th Cir. 1985)); *Vidacek*, 553 F.3d at 349 ("only a *prima*

2

*facie* showing is required"). Stated differently, "[t]he standard the district court must apply in evaluating a document's authenticity is whether there is enough support in the record to warrant a reasonable person in determining that the evidence is what it purports to be." *United States v. Blanchard*, 867 F.3d 1, 6 (1st Cir. 2017) (quoting *United States v. Paulino*, 13 F.3d 20, 23 (1st Cir. 1994)). Once that showing is made, "[t]he factual determination of whether evidence is that which the proponent claims is ultimately reserved for the jury." *Vidacek*, 553 F.3d at 349. *See also*, *e.g.*, *Belfast*, 611 F.3d at 819 ("Once that *prima facie* case is established, the evidence is admitted and the ultimate question of authenticity is decided by the jury.").

To make out a prima facie showing of authenticity, "circumstantial evidence of authenticity can be sufficient." *United States v. Bruner*, 657 F.2d 1278, 1284 (D.C. Cir. 1981). *See*, *e.g.*, *United States v. Broomfield*, 591 F. App'x 847, 851 (11th Cir. 2014) (unpublished) ("Authentication may be established 'solely through the use of circumstantial evidence.'") (quoting *United States v. Smith*, 918 F.2d 1501, 1510 (11th Cir. 1990)). And, importantly, the party seeking to admit evidence need not "rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be." *United States v. Holmquist*, 36 F.3d 154, 168 (1st Cir. 1994). Rather, "the government must only 'demonstrate that, as a matter of reasonable probability, possibilities of misidentification and adulteration have been eliminated.'" *United States v. Celis*, 608 F.3d 818, 842 (D.C. Cir. 2010) (quoting *United States v. Stewart*, 104 F.3d 1377, 1383 (D.C. Cir. 1997)). *See*, *e.g.*, *United States v. Bowens*, 938 F.3d 790, 794-95 (6th Cir. 2019) (explaining that "[a]nyone could have used the defendants' Facebook accounts, just as the pictures could have depicted the men smoking tobacco cigars, and 'getting high' could have been a reference to skydiving," but that there was sufficient circumstantial evidence "for the jury to infer that the accounts belonged to the defendants, and that the defendants were the authors of the

3

posts about using marijuana"); *Broomfield*, 591 F. App'x at 852 (finding sufficient evidence of authenticity even though "there was no testimony establishing that the recording equipment was reliable or that the video was not altered or staged").

In deciding preliminary questions about the admissibility of these videos, "[t]he court is not bound by evidence rules, except those on privilege." Fed. R. Evid. 104(a). In other words, the government may rely upon otherwise inadmissible evidence in establishing the authenticity of the video evidence described in this motion. *See, e.g.*, *United States v. White*, 116 F.3d 903, 914 (D.C. Cir. 1997). Of course, even with a pretrial ruling that evidence is authentic, and thus admissible, the government must introduce sufficient evidence at trial from which a reasonable juror could reach the same conclusion regarding authenticity. *See, e.g.*, *United States v. Gammal*, 831 F. App'x 539, 542 n.6 (2d Cir. 2020) (unpublished) ("Insofar as the District Court relied on non-public information to make its preliminary determination, it did not err because it did not do so in lieu of the presentation of sufficient authenticating public evidence later at trial."); *United States v. Puttick*, 288 F. App'x 242, 246 (6th Cir. 2008) (unpublished) ("It is permissible for the judge to make a preliminary determination as to authentication, admit the evidence conditionally under Rule 104(b), and then allow the jurors to be the final arbiters of whether it was actually authenticated."); *United States v. Branch*, 970 F.2d 1368, 1371 (4th Cir. 1992) ("Thus, even though the district court may have ruled during an in camera proceeding that the proponent had presented sufficient evidence to support a finding that a tape recording was authentic, evidence that would support this same ruling must be presented again, to the jury, before the tape recording may be admitted.").

## ANALYSIS

The government's evidence will show that all the videos described herein fairly and accurately depict events at the Capitol which are relevant to an issue of consequence in defendant's trial. While the government anticipates that the admission of USCP and MPD video footage will not be controversial, we discuss the evidentiary basis for authentication below. The bulk of the government's argument focuses on authentication of videos from other sources, the distinctive events and characteristics visible in those videos, and the corroboration that can be found from other pieces of evidence.

