```
1                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
2

3    United States of America,      ) Criminal Action
                                    ) No. 21-cr-127
4                    Plaintiff,     )
                                    ) VERDICT
5    vs.                            )
                                    ) Washington, DC
6    Joshua Matthew Black,          ) January 13, 2023
                                    ) Time:  2:00 p.m.
7                    Defendant.     )
     _____
8
                      TRANSCRIPT OF VERDICT
9                        HELD BEFORE
           THE HONORABLE JUDGE AMY BERMAN JACKSON
10                UNITED STATES DISTRICT JUDGE
     _____
11
                    A P P E A R A N C E S
12
     For Plaintiff:     Seth Adam Meinero
13                      Eric Boylan
                        DOJ-USAO
14                      601 D Street NW
                        Washington, DC  20001
15                      (202) 252-5847
                        Email:  Seth.meinero@usdoj.gov
16                      Email:  Eric.boylan@usdoj.gov
                        Emily W. Allen
17                      DOJ-USAO
                        222 West 7th Avenue, Room 253
18                      Anchorage, AK  99513
                        (907) 271-4724
19                      Email:  Emily.allen@usdoj.gov

20   For Defendant:     Clark U. Fleckinger, II
                        Clark U. Fleckinger II, Attorney at Law
21                      9805 Ashburton Lane
                        Bethesda, MD  20817
22                      (301) 294-7302
                        Email:  Cufleckinger@aol.com
23
     Court Reporter:    Janice E. Dickman, RMR, CRR, CRC
24                      United States Courthouse, Room 6523
                        333 Constitution Avenue, NW
25                      Washington, DC  20001
                        Email:  Janice_e_dickman@dcd.uscourts.gov
```

1          THE COURTROOM DEPUTY:  Good afternoon Your Honor.

2     This afternoon we have case number 21-127, the United States of

3     America V. Joshua Matthew Black.  Mr. Black is present and in

4     the courtroom, represented by Mr. Fleckinger.  Counsel for the

5     government are here, represented by Mr. Meinero, Ms. Allen, and

6     Mr. Boylan.

7          THE COURT:  All right.  Good afternoon, everyone.  To

8     the extent findings of fact are necessary as part of this

9     proceeding, they are going to be incorporated in the transcript

10    of the ruling that I'm about to issue.  There's not going to be

11    a subsequent written opinion.  I assure you there will be

12    plenty of information delivered orally this afternoon.

13          I want to note, at the outset, that a lot of what I

14    have to say about the facts is in response to what the parties

15    chose to emphasize and argue.  And a good portion of that,

16    particularly of the defendant's crosses and closing, was really

17    more relevant to the question of what the punishment should be

18    than to the elements of the particular offenses charged.

19          The defense placed considerable emphasis on the fact

20    that there was no evidence that the defendant physically

21    attacked anyone, destroyed any property, brandished a weapon,

22    threatened anyone with a weapon, assaulted an officer, verbally

23    abused an officer, berated or accosted the officers or was

24    profane.  It emphasized the fact that the defendant turned

25    himself in, was cooperative, told the police about the knife

1      they didn't know about before, and gave them access to his

2      phone.  All that was largely accurate, although the prosecution

3      witnesses and the prosecutors had a few legitimate quibbles

4      with some of it.

5           But I guess the key point I want to make is he's not

6      charged with assaulting, resisting, or impeding the officers,

7      the § 111 counts in many January 6 indictments.  He's not

8      charged with impeding officers perform their duties in a civil

9      disorder, also charged in many January 6 indictments there's.

10      Not one count where violence or the use of a weapon is an

11      element, and he's not even charged with resisting the officers.

12           And while he did not physically strike or verbally

13      abuse any officers or urge others to do so and, indeed, on at

14      least one occasion took steps to protect an officer from harm

15      by others, his overall pattern of behavior and repeated failure

16      to comply with the officers' directives, going where he knew

17      they were trying to stop him from going, was inconsistent with

18      the differential, respectful attitude counsel was trying to

19      maintain that he displayed at all times.  You don't have to be

20      rude or insolent or physically aggressive to be utterly

21      noncompliant.

22           So with that background, what do the facts show about

23      what the defendant did?  We know he came to Washington, D.C.

24      and went to the rally on the Ellipse.  In the January 14th,

25      2021 interview, Government's Exhibit 101.11, he was asked by

1    the agent, "I was wondering, too, like why the U.S. Capitol?"

2    And the defendant said, "Well, there was a girl walking around

3    at the Trump, right before Trump's speech, going, 'They're

4    storming the Capitol after the speech.'  So I was like, Well, I

5    guess I better get over there and see what's happening, you

6    know?  So that's why I went.  But everybody's like -- everybody

7    said they were doing a protest at the Capitol.  So I was like,

8    Well --"

9             The agent said, "Just went over then?"  And Mr. Black

10   said, "I'm not young, so I better go ahead and, you know, get

11   to walk out."

12            Also, Government's Exhibit 100.CC, the YouTube video,

13   he started out by saying, "Like, I was at the rally when Trump

14   was speaking and then I was like -- I heard that they said,

15   yeah, after this we're marching to the Capitol building.  So I

16   asked 'em, like where's the Capitol building?  I looked up

17   there and I was like, I need to go there."  We don't know

18   exactly when he goes, but he goes.

19            By 12:45 Inspector Lloyd has received a concerned

20   call saying a large number much people are coming his way.  And

21   the defendant gets down Pennsylvania Avenue with the very first

22   wave of people to arrive at the snow fence, which had been

23   reinforced by bike racks and signs that said, "Area Closed,"

24   and officers standing behind them.  These posed no deterrent

25   whatsoever.

1          By 12:54 Inspector Lloyd received notification that

2     the protestors had already breached the line at the Peace

3     Circle.  We know that Mr. Black has because he has marched

4     himself up past the barricades and the officers behind him to

5     the fencing directly in front of the Lower West Terrace.

6     Officer Gibson is there to see him arrive at 12:54 p.m.  There

7     is no one in front of Mr. Black.  He walks right up to the gate

8     at the northern end of the Lower West Terrace and tests it.  He

9     shakes it, he tries to lift it.  It's Government's Exhibit

10    402.A.1.

11         There are two police officers standing directly in

12    front of him, monitoring him, signaling him and the others,

13    making it quite clear that they are supposed to stop right

14    there.  But they have to walk back and forth to patrol the

15    entire space.

16         At 12:57 the defendant seizes an opportunity.  He is

17    one of the first, if not the first person to climb over the

18    fence that had been erected to protect the inaugural stage, and

19    he starts strolling across the stage.  Officer Gibson says this

20    made the rest of the crowd noticeably louder.  The defendant is

21    intercepted by Officer Gibson, who escorts him back to the

22    fence.  But the defendant does not do what he is obviously

23    supposed to do then either, which is cross back over to the

24    other side.  He stands on the inside and he watches and he

25    waits.

1          Seconds later, when the crowd surges over the fence,

2     he merges right in and heads to the southern edge of the Lower

3     West Terrace.  That barrier, in addition to the one down by the

4     Peace Circle, has been completely breached.  The video shows

5     Mr. Black walking quickly and ending up, again, directly in

6     front of the police line.  He's not supposed to be there

7     either.  You can see the officer trying to direct the crowd to

8     step back.  The crowd is not having any of it.  The defendant

9     is not one of the noisy ones, but he isn't leaving either.

10    He's pushing slowly forward until he is directly in front of

11    the officers.  This is apparent in Government's Exhibit 417,

12    the video.

13         As the pressure mounts on the officers, Inspector

14    Lloyd of the Capitol Police calls for the activation of the

15    nonlethal force unit.  The defendant is struck.  He was right

16    in front of the officers.

17         But while the government is inviting me to do so, I'm

18    not drawing any inferences that because the nonlethal team

19    members are bound to try to target only agitators, that the

20    defendant was in fact a leader or an agitator.  I don't need to

21    go that far.  He was, in fact, in front and not backing down,

22    and that's sufficient.  As Inspector Lloyd said, being in front

23    is part of the problem.  Not leaving is part of the problem.

24    Certainly not part of the solution.

25         The defendant was struck in the face, in the cheek,

1    and it was a bloody scene, and it does have an incendiary

2    effect on the crowd.  But I'm not also not going to go so far

3    as to attribute that to Mr. Black himself.  It's not needed to

4    prove the government's case and I'm not sure it's an entirely

5    fair inference.  What I can say is what Mr. Meinero said at the

6    start of his opening statement:  Even being shot in the face

7    wasn't enough to deter Joshua Black and, as Ms. Allen said, he

8    did not stand down.

9          He did at that point, when an officer was knocked to

10   the ground by other protestors, tell them not to hurt him.  The

11   video is consistent with an attempt of his trying to shield the

12   officer with his own body, though it's not consistent with the

13   later story that the defendant told about that being why he was

14   shot.

15         Another any rate, he declines medical intervention at

16   that point.  No, he says to the officers who want to take him

17   somewhere for help, "I'm with them.  I'm defending the

18   Constitution.  I'm a patriot."

19         Eventually, Inspector Lloyd explained, with MPD's

20   assistance, the Capitol Police establish another line,

21   reinforced with bike racks again.  The MPD unit has more crowd

22   control equipment and pepper spray.  This is not a message the

23   defendant decides to heed either.  And Government's Exhibit

24   609, as that reveals, he's back again at the front of the line.

25   After officers persuade him to come behind the line to have

1      some water, he has the opportunity to leave, but he crosses

2      back into the crowd.  And defendant then makes his way around

3      to the east side of the Capitol.

