**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| | : | |
| **UNITED STATES OF AMERICA** | : | **Case No.: 21-cr-179 RCL** |
| | : | |
| **v.** | : | |
| | : | |
| **RACHEL POWELL,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

### PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, provide the following proposed findings of fact following a trial for the above case:

A two-day bench trial in this criminal matter concluded on May 10, 2023.  For her actions at the riot of January 6, 2021, the government charged Rachel Powell, the defendant, by Superseding Indictment with: (1) Interference with a Law Enforcement Officer during a Civil Disorder, in violation of 18 U.S.C. § 231(a)(1); (2) Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2),2; (3) Destruction of Government Property, in violation of 18 U.S.C. § 1361; (4) Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A); (5) Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(2) and (b)(1)(A); (6) Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C 18 U.S.C. §§ 1752(a)(4) and (b)(1)(A); (7) Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); (8) Act of Physical Violence in a Capitol

1

Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F); and (9) Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

In support of its case, the Government introduced the testimony of four witnesses: (1) Captain Neysha Mendoza of the United States Capitol Police (USCP); (2) Sergeant William Bogner of the Metropolitan Police Department (MPD), (3) Jason McIntyre from the Architect of the Capitol; and (4) Special Agent Thomas Jordan from the Federal Bureau of Investigation (FBI). During the government's case-in-chief, the Court admitted 91 exhibits.

Prior to the Government's case, the United States informed the Court it would no longer be seeking a conviction on the felony Destruction of Government Property charge (Count III of the Superseding Indictment), only the misdemeanor charge.

In reaching a decision on the following findings of fact and conclusions of law, the Court considered the pleadings, the record, including the 91 exhibits, the testimony of the witnesses, the parties' stipulations, the demeanor of the witnesses while testifying, the reasonableness of the testimony, the probability of the testimony, and all reasonable inferences to be drawn therefrom, among all other matters bearing on the credibility of the witnesses and the facts and exhibits in evidence.

## FINDINGS OF FACT

### A.    The Defendant's Actions on January 6, 2021

1.    Per stipulation[1], the United States Capitol, which is located at First Street, SE, in Washington, D.C., is secured twenty-four hours a day by USCP.  Restrictions around the Capitol include permanent and temporary security barriers and posts manned by USCP.  Only authorized people with appropriate identification are allowed access inside the Capitol.

---

[1] The parties' stipulations were admitted as Exhibit 60.

2.      According to the testimony of Captain Mendoza, on January 6, 2021, the exterior plaza of the Capitol was closed to the public, with a variety of signage placed to alert passersby not to enter the area.  As provided in her testimony as well as in Exhibits 4 and 6, the grounds surrounding the Capitol Building had a combination of bike racks, snow fencing, and other barriers with signs that read: "Area Closed."

3.      Per stipulation, on that day, a joint session of the United States Congress convened at the Capitol.  During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in both the House and Senate chambers of the Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on Tuesday, November 3, 2020.  Per stipulation, Vice President Michael Pence was in the Capitol building and presiding over this joint session.  Senators were evacuated from the Senate Chamber at 2:13 p.m., and members of the House of Representatives were evacuated from the House Chamber at 2:30 p.m.

4.      Further by stipulation, beginning at 12:53 p.m., and continuing until approximately 6:30 p.m., the events on the Grounds of the United States Capitol and in the United States Capitol building constituted a "civil disorder" as that term is used in Title 18, United States Code, Section 231(a)(3).  This civil disorder obstructed, delayed, or adversely affected commerce or the movement of any commodity in commerce as used in 18 U.S.C. § 231(a)(3).  Further, the civil disorder affected two federally protected functions, namely USCP's protection of the Capitol and its grounds, and the United States Secret Service's protection of the Vice President of the United States and his family.

5.      Before entering Capitol grounds, the defendant joined other protesters at Peace Circle near First Street. As seen in Exhibit 1.01A, the defendant walked along the path leading

from Peace Circle to the West Plaza almost immediately after the breach of the Peace Circle barricades.

6.      Captain Mendoza testified to the timing of the breach of the Peace Circle—at approximately 12:53 p.m.  This was corroborated by Exhibits 10 and 1.01A.  In Exhibit 1.01A, at approximately 33 seconds, the individual filming exclaimed, "They broke the gate? Oh my gosh guys, they broke the gate."  At 48 seconds, the individual filmed bike racks strewn on the ground.

7.      Exhibit 1.01A is contemporaneous with the defendant's approach to the West Plaza; the defendant was seen on the video at: (1) 2 seconds, (2) 3 minutes and 32 seconds, and (3) 8 minutes and 6 seconds.  In Exhibit 1.03, found in the defendant's iCloud account, during the defendant's march to the West Plaza from the Peace Circle, she entered the restricted area, passing over downed barriers in place to provide notice that the area was restricted.  The defendant further passed snow fencing with signs stating, "AREA CLOSED."

8.      After entering the restricted area and arriving at the West Plaza, the defendant and other rioters stood before a line of USCP officers.  Within Exhibit 2.01, the defendant joined other rioters in chants of "U.S.A.!"  At the same location, as seen in Exhibits 2.04 through 2.06—pictures from the defendant's iCloud account—officers put bike racks in place to prevent rioters from moving closer toward the Capitol building.

