UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 1:21-cr-179-RCL** |
| **RACHEL MARIE POWELL,** | |
| *Defendant.* | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

A two-day bench trial in this criminal matter was held on May 9 and 10, 2023. For her actions at the Capitol riot of January 6, 2021, the government charged Defendant Rachel Marie Powell by Superseding Indictment with: (1) interference with a law enforcement officer during a civil disorder, in violation of 18 U.S.C. § 231(a)(3); (2) obstruction of an official proceeding and aiding and abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2; (3) destruction of government property, in violation of 18 U.S.C. § 1361; (4) entering and remaining in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A); (5) disorderly and disruptive conduct in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. §§ 1752(a)(2) and (b)(1)(A); (6) engaging in physical violence in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. §§ 1752(a)(4) and (b)(1)(A); (7) disorderly conduct in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D); (8) committing an act of physical violence in the Capitol grounds or buildings, in violation of 40 U.S.C. § 5104(e)(2)(F); and (9) parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G). Superseding Indictment, ECF No. 97.

Prior to the government's case, the United States informed the Court it would no longer be seeking a conviction on the felony version of Count Three (destruction of government property),

1

but only the misdemeanor version of that charge. *See* 18 U.S.C. § 1361 (setting maximum term of imprisonment at one year for causing over $1,000 or less in damage and ten years for over $1,000).

In support of its case, the Government introduced the testimony of four witnesses: (1) Captain Neysha Mendoza of the United States Capitol Police ("USCP"), (2) Sergeant William Bogner of the District of Columbia Metropolitan Police Department ("MPD"), (3) Jason McIntyre from the Office of the Architect of the Capitol, and (4) Special Agent Thomas Jordan of the Federal Bureau of Investigation ("FBI"). During the government's case-in-chief, the Court admitted 91 exhibits. The defense did not call any witnesses.

In reaching a decision on the following Findings of Fact and Conclusions of Law, the Court considered the pleadings and all evidence presented at trial. Except where otherwise noted, the Court considers the evidence recounted below to be undisputed and/or unrebutted. For the reasons that follow, the Court finds Powell **GUILTY** on all counts.

## I.   FINDINGS OF FACT

### A.   Powell's Actions on January 6, 2021

Per stipulation,[1] the United States Capitol, which is located at First Street, SE, in Washington, D.C., is secured twenty-four hours a day by USCP. Restrictions around the Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the Capitol.

According to the testimony of Captain Mendoza, on January 6, 2021, the exterior plaza of the Capitol was closed to the public, with a variety of signage placed to alert passersby not to enter the area. As provided in her testimony as well as in Government Exhibits ("GX") 4 and 6, the grounds

---

[1] The parties' stipulations were admitted as Government Exhibit 60.

surrounding the Capitol Building had a combination of bike racks, snow fencing, and other barriers, some of them bearing signs that read "AREA CLOSED."

Per stipulation, on that day, a joint session of the United States Congress convened at the Capitol. During the joint session, elected members of the United States House of Representatives and the United States Senate met in both the House and Senate chambers of the Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on Tuesday, November 3, 2020. Per stipulation, Vice President Michael Pence was present in the Capitol Building and presiding over this joint session. Senators were evacuated from the Senate Chamber at 2:13 p.m., and members of the House of Representatives were evacuated from the House Chamber at 2:30 p.m.

Further by stipulation, beginning at 12:53 p.m., and continuing until approximately 6:30 p.m., the events on the grounds of the United States Capitol and in the United States Capitol Building constituted a "civil disorder" as that term is used in 18 U.S.C. § 231(a)(3). This civil disorder obstructed, delayed, or adversely affected commerce or the movement of any commodity in commerce as used in that statute. Further, the civil disorder affected two federally protected functions, namely USCP's protection of the Capitol and its grounds, and the United States Secret Service's protection of the Vice President of the United States and his family.

Before entering the Capitol grounds, Powell joined other protesters at the Peace Circle near First Street. As seen in the video marked as GX 1.01A, Powell walked along the path leading from the Peace Circle to the West Plaza almost immediately after the breach of the Peace Circle barricades. Captain Mendoza testified to the timing of the breach of the Peace Circle—approximately 12:53 p.m. That testimony was corroborated by GX 10 and 1.01A. At approximately 33 seconds into GX 1.01A, the individual filming exclaimed, "They broke the gate? Oh my gosh guys, they broke the gate." At 48 seconds, that individual filmed bike racks strewn on the ground. GX 1.01A is

3

contemporaneous with Powell's approach to the West Plaza; Powell can be seen on the video at: (1) 2 seconds, (2) 3 minutes and 32 seconds, and (3) 8 minutes and 6 seconds. In GX 1.03, found in Powell's iCloud account, during Powell's march to the West Plaza from the Peace Circle, she entered the restricted area, passing over downed barriers in place to provide notice that the area was restricted. Powell further passed snow fencing with signs stating, "AREA CLOSED."

After entering the restricted area and arriving at the West Plaza, Powell and other rioters stood before a line of USCP officers. As seen in GX 2.01, Powell joined other rioters in chants of "U.S.A.!" At the same location, as seen in GX 2.04, 2.05, and 2.06—pictures from Powell's iCloud account— officers put bike racks in place to prevent rioters from moving closer toward the Capitol Building. According to GX 12, by approximately 1:12 p.m., MPD officers reinforced USCP officers attempting to prevent the mob gathered at the West Plaza from reaching the Capitol Building. According to Captain Mendoza and GX 2.12, officers deployed nonlethal force in an unsuccessful effort to disperse the crowd. According to GX 2.09, at approximately 2:03 p.m., officers blared an alarm and then a recorded announcement: "This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b). All people must leave the area immediately. Failure to comply with this order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon."