1. **U.S. Capitol Police Video Footage**

Admission of footage from USCP's own systems is straightforward. The government will present a USCP witness to testify to their surveillance system. This witness will be able to explain how the system is used, that it reliably records and depicts the areas where USCP has installed cameras, and the internal characteristics of videos—such as date and time stamps—which allow USCP to identify and retrieve segments of video. A USCP witness who was present during the attack on the Capitol will be able to explain that the videos used by the government here are consistent with the events that occurred, generally, on January 6, 2021. Such evidence satisfies the requirement of Fed. R. Evid. 901(b)(4), which allows authentication by way of "the appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." It also accords with the requirements of Rule 901(b)(9), which allows authentication by "[e]vidence describing a process or system and showing that it produces an accurate result."

This case will focus on USCP cameras at the Lower West Terrace. The cameras will show rioters first approaching the Lower West Terrace at approximately 2:40 pm. Then, for the next 2 hours and 20 minutes, until approximately 5:00 pm, the cameras will depict the ongoing onslaught

of violence at the mouth of the Lower West Terrace tunnel, as USCP and MPD officers denied rioters entry through the doors at the Lower West Terrace.

   **2. Body-Worn Camera Footage from the Metropolitan Police Department**

The admissibility of footage from body-worn cameras, worn by MPD Officers on January 6, 2021, is likewise clear. Either the officer who wore the camera, or any other witness to the events depicted in the video, can authenticate the video based on their personal knowledge that the video fairly and accurately depicts the events that occurred. Fed. R. 901(b)(1) (allowing authentication by "[t]estimony that an item is what it is claimed to be"). This is standard authentication for any photograph or video. *See*, *e.g.*, *United States v. Patterson*, 277 F.3d 709, 713 (4th Cir. 2002) ("The necessary foundation for the introduction of a photograph is most commonly established through eyewitness testimony that the picture accurately depicts the scene in question[.]"); *United States v. Rembert*, 863 F.2d 1029, 1026 (D.C. Cir. 1988) (noting one method of authentication occurs where "a sponsoring witness (whether or not he is the photographer) who has personal knowledge of the scene depicted testifies that the photograph fairly and accurately portrays that scene").

While MPD officers deployed throughout the Capitol Building and grounds on January 6, 2021, the focus will be on MPD officers in the West Plaza. The West Plaza is outside and directly west of the U.S. Capitol Building, and on the ground level. The government will seek to introduce eight MPD body-worn camera videos from the West Plaza.[1]

On January 6, by about 12:55 pm, rioters had penetrated USCP perimeters west of the Capitol and pushed USCP officers back to the West Plaza. MPD officers began arriving in the

---

[1] The government will introduce one MPD body-worn camera from the Lower West Terrace from approximately 2:53 pm.

West Plaza shortly after 1:10 pm. From then until about 2:30 pm, MPD officers attempted to maintain a police line that would prevent rioters from penetrating deeper into the Capitol grounds and, ultimately, breaching the Capitol building.

Due to the nature of the event—a crowd of rioters pushing against a tight line of police officers—many cameras recorded slightly different angles on the same event. Any single officer who was present there will be able to testify that all the videos fairly and accurately depict what occurred. Fed. R. 901(b)(1). The assault can also be seen from an elevated USCP surveillance camera, and a comparison of this birds-eye view of the assault with MPD body-worn cameras make clear that they record the same event. Thus, the USCP footage corroborates the events recorded on body-worn camera and supports their admissibility. *See* Fed. R. Evid. 901(b)(4) (authentication by comparison with another authenticated specimen).

### 3. Cameras Carried by Persons Present in the Crowd

The government also intends to offer numerous video clips from sources other than USCP and MPD. Some of these were taken from reporters who were present in the Capitol that day. Others were taken by the defendant's fellow rioters or other members of the crowd. Some are from the defendant's own phone, seized the day of her arrest. Many were obtained through open-source means and are publicly available.

For these videos, as described further below, the government will establish authenticity by asking the jury to compare them with other, authenticated exhibits: USCP and MPD footage. Fed. R. Evid. 901(3). Police footage confirms these other videos are what they purport to be: recordings of the same events, captured from a slightly different perspective, and in some cases depicting events that were not captured by the USCP or MPD systems. The distinctive characteristics of the defendant's attire, combined with the distinctive characteristics of other rioters depicted captured

7

on USCP and MPD footage, will further help support authentication of these exhibits. Fed. R. Evid. 901(4).