4              Officer Mark Carrion hears, at 1:59, that the group

5      coming from the west was headed around the north side of the

6      Capitol and joining up with the protestors already on the east

7      side.  He describes the scene as once again woefully

8      outnumbered -- a woefully outnumbered corps of officers is

9      struggling to hold a line of bike racks.  And it doesn't work

10     this time either.

11             The protestors break through, they overwhelm the

12     officers.  A small group, including Officer Carrion, raced up

13     to position themselves outside the Rotunda doors.  Meanwhile,

14     the mob surges up the stairs.  And there, again, the defendant

15     is close to the front.  He is there as officers are assaulted

16     by the crowd with an array of weapons, from their water bottles

17     to debris on the scene to chemical spray they brought with them

18     from home and, one by one, they are rendered unable to go on.

19             Ultimately, Mr. Black winds up directly in front of

20     the two officers left trying, by the themselves, to hold the

21     door against the sea of rioters that fills not only the entire

22     terrace, but the entire staircase that leads up to it.  The

23     only thing that keeps him from being overrun immediately, as

24     the defendant noted, is the inconvenient fact for the mob that

25     the doors open out.  But members of the mob appear on the

1    inside and succeed in breaking the pitiful barriers the

2    officers had tried to create with a flagpole and the ones

3    outside gain access.

4           Was the defendant helping the police at this point?

5    This is what he said in Government's Exhibit 1.GG, the YouTube

6    video.  "And then they were pushing so hard, I couldn't even

7    breathe.  You know?  I mean, they were, like, crushing my

8    chest.  You know?  And I was yelling with what air I had, you

9    know, We need to let this cop out of here.  You know?  If we

10   don't let him out of here, we're never getting in.  And then

11   they said, Whoa, okay.  Well, that -- that makes sense."

12          His objective was not to assist law enforcement.  His

13   objective was to get in.  Maybe he'd been trapped by Carrion's

14   body, but once the door opened, he slid right between the

15   officers and into the Capitol building that it was abundantly

16   clear he was not supposed to enter.  In Government's Exhibit

17   706 you can see him turn sideways and lead with his shoulder,

18   like someone trying to run a football, and he squeezed straight

19   through the two linemen.

20          The defendant tries to take the pushing and shoving

21   that was evident outside the door some time before, during this

22   heave-ho maneuver, to say, well, he got pushed in, he didn't

23   mean to go in.  No, you cannot say that once he had positioned

24   himself precisely in front of the door, that he was forced in

25   by others.  His face is resolute.  You cannot see anyone one

1    behind him.  He is not reacting to anyone behind him.  And

2    after he gets through the two officers, he does not stop and

3    turn and remonstrate with anyone.  He doesn't try to turn and

4    leave because he didn't mean to be there.  He walks straight

5    ahead.  And other people did push their way out.

6          Next we see him on the third floor, outside the

7    Senate Gallery.  Government's Exhibit 407.  Here, again, we

8    have a few outnumbered U.S. Capitol Police trying to keep the

9    belligerent protestors out of the gallery, to get them to leave

10   the area.

11         As we know from Government's Exhibits 420, 500, and

12   510, by then the vice president had been evacuated to another

13   location on the grounds, the Senate had been locked down and

14   stood in recess as of 2:13 p.m.  It was not adjourned.  And

15   defendant appears at about 2:42 p.m. Officers manage to get the

16   protestors in the gallery to walk away and head back down the

17   steps.  The defendant makes it down to the Senate lobby on the

18   second floor, exactly where we just seen the Vice President

19   make his escape.  Exactly where Officer Gazelle had whisked

20   away the remaining straggling senator.

21         Mr. Black sees the glass doors that make it clear he

22   is standing outside the United States Senate, and he tries to

23   open them.  They are locked.  He is not supposed to go in.  He

24   appears to kneel and pray at this time.  But then other

25   protestors appear with keys, people who clearly do not have the

1   authority to open the doors are making their best effort,

2   testing them out with the defendant right there waiting.  But

3   then others arrive to let them know there's another way in, and

4   off he goes.

5          2:48 p.m. the defendant enters the Senate chamber.

6   This is entirely unauthorized.  There was a remarkable bit of

7   testimony from the U.S. Capitol Police officer who tried to get

8   the protestors out of there, who testified that even he was not

9   allowed to be there and he had never been on the Senate floor

10  before.  This is a uniformed U.S. Capitol Police officer.

11         The scene obviously reflects the fact that the people

12  using the room for their official business had been interrupted

13  and left in a hurry.  Their papers and their laptops are still

14  on the desks.

15         The defendant wanders around, he checks out what's on

16  the desks in front of the daïs, he touches the keypads of the

17  computers that are not his to touch and are plainly part of the

18  Senate's official business.  He joins others looking at papers

19  on Senator Cruz's desk and takes the one they found interesting

20  to another desk and photographs it.  Turned out to be the

21  document reflecting that Representative Gosar and Senator Cruz

22  were going to object to the certification of the count in

23  Arizona.  And now that his camera is out, he poses for photos.

24         The crowd inside continues to swell and it's

25  eventually joined by the man in the hat with the Viking horns

1   and the body paint, what others in the press have referred to

2   as the Shaman.  The lone U.S. Capitol Police officer, Officer

3   Robishaw, enters at the same time.  By that point the defendant

4   has seated himself on the floor in front of the daïs and he's

5   making a phone call.  Officer Robishaw asks, "Is there any way

6   I can get you guys to leave?"  The defendant does not budge.

7            Officer Robishaw, "I want you to know that this is

8   the sacredest place."  Nothing happens.  Officer Robishaw tries

9   again, "Can I get you guys to walk out of the room, please?"

10  The defendant tells the officer more people are coming.  The

11  defendant does tell the Shaman not to disrespect the place.

12           I am not at all impressed with the defense attempt to

13  excuse the defendant's blatant disregard of what a uniformed

14  law enforcement officer, acting in the course of his official

15  duties, asked him to do by saying oh, it was a request, not an

16  order.  He used the word "ask."  Come on.  The defendant knew

17  that a law enforcement officer wanted him to leave and he

18  ignored him twice, precisely because he knew the officer was

19  being friendly and being low key because he was so badly

20  outnumbered and at great physical risk.  And that's obvious in

21  his interview on January 14th, Government's Exhibit 101.EE and

22  101.G.1.

23           It's all of a piece with every other time he was

24  confronted by officers and did exactly the opposite of what it

25  was entirely obvious that they wanted him to do.

1    The horned-hat man, along with a few others, now lead
2    a boisterous prayer from the daïs.  "It's our nation, not
3    theirs."  Defendant joins in, 3:06 p.m., "Praise the name of
4    Jesus."  And he's noticed, particularly because of his wound,
5    and he's recognized by the crowd up front.
6    Finally a long line of MPD officers, in full gear,
7    enter and wave the defendant and everyone else out.  And that
8    point, when the protestors are outnumbered, he does leave.
9    It's 3:10 and 49 seconds.  He's been inside the building for 30
10   minutes.  And, yes, he was generally quiet and calm and not
11   verbally obstreperous, not physically attacking with the
12   police.  But he was purposeful.  He acted with attention at
13   every point.  Yes, he was occasionally in situations involving
14   jostling and pushing.  But each time he gets himself directly
15   up to the front of the line, where the officers were trying to
16   hold the line, under his own power.  He places himself there.
17   Inspector Lloyd testified, "If you were on the front line, you
18   are part of the problem."
19   The defense spent a lot of time emphasizing the
20   defendant's size.  They never actually said how tall he was,
21   but said that he weighed 135 pounds repeatedly.  He is slight,
22   he is thin.  He is not quite as short as the defense wanted to
23   make him out to be.  Yes, sometimes he looks small compared to
24   much larger, taller men.  But he doesn't stand out in the crowd
25   as a tiny person, markedly shorter than average.

1    When he squeezes past the 6-foot-3 Officer Carrion in

2    Government's Exhibit 706.  His eyes and eyebrows are at a

3    parallel with the officer's mustache and the other officer's

4    chin.  It's not as if he just comes up to his chest or fits

5    tidily under the officer's chin.  Even if he's six inches

6    shorter, he would be 5-foot-9; eight inches shorter, he would

7    be 5-foot-7.  He's not tiny.  He's not the smallest person

8    attacking the Capitol by a long shot.  He certainly didn't

9    think he was too little to be there.

10    There was also zero evidence that area carried,

11    pushed, dragged, or otherwise moved to, in, or around the

12    Capitol by any means other than his own power.  He walked to,

13    in, around and out of the Capitol on his own two feet.

14    The defendant says he got jostled and pushed while in

15    the crowd while at the stop of the stairs.  Maybe so.  But he

16    had already gotten himself up there all by himself.  And if

17    anything, his size works to his advantage at many points.  He

18    was more maneuverable and he could press his way into tight

19    spaces and he did it quickly.  It's captured quite memorably in

20    Government's Exhibit 706 when he squeezes between the two

21    officers to get inside.

22    He also scooted up the Rotunda stairs, and you could

23    see him passing a very large Oath Keeper, loaded down with

24    gear.  He got there ahead of him.  You can see at various

25    points, and not just the one in Government's Exhibit 417, where

1    Inspector Lloyd characterized his actions as using a larger man

2    in front of him as shield, that he adopts the same strategy on

3    more than one occasion of getting quite close up behind a

4    large, broad-shouldered man, sometimes putting his hands on the

5    person in front of him, sometimes not, but letting that person

6    do the blocking for him.  He is directly behind someone large

7    in Government' Exhibit 402.A.1, walking towards the spot were

8    he ended getting shot with the pellet.