9.      According to Exhibit 12, by approximately 1:12 p.m., MPD officers reinforced USCP officers attempting to prevent the mob gathered at the West Plaza from reaching the Capitol building.  According to Captain Mendoza and Exhibit 2.12, officers deployed nonlethal force in an unsuccessful effort to disperse the crowd.

10.     According to Exhibit 2.09, at approximately 2:03 p.m., officers blared an alarm and then a recorded announcement, "This area is now a restricted access area pursuant to D.C. Official

Code 22-1307(b).  All people must leave the area immediately. This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon."

11.     As seen in Exhibits 2.07, 2.08, 2.10, and 2.11, the defendant repeatedly pushed against bike racks using her hands, shoulders, and back.  As seen in Exhibit 2.07, USCP officers attempted to lock bike racks together to form a barrier against the rioters.  At 38 seconds, the defendant pushed against the bike racks with her hands to prevent them from locking the racks.  In Exhibit 2.08, the defendant pushed against bike racks with her body as she encouraged other rioters to join her, shouting, "Come on up people, don't be shy!"  In Exhibit 2.10A, at 49 seconds, the defendant pushed against the bike racks with her back as officers attempted to prevent the barriers from falling over.  The defendant ignored the repeated yells of the officers, "Get off the fence!"  Likewise, in Exhibit 2.11, the defendant again pushed against the bike racks and the officers' attempts to maintain the line.

12.     Per stipulation, these officers were lawfully performing their duties incident to or during the commission of a civil disorder.

13.     At approximately 2:28 p.m., seen in Exhibit 12, rioters breached the police line at the West Plaza and pushed forward towards the Capitol, violently assaulting law enforcement officers along with way.  As seen in Exhibits 2.13, 2.14, and 2.15, the defendant participated in the breach by pushing against bike racks as the police line broke.  Afterwards, as seen in Exhibit 2.15, at 17 seconds onwards, and in Exhibit 18, the defendant and other rioters collectively pushed retreating law enforcement into a semi-circle near the corner of the West Plaza.  When law enforcement officers finally retreated from the area, the defendant cheered with other rioters, shouting, "Whose house? Our House!"  Exhibit 2.19.

14.     Next, the defendant joined other rioters who broke through the line of police and at 2:40 p.m., made her way up a narrow stairwell to the Presidential Inaugural stage.  Exhibit 103. This area was called the Lower West Terrace, and the focal point of the stage was an archway (or tunnel) that led to the Lower West Terrace entrance.  According to Captain Mendoza, the entrance, through various interior halls and office suites, would provide access to all other parts of the Capitol building if someone were to enter it.

15.     Officers formed a line within this entranceway to prevent rioters from gaining access inside the Capitol building.  According to Exhibits 3.02, 3.03, and 3.04, the defendant joined other rioters and entered this tunnel.  According to Exhibit 3.02, while inside the tunnel, the defendant observed others smash the doors to gain entrance.  When rioters were unsuccessful in bypassing the line of police officers at the Lower West Terrance entrance, the defendant exited the tunnel and repositioned herself immediately outside the entrance.  Exhibits 3.05 & 3.06B.

16.     According to Exhibit 3.06B, the defendant stood at the entrance of the tunnel while other rioters violently thrashed against law enforcement.  From this vantage point, and based on the direction she was facing, the defendant observed the officers worked to regain the tunnel entrance and push other rioters out of the building.  According to Exhibit 3.06B, the defendant was standing within arm's reach of an officer being violently pulled out of the tunnel and assaulted in the crowd.  The defendant observed the crazed environment of that moment as well as heard the screams of her fellow rioters.

17.     According to Special Agent Thomas, at approximately 4:25 p.m., the defendant made her way just a few steps left to a two-story window left of the tunnel entrance.  According to Mr. McIntyre, the window led to room "Senate Terrace 2," or "ST-2" for short.  According to Exhibits 3.08 through 3.10, the defendant entered this room by crawling through an already broken

window.  In Exhibit 3.11, upon entering, the defendant joined her fellow rioters in chants of: "Whose house? Our house."  At some point, the defendant left through the same window she entered before pushing her way to another two-story window right of the Lower West Terrace tunnel entrance leading to "House Terrace 2," or "HT-2" for short.

18.     According to Exhibits 3.12 and 3.13, the defendant used an ice axe in her attempt to break through the window to HT-2, and then used a large cardboard tube as a battering ram on that same window.  Exhibit 3.12 showed not only the violent acts against the Capitol window, but also the preparation the defendant took before attempting to smash through the window.  She adjusted the strap of her backpack; she nodded to the fellow rioter on the other side of the battering ram; she adjusted her hat; and grabbed the tube with both hands.

19.     According to Mr. McIntyre, the window that the defendant smashed with the ice axe and the cardboard tube cost approximately $753.