As seen in GX 2.07, 2.08, 2.10, and 2.11, Powell repeatedly pushed against bike racks using her hands, shoulders, and back. As seen in GX 2.07, USCP officers attempted to lock bike racks together to form a barrier against the rioters. At 38 seconds, Powell pushed against the bike racks with her hands to prevent them from locking the racks. In GX 2.08, Powell pushed against bike racks with her body as she encouraged other rioters to join her, shouting, "Come on up people, don't be shy!" In GX 2.10A, at 49 seconds, Powell pushed against the bike racks with her back as officers attempted to prevent the barriers from falling over. Powell ignored the officers' repeated yells of "Get off the fence!" Likewise, in GX 2.11, Powell again pushed against the bike racks, fighting the

officers' attempts to maintain the line. Per stipulation, these officers were lawfully performing their duties incident to or during the commission of a civil disorder.

At approximately 2:28 p.m., seen in GX 12, rioters breached the police line at the West Plaza and pushed forward towards the Capitol, violently assaulting law enforcement officers along the way. As seen in GX 2.13, 2.14, and 2.15, Powell participated in the breach by pushing against bike racks as the police line broke. Afterwards, as seen in GX 2.15, at 17 seconds onwards, and in GX 2.18, Powell and other rioters collectively pushed retreating law enforcement into a semi-circle near the corner of the West Plaza. When law enforcement officers finally retreated from the area, Powell cheered with other rioters, shouting, "Whose house? Our house!" GX 2.19.

Next, Powell joined other rioters who broke through the line of police and, at 2:40 p.m., made her way up a narrow stairwell to the Presidential Inaugural stage. GX 103. That area was called the Lower West Terrace, and the focal point of the stage was an archway (or tunnel) that led to the Lower West Terrace entrance. According to Captain Mendoza, the entrance, through various interior halls and office suites, would provide access to all other parts of the Capitol Building if someone were to enter it.

Officers formed a line within this entranceway to prevent rioters from gaining access inside the Capitol Building. According to GX 3.02, 3.03, and 3.04, Powell joined other rioters and entered the tunnel. According to GX 3.02, while inside the tunnel, Powell observed others smash the doors to gain entrance. When rioters were unsuccessful in bypassing the line of police officers at the Lower West Terrace entrance, Powell exited the tunnel and repositioned herself immediately outside the entrance. GX 3.05, 3.06B.

According to GX 3.06B, Powell stood at the entrance of the tunnel while other rioters violently thrashed against law enforcement. From this vantage point, and based on the direction she was facing, Powell observed the officers working to regain the tunnel entrance and push other rioters out

of the building.  According to GX 3.06B, Powell was standing within arm's reach of an officer being violently pulled out of the tunnel and assaulted in the crowd.  Powell observed the crazed environment of that moment and heard the screams of her fellow rioters.

According to Special Agent Thomas, at approximately 4:25 p.m., Powell made her way just a few steps left to a two-story window left of the tunnel entrance.  According to McIntyre, the window led to room "Senate Terrace 2," or "ST-2" for short.  According to GX 3.08, 3.09, and 3.10, Powell entered this room by crawling through an already broken window.  In GX 3.11, upon entering, Powell joined her fellow rioters in chants of "Whose house? Our house!"  At some point, Powell left through the same window she entered before pushing her way to another two-story window right of the Lower West Terrace tunnel entrance leading to "House Terrace 2," or "HT-2."

According to GX 3.12 and 3.13, Powell used an ice axe in her attempt to break through the window to HT-2, and then used a large cardboard tube as a battering ram on that same window.  GX 3.12 showed not only the violent acts against the Capitol window, but also the preparation Powell took before attempting to smash through the window.  She adjusted the strap of her backpack, she nodded to the fellow rioter on the other side of the battering ram, she adjusted her hat, and she grabbed the tube with both hands. According to McIntyre, the window that Powell smashed with the ice axe and the cardboard tube cost approximately $753.

McIntyre further testified that immediately inside of HT-2 was a glass floor and underneath that floor was another set of rooms.  At approximately 5:01 p.m., after smashing the HT-2 window, Powell returned to the left side of the Lower West Terrace tunnel entrance.  There, using a bullhorn, Powell provided the following instructions to other rioters within ST-2:

> Hey guys, I've been in the other room, listen to me.  In the other room, on the other side of this door, right here where these feet are standing, there is a glass, that if somebody, if it's broken, you can drop down into a room underneath it.  There's also two doors in the other room, one in

> the rear and one to the right when you go in, so people should probably
> coordinate together if you're going to take the building...

GX 3.15. After providing those instructions, according to GX 3.17, Powell returned to the right side

of the tunnel entrance. According to Special Agent Thomas, law enforcement officers dispersed the

rioters near the Lower West Tunnel entrance sometime after 5:00 p.m.

## B.    Powell's Social Media Presence

Before and after January 6, 2021, Powell actively used her Facebook account.  Portions of

Powell's account—including the months before and days after January 6—were admitted during trial

as GX 55C and 55D.  Records from Powell's Facebook account prior to January 6, 2021 show that

in the months leading up to that day, Powell claimed that the election was stolen, expressed support

for violence, and discussed her plans to travel to Washington, D.C. on January 6.