### A. *The Defendant's Approach to the Capitol*

At 12:50 pm, the defendant and other rioters approached the Peace Circle on the west side of the U.S. Capitol, as seen in Exhibits 1.1A and 1.2A. Both videos are videos from third parties that provide a close look of the front and back of the defendant's attire. Exhibit 1.1B is a screenshot of 1.1A. Both 1.1A and 1.1B show the defendant's face, her pink ski cap, black jacket with the fur trim, black gloves, dark jeans, and black boots, as well as a female in a purple jacket accompanying the defendant.

Exhibit 1.2B is a screenshot of 1.2A. Both show the back of the defendant, including the black backpack she carried that day. Exhibit 1.3 is footage from the defendant's iPhone depicting her approach from the Peace Circle to the West Plaza. The defendant can be heard chanting alongside other rioters throughout the 7-minute video.

Both Exhibits 1.2A & B and 1.3 can be corroborated from USCP footage of the West Plaza. USCP footage confirms that, after rioters overran the police line at the Peace Circle at about 12:55 pm, those officers retreated to the West Plaza. Exhibits 1.2A and 1.3 end at the West Plaza, where USCP officers are visible in the background of the footage. In addition to the videos, any USCP officer present at the West Plaza at approximately 1:00 pm can fairly and accurately attest to the gathering crowd of rioters at that time. Exhibits 1.1A, which is only 10 seconds long, and 1.1B are cross authenticated by Exhibits 1.2A & B: all show the defendant in the same place, wearing the same clothing, and the same people nearby, but capture different angles on the event. The government anticipates introducing Exhibits 1.1A & 1.1B after authenticating Exhibits 1.2A and 1.2B.

B.  *The Defendant's Actions at the West Plaza*

While the government will seek to introduce eight body-worn camera videos at the West Plaza, titled Exhibits 2.6, 2.8, 2.9, 2.11, 2.13, 2.14, 2.16, and 2.17, the government will also introduce videos from third parties.

According to photographs from the defendant's iPhone, she arrived at the West Plaza by approximately 1:00 pm, shortly after rioters overwhelmed the police line at the Peace Circle. The government will seek to introduce five photographs from the defendant's phone, titled Exhibits 2.1 through 2.5. According to the files' metadata, Exhibit 2.1 is from 1:01 pm and 2.2 to 2.5 are from 1:26 pm. In three of the four photographs time stamped 1:26 pm, law enforcement officers in riot gear, standing behind bike racks positioned as barricades, are visible in the photographs. The photographs can be authenticated by comparison to USCP footage, MPD body-worn camera, and by USCP and MPD officers present at the scene.

At approximately 1:27 pm, in the West Plaza, rioters pushed against multiple metal bike-rack barricades and the police lines directly behind them in an apparent attempt to breach the police lines. The defendant was part of the crowd. The government will show body-worn camera footage from that period. After, at 1:43 pm, in Exhibit 2.7, a video from defendant Albert Carpelli[2], the defendant pressed against the barricades while shouting, "come on people, don't be shy!"

Additional body-worn camera footage will show the defendant at 2:07 pm and 2:15 pm. At 2:07 pm, in a video taken by videographer William Allen DuPraw, who was present at the U.S. Capitol on January 6, titled Exhibit 2.10, the defendant again pushed against the barricades repeatedly while confronting law enforcement officers.  Body-worn camera footage will corroborate 2.10.

---

[2] Albert Carpelli is another January 6 defendant.  His case number is 21-mj-38-RMM.

9

At approximately 2:28 pm, rioters successfully breached the police line, attacking law enforcement officers before pushing remaining officers to a corner of the West Plaza stage. The government will seek to introduce Exhibit 2.15, a video taken by defendant Andrew Jackson Morgan, Jr., as part of his "Political Trance Tribune" Youtube page.[3] The video depicts the defendant at approximately 2:28 pm pushing against barricades and then rushing towards the law enforcement officers. An additional third-party video, titled Exhibit 2.18, provides an aerial view of the defendant's conduct. The videos will be corroborated by body-worn camera footage as well as USCP footage.

At approximately 2:29 pm, according to two third-party videos, Exhibits 2.21 and 2.22, the defendant participated with the crowd surging forward to corner a small group of retreating law enforcement officers. In Exhibit 2.22, at approximately 2:30 pm, as the last of the officers finally retreated up a set of stairs, the defendant cheered with other rioters, "USA" and "Whose house? Our house!" The videos will be corroborated by USCP footage.

The government will further seek to introduce other acts observed or committed by the defendant at the West Plaza. In Exhibits 2.19A and B, the defendant observed and walked past a rioter attempting to gouge an officer's eyes. In Exhibit 2.12, law enforcement officers sprayed rioters with chemical spray, including the defendant, as they remained, undeterred, at the West Plaza. In Exhibit 2.20, the defendant chanted "USA" alongside other rioters after rioters had overrun the barricades.