9          You see it again at the Rotunda doors, where he's got

10   his hands on a larger man's back during the heave-ho movement.

11   And I agree with the officer's testimony that Government

12   Exhibit 707 shows the defendant participating.  He is trying to

13   get in.

14         And when the crowd so disables the sergeant trying to

15   hold the door with Officers Carrion and Salky by spraying them

16   with chemical spray that he has to make his way just past the

17   defendant, to the defendant's left, to a clear space to

18   recover, you can see in the video that there are spaces created

19   in which to move.  And the defendant manages to maneuver

20   through those narrow spaces to get where?  Directly in front of

21   Officer Carrion.

22         And defense counsel argues, well, he didn't realize

23   he had a way out.  But that's not what the defendant said.  In

24   Government's Exhibit 1.E.1, he said that an officer, "was

25   walking like a blind man because he got it right in the face.

1    You know?  And I feel bad for them cops that got sprayed
2    because that pepper spray is no joke.  You know?  But they wind
3    up getting -- there was six of them, and when they -- all
4    pepper-spray guys got outta there, people were pulling them one
5    way and pulling them another way.  The last guy that got out
6    was getting pulled one way and another.  And I told -- I knew
7    he could get out on my left.  And they were trying to pull him
8    to the right, and there was no way out that way.  I said, let
9    him go.  Let them go, they're going this way."

10           Also, Officer Carrion made a very interesting comment
11   when asked if the defendant spoke to him, that he felt like the
12   defendant was trying not to be seen.  And that struck me as
13   accurate as well.  Almost every time you see him, he not only
14   has on the cap and the dark glasses, but he's got the
15   camouflage hood pulled up over the cap.  He is generally not
16   attracting attention.  He is trying to slip by, and that is
17   exactly what he does, most of the time.  Sometimes he wanted to
18   be heard.  Sometimes he wanted to be photographed.

19           Having reviewed the video evidence, and particularly
20   Government's Exhibit 408, where you can see the movement of the
21   defendant's head as the voice rings out down the stairwell, I
22   agree with Special Agent Weeks that it was Mr. Black who
23   shouted, "We will not stand down."  And that announcement is
24   emblematic of the entire period he spent on the restricted
25   grounds that day, from just before 1 o'clock when he jumped the

1   fence until he left at 10 after 3.  It wasn't until it was

2   clear that the rioters were outnumbered that he would stand

3   down.

4           So, I have reached a verdict in this case.  The

5   standard is that the government must prove every element of

6   every offense beyond a reasonable doubt.  I have reviewed the

7   jury instructions to make sure that my fact finding process was

8   governed by the appropriate rules.  And this ruling is

9   specifically made in accordance with all of the jury

10  instructions set forth in the parties' agreed proposed

11  instructions.  In particular and in including Burden of Proof

12  and Presumption of Innocence 2.107, Reasonable Doubt at 2.108,

13  and Proof of State of Mind at 3.101.

14          Count 1 charges obstruction of an official proceeding

15  and aiding and abetting, in violation of 18 U.S. Code §

16  1512(c)(2) and 18 U.S. Code 2.  The first element of that

17  offense is that the defendant attempted to or did obstruct an

18  official proceeding.  Specifically, Congress's certification of

19  the Electoral College vote as set out in the 12th Amendment of

20  the Constitution.  So this is whether he attempted to or did

21  obstruct or impede it.  And that has been established beyond a

22  reasonable doubt.

23          Defendant's forced entry into and unlawful ongoing

24  presence in the building as a member of the mob, none of whom

25  had passed through the ordinary security screens, not to

1    mention his unauthorized presence on the floor of the Senate

2    Chamber itself, made it impossible for the certification to

3    proceed.

4         The second element of this offense is that the

5    defendant intended to obstruct or impede the official

6    proceeding.  This is the most difficult issue to resolve in

7    this case.  And the assessment must recognize that the

8    government carries a very heavy burden at this point.

9         What was the defendant trying to do?  D.C. Standard

10   Jury Instruction 3.101 says you may infer someone's intent from

11   the surrounding circumstances.  You may consider any statement

12   made or acts done, or not done, by the defendant and all other

13   facts and circumstances received in evidence which indicate his

14   intent.  You may infer, but are not required to infer, that a

15   person intends the natural and probable consequences of acts he

16   intentionally did or intentionally did not do.

17        I do not agree with the defense that the defendant's

18   sole, or even primary motivation was spiritual.  His motivation

19   was obviously political.  And the defendant's own statements

20   are of great relevance here.

21        He starts his YouTube video, Exhibit 1.A.1, saying he

22   wanted to get his side of the story out there.  And he says,

23   "Once we found out that Pence turned on us and that they had

24   stolen the election, like officially, the crowd went crazy.  I

25   mean, it became a mob.  We crossed the gate, we got up."  And

1    then he says, "When we got there the cops had formed a line and

2    they were out numbered, probably 1,000 to 1.  There was no way.

3    The only way they were going to stop the crowd was lead

4    bullets."

5         He does also say in Exhibit 1.AA, "I just wanted to

6    get in the -- inside the building so I could plead the blood of

7    Jesus over it.  That was my goal."

8         After he's shot, he says, at Exhibit 1.BB, "They

9    tried to pull me behind the gate to give me medical, is what

10   they said.  And I was like, 'No, I'm with them.  You know.  I'm

11   here to defend the Constitution.  I'm a patriot.  You know?'"

12        Exhibit 1.DD he talks about once he gets around to

13   the east side of the building and the Rotunda doors.  "So I got

14   down the back and I was sitting there thinking, 'Why is

15   everybody just sitting on the steps?'  I thought the goal was

16   to show the politicians that the people run this country.

17   That's the way it's supposed to be.  You know?  And so I was

18   like, 'Why are we just sitting here?'"  And then he says, when

19   he got to the top and he got to the door, the people were

20   just -- "it became a mob rule situation.  You know what I'm

21   saying?  It was -- the patriots were pissed.  I mean, it was so

22   much anger.  So I just kept saying, 'Praise the name of Jesus.

23   Glory to God.  God bless America.'  You know?  'Praise the name

24   of Jesus.  I plead the blood of Jesus.  Glory to God.'"  This

25   shows both his spiritual thinking and his political motivation.

1          He says, in Exhibit 1.E.1, that when he gets up to

2     the Rotunda doors and he's confronted with Officer Carrion,

3     he's either thinking or he says, "You know, I appreciate your

4     service.  But, you know, we've got to show these politicians

5     that we mean business.  You know?  We're not -- we're -- we're

6     tired of getting lied to.  We're tired of ya'll getting filthy

7     rich off our backs.  You know?  Lying and cheating and stealing

8     and -- we're tired of it, you know?  That ain't exactly what I

9     said.  But it was -- that's the gist of it, you know?"

10          Exhibit 1.F.1, again confirms the political

11     motivation.  When the door gets opened up from the inside he

12     says, "They opened it up from the in -- the guys on the inside.

13     The mob, the pissed-off patriots, the guys that were here to

14     defend the Constitution of the United States.  Because it

15     clearly says something about if they, you know -- my brother

16     sent me a text -- oh, man, I should have looked that up before

17     I done this.  But it clearly states that in the Constitution,

18     that if the government gets crooked, as they are now, and needs

19     to be abolished or overthrown or something to that effect.  You

20     know?  So that's what I was there for.  I was obeying the

21     Constitution.  You know?"

22          Exhibit 1.H.1.  We're still in the YouTube video.

23     Says he got to the place were he saw the door that said "U.S.

24     Senate on it.  And said, 'I need to get in there.'  I just felt

25     like the spirit of God wanted me to go in the Senate room.  You

1    know?  I was about to break the glass and I thought, 'No, this

2    is our house.  This is not -- we don't act like that.'  You

3    know?  But I was tempted to, I ain't gonna lie.  You know?

4    Because I'm pretty upset.  You know?  They stole my country."

5           And at 1.I.1 he said, "There was no organization that

6    I knew of.  You know?  It was just everybody found out that we

7    lost our country, and they were pissed.  You know?  Because the

8    Constitution specifically says if they get out of line, that

9    we, the people, will abolished them.  And that's -- that's what

10   the Constitution says.  So that's what we were doing.  You

11   know?"

12          The second part of the YouTube video, Exhibit 2.A.1,

13   he says again, "There was no plan.  It wasn't an organized

14   event.  This was just the we-the-people standing up to obey the

15   Constitution, to abolished a corrupt government.  That's what I

16   mean.  But once we got in there, what are we gonna do?  Can't

17   kill nobody.  I mean, that ain't going to look right.  It's all

18   about PR, you know?  I mean, it may come to that.  I hope it

19   don't.  But it's a Democrat house.  A crooked Democrat house.

20   Crooked Republicans, too.  And a crooked Democrat Senate.

21   Crooked Republicans, too.  And now there's a straight-up,

22   crooked, lying, cheating, you know, president.  And I ain't

23   even going to say nothing about Kamala Harris.  I mean, I'm a

24   Christian and I ain't supposed to talk bad about folks.  So I'm

25   not going -- but you know what I'm saying.  Like, you know how

1   she got to the top."

2          He says, 2.B.1, "Just want to get my side of the

3   story out there.  I mean, this was kind of a long video and it

4   was rambling.  But I just -- God bless America.  Praise the

5   name of Jesus.  If God don't do it, it ain't gonna get done.  I

6   don't know what's coming next, but America has been stolen."

7          That's the end of his YouTube video.  I think his

8   political motivation is somewhat clear.