20.     Mr. McIntyre further testified that immediately inside of the HT-2 was a glass floor and underneath that floor was another set of rooms.  At approximately 5:01 p.m., after smashing HT-2, the defendant returned to the left side of the Lower West Terrance tunnel entrance.  There, using a bullhorn, the defendant provided the following instructions to other rioters within ST-2:

> Hey guys, I've been in the other room, listen to me.  In the other room, on the other side of this door, right here where these feet are standing, there is a glass, that if somebody, if it's broken, you can drop down into a room underneath it.  There's also two doors in the other room, one is the rear and one to the right when you go in, so people should probably coordinate together if you're going to take the building…

> Exhibit 3.15.

21.      Afterwards providing the instruction, according to Exhibit 3.17, the defendant returned to the right side of the tunnel entrance.

22.     According to Special Agent Thomas, law enforcement officers dispersed the rioters near the Lower West Tunnel entrance after 5 p.m.

**B.     The Defendant's Social Media Presence**

23.     Before and after January 6, 2021, the defendant actively used her Facebook account.  Portions of the defendant's account—including the months before and days after January 6—were admitted during trial as Exhibits 55C and D.   Records from the defendant's Facebook account prior to January 6, 2021, show that in the months leading up to January 6, 2021, the defendant claimed that the election was stolen, expressed support for violence, and discussed her plans to travel to D.C. on January 6. For example, on October 14, 2020[2], the defendant replied in part to a comment to a post, "I agree with the possibility of civil war happening. I can see that too. Unfortunately the only way this is probably capable of being fixed is bloodshed because I'm not so sure our government can be fixed the political way anymore either."

24.     On November 4, 2020, the day after Election Day, the defendant posted in part on her account:

> And now so many of you are complaining on social media about probable fraud in the voting system? You can't complain! Not even one of you that has been complacent should open your mouths! Hang your head in shame and shut your face unless you are going to actively do something. The government knows exactly how far you can be pushed because the population has been successfully tested. They know 99.9% of the people will roll over, belly up, like a bunch of cowards.

25.     On November 12, 2020, the defendant posted, "For Biden to have won PA he would have had to get at least 80% of the mail in ballots.  That's impossible."

---

[2] The government is referring to the dates and times if the times were in EST rather than UTC.

26.     On November 12, 2020, in a private chat, the defendant told another individual that she was "headed to dc." When asked if she was going for "[e]lection stuff or vacation," the defendant responded, "[t]he caravan. I wish we were dragging the political fuckers out of office."

27.     On November 15, 2020, the defendant left a voice message specifically outlining her plan to keep former President Trump in power:

> So I'm still in D.C. but last night I met with some people and I think we have a reasonably good plan: if Trump concedes, or does not concede, I'm sorry, then if it gets through the courts and the courts agree with him, then it will have to go to the House to be voted on, to see whether or not he gets to stay President. So, if we can simply determine who those people are, that would cast their vote for him and call them and talk to them, the ones that are not making the correct decision for the people, instead of having protests in Washington, D.C., we'll take to their homes.

28.     On November 16, 2020, the defendant notified another individual in her account that she was "back home tomorrow. I had a meeting I needed to stop by tonight. I think we have some really good plans coming in the future to help stop the election fraud." When asked if she got "caught up in the violence," the defendant responded, "I only mildly did. I was going around dc with a little beater bar all weekend and wasp spray and knives in my bag so I was pretty confident." The defendant further added, "[t]hey only pick on the vulnerable."

29.     On November 22, 2020, in a private chat with another individual:

> Powell: We did surveillance on an officials home. The person was not seen coming in and out. Is there a way to check and make sure she still owns this house so we KNOW we have the correct address?
>
> B.K.: . . . its better to send letters to their office and leave their family and private residences alone
>
> Powell: No, it isn't. These fuckers need to start listening to the people and doing their jobs.
> Letters aren't working.
> Can I find this information at any courthouse or does it have to be from the courthouse that is near the home?
>
> B.K.: the county courthouse of the area the house is in

Powell: Is there ANY way to get this without going into that courthouse?

. . .

B.K.: have u tried a petition or scheduling a one on one

Powell: It's time to take protests to their doors

…

Powell: Ok, here's the deal. We can still get Trump in I believe. If we do we might be ok for a few more years. So we need to really be on the people in charge of elections.

30.     On December 6, 2020, the defendant commented on a post, "But what everyone should do, imo, is just defy the government. No game playing. Just defiance. We will do what we want and there's nothing the gov can do to stop us."

31.     One day after January 6, 2021, the defendant posted on her Facebook, in reference to the day before, "🤣 we have given you all a chance to help us settle this peacefully. We have been patient. The time is up."  In another post, the defendant wrote, "the police fought back well. I did see them retreat before people were on the second floor but that was a fight to get them to retreat. They had their barricades removed from them and were pushed back. Some police showed fear. Some of them were patriots and you could see it in their face. Many of them stood their ground."

32.     In another post on January 7, the defendant wrote, "we have been patient and tried to go the legal route. It isn't working and the government isn't hearing us. It's time to rise."  The defendant also wrote, "nobody was let the fuck in. It was war."