On November 4, 2020,[2] the day after Election Day, Powell posted in part on her account:

> And now so many of you are complaining on social media about
> probable fraud in the voting system? You can't complain! Not even
> one of you that has been complacent should open your mouths! Hang
> your head in shame and shut your face unless you are going to actively
> do something. The government knows exactly how far you can be
> pushed because the population has been successfully tested. They
> know 99.9% of the people will roll over, belly up, like a bunch of
> cowards.

GX 55C at 4.[3] On November 12, 2020, Powell commented on a post, "For Biden to have won PA he

would have had to get at least 80% of the mail in ballots.  That's impossible." *Id.* at 7.

On November 12, 2020, in a private chat, Powell told another individual that she was "[h]eaded

to dc." *Id.* at 9.  When asked if she was going for "[e]lection stuff or vacation," Powell responded,

---

[2] For purposes of these Findings of Fact and Conclusions of Law, the Court will convert all times and dates marked in exhibits in Coordinated Universal Time to Eastern Standard Time.

[3] Citations of GX 55C refer to the electronic pagination, as the exhibit compiles multiple nonconsecutive pages of Facebook records.

"The caravan. I wish we were dragging the political fuckers out of office." *Id.* at 9–10. In a voice message on the same day, she stated, "I'm actually headed towards Lancaster right now, and in the morning, I will be leaving with some people that have an office in D.C. . . . The people that I'm going with, they rented a house there, so I'm just staying overnight . . . . Saturday morning I'm going to meet some other patriots, Three Percenter type people." *Id.* at 8; GX 55D. On November 15, 2020, Powell left another voice message specifically outlining her plan to keep former President Trump in power:

> So, I'm still in D.C., but last night I met with some people, and I think we have a reasonably good plan: if Trump concedes—or does not concede, I'm sorry—then if it gets through the courts and the courts agree with him, then it'll have to go to the House to be voted on, to see whether or not he gets to stay President. So, if we can simply determine who those people are, that would cast their vote for him, and call them and talk to them, the ones that are not making the correct decision for the people, instead of having protests in Washington, D.C., we'll take it to their homes.

GX 55C at 11; GX 55D.

On November 16, 2020, Powell notified another individual on Facebook that she would be "back home tomorrow. I had a meeting I needed to stop by tonight. I think we have some really good plans coming in the future to help stop the election fraud." GX 55C at 12. When asked if she got "caught up in the violence,"[4] Powell responded, "I only mildly did. I was going around dc with a little beater bar all weekend and wasp spray and knives in my bag so I was pretty confident." *Id.* Powell further added, "They only pick on the vulnerable." *Id.*

On November 22, 2020, Powell had the following conversation with another individual, identified for purposes of these Findings of Fact as "B.K.," via Facebook message:

> Powell:     We did surveillance on an officials home. The person was not seen coming in and out. Is there a way to

---

[4] It is unclear from the evidence presented at trial what "violence" this individual was referencing.

|  | check and make sure she still owns this house so we KNOW we have the correct address? |
|---|---|
| . . . . | |
| B.K. | its better to send letters to their office and leave their family and private residences alone |
| Powell: | No, it isn't. These fuckers need to start listening to the people and doing their jobs. Letters aren't working. Can I find this information at any courthouse or does it have to be from the courthouse that is near the home? |
| B.K.: | the county courthouse of the area the house is in |
| Powell: | Is there ANY way to get this without going into that courthouse? |
| . . . . | |
| B.K.: | have u tried a petition or scheduling a one on one |
| Powell: | It's time to take protests to their doors. |
| . . . . | |
| Powell: | Ok, here's the deal. We can still get Trump in I believe. If we do we might be ok for a few more years. So we need to really be on the people in charge of elections. |

*Id.* at 13–14. On December 6, 2020, Powell commented on a post, "But what everyone should do, imo, is just defy the government. No game playing. Just defiance. We will do what we want and there's nothing the gov can do to stop us." *Id.* at 15.

One day after January 6, 2021, Powell commented on a Facebook post, in reference to the day before, "we have given you all a chance to help us settle this peacefully. We have been patient. The time is up." *Id.* at 16. In another comment, Powell wrote, "the police fought back well. I did see them retreat before people were on the second floor but that was a fight to get them to retreat. They had their barricades removed from them and were pushed back. Some police showed fear. Some of them were patriots and you could see it in their face. Many of them stood their ground." *Id.* at 18. In another,

Powell wrote, "we have been patient and tried to go the legal route. It isn't working and the government isn't hearing us. It's time to rise." Powell also wrote, "nobody was let the fuck in. It was war." *Id.* at 17.

On January 9, 2021, in an apparent reference to Pennsylvania State Senator Doug Mastriano, Powell wrote:

> What I want to know is what men like Mastriano expect Americans to do. We tried legal routes to ensure a fair election. When there wasn't going to be one, and legal routes were found to be a dead end, the people took/tried to take the Capitol back. What are Americans suppose to do? Sit back and do nothing? Why don't we just start calling the president king? This makes no sense to me. Please, Mastriano, explain WHEN it's ok for the people to fight back?

*Id.* at 19.

## C.   The Execution of the Search Warrant and Arrest of Powell

On February 4, 2021, FBI executed a search warrant at Powell's residence. According to Special Agent Thomas, prior to February 4, FBI had issued a public BOLO (Be on The Lookout) on their website for Powell. On February 4, Special Agent Thomas called Powell prior to the execution of the search warrant. Powell did not pick up.

According to Special Agent Thomas, Powell was not home when the FBI arrived at her residence. FBI found at Powell's residence, among other things, a black jacket with a fur-lined hood that matched the one Powell wore on January 6, 2021; multiple broken phones; and two "go-bags" containing ammunition, rope, duct tape, knives, ninja stars, and lighters. GX 13–32, 37–39. The government did not, however, present any evidence that Powell brought any of the items other than the jacket with her to Washington on January 6, nor that they belonged to her rather than another member of her household.