Several overlapping characteristics support authentication of the videos. First, USCP surveillance video showed the police line being overrun, and rioters arriving in the West Plaza, at

---

[3] Andrew Jackson Morgan, Jr. is another January 6 defendant. His case number is 21-cr-313-TJK.

the same time and in the same manner as depicted in the above videos and photographs. Second, the government will seek to introduce eight separate videos from body worn cameras of the defendant's actions at the West Plaza. The body worn cameras footage are contemporaneous with video footage from the other sources, and taken together, these videos authentically depict the defendant's arrival and actions at the West Plaza.

C. *The Defendant's Actions at the Lower West Terrace*

At approximately 2:40 pm, the defendant arrived at the Lower West Terrace. Upon arriving, according to CCTV, titled Exhibit 3.1A, the defendant held up her cellular phone and entered the tunnel. Contemporaneous footage of the defendant entering the tunnel from defendant Edward Lang's phone is titled Exhibit 3.2.[4] Inside of the tunnel, according to video from defendant Chad Barrett Jones titled Exhibit 3.3, the defendant cheered alongside other rioters against the broken door inside the tunnel.[5] In Exhibit 3.4, which is body-worn camera footage from inside of the tunnel, the defendant can be see observing the violence around her.

At approximately 2:59 pm, phone footage from defendant Yvonne St. Cyr, titled Exhibit 3.5, depicts the defendant exiting the tunnel.[6] The footage is also depicted in the USCP footage

---

[4] Edward Lang is another January 6 defendant. His case number is 21-cr-53-CJN.

[5] Chad Barrett Jones is another January 6 defendant. His case number is 21-cr-213-RKL.

[6] Yvonne St. Cyr is another January 6 defendant. Her case number is 22-cr-185-JDB. Following a trial, the defendant was convicted of civil disorder, in violation of 18 U.S.C. §§ 231(a)(3),2; entering or remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1); disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2); disorderly conduct in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D); and parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G). Defendant St. Cyr's cell phone footage feature prominently and was found to be authentic.

titled Exhibit 3.1B. For some time, according to Exhibits 3.6 and 3.7, the defendant remained standing to the left of the tunnel,[7] while observing the violence unfold at the mouth of the tunnel.

Numerous open-source videos depict the defendant's subsequent actions. For example, at approximately 4:25 pm, three videos, titled Exhibits 3.8 to 3.10, show the defendant crawling into a window. At approximately 4:28 pm, according to Exhibit 3.11, a video from defendant Annie Howell, the defendant remained inside of the U.S. Capitol with other rioters.[8] Although there are no USCP cameras or officers present inside the specific room, Howell's other videos outside in the Lower West Terrace can be cross authenticated by USCP videos. In addition, defendant St. Cyr's videos, which have been authenticated, include footage of her in the same room.

The defendant is next observed standing outside again on the right side of the tunnel, holding a cardboard pole and then an ice axe, and slamming both objects repeatedly against a window to the U.S. Capitol in Exhibits 3.12 to 3.14. At approximately 5:01 pm, according to Exhibits 3.16 and 3.17, the defendant crossed over to the left side of the tunnel, to use a bullhorn through an open window. At approximately 5:02 pm, the defendant crossed again to the right side of the tunnel, seen in Exhibit 3.17.

The videos can be authenticated through USCP surveillance videos, which depict the violence at the mouth of the tunnel by the rioters against the law enforcement inside of the tunnel. The videos of the defendant, which show the violence at the tunnel, can be authenticated and time stamped by cross referencing the videos against USCP videos.

---

[7] The government is referring to the "left" of the tunnel if one were to face the front of the tunnel directly while standing outside the tunnel.

[8] Annie Howell is another January 6 defendant. Her case number is 22-cr-217-TFH. The defendant pled guilty to entering or remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1).

**Conclusion**

For the reasons stated herein, the government respectfully requests that this Court rule *in limine* that the government's video evidence satisfies the authenticity requirement of Fed. R. Evid. 901.

                              Respectfully submitted,

                              Matthew M. Graves
                              United States Attorney
                              D.C. Bar No. 481052

By:    s/ Lucy Sun
        Lucy Sun
        Assistant United States Attorney
        MA Bar No. 691766
        One Courthouse Way
        Boston, MA 02110
        Lucy.sun@usdoj.gov