9          In his interview with the FBI, this is the first one,

10  on January 8th, in Exhibit 100.DD he says -- talks about when

11  he gets around to the other side.  And he says, "So, I got back

12  there and the Lord told me -- I just felt like the lord wanted

13  me to go in there and plead the blood of Jesus.  Inside the

14  building, you know?  I jut wanted to show the politicians that

15  we, the people, run this country, you don't.  You know, you

16  swore an oath to defend the Constitution and you didn't do it,

17  you know?  You're a bunch of lying crooks, Democrats and

18  Republicans, you know.  I ain't a Republican, but you ain't got

19  no other choice, you know?  They're a bunch of -- I ain't

20  supposed to talk bad about folks.  But they ain't doing their

21  job, they ain't working for us.  You know, they're all about

22  that, you know?"

23          So the agent says, "So basically you wanted to show

24  the politicians up?"

25          And he says, "Well, I wanted them to know that we,

1   the people, can do it if we decide, you know?  There wasn't no

2   lead bullets flying from us.  But, you know, we had the numbers

3   and the power at the moment to show them that you don't run the

4   country.  We do.  You know?  That was -- and I wanted to plead

5   the blood of Jesus on that place because there's all kinds of

6   evil coming out of that thing.  Their mission is not for the

7   good of the people, you know?  And I believe that considerably."

8          Exhibit 100.F.1, also in the January 8th interview,

9   he's talking about the agents, the officers, "And they were,

10  like, 'I'm just doing my job.  I'm just doing my job.'  You

11  know?  'I swore an oath.'  And I was like, 'Yeah to defend the

12  Constitution and that ain't what you're doing right now.

13  You're defending a bunch of crooked politicians,' which I'm

14  glad they got them out of there because if the mob had got

15  ahold of them, it would have been -- it would not have been

16  good, 'cause America is pissed off at our elected officials.

17  You can't trust them no more.  They're a bunch of dirt bags,

18  you know?  I'd say 90-plus percent of them are crooked as a

19  dog's leg.  They can't be trusted."

20          And finally, on the January 14th interview, Exhibit

21  101.H.1, he's asked again what was the general intention, what

22  was the general idea.  And Mr. Black said, "Well, we've been

23  watching the protests on TV for two years where they're burning

24  cities to the ground, killing people.  So, I mean, I figured,

25  well, shoot -- I guess, you know, we'll go in there and show

1   them that we could, if we wanted to, you know?  I mean, I think

2   that was pretty much the general idea."

3           The officer, agent, says, "General idea?"

4           Mr. Black says, "Like, what -- you know, we could if

5   we wanted to.  We ain't, you know?"

6           He also made statements in his Man On The Street

7   interview at the Capitol, Government Exhibit 612:  They stole

8   our country -- all crooked and dirty.  They're not protecting

9   our freedom.  God gave it to us, not the government.

10          Government's Exhibit 613:  Why are you here?  To

11  defend the Constitution.  "Well-regulated militia" is a good

12  idea right now.  The politicians are trying to divide us.

13  Can't put up with this.

14          I do agree that there is a significant spiritual

15  component to his decision making process.  I credit his

16  statements that he prayed and consulted God for guidance about

17  whether and how to act on his political concerns that he

18  clearly had, and that he indeed "felt" -- and that's his word,

19  not mine -- that God was giving him direction.

20          But even as the defendant tells the story, he's not

21  claiming that he was just going about his business, and the

22  Lord spoke to him directly, out of the blue, and told him to do

23  something.  It's more nuanced than that.

24          Rather, as he explained -- about as clearly as you

25  can to someone who may not share your particular faith -- that

1   once he was contemplating taking a particular action, he would

2   think deeply about each of the two competing options:  Should I

3   do this?  Or not do this?  And based on whether he's thinking

4   about one or the other brought him a sense of peace, he gained

5   an understanding about what he felt God was telling him to do.

6   He says this in his January 8th FBI interview at Government's

7   Exhibit 100.AA and 100.CC.

8          And I want to emphasize that in my view, the record

9   establishes that he is entirely sincere about this, and I

10  accepting it as a true and accurate statement of his state of

11  mind.

12         But for purposes of this element, and the decision I

13  have to make, I don't have to resolve the complex

14  psychological -- or maybe it's philosophical or maybe it's

15  theological -- question of whether that means he was first and

16  foremost motivated by what he understood God wanted him to do

17  or motivated by his clearly articulated desire to upend the

18  government, or at least to demonstrate to those in power that

19  the mob was capable of overthrowing them.

20         These are not mutually exclusive.  And the motivation

21  to overthrow the government is not an element of any charge in

22  this case.  He is not charged with sedation, there was no need

23  for the government to establish that he was a revolutionary.

24  The question before me is what did he intend to do?  Not why.

25         And the second element of Count 1 is whether he

1    intended to obstruct or impede a specific official proceeding;

2    the certification of the Electoral college results.  That's

3    what he's charged with.  It doesn't matter to this element if

4    he intended to do that with an understanding that he had the

5    Lord's imprimatur or agreement or discretion, or if he intended

6    to do it without taking that into consideration.

7           It also didn't matter if he intended to do that and

8    also intended to plead the blood of Jesus on the Senate floor.

9           And I want to digress here for a minute about that

10   because the evidence is replete with the defendant's statements

11   about pleading the blood of Jesus or wanting to plead the blood

12   of Jesus.  There is no evidence in the record, though, about

13   what this means as a matter of theology.  And that could vary

14   anyway depending on one's particular form of Christianity,

15   congregation you belong to, what you've been taught.  And I

16   would not presume to enter that discussion.

17          But more importantly, there is little or no evidence

18   in the record about what it meant to the defendant.  We get

19   only one glimpse, and that's the time when he says, in

20   Government's Exhibit 100.DD, during the FBI interview, "I

21   wanted to plead the blood of Jesus on that place because

22   there's all kinds of evil coming out of that thing."  So that's

23   consistent with the expelling evil spirits theory advanced by

24   counsel in its opening.  But that may not be all there is to

25   it.

1          I also note that even if you credit the defendant's

2    own statements, the evidence is consistent with the

3    government's theory that this may have been a later, or at

4    best, an additional motivation.

5          In the YouTube video, Government's Exhibit 1.GGG,

6    after he gets through the rotunda doors, he explains, "And then

7    I thought -- I just -- I thought, well, I was inside the

8    building.  I'm gonna walk around and plead the blood on this

9    thing.

10         And in the January 8th interview he says, at 100.DD,

11   I just felt like the lord wanted me to go in there and plead

12   the blood of Jesus inside the building, you know.  I just

13   wanted to show the politicians that we, the people, run this

14   country.

15         And that's when he explains, as I just read, that he

16   wanted to show them that we, the people, can do it if we

17   decide.  We had the power and the numbers at the moment to show

18   them that you don't run the country, we do.  And then he goes,

19   "and I wanted to plead the blood of Jesus on that place because

20   there's all kinds of evil coming out of that thing."

21         The government argued in closing, Well, if you wanted

22   to do that, he did that outside of the Senate, in the lobby.

23   He didn't need to go in the chambers and he didn't even do it

24   when he was inside.  I'm not sure we can say that.  It's not at

25   all clear to me that for this man, the pleading the blood of

1     Jesus is a distinct, visible, drop-to-your-knees moment in

2     time, a specific prayer.  It could very well be an ongoing

3     internal conversation or thought process or a state of mind or

4     intention or spirituality that moved him throughout the entire

5     day.

6              But as I said, whether he had that intention and how

7     he did or did not act upon it is not the point for this count.

8              The whole discussion about the two motivations was

9     largely beside the point because for this count we have to

10     wrestle with a different question:  His intent to obstruct the

11     official proceeding alleged in the indictment.

12              The law does not require proof that the official

13     proceeding was actually pending, or underway, or that it was

14     about to be instituted at the time of the defendant's actions.

15     But if the official proceeding was not pending at the time of

16     the defendant's conduct, the government must prove beyond a

17     reasonable doubt that the official proceeding was reasonably

18     foreseeable to the defendant at that time.

19              In addition, the law requires that there be a

20     connection or relationship in time, causation, or logic between

21     the obstructive act and the proceeding; that is, the government

22     must show that the defendant had knowledge that his actions

23     were likely to affect the proceeding.

24              The parties submitted jury instructions in this case

25     and in footnote 2 to the proposed jury instruction for Count 1,

1    the government provided the case law that supports what it

2    referred to as the nexus requirement.  And it cited

3    *United States versus Aguilar*, 515 U.S. 593, at 599 to 600.

4         The *Aguilar* case defined the nexus requirement in

5    connection with the offense of obstructing a judicial

6    proceeding to be, quote, that the act must have a relationship

7    in time, causation, or logic with the judicial proceeding.  The

8    Supreme Court reiterated the requirement that there be a "nexus

9    between the obstructive act and the proceeding" for purposes of

10   § 1512 in the *United States versus Arthur Anderson*, 544 U.S.

11   696, at 607.  And it mentioned and it made it clear that the

12   defendant has to have a particular official proceeding in mind.

13   And here the official proceeding has to be the one alleged in

14   the indictment, the congressional certification of the

15   Electoral college results.  Not simply some business of the

16   government, some business of the Congress or the results of the

17   election in general.  But the government is not required to

18   show that the defendant's sole intent was to impede the

19   proceeding.  And that's why he could have been there for his

20   religious reasons as well.

21        After reviewing all of the evidence, more than once,

22   I conclude that while it is through no fault of the

23   investigators or the prosecutors, that appears to be absent

24   from the government's proof in this case.