33.     On January 9, 2021, the defendant wrote, "What I want to know is what men like Mastriano expect Americans to do.  We tried legal routes to ensure a fair election.  When there wasn't going to be one, and legal routes were found to be a dead end, the people took/tried to take the Capitol back.  What are Americans suppose to do?  Sit back and do nothing?  Why don't we

just start calling the president King?  This makes no sense to me.  Please, Mastriano, explain WHEN it's ok for the people to fight back?"

## C.     The Execution of the Search Warrant and Arrest of the Defendant

34.     On February 4, 2021, FBI executed a search warrant at the defendant's residence. According to Special Agent Thomas, prior to February 4, FBI had issued a public BOLO (Be On The Lookout) on their website for the defendant.

35.     On February 4, Special Agent Thomas called the defendant prior to the execution of the search warrant.  The defendant did not pick up.

36.     According to Special Agent Thomas, upon arrival, the defendant was not at the residence.  Among other things, FBI found four smashed phones in the defendant's residence, as well as two "go-bags" containing ammunition, rope, duct tape, knives, ninja stars, lighters as well as the black jacket with the fur-lined hood that matched the one the defendant wore on January 6th.  Exhibits 13-32, 37-39.

37.     Special Agent Thomas further testified that the defendant turned herself in at the FBI Field Office that night.  At the time she turned herself, FBI found an additional "go-bag" inside of her vehicle.  Exhibits 40-52.  FBI further found an empty iPhone box inside of her vehicle. *Id.*  According to Special Agent Thomas, no phone was found on the defendant's person or in her vehicle.  Special Agent Thomas' phone number and name were written on the defendant's arms.

38.     Special Agent Thomas is aware that the defendant does own a phone.  The defendant texted Special Agent Thomas after her arrest on February 4, requesting to speak to him.[3] Exhibit 59.  According to 55C, the defendant also had a phone prior to February 4, 2021. According to her iCloud account, the defendant had a phone on January 6, 2021.

---

[3] According to Exhibit 59, Special Agent Thomas declined to speak to the defendant because she was represented by an attorney.

39.     Special Agent Thomas testified that after the defendant's arrest, she was briefly detained at the Butler County Jail, and while there, the defendant made phone calls.  In one of the calls, the defendant had a conversation with her daughter.  Exhibit 54.  During the conversation, the two had the following exchange:

Powell: it's crazy what they're saying.  But all it is is a broken window in reality.

Daughter: An expensive broken window though.

Powell: I know but it wasn't even that big of a window. I don't understand. They are trying to say it was over $1,000 dollars.

40.     Later, during the call, the defendant stated, "Well that was like a plastic pipe.  So it wasn't very sturdy either.  But it was a thick window."  Exhibit 54.

## CONCLUSIONS OF LAW

**A.     Count One**

41.     Count One of the Superseding Indictment charges the defendant with Interference with a Law Enforcement Officer during a Civil Disorder, in violation of 18 U.S.C. § 231(a)(3).  In order to find the defendant guilty, the government must prove beyond a reasonable doubt that: (1) first, the defendant knowingly committed an act or attempted to commit an act with the intended purpose of obstructing, impeding, or interfering with one or more law enforcement officers; (2) second, at the time of the defendant's actual or attempted act, the law enforcement officer or officers were engaged in the lawful performance of their official duties incident to and during a civil disorder; and (3) third, the civil disorder in any way or degree obstructed, delayed, or adversely affected either commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function.  18 U.S.C. § 231(a)(3); *United States v. Pugh*, 20-cr-73 (S.D. Ala. May 19, 2021); *United States v. Rupert*, No. 20-cr-104 (D. Minn. Mar. 12, 2021) (ECF No. 81)).

42.     A person acts "knowingly" if she realizes what she is doing and is aware of the nature of her conduct, and does not act through ignorance, mistake, or accident.  *United States v. Kelly*, No. 21-cr-708 (RCL) (ECF No. 101 at 9).

43.     The parties stipulated to the second and third elements.  Exhibit 60.

44.     The defendant knowingly pushed against bike racks to obstruct, impede, and interfere with law enforcement attempting to maintain the bike racks and prevent rioters from gaining entrance into the Capitol.  Her repeated actions—throughout her time at the West Plaza—demonstrate that her actions were not by mistake or accident; the defendant's objective was to impede the officer line.  Indeed, Exhibits 2.07, 2.08, 2.10, and 2.11, 2.13, 2.14, and 2.15 all show the defendant pushing against bike racks or law enforcement officers at different times, from as early as after 1 p.m. to the breach of the police line at 2:28 p.m.  The defendant ignored the alarms and repeated orders by law enforcement officers to stand back, and even encouraged others to join her, yelling, "come on up people, don't be shy!"

45.     In short, the defendant's actions clearly demonstrate that she committed the above acts to obstruct, impede, and interfere with law enforcement officers who were lawfully engaged in the lawful performance of their duties incident to a civil disorder in violation of 18 U.S.C. § 231(a)(3).  The Court therefore finds that the Government has carried its burden beyond a reasonable doubt and finds the defendant GUILTY on Count 1.