Special Agent Thomas further testified that Powell turned herself in at the FBI Field Office that night. At the time she turned herself in, FBI found an additional "go-bag" inside of her vehicle.

GX 40–52. FBI further found an empty iPhone box inside of her vehicle. *Id.* According to Special Agent Thomas, no phone was found on Powell's person or in her vehicle. Special Agent Thomas's phone number and name were written on Powell's arms.

Special Agent Thomas is aware that Powell owns a phone. Powell texted Special Agent Thomas after her arrest on February 4, requesting to speak to him.[5] GX 59. According to GX 55C, Powell also had a phone prior to February 4, 2021. According to her iCloud account, Powell had a phone on January 6, 2021.

Special Agent Thomas testified that after Powell's arrest, she was briefly detained at the Butler County Jail, and while there, Powell made several phone calls. In one of the calls, Powell had a conversation with her daughter. GX 54. During the conversation, the two had the following exchange:

> Powell:    It's crazy what they're saying. But all it is is a broken window in reality.
>
> Daughter:   Yeah. An expensive broken window, though.
>
> Powell:    I know, but it wasn't even that big of a window. I don't understand. They're trying to say it was over $1,000 dollars.

*Id.* Later, during the call, Powell stated, "Well that was like a plastic pipe. So it wasn't very sturdy either. But it was a thick window." *Id.*

## II.    CONCLUSIONS OF LAW

### A.    Count One

Count One of the Superseding Indictment charges Powell with interference with a law enforcement officer during a civil disorder, in violation of 18 U.S.C. § 231(a)(3). In order to find the

---

[5] According to GX 59, Special Agent Thomas declined to speak to Powell because she was represented by an attorney.

defendant guilty of that offense, the Court must find the following beyond a reasonable doubt: (1) the defendant knowingly committed an act or attempted to commit an act with the intended purpose of obstructing, impeding, or interfering with one or more law enforcement officers; (2) at the time of the defendant's actual or attempted act, the law enforcement officer or officers were engaged in the lawful performance of their official duties incident to and during a civil disorder; and (3) the civil disorder in any way or degree obstructed, delayed, or adversely affected either commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function. Jury Instrs. at 32, *United States v. Nordean*, No. 21-cr-175-TJK, ECF No. 767 (D.D.C. Apr. 26, 2023).

The parties stipulated to the second and third elements. GX 60. Therefore, the Court's analysis focuses on the first element. A person acts "knowingly" if she realizes what she is doing and is aware of the nature of her conduct, and does not act through ignorance, mistake, or accident. Jury Instrs. at 9, *United States v. Kelly*, No. 21-cr-708-RCL, ECF No. 101 (D.D.C. May 8, 2023).

Powell knowingly pushed against bike racks to obstruct, impede, and interfere with law enforcement attempting to maintain the bike racks and prevent rioters from gaining entrance into the Capitol. Her behavior throughout her time at the West Plaza demonstrate that her actions were not by mistake or accident; her objective was to impede the officer line. Indeed, GX 2.07, 2.08, 2.10, 2.11, 2.13, 2.14, and 2.15 all show Powell pushing against bike racks or law enforcement officers at different times, from as early as after 1:00 p.m. to the breach of the police line at 2:28 p.m. Powell ignored the alarms and repeated orders by law enforcement officers to stand back, and even encouraged others to join her, yelling, "Come on up people, don't be shy!"

In short, Powell's actions clearly demonstrate that she committed the above acts to obstruct, impede, and interfere with law enforcement officers who were lawfully engaged in the lawful performance of their duties incident to a civil disorder, in violation of 18 U.S.C. § 231(a)(3). The

Court therefore finds that the government has carried its burden beyond a reasonable doubt and finds Powell **GUILTY** on Count One.

**B.**     **Count Two**

Count Two of the Superseding Indictment charges Powell with obstruction of an official proceeding and aiding and abetting, in violation of 18 U.S.C. § 1512(c)(2).  In order to find the defendant guilty of that offense, the Court must find the following beyond a reasonable doubt: (1) the defendant obstructed or impeded an official proceeding; (2) the defendant intended to obstruct or impede the official proceeding; (3) the defendant acted knowingly, with awareness that the natural and probable effect of her conduct would be to obstruct or impede the official proceeding; and (4) the defendant acted corruptly.  Jury Instrs. at 8–9, *Kelly*, No. 21-cr-708-RCL, ECF No. 101.

The term "official proceeding" includes a proceeding before Congress.  For purposes of this count, the term "official proceeding" means Congress' Joint Session to certify the Electoral College vote.  *See United States v. Fischer*, 64 F.4th 329, 342 (D.C. Cir. 2023); *see also* 18 U.S.C. § 1515(a)(1)(B) (defining "official proceeding" to include "a proceeding before the Congress").

The Court applies the same definition of "knowingly" as in Count One.

As this Court explained in *United States v. Kelly*, No. 21-cr-708-RCL, to act "corruptly," the defendant must use independently unlawful means or act with an unlawful purpose, or both.  The defendant must also act with "consciousness of wrongdoing."  "Consciousness of wrongdoing" means with an understanding or awareness that what the person is doing is wrong.  Not all attempts to obstruct or impede an official proceeding involve acting corruptly.  For example, a witness in a court proceeding may refuse to testify by invoking his constitutional privilege against self-incrimination, thereby obstructing or impeding the proceeding, but he does not act corruptly.  In addition, the First Amendment to the United States Constitution affords people the right to speak, assemble, and petition the government for grievances.  Accordingly, an individual who does no more

than lawfully exercise those rights does not act corruptly. In contrast, an individual who obstructs or impedes a court proceeding by engaging in conduct such as offering illegal bribes, engaging in violence, committing fraud, or through other independently unlawful conduct, is acting corruptly. Often, acting corruptly involves acting with the intent to secure an unlawful advantage or benefit either for oneself or for another person. Jury Instrs. at 9–10, *Kelly*, No. 21-cr-708-RCL, ECF No. 101; *see also Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005).