25        The government relies heavily on context:  He went to

1    a Stop the Steal rally, people were yelling, "stop the steal"

2    at the Capitol.  They tell me I can extrapolate from the words

3    "stop the steal" -- particularly given the context that the

4    attack on the Capitol came right on the heels of President

5    Trump's speech -- that they were talking about the

6    certification that Trump had been decrying before and decried

7    in his speech.

8            One problem we have with that is that the speech is

9    not in evidence.  Also, we don't know how much of it the

10   defendant heard or internalized.  We do know that he left with

11   the first wave of protestors and was walking towards the

12   Capitol well before it was over.

13           I do agree that you may be able to draw those

14   inferences with respect to a lot of the protestors.  But we do

15   not have one single text or Tweet or statement by this

16   defendant -- before, on, or after January 6 -- where he

17   articulates his grievance in terms of anything that Congress

18   was supposed to do in terms of any proceeding that was going on

19   that day.  We don't even have one single statement where

20   Mr. Black uses the phrase "Stop the steal."

21           He said, during his January 14th interview, that when

22   he got to the rally, people said that they were going to the

23   Capitol and he decided to go.  Government Exhibit 101.11, he

24   was told, "We're doing a protest at the Capitol."  And that is

25   a specific as it ever got.

1       The evidence did include information that President

2   Trump told the crowd to go up Pennsylvania Avenue to the

3   Capitol, but the evidence didn't include what he was

4   complaining about in particular, or what they were supposed to

5   go when they got there.

6       Defendant unquestionably went and unquestionably went

7   under his own power with the clear intent to get there and get

8   inside.

9       The government points to the Vice President's

10  announcement and the fact that the defendant said at the very

11  start of his video telling his side of the story, Government's

12  Exhibit 1.A.1, "Once we found out that Pence turned on us and

13  that they had stolen the election, like officially, the crowd

14  went crazy."  But the defendant had already breached the

15  barricade at the Peace Circle by that point and he was at the

16  gate in front of the Lower West Terrace before Pence issues his

17  statement, after 1 p.m.

18      The defendant was the first to breach that barrier at

19  12:57 and 55 seconds, according to Government's Exhibit 402A.

20  And that fleeting mention of Pence is the main piece of

21  evidence that, according to the government, anchors the

22  defendant's presence at the Capitol to the certification.

23      But if the focus is the defendant's intent and not

24  the intent of the mob, another thing you can't help notice --

25  can't help but notice is that he keeps using the past tense,

1    "they had stolen the election."  We had a lying, crooked

2    president.  Every other statement is like that as well, and I

3    can't help think but about something Mr. Fleckinger said in his

4    opening statement, which is that the defendant seemed to have

5    thought it was already over.

6          The government persuasively argued that once the

7    defendant entered the Senate, the document that caught his

8    attention was about Cruz's objection.  That the defendant went

9    to the effort to photograph it and save that photograph, even

10   if he may have deleted others.  So maybe he wasn't clueless

11   about the import of the day and the nature of the proceeding.

12         But the scene surrounding the document shows the

13   defendant walked up when others had already found it and

14   they're discussing it -- and indeed, the first person to look

15   at it and interpret it mistakenly saw it as a sign that Senator

16   Cruz had forsaken the, too.  The defendant does not weighed in

17   on the discussion and what he's thinking, as usual, is largely

18   inscrutable.

19         One could, in good faith, make the argument the

20   government made.  One could urge that one could draw the

21   inferences, make the assumptions and connections it asks me to

22   make.  And that could possibly be sufficient for Rule 29

23   purposes, where the Court is required to resolve all inferences

24   in favor of the government.  But as a factfinder, I cannot say,

25   in good conscience, that the government has proved this element

1     beyond a reasonable doubt.  I'm on the fence and I am troubled

2     by it and that's not good enough.

3          The third element of this count is that the defendant

4     acted knowingly, with awareness that the natural and probable

5     effective of his conduct would be to obstruct or impede the

6     official proceeding.  I think it's clear that he knew he was

7     obstructing or attempting to obstruct something governmental,

8     but what is quite vague and so that falls with the previous

9     element, given the absence of the specificity.

10          The fourth element is that the defendant acted

11    corruptly.  This is where I think the defendant's religiosity

12    has greater bearing than on the second element.  The defendant's

13    political and religious views are deeply intertwined, and

14    they're certainly a spiritual aspect to all of it.

15          I will say first, for purposes of the Rule 29 motion,

16    that I don't find that the defense motion has to be granted on

17    the basis that the government's case included evidence that the

18    defendant believed that his actions were at least approved of,

19    if not directed by God.

20          According to *United States versus Davis*, 562 F.2d

21    681, at 683 from the D.C. Circuit, it's only when there is no

22    evidence upon which a reasonable mind might fairly conclude

23    guilt beyond a reasonable doubt that the judge may properly

24    take the case from the jury.  Put another way, as the Circuit

25    said in *United States versus Weisz*, 718 F.2d, at 437, the

1    district court may grant a motion for judgment of acquittal

2    only when a reasonable juror must necessarily have had a

3    reasonable doubt as to the defendant's guilt.  And in

4    evaluating a motion for judgment of acquittal, the Court should

5    consider the evidence in the light most favorable to the

6    government.  That's *United States versus Wahl*, 290 F.3d 370.

7              So from the perspective of Rule 29, a juror could

8    have considered all of the evidence and found that

9    notwithstanding the mixed motives, the defendant was acting

10   with an unlawful purpose.

11             It is a much closer question, though, as to whether

12   one could conclude beyond a reasonable doubt that this

13   particular defendant, given the unique stew in his mind that

14   considerable misunderstanding about the Constitution,

15   considerable misinformation about the outcome of the election,

16   some pretty ugly assumptions about some of the political

17   figures involved, and a deep faith that infused all of his

18   political beliefs that all of that is percolating together and

19   is being further agitated and heated up by rhetoric available

20   on social media.  It is a close question whether one could

21   conclude then, beyond a reasonable doubt, that Mr. Black had,

22   quote, an understanding or awareness that what he was doing was

23   wrong or unlawful, unquote.  It's not the objective test of

24   whether he had it or should have had it, it's a subjective test

25   of what's inside his head.

1          Given the number of times he repeatedly passed

2    through or over obvious barricades, he repeatedly pushed his

3    way past uniformed officers, he repeatedly ignored their

4    official entreaties to desist or depart, all notwithstanding

5    the very obviously illegal mayhem around him and the very

6    obvious way the U.S Capitol Police had tried to stop him in

7    particular, a reasonable juror could conclude that this element

8    was established.  But I need not decide this very close issue

9    myself, given my determination with respect to the second

10   element that requires a not guilty verdict on this count.

11          The government also moved, though, on an aiding and

12   abetting theory.  So I need to consider that as well.  The

13   first element of that is that others committed obstruction of

14   an official proceeding by committing each of the elements in

15   the offense charged.  That was conceded.

16          But even if the government also proved the second

17   element, that the defendant knew that obstruction of an

18   official proceeding was going to be committed or was being

19   committed by others, that the defendant performed an act or

20   acts in furtherance of the offense, and that the defendant

21   knowingly performed that act or acts for the purpose of aiding,

22   assisting, soliciting, facilitating, or encouraging others in

23   committing the offense of an obstruction of an official

24   proceeding, some of that I think is iffy.  You don't have the

25   same intent problem with the fifth element that you have in

1    charging him with a principal portion of this count, which is

2    that the defendant did those act or acts with the intent that

3    others commit the offense of obstruction of an official

4    proceeding.

5              And, therefore, I find the defendant not guilty even

6    on an aiding and abetting theory of Count 1.

7              That brings us to Count 2, entering or remaining in a

8    restricted building or grounds with a deadly or dangerous

9    weapon, in violation of 18 U.S. Code § 1752(a)(1) and

10   (b)(1)(A).  The defense has conceded the lesser included

11   offense, but not the aggravated offense of doing this while

12   armed.  Concedes that the defendant entered or remained in a

13   restricted building or grounds without lawful authority to do

14   so.  And he concedes that the defendant did so knowingly.  He

15   does not concede that the defendant used or carried a deadly or

16   dangerous weapon during and in relation to the offense.  The

17   parties agreed that this is to be determined based on the facts

18   of the case.

19             Our agreed jury instruction was:  An object may be

20   considered a deadly or dangerous weapon for one of two reasons.

21   First, an object is a deadly or dangerous weapon if it is

22   inherently or obviously dangerous or deadly.  Second, an object

23   is a deadly or dangerous weapon if the object is capable of

24   causing serious bodily injury or death to another person and

25   the defendant carried it with the intent that it be used in a

1    manner capable of causing serious bodily angry or death.  The

2    defendant need not have actually used the object in that

3    manner.

4         While other courts and circuit have found that a

5    knife, like a gun, is inherently dangerous, end of story, the

6    government quotes a number of these cases in its submission at

7    docket 77.  We don't have circuit authority here directly on

8    that point.

9         The D.C. Circuit opinion that discusses the issue,

10   *U.S. versus Vinton*, 594 F.3d 14, at page 22, from the D.C.

11   Circuit in 2010, was considering whether there was probable

12   cause for a police officer to conclude that an individual had

13   violated a D.C. statute that was in effect at the time, not a

14   federal statute, that prohibited the carry of a deadly or

15   dangerous weapon, defined in that statute as one likely to

16   produce death or great bodily harm by the use made of it.  Kind

17   of more like the second part of the standard that we have then

18   the first.  And, therefore, the court looked to controlling

19   opinions issued by the D.C. Court of Appeals.