**B.     Count Two**

46.     Count Two of the Superseding Indictment charges the defendant with Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. § 1512(c)(2).  In order to find the defendant guilty, the government must prove the following elements beyond a reasonable doubt: (1) first, the defendant obstructed or impeded an official proceeding; (2) second,

the defendant intended to obstruct or impede the official proceeding; (3) third, the defendant acted knowingly, with awareness that the natural and probable effect of her conduct would be to obstruct or impede the official proceeding; and (4) fourth, the defendant acted corruptly.  18 U.S.C. § 1512(c)(2); *United States v. Kelly*, No. 21-cr-708 (RCL) (ECF No. 101 at 8).

47.    The term "official proceeding" includes a proceeding before Congress.  For purposes of this count, the term "official proceeding" means Congress' Joint Session to certify the Electoral College vote.  *See United States v. Fischer*, 64 F.4th 329, 342 (D.C. Cir. 2023); s*ee also* 18 U.S.C. § 1515(a)(1)(B) (defining "official proceeding" to include "a proceeding before the Congress").

48.    To act "corruptly," the defendant must use independently unlawful means or act with an unlawful purpose, or both.  The defendant must also act with "consciousness of wrongdoing."  "Consciousness of wrongdoing" means with an understanding or awareness that what the person is doing is wrong.  Not all attempts to obstruct or impede an official proceeding involve acting corruptly.  For example, a witness in a court proceeding may refuse to testify by invoking his constitutional privilege against self-incrimination, thereby obstructing or impeding the proceeding, but he does not act corruptly.  In addition, the First Amendment to the United States Constitution affords people the right to speak, assemble, and petition the Government for grievances.  Accordingly, an individual who does no more than lawfully exercise those rights does not act corruptly.  In contrast, an individual who obstructs or impedes a court proceeding by engaging in conduct such as offering illegal bribes, engaging in violence, committing fraud, or through other independently unlawful conduct, is acting corruptly.  Often, acting corruptly involves acting with the intent to secure an unlawful advantage or benefit either for oneself or for

another person.  *United States v. Kelly*, No. 21-cr-708 (RCL) (ECF No. 101 at 8); *see also Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005).

49.     The government further alleges that the defendant aided and abetted others in committing obstruction of an official proceeding.  To satisfy its burden of proof in proving that the defendant aided and abetted others in committing this offense, the government must prove the following beyond a reasonable doubt: (1) others committed obstruction of an official proceeding by committing each of the elements of the offense charged; (2) the defendant knew that obstruction of an official proceeding was going to be committed or was being committed by others; (3) the defendant performed an act or acts in furtherance of the offense; (4) the defendant knowingly performed that act or acts for the purpose of aiding, assisting, soliciting, facilitating, or encouraging others in committing the offense of obstruction of an official proceeding; and (5) the defendant did that act or acts with the intent that others commit the offense of an obstruction of an official proceeding.  *United States v. Kelly*, No. 21-cr-708 (RCL) (ECF No. 101 at 10).

50.     The government applies the same definition of "knowingly" as in Count 1.

51.     The defendant's Facebook account postings, private messages, and voice memos collectively show that she claimed that the election was stolen and wanted to take steps to keep former President Trump in power.  One week after the election, the defendant posted an audio message about her plans on the weekend of November 12, 2020.  She stated: "I will be meeting with some people that have an office in D.C. . . . the people that I'm going with, they rented a house there, staying overnight . . . Saturday morning I'm going to meet some other patriots, 3 percenter type people."  Days later, in another audio message, the defendant stated, "So I'm still in D.C. but, last night I met with some people and I think we have a reasonably good plan."  The

plan she then outlined had one goal: keeping former President Trump in office despite the election results from November 3, 2020.

52.     As time progressed, the defendant's statements became more aggressive, more violent. On November 22, 2020, the defendant stated: "These fuckers need to start listening to the people and doing their jobs."  And then: "Letters aren't working." And then: "We can still get Trump in I believe. If we do we might be ok for a few more years. So we need to really be on the people in charge of elections."  A month before January 6, the defendant wrote: "what everyone should do, imo, is just defy the government. No game playing. Just defiance. We will do what we want and there's nothing the gov can do to stop us."

53.     On January 6, the defendant stayed at the Capitol for over four hours for one purpose: to get inside the building and stop the certification of the electoral vote.  To do that, the defendant pushed against bike racks, pushed against law enforcement officers, smashed windows with an ice axe and cardboard pole, and provided instruction to other rioters on how to push deeper into the Capitol building to "take the building."

54.     At trial, there was also evidence of the defendant's statements made after the January 6 riot.  For example, that evening, the defendant wrote: "we have given you all a chance to help us settle this peacefully. We have been patient. The time is up."  The defendant also clarified that "they didn't open the gates. The people trampled them. It was war."  Days later, the defendant told another Facebook user: "we have been patient and tried to go the legal route. It isn't working and the government isn't hearing us. It's time to rise."  This theme continued the following day, "We tried legal routes to ensure a fair election. When there wasn't going to be one, and legal routes were found to be a dead end, the people took/tried to take the Capitol back."