The government further alleges that Powell aided and abetted others in committing obstruction of an official proceeding. To satisfy its burden of proving that the defendant aided and abetted others in committing that offense, the government must prove the following beyond a reasonable doubt: (1) others committed obstruction of an official proceeding by committing each of the elements of the offense charged; (2) the defendant knew that obstruction of an official proceeding was going to be committed or was being committed by others; (3) the defendant performed an act or acts in furtherance of the offense; (4) the defendant knowingly performed that act or acts for the purpose of aiding, assisting, soliciting, facilitating, or encouraging others in committing the offense of obstruction of an official proceeding; and (5) the defendant did that act or acts with the intent that others commit the offense of an obstruction of an official proceeding. Jury Instrs. at 11–12, *Kelly*, No. 21-cr-708-RCL, ECF No. 101.

The government proved beyond a reasonable doubt that Powell obstructed or impeded an official proceeding, namely the Electoral College certification vote. On January 6, Powell stayed at the Capitol for over four hours, during which time she pushed against bike racks, pushed against law enforcement officers, smashed a window with an ice axe and cardboard pole, and provided instructions to other rioters on how to push deeper into the Capitol Building to "take the building." Her actions contributed to a significant security risk that required Congress to cease the certification proceedings until the riot was over.

The government further proved beyond a reasonable doubt that Powell intended to obstruct or impede the Electoral College certification vote and that she did so knowingly, with the awareness that the natural and probable effect of her conduct would be to obstruct or impede it. Powell's Facebook account postings, private messages, and voice messages collectively show that she claimed that the election was stolen and wanted to take steps to keep former President Trump in power. One week after the election, Powell posted an audio message about her plans on the weekend of November 12, 2020. She stated, "in the morning, I will be leaving with some people that have an office in D.C. . . . The people that I'm going with, they rented a house there, so I'm just staying overnight . . . . Saturday morning I'm going to meet some other patriots, Three Percenter type people." GX 55C at 8; GX 55D. Days later, in another audio message, Powell stated, "So, I'm still in D.C., but last night I met with some people, and I think we have a reasonably good plan." GX 55C at 11; GX 55D. The plan she then outlined had one goal: keeping former President Trump in office despite the election results from November 3, 2020.

As time progressed, Powell's statements became more aggressive and violent. On November 22, 2020, Powell stated, "These fuckers need to start listening to the people and doing their jobs." GX 55C at 13. And then: "Letters aren't working." *Id.* She further stated, "We can still get Trump in I believe. If we do we might be ok for a few more years. So we need to really be on the people in charge of elections." *Id.* at 14. A month before January 6, Powell wrote, "what everyone should do, imo, is just defy the government. No game playing. Just defiance. We will do what we want and there's nothing the gov can do to stop us." *Id.* at 15.

Powell's statements on and shortly after January 6 demonstrate that she breached the Capitol on January 6 to carry out her plan to keep former President Trump in office, specifically by disrupting the Electoral College certification vote. On the evening of January 6, Powell wrote, "we have given you all a chance to help us settle this peacefully. We have been patient. The time is up." *Id.* at 16. Days

later, Powell told another Facebook user, "we have been patient and tried to go the legal route. It isn't working and the government isn't hearing us. It's time to rise." *Id.* at 18. This theme continued the following day, with Powell commenting, "We tried legal routes to ensure a fair election. When there wasn't going to be one, and legal routes were found to be a dead end, the people took/tried to take the Capitol back." *Id.* at 19. In short, it is abundantly clear to the Court from Powell's own statements that she understood her actions would disrupt the Electoral College certification proceedings going on inside the Capitol on January 6.

Contrary to Powell's suggestion, *see* Def.'s Resp. to Gov't's Proposed Findings of Fact and Conclusions of Law ("Def.'s Resp.") at 5–6, ECF No. 105, the requirement that there be a "nexus" with a specific official proceeding, *see United States v. Young*, 916 F.3d 368, 385–86 (4th Cir. 2019) (citing *United States v. Aguilar*, 515 U.S. 593, 599–600 (1995), and *Arthur Andersen*, 544 U.S. at 707–08), does not mean that she needed to know how those proceedings worked in every particular. The Court has no doubt that Powell, who was politically engaged in issues surrounding the 2020 Presidential Election, had previously attended multiple rallies on the subject, and who understood herself to be departing from the "legal routes" to her desired outcome, understood the basic fact that her actions would obstruct or impede the Electoral College certification vote and intended that result.

Furthermore, the government proved beyond a reasonable doubt that Powell acted corruptly. Powell's statements and actions demonstrate that she not only acted through unlawful means— including the independently felonious means of engaging in a civil disorder, as explained above, and of engaging in various offenses on restricted grounds using a dangerous or deadly weapon, as explained below—but that she also had an unlawful purpose, and she knew it. Powell's knowledge of the electoral vote certification on January 6 can be inferred from the severity of her actions that day. She further described the events at the Capitol on January 6, 2021 as a war. In Powell's view, "legal routes were . . . a dead end," and therefore, "the people took/tried to take the Capitol back." GX 55C

at 16. Powell's statements demonstrate that although she knew that her method was the illegal route, she believed it to be necessary to order to ensure that former President Trump stayed in power. Powell's statements, in sum, show she acted with consciousness of wrongdoing. They also show that she acted with a purpose of procuring for herself and another—former President Trump—the benefit of his continuance in office.