20        The circuit was talking about a different type of

21   knife than the one here.  It had a butterfly knife in front of

22   it, and it said:  Two categories of objects are likely to

23   produce the death or great bodily harm.  Those that are

24   inherently dangerous, that is, where the design of the object

25   is such that in its ordinary use it is likely to cause great

1   bodily injury, and those that ostensibly may be used as a tool

2   in certain trades or hobbies or may be carried for utilitarian

3   reasons, but where the surrounding circumstances indicate that

4   the purpose of carrying the object is its use as a weapon.

5   That's the circuit in *Vinton* and it is quoting *United States*

6   *versus Strong*, 581 A.2d 383, and also *Scott versus*

7   *United States*, 243 A.2d 54 from the D.C. Court of Appeals.

8          The circuit described the butterfly knife and

9   rejected the notion that it was, quote, inherently dangerous,

10   close quote.  It said, The record doesn't establish that

11   butterfly knives are inherently dangerous and, indeed, one can

12   imagine they might be used for sport or entertainment.

13   Nonetheless, the surrounding circumstances provided the

14   arresting officer with probable cause to believe that *Vinton*

15   intended to use it as a dangerous weapon.  And it cited *Lewis*

16   *versus United States*, 767 A.2d 219, at 222 where the D.C. Court

17   of Appeals had explained where the knife possessed by the

18   defendant is not inherently dangerous, the government must

19   prove beyond a reasonable doubt that the purpose of carrying it

20   was its use as a dangerous weapon.

21          The cited case from the D.C. Court of Appeals, *Lewis*,

22   seems to focus on the surrounding circumstances, but it also

23   looks to the design of the particular knife.  And it derived

24   its standard from *Scott versus United States*, at 243 A.2d 54,

25   in which the D.C. Court of Appeals said, "This court has

1    previously held that all knives are not per se dangerous

2    weapons.  A knife may be used as a tool in certain trades or

3    hobbies or it may be carried for utilitarian purposes.  Section

4    22-3204 does not prohibit the carrying of such instruments for

5    a legitimate purpose.  The statute, as we interpret it, outlaws

6    the carrying of an otherwise useful object where the

7    surrounding circumstances, such as the time and place the

8    defendant was found in possession of such an instrument, or the

9    alteration of the object, indicate that the possessor would use

10   the instrument for a dangerous purpose."

11          Even if the weapon had not been altered, its design

12   or construction could be relevant.  In some D.C. cases the

13   court found that an inherently dangerous design or the fact

14   that the object need not be altered for effectiveness as a

15   weapon, when combined with the surrounding circumstances, can

16   be the determining factor.

17          For instance, particularly menacing knives or a

18   machete have been found to constitutes dangerous weapons by the

19   court, in *Strong versus United States*, 581 A.2d 383, and *Mackey*

20   *versus United States*, 451 A.2d 887.

21          So if you put all of that case law together here, I

22   think the evidence could support a finding that the knife in

23   the circumstances of this case -- and I'm not deciding about

24   all knives, and I definitely don't have to decide about

25   smaller, folding Swiss Army pocket knives -- that this knife is

1    inherently dangerous.

2         But even if that's incorrect, it isn't necessary

3    because I also find that the second prong of the definition has

4    been satisfied, in any event.

5         The defendant's knife is long enough and sharp enough

6    from both the tip and along its edge to cut or stab.  And given

7    its curved shape, its design and its condition, it's

8    intrinsically and obviously capable of inflicting death or

9    serious bodily injury.  You would not need to alter it in any

10   way to render it incapable of doing so.  It's true, though,

11   that those aspects make it useful in other settings; hunting,

12   fishing, the defendant's daily outdoor labor.

13        But what we do not have a situation where this

14   defendant was stopped driving his truck on the way to work in

15   Alabama, or he got into a tussle there for some reason and we

16   have to determine if that happened while armed with a dangerous

17   weapon.  He wasn't coming or going from work.  He wasn't

18   hunting and he wasn't fishing.

19        He drove a truck all the way here from Alabama.  He

20   had a gun in the truck.  He stayed overnight in Virginia.  In

21   the morning, he woke up and he was going to a rally in the

22   nation's capital.  He got up and he got dressed and he chose to

23   equip himself with the knife.  He deliberately did not bring

24   the gun.

25        So the surrounding circumstances all indicate that in

1   this instance it was, handy as it might be, being carried as a

2   weapon and not as a tool.

3          But even if it's not inherently dangerous and the

4   issue is simply whether it is capable of causing serious bodily

5   injury or death and the defendant carried it with the intent

6   that it be used in a manner capable of causing serious bodily

7   injury or death, the evidence satisfies that test as well.

8          The evidence supports the finding that this knife is

9   capable of causing serious bodily injury or death for all the

10   reasons I just listed:  Its sharp edge, its pointed tip, the

11   length of the blade, its weight, its shape.  It could cut or

12   stab, and an upward stroke with the curve could do some

13   significant damage.

14          But beyond the surrounding circumstances that I

15   already discussed, we do know something about the defendant's

16   intent in connection with this knife; it's what he told us and

17   it answers the question.

18          The government's Exhibit 1.C.1, when the defendant

19   told his side of the story to YouTube, he said, "Actually, I

20   had a knife on me.  But they never -- I had too much clothes

21   on.  It was freezing out there, you know?  So I never -- I

22   wasn't planning on pulling.  I just carried a knife 'cause I

23   do.  I work outside and you need knives, you know?  I just -- I

24   don't -- you're not allowed to carry guns in D.C. and I don't

25   like being defenseless."

1            To the extent there's any lingering doubt about

2    whether this useful hunting, fishing, potentially landscaping

3    tool was, on January 6, a weapon, that answers the question.

4    If you are carrying it, arming yourself with it to defend

5    yourself with it, in lieu of your firearm, you are carrying it

6    with the intent to use it to cause physical harm to another

7    person.

8            The fact that the defendant said he intended to use

9    it defensively and not offensively does not affect the

10   analysis.  A firearm would have been a deadly or dangerous

11   weapon even if the person carrying it believed in good faith

12   that he would only pull it in self defense.  And in this

13   instance that's what the knife was, too.

14           The distinction might bear upon the legality of using

15   it if he used it and if the elements of self defense were

16   established, but it doesn't change the nature of the item

17   itself or the purpose for which it was carried.

18           While it might be legal to use something that is a

19   weapon, and a dangerous weapon, in self-defense, there is no

20   such distinction in what these statutes criminalize, which is

21   being in a particular place, a restricted area -- conduct that

22   was conceded -- while armed.  The defendant has pointed to no

23   case law that supports his assertion that such a law is not

24   violated as a matter of law if the person was ostensibly

25   carrying it for self-defense.  And, indeed, there is

1    controlling authority to the contrary.  In *Vinton*, 594 F.3d at

2    23, "that he may have planned to use the knife only in

3    self-defense or defense of another is irrelevant, so long as he

4    intended to use it as a weapon."

5         The defense filed an interesting submission that was

6    centered around the purpose for which the knife was designed.

7    In other words, the intent of the manufacturer.  That isn't

8    really an aspect of the jury instructions that the defense

9    agreed upon.  But, more importantly, the defendant's own

10   examples make it quite clear why that can't possibly be the

11   deciding factor.

12        The defense noted that scalpels are designed for

13   good, they're intended for people's health, surgery.  Cooking

14   knives are designed and intended for food preparation; dinner,

15   another happy outcome.  But surely, surely, both could qualify

16   as dangerous or deadly weapons.  For instance, if the surgeon

17   got angry and started chasing a nurse around the operating room

18   with his extremely sharp surgical tool, or if a chef went after

19   a waiter.

20        The defendant calls the knife here a hunting knife.

21   But that's kind of a broad and vague category for which the

22   defendant points to no commonly accepted definition.  But even

23   if that is a thing, a hunting knife is a distinct type of

24   knife, it doesn't answer the question.  It may very well be

25   that the defendant's knife was indeed designed for hunting

1    animals, and specifically, as the defense noted, for gutting

2    game.  And if carried for that purpose, the D.C. Court of

3    Appeals and the D.C. Circuit might well agree that the

4    government hasn't satisfied the test.  And the D.C. statute has

5    been amended to be more specific since the time of the case law

6    anyway.

7         But I am not sure it helped the defense any to

8    emphasize the gutting.  If you combine the fact that, according

9    to the defendant, this knife is capable of eviscerating a deer,

10   which is large animal with a thick hide that gets used to make

11   leather products, one can easily conclude that it is capable

12   causing great bodily harm to a person and would qualify as a

13   deadly weapon if carried for that purpose; that is, for the

14   purpose of being a weapon, as opposed to its intended design.

15        And, therefore, I reject the motion for judgment of

16   acquittal with respect to the aggravating element of this

17   offense, and I find that the defendant in fact carried a deadly

18   or dangerous weapon during the commission of the otherwise

19   conceded offense of entering or remaining in a restricted

20   building or grounds, which were restricted here due to the

21   ongoing visit by the Vice President of the United States.

22        I find him guilty of Count 2.

23        Count 3, disorderly or disruptive conduct in a

24   restricted building or grounds with a deadly or dangerous

25   weapon, in violation of 18 U.S. Code § 1752(a)(2) and(b)(1)(A).

1            First element is the defendant engaged in disorderly

2     or disruptive conduct in a restricted building or grounds.  And

3     this is conceded and is certainly supported by the facts.