55.     The defendant's statements and actions demonstrate that she not only acted through unlawful means—including disobeying officer commands, pushing against bike racks and officers, and the destruction of federal property—but that she also had an unlawful purpose, and she knew it.  The defendant's knowledge of the electoral vote certification on January 6 can be inferred by the severity of her actions that day.  She further described the events at the Capitol on January 6, 2021, as a war.  The defendant believed that "legal routes were . . . a dead end"; therefore, "the people took/tried to take the Capitol back."  The defendant's statements demonstrate that although she knew that her method was the illegal route, she believed it to be necessary to order to ensure former President Trump stayed in power.  The defendant's statements, in sum, show she acted with consciousness of wrongdoing.  The defendant was acting in her attempt to benefit herself—and that of former President Trump—to "be okay for a few more years" by attempting to "still get Trump in."  The defendant acted corruptly when she acted on January 6, 2021.

56.     Moreover, for her conduct in at the Capitol—pushing bike racks and against law enforcement officers with other rioters, smashing the window, and instructing rioters to look for a route deeper into the Capitol to "take the building"—the defendant aided and abetted others in obstructing an official proceeding.

57.     The Court therefore finds that the Government has carried its burden beyond a reasonable doubt and finds the defendant GUILTY on Count 2.

## C.      Count Three

58.     Count Three of the Superseding Indictment charges the defendant with Destruction of Government Property, in violation of 18 U.S.C. § 1361.  The government must prove the following elements beyond a reasonable doubt: (1) the defendant injured, damaged, or destroyed property; (2) the defendant did so willfully; and (3) the property involved was property of the

United States.  18 U.S.C. § 1361; *see also United States v. Jenkins*, No. 21-cr-245 (APM) (ECF No. 78 at 24).

59.     A person acts "willfully" if she acts with the intent to do something that the law forbids, that is, to disobey or disregard the law.  While the government must show that a defendant knew that the conduct was unlawful, the government does not need to prove that the defendant was aware of the specific law that his conduct violated.  *Bryan v. United States*, 524 U.S. 184, 191-192 (1998) (internal quotation marks omitted).

60.     The defendant damaged and destroyed a window of the Capitol—the window to room HT-2—by using an ice axe and a cardboard pole.  The defendant further admitted to her actions in a phone call with her daughter in Exhibit 54.

61.     The defendant's actions were willful.  It is common sense that smashing the window of a federal building is unlawful.  The defendant clearly had the intent to commit the action, as Exhibit 3.12 demonstrated that the defendant prepared herself and others prior to using the cardboard pole: she looked around, adjusted her hat, nodded to her accomplice, and then lifted the pole.  As noted in her Facebook post (Exhibit 55C), the defendant was also aware her conduct on January 6 was generally unlawful yet believed the people needed to "fight back."

62.     According to Mr. McIntyre, the window had to be replaced.

63.     The Court therefore finds that the Government has carried its burden beyond a reasonable doubt and finds the defendant GUILTY on Count 3.

**D.     Count Four**

64.     Count Four of the Superseding Indictment charges the defendant with Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A).  In order to find the defendant guilty, the government

must prove beyond a reasonable doubt that: (1) the defendant entered or remained in a restricted building or grounds without lawful authority to do so; (2) the defendant did so knowingly; and (3) the defendant knowingly used or carried a deadly or dangerous weapon during and in relation to the offense. *See generally United States v. Jabr*, 4 F.4th 97, 101 (D.C. Cir. 2021).

65.    The government applies the same definition of "knowingly" as in Count 1.

66.    An object may be a "deadly or dangerous weapon" in one of two ways.  First, an object is a deadly or dangerous weapon if it is inherently or obviously dangerous or deadly.  Such inherently dangerous weapons include guns, knives, and the like.  Second, if the object is not inherently or obviously dangerous or deadly, an object is a deadly or dangerous weapon if the object is capable of causing serious bodily injury or death to another person and the defendant used it in that manner.  *United States v. Arrington*, 309 F.3d 40, 44 (D.C. Cir. 2002); *United States v. Smith*, 561 F.3d 934, 939 (9th Cir. 2009); *United States v. Guilbert*, 692 F.2d 1340, 1343 (11th Cir. 1982); *see also United States v. Webster*, No. 21-cr-208 (APM) (ECF No. 101 at 15).

67.    The parties have stipulated that the grounds of the Capitol were restricted on January 6, 2021.  Exhibit 60.  Captain Mendoza further testified to that fact.

68.    The defendant was aware that she was on restricted grounds.  As seen in Exhibits 1.01A and 1.03, the defendant bypassed bike racks on the ground, snow fencing and signs that read, "AREA CLOSED."  At the West Plaza, the defendant observed more bike racks, *see* Exhibits 2.04 to 2.06, which signaled that the defendant could not go further.  The defendant was also aware that officers were deploying nonlethal force, such as chemical spray, in an attempt to disperse the crowd.  Exhibit 2.12.  Nevertheless, the defendant proceeded to engage in multiple violent confrontations with law enforcement officers as she attempted to bypass the bike racks.  Exhibits

2.07, 2.08, 2.10, and 2.11.  The defendant's proactive actions demonstrate that she knew she was in a restricted area and intended to go further.