Furthermore, the Court rejects Powell's argument that the sincerity of her belief that former President Trump was the rightful winner of the 2020 Presidential Election negates her corrupt intent because "the government must establish that Powell acted with 'the intent to procure a benefit which [she] *knows* is unlawful.'" Def.'s Resp. at 5–6, ECF No. 105 (quoting *Fischer*, 64 F.4th at 352 (Walker, J., concurring in part) (alteration added in Def.'s Resp.) (emphasis in original)). Assuming without deciding that Judge Justin Walker's concurring opinion in *United States v. Fischer* is binding on this Court, it does not, as Powell's selective quotation suggests, require that the benefit *itself* be inherently unlawful. Rather, Judge Walker recognized that a defendant may act corruptly by seeking to obtain an otherwise lawful benefit through *means* she knows to be unlawful. For example, in exploring a hypothetical about a protestor picketing outside a Supreme Court Justice's home in support of a particular outcome in a case, Judge Walker considered the deciding factor to be not whether that desired *outcome* was lawful, but whether the protestor "*knew* that his *picket* was unlawful." *Fischer*, 64 F.4th at 358 (Walker, J., concurring) (first emphasis in original) (second emphasis added). Even assuming Powell sincerely believed—which it appears she did—that former President Trump was being wrongfully ejected from office and had a right to remain there, she must still have known it was unlawful to vindicate that perceived injustice by engaging in mob violence to obstruct Congress.

Similarly, belief that one's actions are ultimately serving a greater good does not negate consciousness of wrongdoing. For purposes of 18 U.S.C. § 1512, the phrase "consciousness of

wrongdoing" comes from *Arthur Andersen LLP v. United States*. The Supreme Court used that phrase in the context of explaining why it was error for the district court to instruct the jury that the defendant could be guilty of corruptly obstructing an official proceeding "even if [it] honestly and sincerely believed that its conduct was lawful." *Arthur Andersen*, 544 U.S. at 706. The point is not that the defendant needs to understand that her actions are *morally* wrong; she needs only understand that her actions are *unlawful*.

Moreover, for her conduct at the Capitol—pushing bike racks and against law enforcement officers with other rioters, smashing the window, and instructing rioters to look for a route deeper into the Capitol to "take the building"—Powell aided and abetted others in obstructing an official proceeding.

The Court therefore finds that the government has carried its burden beyond a reasonable doubt and finds Powell **GUILTY** on Count Two.

C.     **Count Three**

Count Three of the Superseding Indictment charges Powell with destruction of government property, in violation of 18 U.S.C. § 1361. In order to find the defendant guilty of that offense, the Court must find the following beyond a reasonable doubt: (1) the defendant injured, damaged, or destroyed property; (2) the defendant did so willfully; and (3) the property involved was property of the United States. Jury Instrs. at 24, *United States v. Jenkins*, No. 21-cr-245-APM, ECF No. 78 (D.D.C. Apr. 26, 2023).

A person acts "willfully" if she acts with the intent to do something that the law forbids, that is, to disobey or disregard the law. While the government must show that a defendant "acted with knowledge that [her] conduct was unlawful," the government does not need to prove that the defendant was aware of the specific law that his conduct violated. *Bryan v. United States*, 524 U.S.

184, 191–192 (1998) (internal quotation marks omitted); Jury Instrs. at 16, *Kelly*, No. 21-cr-708-RCL, ECF No. 101.

Powell damaged and destroyed property of the United States—namely, the window to room HT-2 of the Capitol—by using an ice axe and a cardboard pole. Powell further admitted to her actions in a phone call with her daughter in GX 54. According to McIntyre, the window had to be replaced.

Powell's actions were willful. Powell clearly had the intent to smash the window, as GX 3.12 demonstrates. Powell prepared herself and others prior to using the cardboard pole; she looked around, adjusted her hat, nodded to her accomplice, and then lifted the pole. As noted in her Facebook post, *see* GX 55C at 19, Powell was also aware her conduct on January 6 was generally unlawful yet believed the people needed to "fight back."

The Court therefore finds that the government has carried its burden beyond a reasonable doubt and finds Powell **GUILTY** on Count Three.

## D.     Count Four

Count Four of the Superseding Indictment charges Powell with entering and remaining in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A).  In order to find the defendant guilty of that offense, the Court must find the following beyond a reasonable doubt: (1) the defendant entered or remained in a restricted building or grounds without lawful authority to do so; (2) the defendant did so knowingly; and (3) the defendant knowingly used or carried a deadly or dangerous weapon during and in relation to the offense. Jury Instrs. at 19, *United States v. Robertson*, No. 21-cr-34-CRC, ECF No. 86 (D.D.C. Apr. 8, 2022).

As relevant here, "the term 'restricted buildings or grounds' means any posted, cordoned off, or otherwise restricted area . . . of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting." 18 U.S.C. § 1752(c)(1)(B). The term "person

protected by the Secret Service" includes the Vice President and the immediate family of the Vice President. *Id.* §§ 1752(c)(2), 3056(a)(1)–(2).

The Court applies the same definition of "knowingly" as in Count One.