4            Second element, which was not conceded, is that the

5     defendant did so knowingly and with the intent to impede or

6     disrupt the orderly conduct of government business or official

7     functions.

8            While I could not find my way to the intent to

9     obstruct the specific official proceeding of the certification

10    of the Electoral College vote, I do find, based on all of the

11    defendant's statements that I quote earlier, not to mention his

12    persistent, relentless efforts to get inside and stay there --

13    contrary to the very clear directions being provided by the

14    officers he insists that he respected -- that he very much

15    wanted to, at the very least, impede or disrupt the orderly

16    conduct of government functions that day.

17           The third element was that the defendant's conduct

18    occurred when or so that his conduct in fact impeded or

19    disrupted the orderly conduct of government business or

20    official functions.  And that, too, is conceded and is

21    supported by the facts; in particular, his remaining on the

22    Senate floor, but his remaining in the building at all and they

23    couldn't do anything.

24           And finally, the fourth element is that the defendant

25    used or carried a deadly or dangerous weapon during and in

1    relation to the offense.

2            I deny the Rule 29 motion on that element and I find

3    that that has been established beyond a reasonable doubt for

4    the exact same reasons I noted with respect to Count 2, and

5    find the defendant guilty of count 3.

6            Count 4, unlawful possession of a dangerous weapon on

7    Capitol grounds or buildings.  It's a different statute, 40

8    U.S. Code § 5104(e)(1)(A)(i).

9            The first element is that the defendant knowingly

10    entered the Capitol grounds or any of the Capitol buildings.

11    That is conceded.

12            The second element is that while he was on the

13    Capitol grounds or any of the Capitol buildings, the defendant

14    knowingly carried or had readily accessible to himself a

15    dangerous weapon.  This time that term is defined in 40 U.S.

16    Code § 5104(a)(2)(B) to include, quote, a knife having a blade

17    over 3 inches in length."

18            It's something of a mixed question of law and fact

19    here because while the measurements are not disputed, what is

20    included in the, quote, blade, unquote, to be measured is

21    disputed.

22            If I were to define the blade of the knife as the

23    defense proposes, it would not be over 3 inches in length, if

24    measured in a straight line from the handle to the point, and,

25    therefore, the defendant would have to be acquitted of the

1     greater offense as a matter of law.  But my legal ruling, for

2     purposes of the Rule 29 motion, is that the blade should be

3     measured as the government proposes.  I agree with the many

4     courts that have concluded that the definition of "blade"

5     should not vary with the knife.

6            The issue here is whether the non, not sharpened and

7     just slightly wider part of the metal blade above the bolster,

8     which is part of the handle, should be included when one talks

9     about the blade.  There is some suggestion in some of the

10    authorities that the word for the portion of the metal above

11    the bolster but below the sharpened portion of the metal blade

12    might be the tang.

13           We've previously found that the extension of the

14    metal blade all the way down into the handle is called the tang

15    and that is an extension of the metal that goes into the

16    bolster.  Whether it's called the tang or not, I'm not certain,

17    but I think everyone in the room knows exactly what I'm talking

18    about right now, and it was shown many times that there's a

19    clear differentiation where the knife gets considerably wider,

20    where the bolster or guard at the top of the handle begins and

21    then there's several eighths of an inch between that and the

22    sharpened portion of where the cutting edge, I think as people

23    have described it, of the blade.  So is that part of the

24    blade -- part of the blade, in quotes -- for purposes of this

25    statute?

1          There's no D.C. Circuit authority, so I'm going to

2     start with the plain meaning of the text.  Merriam-Webster

3     dictionary defines blade as, "The cutting part of an implement."

4     It defines knife as "A cutting instrument consisting of a sharp

5     blade fastened to a handle."

6          Oxford English dictionary defines blade as, "The thin

7     cutting part of an edged tool or weapon, as distinguished from

8     the handle."  Knife is defined as, "A cutting instrument,

9     consisting of a blade with a sharpened longitudinal edge fixed

10    in a handle.  The blade is generally of steel, but sometimes of

11    other material."

12         So, the two dictionary definitions talk about two

13    portions of a knife, a blade and a handle, and they don't

14    discuss the portion that we're talking about here expressly.

15    However, the American Knife and Tool Institute, which seems to

16    be the only professional organization about the knife industry

17    that either side has pointed me to, has a protocol for

18    measuring blade length, effective as of January 1st, 2005.  And

19    it says, "Where a statute, regulation or ordinance refers to

20    knife blade length, the measurement shall be the straight line

21    extending from the tip of the blade to the forward-most aspect

22    of the hilt or handle."  Doesn't stop you or make any

23    differentiation where the sharpened portion of the blade is or

24    is not.

25         And here the forward most aspect of the hilt or

1    handle is the bolster, which adds heft to the knife, but also

2    serves to protect your hand from sliding down to where it could

3    be cut by the blade.  And so that suggests that the blade

4    begins where it stops.  There is that very slightly wider,

5    non-sharpened portion of the blade on the other side of the

6    bolster.  But it's not differentiated from the sharpened

7    portion on our knife in any way and it is plainly different

8    from the bolster.

9            Special Agent Weeks explained that the resistant

10   point -- resistance point that would stop the knife from

11   penetrating into a body or some other item if the knife was

12   used in a stabbing motion, as opposed to a cutting motion,

13   would be the bolster.  But that unsharpened edge of the metal

14   just above the bolster that is contiguous and part of the metal

15   blade could penetrate.

16           So even if you called it a tang and not part of the

17   blade, the tang is that portion of the blade that continues

18   into the handle.  It isn't part of the handle, like the bolster

19   is.  And, indeed, Webster's defines the tang as, "The

20   projecting shank, prong, fang, or tongue, as on a knife, to

21   connect with the handle."  And the Oxford English dictionary

22   defines the tang as, "An extension of a metal tool or

23   instrument, as a knife, by which it is secured to its handle."

24   So it doesn't differentiate.  It doesn't include the tang in

25   the handle, it differentiates it from the handle in the way all

1   these cases and all these definitions differentiate the blade

2   from the handle.

3           And that is what led the court, in *People versus*

4   *Sito*, 994 N.E.2d 624, at 630 to 631, for the Illinois Court of

5   Appeal, in 2013, to determine that "The blade of a knife is

6   properly measured from the hilt to the tip of the blade."  The

7   court examined the dictionary definitions and held that they

8   make it clear that a knife is comprised of two components -- a

9   handle and a blade -- and, thus, the part of the knife that's

10  not the handle is the blade.

11          In *Perez versus State* out of Texas, at 1999 Westlaw

12  521705, July 23rd, 1999, that that court affirmed the district

13  court's inclusion of the knife's tang in determining the

14  blade's length.  Defining tang to be the very thing we're

15  talking about here, "The unsharpened portion of the knife blade

16  that attaches to the handle."  The court rejected -- in that

17  case the issue was whether it was void for vagueness.  But it

18  said, "Any ordinary person exercising common sense would be on

19  notice that a blade includes that portion of a knife between

20  the handle and the sharpened portion of the blade."

21          Similarly, *McMurrough versus State*, 995 S.W.2d 944,

22  at 946, also out of Texas, said the blade -- quoting a

23  different dictionary -- is, "The flat-edged cutting part of a

24  sharpened tool or weapon."  But it rejected the defendant's

25  argument that a blade only included that, noting the common

1   meaning merely distinguishes the cutting part from the handle.

2   Therefore, a blade is the flat-edged part, which includes the

3   sharpened part of the instrument and any remaining flat-edged

4   part up to, but not including, the handle.

5         The court came out the same way in *United States*

6   *versus Deisher*, D-E-I-S-H-E-R, at 32 M.J. 579, 580.  This was a

7   folding knife, but it talked about the entire folding metal

8   portion of the knife that extends from the handle to the tip of

9   the blade.  And it found that the sharpened or honed and

10  unsharpened or unhoned portion of the folding metal part was

11  part of the blade because it wasn't part of the handle or the

12  hilt.  Similarly, *Rainer versus State*, 763 S.W.2d 615.

13        There are, true, some courts that have gone the other

14  way.  *Bradvica versus State*, 760 P.2d 139, at 141, from Nevada

15  in 1988, where the court said, "In strictly construing the

16  statute, we hold that the blade of such a knife is that portion

17  which is customarily sharpened from the tip of the knife to the

18  tang."  So they did not include the unsharpened extension of

19  the blade which forms the hinge connecting the blade to the

20  handle.  Which already shows you the problem if they're calling

21  the tang a portion of the blade.

22        The *Sito* court rejected that as being inconsistent

23  with the common understanding and the dictionary definition of

24  a knife, which is a blade and a handle.  That court also noted

25  that the statute that was before it, the *Sito* court, also

1    included daggers, dirks, and stilettos, items that stab and

2    don't just cut, and it reasoned that since the entire stabbing

3    portion, and not just the cutting portion, should be included

4    when you're talking about those knives, it should be included

5    when you're talking about the length of the blade.

6         I find all of that to be persuasive, as our statute

7    also includes a dagger, dirk, or stiletto within the definition

8    of what could be a dangerous weapon.

9         I do recognize that there is another case, *In re:*

10   *Rosalio*, that also agreed with the *Bradvica* decision.  And the

11   district court -- court in this district pointed out, as the

12   defense told me, that when Congress has provided no definition

13   for the particular term, the ordinary meaning associated with

14   that term applies.  To me, that points to the dictionary

15   definitions that we've been talking about and the ordinary

16   concept of a knife having a blade and a hilt, and the fact that

17   even when people talk about the tang, they talk about it as

18   being part of the blade.