69.     As seen in Exhibits 3.12 and 3.13, the defendant used an ice axe and a large cardboard pole to smash a window of the Capitol.  Both the ice axe and the pole are dangerous and deadly weapons because they are inherently or obviously dangerous or deadly.  The defendant used both to smash glass windows, and if used against a human in the same way, the defendant's actions could have caused serious bodily injury.  The ice axe has a sharpened point designed to inflict harm by stabbing or piercing, and the large pole could and was used like a battering ram, capable of causing blunt force trauma.

70.     The Court therefore finds that the Government has carried its burden beyond a reasonable doubt and finds the defendant GUILTY on Count 4.

**E.     Count Five**

71.     Count Five of the Superseding Indictment charges the defendant with Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(2) and (b)(1)(A).  In order to find the defendant guilty, the government must prove beyond a reasonable doubt that: (1) the defendant engaged in disorderly or disruptive conduct in, or in proximity to, any restricted building or grounds; (2) the defendant did so knowingly, and with the intent to impede or disrupt the orderly conduct of Government business or official function; (3) the defendant's conduct occurred when, or so that, her conduct in fact impeded or disrupted the orderly conduct of Government business or official function; and (4) the defendant knowingly used or carried a deadly or dangerous weapon during and in relation to the offense.  *United States v. Jensen*, No. 21-cr-6 (TJK) (ECF No. 97 at 37); *United States v. Schwartz, et al,*, No. 21-cr-178 (APM) (ECF No. 172 at 25); *United States v. Barnett*, 21-cr-38

(CRC) (ECF No. 158 at 22); *United States v. Robertson*, 21-cr-34 (CRC) (ECF No. 86 at 22),

*United States v. Kelly*, 21-cr-708 (RCL) (ECF No. 101 at 16).

72. "Disorderly conduct" occurs when a person, is unreasonably loud and disruptive

under the circumstances, or interferes with another person by jostling against or unnecessarily

crowding that person. "Disruptive conduct" is a disturbance that interrupts an event, activity, or

the normal course of a process. Redbook 6.643.

73. The government applies the same definition of "knowingly" as in Count 1.

74. As stated in Count 4, the defendant was on restricted grounds and was armed with

a deadly or dangerous weapon during and in relation to the offense.

75. The defendant's conduct was both disorderly and disruptive. As another judge in

this district has found that "even mere presence in an unlawful mob or riot is both (1) 'disorderly'

in the sense that it furthers the mob's 'disturb[ing] the public peace' and (2) 'disruptive' insofar as

it disturbs the normal and peaceful condition of the Capitol grounds and buildings, its official

proceedings, and the safety of its lawful occupants." *United States v. Rivera*, 607 F. Supp. 3d 1, 8

(D.D.C. 2022); *see also* ECF No. 81 at 404, *United States v. Brock*, 21-cr-140-JDB; ECF No. 106

at 46-47, *United States v. Fitzsimons*, 21-cr-158-RC (D.D.C. Oct. 27, 2022) (both agreeing).

76. As noted in Counts 1, 2, and 3, the defendant was no mere trespasser that day.

Further, as noted in Count 2, the defendant's objective on January 6 was to stop the certification

and help former President Trump remain in power.

77. The law permits the factfinder to infer that a person intends the natural and probable

consequences of their actions. *See United States v. Mejia*, 597 F.3d 1329, 1341 (D.C. Cir. 2010)

(cited in *Rivera*, 607 F. Supp. 3d at 8; *United States v. Grider*, No. CR 21-022 (CKK), 2022 WL

17829149, at *12 (D.D.C. Dec. 21, 2022)). "The probable and natural consequence of breaking

into the United States Capitol is the disruption of Congressional business and proceedings." *Rivera*, 607 F. Supp. 3d at 8; *see also* ECF No. 81 at 397, *Brock*, 21-cr-140-JDB; ECF No. 106 at 47, *Fitzsimons*, 21-cr-158-RC.

78.     The defendant's actions did in fact disrupt the certification.  As seen in Exhibit 10, rioters did successfully breach the Capitol.  "'Even the presence of one unauthorized person is reason to suspend the Congressional proceedings,' and disruption grows with the mob." *Grider*, 2022 WL 17829149, at *13 (quoting *Rivera*, 607 F. Supp. at 9).  The breach of the Capitol by rioters—including the defendant—resulted in the evacuation of Congress from their respective chambers and delayed the certification of the electoral vote.  According to Exhibit 60, the Senate and House resumed meeting at approximately 8:06 p.m. and 9:02 p.m., respectively.  Congress' joint session continued until approximately 3:44 a.m. on January 7, 2021.  The conduct of Government business or official functions was impeded.   Exhibit 60.

79.     The Court therefore finds that the Government has carried its burden beyond a reasonable doubt and finds the defendant GUILTY on Count 5.