An object may be a "deadly or dangerous weapon" in one of two ways. First, an object is a deadly or dangerous weapon if it is inherently or obviously dangerous or deadly. Such inherently dangerous weapons include guns, knives, and the like. Second, if the object is not inherently or obviously dangerous or deadly, an object is a deadly or dangerous weapon if the object is capable of causing serious bodily injury or death to another person and the defendant used it in that manner. *See United States v. Arrington*, 309 F.3d 40, 45–46 (D.C. Cir. 2002).

The parties have stipulated that the grounds of the Capitol were restricted on January 6, 2021. GX 60. Captain Mendoza further testified to that fact.

Powell was aware that she was on restricted grounds. As seen in GX 1.01A and 1.03, Powell bypassed bike racks on the ground, snow fencing and signs that read, "AREA CLOSED." At the West Plaza, Powell observed more bike racks, *see* GX 2.04, 2.05, 2.06, which signaled that Powell could not go further. Powell was also aware that officers were deploying nonlethal force, such as chemical spray, in an attempt to disperse the crowd. GX 2.12. Nevertheless, Powell proceeded to engage in multiple violent confrontations with law enforcement officers as she attempted to bypass the bike racks. GX 2.07, 2.08, 2.10, 2.11. Powell's proactive actions demonstrate that she knew she was in a restricted area, without lawful authority to be there, and intended to go further.

Furthermore, Powell knowingly carried a dangerous or deadly weapon. As seen in GX 3.12 and 3.13, Powell used an ice axe and a large cardboard pole to smash a window of the Capitol. The ice is a dangerous and deadly weapon because it is inherently or obviously dangerous or deadly. Powell used both the ice axe and the cardboard pole to smash glass windows, and if used against a human in the same way, Powell's actions could have caused serious bodily injury. The ice axe has a

20

sharpened point designed to inflict harm by stabbing or piercing, and the large pole could be and was used like a battering ram, capable of causing blunt force trauma.

The Court therefore finds that the government has carried its burden beyond a reasonable doubt and finds Powell **GUILTY** on Count Four.

### E.    Count Five

Count Five of the Superseding Indictment charges Powell with disorderly and disruptive conduct in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. §§ 1752(a)(2) and (b)(1)(A).  In order to find the defendant guilty of that offense, the Court must find the following beyond a reasonable doubt: (1) the defendant engaged in disorderly or disruptive conduct in, or in proximity to, any restricted building or grounds; (2) the defendant did so knowingly, and with the intent to impede or disrupt the orderly conduct of government business or official functions; (3) the defendant's conduct occurred when, or so that, her conduct in fact impeded or disrupted the orderly conduct of government business or official functions; and (4) the defendant knowingly used or carried a deadly or dangerous weapon during and in relation to the offense.  Jury Instrs. at 22, *Robertson*, No. 21-cr-34-CRC, ECF No. 86.

"Disorderly conduct" occurs when a person is unreasonably loud and disruptive under the circumstances or interferes with another person by jostling against or unnecessarily crowding that person. Crim. Jury Instrs. for D.C. § 6.643. "Disruptive conduct is a disturbance that interrupts an event, activity, or the normal course of a process." *Id.* (internal quotation marks omitted).

The Court applies the same definition of "knowingly" as in Count One.

As stated in Count Four, Powell was on restricted grounds and was armed with a deadly or dangerous weapon during and in relation to the offense.

Powell's conduct was both disorderly and disruptive. As Judge Colleen Kollar-Kotelly has explained, "[e]ven mere presence in an unlawful mob or riot is both (1) 'disorderly' in the sense that

it furthers the mob's 'disturb[ing] the public peace' and (2) 'disruptive' insofar as it disturbs the normal and peaceful condition of the Capitol grounds and buildings, its official proceedings, and the safety of its lawful occupants." *United States v. Rivera*, 607 F. Supp. 3d 1, 8 (D.D.C. 2022).

Powell engaged in that conduct knowingly and intentionally. As noted in Counts One, Two, and Three, Powell was no mere trespasser at the Capitol that day. Further, as noted in Count Two, Powell's objective on January 6 was to stop the certification and help former President Trump remain in power. The law permits the factfinder to infer that a person intends the natural and probable consequences of her actions. *See United States v. Mejia*, 597 F.3d 1329, 1341 (D.C. Cir. 2010). "[T]he probable and natural consequence of breaking into the United States Capitol is the disruption of Congressional business and proceedings." *Rivera*, 607 F. Supp. 3d at 8.

Furthermore, Powell's actions did in fact disrupt the certification. As seen in GX 10, rioters did successfully breach the Capitol. "'Even the presence of one unauthorized person is reason to suspend Congressional proceedings,' and disruption grows with the mob." *United States v. Grider*, No. 21-cr-22-CKK, — F. Supp. 3d. —, 2022 WL 17829149, at *13 (D.D.C. Dec. 21, 2022) (quoting *Rivera*, 607 F. Supp. 3d at 9). The breach of the Capitol by rioters—including Powell—resulted in the evacuation of members of Congress from their respective chambers and delayed the certification of the electoral vote. According to GX 60, the Senate and House resumed meeting at approximately 8:06 p.m. and 9:02 p.m., respectively. Congress's joint session continued until approximately 3:44 a.m. on January 7, 2021. The conduct of government business or official functions was impeded. GX 60.

Finally, as explained in Count Four, Powell knowingly used and carried dangerous or deadly weapons, namely an ice axe and a large cardboard pole.

The Court therefore finds that the government has carried its burden beyond a reasonable doubt and finds Powell **GUILTY** on Count Five.