19        I do agree with the defense, with the statement of

20   law that if something is ambiguous, the Rule of Lenity requires

21   the court to resolve it in the defendant's favor.  But I don't

22   find "blade" to be ambiguous in the circumstance.

23        Therefore, I find that the blade is 3 3/8 inches long

24   and, thus, exceeds 3 inches, and that the government has proved

25   this element beyond a reasonable doubt.  I don't accept the

1    government's invitation that I could measure it on the curve

2    and get there that way.  It isn't consistent with any of the

3    authorities that the government provided and there's no legal

4    or factual information in the record to suggest that that's how

5    it would be done.

6          And I also want to note that even if my ruling on

7    this point is overturned or incorrect and the blade in this

8    case is as it was measured by Special Agent Weeks, 2 7/8

9    inches, or just under 3 inches, that does not affect the

10   analysis of whether it is a deadly or dangerous weapon for

11   purposes of Counts 2 and 3 at all.

12         The defense provided no authority for the proposition

13   that just because Congress defined the dangerous weapon in

14   Title 40, § 5104, that that definition is somehow supposed to

15   be incorporated into the criminal code in Title 18 where the

16   § 5104 definition is not even referenced.  They are very

17   different sections of the U.S. Code and very different

18   statutes.

19         40 U.S. Code § 5104(e) establishes sanctions for a

20   very narrow and specific type of conduct:  Possession of a

21   deadly or dangerous weapon on a bounded physical area of a

22   federal property that is generally completely open to the

23   general public, the Capitol grounds.  But 18 U.S. Code § 1752

24   covers entering and remaining in, or being disorderly in, any

25   number of spaces, not just the Capitol, but spaces that become

1    restricted to the public purely by virtue of the fact that a

2    Secret Service protectee is there.  Given the high ranking

3    nature of those executive branch officials, and the national

4    security interest in their physical well-being and security,

5    the critical aspect from the legislature's point of view could

6    very well be the harm the weapon could cause, as opposed to an

7    eighth of an inch or two one way or the other.

8           And if we're going to range around the code and

9    incorporate a definition from elsewhere, 18 U.S. Code

10   § 930(g)(2) defines a dangerous weapon to be:  Anything readily

11   capable of causing death or serious bodily injury, except it

12   doesn't include a pocketknife with a blade of less than

13   2.5 inches of length.  So this knife would qualify.

14          Given the lack of any indication that Congress

15   intended to incorporate either definition in § 1752, we can't

16   just pick up one and say it applies.  And the analysis I set

17   forth in connection with those counts controls, notwithstanding

18   the analysis of purposes of Count 4.

19          So I find the defendant guilty of Count 4, while

20   armed.

21          Count 5, entering or remaining on the floor of

22   Congress, 40 U.S. Code § 5104(e)(2)(A), the defendant conceded

23   the entire count, that he entered and remained on the floor of

24   either House or Congress without lawful authority to do so.

25   And he acted willingly and knowingly.  And the evidence

1   certainly supports those concessions.

2          So I find the defendant guilty of Count 5.

3          Count 6, disorderly conduct in a Capitol building, 40

4   U.S. Code § 5104(e)(2)(D), that the defendant engaged in

5   disorderly or disruptive conduct in any of the United States

6   Capitol buildings.  That element was conceded.

7          The second element, which is not conceded, is that

8   the defendant did so with the intent to impede, disrupt, or

9   disturb the orderly conduct of a session of Congress or either

10  House of Congress.  I find, similarly to the way I did for

11  Count 3, that this element has been established beyond a

12  reasonable doubt based both on the defendant's statements

13  afterward about what he was trying to do and his statements and

14  actions while on the premises, that I've described in detail,

15  and the way the defendant conducted himself and declined to

16  depart until essentially forced to do.

17         The object of the conduct penalized in this provision

18  is not specifically focused on a particular congressional

19  proceeding, as in Count 1.  It is simply the legislature's

20  ability to go about its business in an orderly way.  The

21  defendant was clearly there and he took repeated intentional

22  steps that had the natural and probable consequence of

23  preventing this group of politicians, as he called them, from

24  doing their work.

25         The third element of that offense is that the

1    defendant acted wilfully and knowingly, and that is conceded.

2              And, therefore, I find the defendant guilty of

3    Count 6.

4              In sum, I have found the defendant not guilty of

5    Count 1, and guilty of Counts 2, 3, 4, 5, and 6.

6              At this point what we need to do is set a sentencing

7    date.  But we need to discuss the question of the defendant's

8    bond.

9              Mr. Meinero, would you like to be heard?

10             MR. MEINERO:  Yes, Your Honor.  Thank you.  In light

11   of the Court's verdict, we will not be opposed to Mr. Black

12   maintaining release pending sentencing.

13             But also in light of the Court's findings based on

14   the facts of this case, that he did engage in conduct -- or,

15   participated in conduct that was violent, although he may not

16   have assaulted officers himself, that he engaged in menacing

17   language towards officers within the Capitol and also that

18   he -- has been compliant during his release, the facts of the

19   case showed noncompliance with law enforcement at the Capitol.

20   We don't --

21             THE COURT:  I'll go with noncompliance with law

22   enforcement at the Capitol.  I'm not sure I spoke about

23   personal violence by Mr. Black.

24             MR. MEINERO:  I'm referring to the heave-ho action,

25   Your Honor, in which he participated.

```
 1                THE COURT:  All right.

 2                MR. MEINERO:  In light of those factors, we think

 3     that maintaining him on his current conditions would be a good

 4     idea.  So that is what we propose.

 5                THE COURT:  All right.  I would not intend to change

 6     his conditions, but I do find by clear and convincing evidence

 7     that with these conditions he's not likely to be a flight risk

 8     or to pose a danger to the community.  He has been 100 percent,

 9     perfectly compliant with his conditions of release since the

10     day I released him.

11                He will remain on all of his existing conditions; the

12     monitoring, everything else.  But I'm not going to detain him

13     between now and his sentencing date.

14                So, happy to hear from you, Mr. Fleckinger, but not

15     that you have anything to add.

16                MR. FLECKINGER:  You don't need to hear from me with

17     regard to that issue.

18                THE COURT:  All right.  Okay.  I believe that the

19     probation office is still asking for 90 days, in terms of

20     preparing a presentence report.  At least -- what does that

21     take us to, Mr. Haley?

22                THE COURTROOM DEPUTY:  One second.

23                MR. FLECKINGER:  April 13th, for the completion of

24     the report.  I can -- I'm almost completely open, I would

25     imagine, in April.  So if that's when you're thinking?
```

```
1                    THE COURTROOM DEPUTY:  90 days takes us to April 13,

2     Your Honor.

3                    THE COURT:  All right.  Let me see.

4                    MR. FLICKINGER:  The probation need 90 days for the

5     completion of the report and then we need a couple --

6     obviously, I'm going to end up preparing a sentencing

7     memorandum --

8                    THE COURT:  What usually happens is you get a

9     draft --

10                    MR. FLECKINGER:  No, I know.

11                    THE COURT:  -- and that has pretty much everything

12     and it can get you started.

13                    MR. FLECKINGER:  No, I will.

14                    THE COURT:  And then sometimes it's around the same

15     time that I get the final.  But I think --

16                    MR. FLECKINGER:  I would suggest, if it's available

17     to the Court, around the end of April.

18                    THE COURT:  All right.  Let me see what's happening

19     then.

20                    THE COURTROOM DEPUTY:  You have a trial.

21                    THE COURT:  I have an antitrust trial.  Why don't we,

22     just because -- given that trial, can we set this down for the

23     first week in May?  Does that make sense?

24                    MR. FLECKINGER:  Sure.  That's fine.

25                    THE COURT:  All right.  How about May 5th, 9:30 in
```

```
 1        the morning?
 2                    MR. FLECKINGER:  May 5 is fine.  What time?
 3                    THE COURT:  9:30.
 4                    MR. FLECKINGER:  Sure.
 5                    THE COURT:  And I'll ask for the sentencing memoranda
 6        on the 28th of April.  And we'll do it -- it has to be in
 7        person, a felony sentencing, now.
 8                    MR. MEINERO:  May 5th at 9:30 is fine for the
 9        government.
10                    THE COURT:  All right.  Is there anything else I need
11        to take up right now on behalf of Mr. Black?
12                    MR. FLECKINGER:  No.  Thank you.
13                    THE COURT:  Anything further for the government?
14                    MR. MEINERO:  No, ma'am.  Thank you.
15                    THE COURT:  Anything further from you?
16                    THE COURTROOM DEPUTY:  No, that's -- I was at
17        sentencing all of a sudden.
18                    THE COURT:  No, no, we're not there yet.
19                    All righty.  I hope everybody in your family is safe
20        after all the tornadoes in Alabama.  I looked, and I didn't
21        seem to think that it went through where you're from.  So I
22        hope everybody is safe and sound when you get home.
23                    THE DEFENDANT:  Thank you, ma'am.
24                    MR. FLECKINGER:  Thank you.
25                    THE COURT:  Thank you.
                                      *   *   *
```

1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, JANICE DICKMAN, do hereby certify that the above and

4     foregoing constitutes a true and accurate transcript of my

5     stenographic notes and is a full, true and complete transcript

6     of the proceedings.

7                              Dated this 25th day of January, 2023

8

9

10                             _____

11                             Janice E. Dickman, CRR, CMR, CCR
                               Official Court Reporter
12                             Room 6523
                               333 Constitution Avenue, N.W.
13                             Washington, D.C.  20001

14

15

16

17

18

19

20

21

22

23

24

25