**F.     Count Six**

80.     Count Six of the Superseding Indictment charges the defendant with Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. 18 U.S.C. § 1752(a)(4) and (b)(1)(A).  In order to find the defendant guilty, the government must prove beyond a reasonable doubt that: (1) the defendant engaged in an act of physical violence against a person or property in, or in proximity to, a restricted building or grounds; (2) the defendant did so knowingly; and (3) the defendant knowingly used or carried a deadly or dangerous weapon during and in relation to the offense.  *United States v. Schwartz, et al.*, No. 21-cr-178 (APM) (ECF No. 172 at 30).

81.     The government applies the same definition of "knowingly" as in Count 1.

82.     As stated in Count 4, the defendant was on restricted grounds and was armed with a deadly or dangerous weapon during and in relation to the offense.

83.     As previously stated in Counts 3, 4, and 5, the defendant engaged in acts of physical violence against property in a restricted building or grounds and did so knowingly.

84.     The Court therefore finds that the Government has carried its burden beyond a reasonable doubt and finds the defendant GUILTY on Count 6.

## G.     Counts Seven and Eight

85.     Count Seven of the Superseding Indictment charges the defendant with Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D).  In order to find the defendant guilty, the government must prove beyond a reasonable doubt that: (1) the defendant engaged in disorderly or disruptive conduct in any of the United States Capitol Buildings or Grounds; (2) the defendant did so with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress; and (3) the defendant acted willfully and knowingly.  *United States v. Barnett*, 21-cr-38 (CRC) (ECF No. 158 at 22); *United States v. Jenkins*, No. 21-cr-245 (APM) (ECF No. 78 at 31); *United States v. Jensen*, No. 21-cr-6 (TJK) (ECF No. 97 at 40); *United States v. Williams*, 21-cr-618 (ABJ) (ECF 122 at 40).

86.     For purposes of this offense, "the orderly conduct of a session of Congress or either House of Congress" includes the actions of Congress' Joint Session to certify the Electoral College vote.  *See United States v. Kelly*, No. 21-cr-708 (RCL) (ECF No. 101 at 17).

87.     Count Eight of the Superseding Indictment charges the defendant with committing an Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F).  In order to find the defendant guilty, the government must prove beyond a

reasonable doubt that: (1) the defendant engaged in an act of physical violence within the Capitol Buildings or Grounds; and (2) the defendant acted willfully and knowingly.  *United States v. Alberts*, No. 21-cr-26 (CRC) (ECF No. 147 at 20).

88.     The government applies the same definition of "knowingly" as in Count 1.

89.     The government applies the same definition of "willfully" as in Count 3.

90.     As stated in Count 2, the defendant's intent was to stop the certification of the electoral vote.

91.     As previously stated in Counts 3, 4, and 5, the defendant engaged in disorderly and disrupt conduct while at the Capitol, which included acts of physical violence against property. As noted in the above counts, the defendant's actions were both willful and knowing.

92.     The Court therefore finds that the Government has carried its burden beyond a reasonable doubt and finds the defendant GUILTY of Counts 7 and 8.

## H.     Count Nine

93.     Finally, Count Nine of the Superseding Indictment charges the defendant with Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).  In order to find the defendant guilty, the government must prove beyond a reasonable doubt that: (1) the defendant paraded, demonstrated, or picketed in any of the United States Capitol Buildings; and (2) the defendant acted willfully and knowingly.  *United States v. Barnett*, 21-cr-38 (CRC) (ECF No. 158 at 23); *United States v. Jensen*, No. 21-cr-6 (TJK) (ECF No. 97 at 42); *United States v. Williams*, 21-cr-618 (ABJ) (ECF 122 at 40).

94.     As other judges in this district have noted, "parading" and "demonstrating" centers on participation in a "march[,] procession," or gathering "in support of some political object" or question.  *See Rivera*, 607 F. Supp. 3d at 10.

95.     The government applies the same definition of "knowingly" as in Count 1.

96.     The government applies the same definition as "willfully" as in Count 3.

97.     The sole focus of Count 9 is the defendant's actions when she was inside the Capitol.  Exhibit 3.11 captured the defendant's actions within that room, including when the defendant joined her fellow rioters inside ST-2, she joined others in chants of "Whose house? Our house!"  The defendant engaged in the chant while she and other rioters attempted to take over the Capitol to stop the certification.

98.     The Court therefore finds that the Government has carried its burden beyond a reasonable doubt and finds the defendant GUILTY of Count 9.

## CONCLUSION

Beyond a reasonable doubt, Rachel Powell knew on January 6, 2021, that her actions at the Capitol were unlawful.  For her participation and actions at the insurrection of January 6, 2021, the Court finds Rachel Powell GUILTY of all nine counts within the Superseding Indictment.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     */s/ Lucy Sun*_____
Lucy Sun
Adam Dreher
Assistant United States Attorneys
Massachusetts Bar Number 691766
Michigan Bar No. P79246

**CERTIFICATE OF SERVICE**

I, Lucy Sun, hereby certify that on this day, May 24, 2023, I caused a copy of the foregoing document to be served on the defendant's attorney, Nicholas Smith, via ECF.

By:     /s/ *Lucy Sun*
        Lucy Sun