## F.    Count Six

Count Six of the Superseding Indictment charges Powell with engaging in physical violence in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. §§ 1752(a)(4) and (b)(1)(A). In order to find the defendant guilty of that offense, the Court must find the following beyond a reasonable doubt: (1) the defendant engaged in an act of physical violence against a person or property in, or in proximity to, a restricted building or grounds; (2) the defendant did so knowingly; and (3) the defendant knowingly used or carried a deadly or dangerous weapon during and in relation to the offense. Notes for Oral Ruling from Bench at 9, *United States v. Worrell*, No. 21-cr-292-RCL, ECF No. 245 (D.D.C. May 12, 2023).

The Court applies the same definition of "knowingly" as in Count One.

As explained in Count Four, Powell was on restricted grounds and was armed with a deadly or dangerous weapon during and in relation to the offense.

As previously stated in Counts Three, Four, and Five, Powell engaged in acts of physical violence against property in a restricted building or grounds and did so knowingly. Specifically, she knowingly pushed against officers and destroyed a window.

The Court therefore finds that the government has carried its burden beyond a reasonable doubt and finds Powell **GUILTY** on Count Six.

## G.    Count Seven

Count Seven of the Superseding Indictment charges Powell with disorderly conduct in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D). In order to find the defendant guilty of that offense, the Court must find the following beyond a reasonable doubt: (1) the defendant engaged in disorderly or disruptive conduct in any of the United States Capitol buildings or grounds; (2) the defendant did so with the intent to impede, disrupt, or disturb the orderly conduct of a session of

Congress or either House of Congress; and (3) the defendant acted willfully and knowingly. Jury Instrs., *United States v. Barnett*, 21-cr-38-CRC, ECF No. 158 (D.D.C. Jan. 24, 2023).

For purposes of this offense, "the orderly conduct of a session of Congress or either House of Congress" includes the actions of Congress' Joint Session to certify the Electoral College vote. Jury Instrs. at 17, *Kelly*, No. 21-cr-708-RCL, ECF No. 101.

The Court applies the same definition of "knowingly" as in Count One.

The Court applies the same definition of "willfully" as in Count Three.

As previously stated in Counts Three, Four, and Five, Powell engaged in disorderly and disruptive conduct while at the Capitol. As noted in the above counts, Powell's actions were both willful and knowing.

As stated in Count Two, Powell's intent was to stop the certification of the electoral vote.

The Court therefore finds that the government has carried its burden beyond a reasonable doubt and finds Powell **GUILTY** on Count Seven.

## H.    Count Eight

Count Eight of the Superseding Indictment charges Powell with committing an act of physical violence in the Capitol grounds or buildings, in violation of 40 U.S.C. § 5104(e)(2)(F). In order to find the defendant guilty of that offense, the Court must find the following beyond a reasonable doubt: (1) the defendant engaged in an act of physical violence within the Capitol buildings or grounds; and (2) the defendant acted willfully and knowingly. Jury Instrs. at 20, *United States v. Alberts*, No. 21-cr-26-CRC, ECF No. 147 (D.D.C. Apr. 21, 2023).

The Court applies the same definition of "knowingly" as in Count One.

The Court applies the same definition of "willfully" as in Count Three.

As previously stated in Counts Three, Four, Five, and Six, Powell engaged in acts of physical violence against property at the Capitol.

As noted in the above counts, Powell's actions were both willful and knowing.

The Court therefore finds that the government has carried its burden beyond a reasonable doubt and finds Powell **GUILTY** on Count Eight.

## I.     Count Nine

Finally, Count Nine of the Superseding Indictment charges Powell with parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G). In order to find the defendant guilty of that offense, the Court must find the following beyond a reasonable doubt: (1) the defendant paraded, demonstrated, or picketed in any of the United States Capitol buildings; and (2) the defendant acted willfully and knowingly. Jury Instrs. at 23, *Barnett*, No. 21-cr-38-CRC, ECF No. 158.

As other judges in this district have noted, "parading" and "demonstrating" centers on participation in a "march[,] procession," or gathering "in support of some political object" or question. *See, e.g.*, *Rivera*, 607 F. Supp. 3d at 10 (internal quotation marks and citation omitted).

The Court applies the same definition of "knowingly" as in Count One.

The Court applies the same definition as "willfully" as in Count Three.

Powell paraded and picketed while inside the Capitol. GX 3.11 captured Powell entering ST-2 and joining her fellow rioters in chants of "Whose house? Our house!" Powell engaged in the chant while she and other rioters attempted to take over the Capitol to stop the certification.

Powell did so knowingly and willfully. Otherwise, she would not have so vocally engaged in the chants just referenced, nor would she have taken to Facebook to explain the impetus for her actions in the following hours and days.

The Court therefore finds that the government has carried its burden beyond a reasonable doubt and finds Powell **GUILTY** on Count Nine.

### III.    CONCLUSION

Beyond a reasonable doubt, Rachel Marie Powell knew on January 6, 2021, that her actions at the Capitol were unlawful.  For her participation and actions at the insurrection of January 6, 2021, the Court hereby **ADJUDGES** Rachel Marie Powell **GUILTY** of the following counts of the Superseding Indictment:

Count One: **GUILTY**

Count Two: **GUILTY**

Count Three: **GUILTY**

Count Four: **GUILTY**

Count Five: **GUILTY**

Count Six: **GUILTY**

Count Seven: **GUILTY**

Count Eight: **GUILTY**

Count Nine: **GUILTY**

A separate Order shall issue setting a sentencing date, which shall occur approximately 90 days from the entry of these Findings of Fact and Conclusions of Law.

Date: July _18_, 2023

Royce C. Lamberth
United States District Judge