**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Case No. 21-cr-179-RCL |
| | ) |
| RACHEL POWELL, | ) |
| | ) |
| Defendant. | ) |

**SENTENCING MEMORANDUM OF RACHEL POWELL**

Rachel Powell made exceptionally poor decisions on January 6.  Along with the crowd, she pushed on police barriers as law enforcement officers were attempting to keep the mob at bay and away from the Capitol.  She briefly entered a small room in the building perched above the Lower West Terrace.  And she broke a Capitol window there.

After a bench trial, the Court found Powell guilty of nine charges, including obstruction of an official proceeding.  Powell is remorseful for her outrageous conduct that day.  At sentencing, she will apologize to law enforcement and members of Congress and their staff.  She is eager to reimburse the Architect of the Capitol for the property damage she caused.

But several considerations argue for caution in determining the severity of Powell's punishment.   Powell, 43, is a mother to eight children, ranging in age from 12 to 26 years old.  She is a grandmother to four adolescents.  The three youngest children live with Powell and the defendant's ex-husband cannot take up the burden of their full-time care.  Should Powell be incarcerated, the "plan" is for her 15-year-old son to manage the family.  Meanwhile, a neuropsychological evaluation assesses that Powell's brutally harsh upbringing has led to disorders that leave her susceptible to manipulation—including of the sort that led her to the

Capitol.  Powell's total offense level under the Guidelines should be calculated at 14, as the specific offense characteristics at U.S.S.G. §2J1.2(b) do not apply for several reasons.  Given her unusual family circumstances, the novel and uncertain nature of the § 1512(c) offense, the very low probability that the grandmother with no criminal history will recidivate, and the need to avoid unwarranted sentence disparities, Powell respectfully requests a sentence of 36 months' probation, 24 months' home detention, 200 hours' community service, and $2,000 in restitution.

**Factual background**

      **A.**    **Powell's background, family, employment history, and character**

Powell's upbringing was like something from *Oliver Twist*.  Her parents routinely engaged in violent altercations in front of the small child.  The family had no money.  Powell's mother was addicted to drugs and alcohol.  Beginning at age 12, Powell was sexually abused.  After the parents separated when she was a young girl, Powell had no contact with her father.  Thus, the first third of Powell's life was punctuated by a constant search for stable family life, moving from one aunt to the next.  Presentence Investigation Report (PSR), p. 19.

Powell married in 2000, which resulted in eight children.  The youngest are 12, 15, 17, 20, 21, and 25 years old.  PSR, p. 20.  After Powell and her husband's divorce, the three youngest children have lived with their mother.  Powell currently resides in Grove City, Pennsylvania with her partner Joseph, 71, who is also her employer.  Joseph's business involves slate roofing, composting and publishing.

Together with this memorandum, Powell has submitted a short film comprising brief interviews with Powell and her family.  Powell hopes that this gives the Court some sense of the family dynamic.  The Court will see that Powell's children are entirely dependent on her

nurturing presence in their lives.  Powell Sentencing Video, Exh. 1 (submitted directly to chambers).

Letters submitted on Powell's behalf show that her kind and compassionate nature has positive effects beyond her immediate family.  Powell Sentencing Ltrs., Exh. 2.  A member of Powell's church notes that Powell has brought her family to Mexico "multiple times . . . to help at an orphanage." *Id.*, p. 7.  When a neighbor was diagnosed with Lyme disease, Powell took care of her children.  *Id.*, p. 27.  In her community, Powell has "led several programs [that] teach[] others about preserving food and living off the land." *Id.*, p. 31.  Powell, one letter explains,

> is the type of person who puts 110% effort into the wellbeing of her family and friends. The type of person who pulls over to give bananas to homeless people.  The type of person who makes the two-hour drive to Cleveland twice a month to fill our trunk with cases of organic produce so that we could split it with other big families in our community, all so she and other local families could afford to provide their families with good, natural food.

Exh. 2, p. 42.

 In January 2023, Powell was given a neuropsychological assessment.  Powell Neuropsychological Assessment, Exh. 3 (submitted directly to chambers).  The evaluation utilized qualitative and quantitative procedures.  *Id.*, p. 1.  The diagnostic impression concluded with diagnoses of posttraumatic stress disorder; paranoid, schizoid and negativistic personality traits; and major depressive disorder.  *Id.*, p. 6.  The assessment explained that Powell's:

> early developmental years were highlighted by trauma, civil unrest, a general distress [regarding] police/government based on family related events. She had to learn to be self-sufficient and relied on her own thoughts of right and wrong using a very ideational approach to problem solving. The impact her childhood/adolescent experiences resulted in a paranoid-like personality structure which results in deficits in reality testing. This allows her to be easily manipulated and the actions as noted in both at Gettysburg and subsequently in Washington DC can be seen as someone who was cultivated into action. The long-standing trait anger, which she was able to control most of her adult life, was overcome with breakthrough aggression. . .

3

It appears that Ms. Powell was very susceptible to coercion and that she was manipulated over time to trust others who eventually led her to Washington DC for the January 6th event. This is someone whose protective factors were exploited by others.

Exh. 3, p. 6.

**B.      The convictions and presentence investigation report**

On May 9 and 10, 2023, the Court conducted a two-day bench trial.  Powell was found guilty of the following charges: Civil Disorder, 18 U.S.C. § 231(a)(3) (Count One); Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count Two); Destruction of Government Property, 18 U.S.C. § 1361 (Count Three); Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A) (Count Four); Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(2) and (b)(1)(A) (Count Five); Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. §§ 1752(a)(4) and (b)(1)(A) (Count Six); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Seven); Act of Physical Violence in the Capitol Grounds or Buildings, 40 U.S.C. § 5104(e)(2)(F) (Count Eight); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Nine).

The PSR identifies U.S.S.G. §2J1.2 as the controlling guideline.  PSR, ¶ 73.  The base offense level is 14.  *Id.*,  ¶ 74.

The PSR applied the specific offense characteristics at (1) §2J1.2(b)(1)(B) because the offense caused property damage (broken window) "in order to obstruct the administration of justice" and (2) §2J1.2(b)(2) because the January 6, 2021 event "resulted in substantial interference with the administration of justice. . ." PSR, ¶¶ 75-76.

4

Thus, the PSR calculated Powell's total offense level at 25.  In Criminal History Category I, that would generate a Guidelines range of 57 to 71 months' incarceration.  PSR, ¶ 139.

**Argument**

**I.      Sentencing procedure**

As it knows, the Court has broad discretion to consider nearly every aspect of a particular case, and a particular defendant, in fashioning an appropriate sentence.  *United States v. Booker*, 543 U.S. 220 (2005); *Gall v. United States*, 552 U.S. 38 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007).  Although the Court must first calculate the appropriate sentencing range under the Guidelines, it is not bound by the Guidelines or Guidelines Policy Statements.  It may make its own policy judgments, even if different from those in the Guidelines.  *Kimbrough*, 552 U.S. at 101.

The Court must merely impose a sentence consistent with the terms of 18 U.S.C. § 3553(a) and § 3661.  As the Court knows, the cardinal requirement of § 3553(a) is that the "court shall impose a sentence sufficient, but not greater than necessary to comply with the purposes of [§ 3553(a)]. . ." § 3553(a).

**II.     The PSR incorrectly applied the specific offense characteristics in U.S.S.G. §2J1.2(b)**

The PSR applied the three-level specific offense characteristic at U.S.S.G. §2J1.2(b)(2) "[c]onsidering [that] the offense resulted in substantial interference with the administration of justice, specifically, the proceeding before Congress. . ." PSR, ¶ 75.  It applied the 8-level specific offense characteristic at U.S.S.G. §2J1.2(b)(1)(B) because Powell's offense caused property damage "in order to obstruct the administration of justice." Legally and factually, that is mistaken.

First, the congressional proceeding on January 6 did not entail "the administration of justice." Any way one looks at it, Congress does not administer justice. That is true under basic separation of powers principles. It's true in terms of ordinary language usage. *United States v. Seefried*, 2022 U.S. Dist. LEXIS 196980, __ F. Supp. 3d __ (D.D.C. Oct. 29, 2022) (the "administration of justice" enhancements do not apply to the novel § 1512(c) offense created for January 6 cases).

Every court of appeals to address the question has held that the statutory phrase "administration of justice" refers to judicial proceedings. *United States v. Richardson*, 676 F.3d 491, 502-03 (5th Cir. 2012); *see also United States v. Brenson*, 104 F.3d 1267, 1280 (11th Cir. 1997) ("Section 1503 employs the term 'due administration of justice' to provide a protective cloak over all judicial proceedings."); *United States v. Warlick*, 742 F.2d 113, 115-16 (4th Cir. 1984) ("[O]bstruction of the administration of justice requires . . . some act that will . . . thwart the judicial process."). Many courts of appeals, if not all of them, hold that the Guidelines are interpreted just as statutes are. *United States v. Savin*, 349 F.3d 27, 35-36 (2d Cir. 2003) (courts interpret the Guidelines just as they do statutes); *United States v. Peterson*, 629 F.3d 432, 434 (4th Cir. 2011) (same); *United States v. Bustillos-Pena*, 612 F.3d 863, 868 (5th Cir. 2010) (same); *United States v. Bahhur*, 200 F.3d 917, 927 (6th Cir. 2000) (same); *United States v. Smith*, 989 F.3d 575, 586 (7th Cir. 2021) (same); *United States v. Collins*, 754 F.3d 626, 630 (8th Cir. 2014) (same); *United States v. Kirilyuk*, 29 F.4th 1128, 1137 (9th Cir. 2022) (same).

Notably, judges who have denied motions to dismiss the government's novel § 1512(c)(2) offense have reasoned that the motions should not be granted precisely because Congress does *not* administer justice. *E.g.*, *United States v. Montgomery*, 578 F. Supp. 3d 54, 61-65 (D.D.C. 2021) ("Congress's constitutionally assigned duties do not include the

'administration of justice. . .'"); *see also United States v. Sandlin*, 575 F. Supp. 3d 16, 23-24 (D.D.C. 2021).

The government's interpretive position is that the Court should isolate the word "justice" and see whether a proceeding that is neither a congressional inquiry nor investigation can fit within the most abstract, tertiary dictionary definition of the term.  However, that is not how courts are supposed to impartially interpret text.  *E.g.*, *Dubin v. United States*, __U.S.__, 143 S. Ct. 1557, 216 L. Ed. 2d 136, 154 (2023) ("'[A] statute's meaning does not always turn solely on the broadest imaginable definitions of its component words.'") (quoting *Epic Sys. Corp. v. Lewis*, 584 U.S. __, __, 138 S. Ct. 1612, 200 L. Ed. 2d 356, 362 (2018)).  Instead, they look to how the relevant sentence or phrase is used in the context of the statute or rule, and they look to how the words at issue are ordinarily used by relevant speakers.  Judge Easterbrook summed up the relevant principle this way: "Slicing a statute into phrases while ignoring . . .the setting of the enactment. . . is a formula for disaster."  *Herrmann v. Cencom Cable Assocs., Inc*., 978 F.2d 978, 982 (CA7 1992); *see also Continental Can Co. v. Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund*, 916 F.2d 1154, 1157 (CA7 1990) ("You don't have to be Ludwig Wittgenstein or Hans-Georg Gadamer to know that successful communication depends on meanings shared by interpretive communities.").

The *Seefried* court demonstrated that the government's novel interpretation of "the administration of justice" is inconsistent with decades of recorded usage by the public:

> The primary linguistic community using and understanding the Sentencing Guidelines is an informed legal audience—most notably, lawyers and judges. Unlike most statutes, which are at least theoretically intended to be read and understood by citizens, the Guidelines are a practitioner's guide to federal sentencing. The Court therefore focused on the Corpus of Caselaw Access Project (COCAP), which compiles the text of federal and state court decisions. *See* https://lncl8.lawcorpus.byu.edu/.

But just in case one thinks the Guidelines should be read like criminal statutes—directed to the general public—the Court also searched the Corpus of Historical American English (COHA), which collects sources across genres, including fiction, magazines, newspapers, and academic articles. *Cf. Rice*, 36 F.4th at 583 n.6 (looking to a database collecting "documents an ordinary speaker of English would interact with regularly" when interpreting a criminal statute). At the very least, it would be notable if these corpora produced wildly different results. As it turns out, they did not.

The Court queried the COCAP for the years 1977-1987. This period represents the decade before and including the year in which the Commission promulgated § 2J1.2. *See* U.S.S.G. § 2J1.2 (effective Nov. 1, 1987). *Cf. Safelite*, 930 F.3d at 444 (Thapar, J., concurring in part and concurring in the judgment) (looking to a ten-year period to generate a sample of written text around the time Congress first passed the relevant language). This search returned 14,118 hits, or "concordance lines." Given such a large universe, the Court reviewed a random sample of 375 concordance lines containing the phrase "administration of justice" to see what sorts of official proceedings were discussed. This sample size produces a 95% confidence interval. A random sample can be generated through the database itself by filtering for a specific number of results.

The most frequent usage of the "administration of justice"—about 65% of the total hits—corresponds with the sense described above: a judicial proceeding deciding legal rights. The phrase appeared in conjunction with witness tampering, contempt of court, various evidentiary privileges, the effect of jury instructions on court proceedings, and the conduct of juries. The phrase also accompanies issues of judicial management, including delays in court proceedings, repeat litigants, and even courtroom dress code. Other hits dealt with media access to judicial proceedings. Finally, some hits reflected more general concerns about retroactivity and the "fair," "proper," "effective," or "thorough" administration of justice by courts.

The next most common context in which the "administration of justice" appeared—around 25% of hits—involved disciplining judges or lawyers for conduct that interfered with judicial proceedings. Some hits referenced violations of various ethical rules, contempt of court, recusal, disqualification of counsel, and perjury when a lawyer testified before a grand jury. Again, the customary usage of the phrase was closely linked with judicial proceedings, or an actor who is intimately involved with the judicial process.

Another category of note—about 4% of hits—involved law enforcement activities. Some hits referenced conduct such as resisting arrest. Others discussed the need for anonymous informants to promote cooperation with law enforcement, the rationale for the exclusionary rule, and prosecutorial discretion. One discussed setting standards for roadside intoxication tests. These hits differed from those described above in that they did not always involve a formal proceeding or a judicial body. But they all contemplate the state's application of force or the government's role in investigating and prosecuting crimes.

**In contrast, the least common usage of "administration of justice" was as a broad term referring to government function generally. The Court identified three such entries out of the 375 it coded**. One dealt with a public utility commission that discussed the administration of justice in broad terms. Another noted that local commissioners' power to issue licenses involves the administration of justice. And another suggested that Texas counties are involved in the administration of justice. **No entries discussed a Congressional proceeding.**

*Seefried*, 2022 U.S. Dist. LEXIS 196980, at *16-18 (emboldening added).

Linguistic analysis like this raises a question whether, in ignoring the public's understanding of language and placing novel interpretations on terms, a court is implementing the will of the Commission (and Congress) or instead creating on-the-spot Guidelines tailored to a specific cohort of defendants, almost like a bill of attainder.  The most one can say of the government's position is that the phrase "administration of justice" could be regarded as ambiguous in the context of congressional proceedings that involve no inquiry or investigation. In that case, the rule of lenity counsels against application of §2J1.2(b)(2) here.  *E.g.*, *United States v. Hamner*, 21-cr-689-ABJ (D.D.C. 2021) (declining to apply ambiguous guideline under the rule of lenity).

Second, even if Congress "administers justice," the specific offense characteristics do not apply on the facts.

The inclusion of "property damage" under subsection (b)(1)(B) is designed to address cases in which *property damage is caused or threatened as a means of intimidation or retaliation* (<u>e.g.</u>, *to intimidate a witness from, or retaliate against a witness for, testifying*). Subsection (b)(1)(B) is not intended to apply, for example, where the offense consisted of destroying a ledger containing an incriminating entry.

§2J1.2 cmt. n. 5 (emphasis added).

No evidence establishes that Powell broke a window to intimidate or retaliate against some identified person.  The government has not identified any person, and certainly not any "witness," whom Powell intended to "intimidate" by breaking the window.  No evidence

depicted a member of Congress within sight at the time of the offense.  No evidence showed Powell (say) gazing at a law enforcement officer as she broke the window and no evidence showed any law enforcement officers within the room on which the window opened.  That is not to say Powell's actions were not criminal.  Of course they were.  But there is no factual basis to infer by a preponderance of the evidence that "intimidation or retaliation" was Powell's object.

Nor does §2J1.2(b)(2) apply to Powell's conduct.  The enhancement requires the government to prove that *the defendant's* conduct "resulted in" substantial interference with the administration of justice.  §2J1.2(b)(2).  That is, there is a causal element the government must establish.  The PSR errs by assuming that the specific offense characteristic can be applied to Powell if *the riot overall* "resulted in" substantial interference.  PSR, ¶ 76 ("As a result of the *January 6, 2021 event*. . .") (emphasis added).  But the provision clearly states that the question is whether the defendant's offense "resulted in" substantial interference.

Here, the government has not shown by a preponderance of the evidence that Powell's conduct caused the joint session "to be halted while legislators were physically evacuated for their own safety." PSR, ¶ 76.  That is so whatever causal test the Court applies (e.g., but-for or proximate cause).  Powell did not break the window until approximately 5:01 p.m.  PSR, ¶ 27.  By that time Congress had been recessed for nearly two hours.  After the joint session resumed in the evening of January 6, legislators continued debating electoral vote counting issues for approximately seven hours, undeterred by Powell's conduct earlier in the day.  Thus, it is not possible to prove that Powell's conduct "resulted in" legislators being evacuated or even that her conduct meaningfully delayed the vote count, much less "substantially."

For all these reasons, the Court should not apply §2J1.2(b)(2).

**III.    The § 3553(a) factors favor a downward variance**

**A.    The nature and circumstances of the offense and the history and characteristics of the defendant (§ 3553(a)(1))**

A number of considerations under § 3553(a)(1) warrant a significant downward variance in Powell's case: (1) Powell's minor children do not have an adequate substitute caregiver; (2) Powell's mental health status; (3) even though the court has accepted the government's novel § 1512(c)(2) charge, which drives the sentencing range, the question is at least a close one, meriting leniency in sentencing if not lenity; (4) first-time offender status and atypical conduct; (5) her family and community support; and (6) her sincere remorse.

**1.    The deleterious effects on Powell's young children**

While a Guidelines policy statement provides that "family ties and responsibilities are not ordinarily relevant in determining whether a *departure* may be warranted," U.S.S.G. §5H1.6, (emphasis added), it is still proper to downwardly vary on that basis and, in any case, the Court is empowered to disagree with the Guidelines on policy grounds. *E.g.*, *United States v. Munoz-Nava*, 524 F.3d 1137 (10th Cir. 2008) (downwardly varying from 46-57 month guideline range to 12 months in prison and 12 months of home confinement based on defendant's role as a caretaker for eight-year-old son and elderly parents). After *Gall*, the sentencing court does not need to find the defendant's family responsibilities "extraordinary" in order to disregard the policy of U.S.S.G. §5H1.6. *E.g.*, *United States v. Warfield*, 283 Fed. App'x 234, 235 (5th Cir. June 20, 2008).  As in every discretionary sentencing decision, the standard is reasonableness.

Here, the deleterious effects on Powell's young children from a sentence of incarceration would be profound.  Powell is not just the primary caregiver to three minor children; she educates them and is responsible for their daily sustenance.  Exh. 1.  Even during her period of home confinement pretrial, Powell's children have been unable to engage in the extracurricular

11

activities of their peers, as Powell's ex-husband cannot take up the burden of raising them on his own.  *Id.*  That problem will only be worsened if Powell is incarcerated, particularly for a lengthy period of time.  The "plan" is for Powell's 15-year-old son to manage the family.  That is a responsibility the boy cannot possibly carry.

The Court has sentencing options available that would both deter Powell and avoid doing extreme collateral damage to her innocent family.  These considerations powerfully argue for a downward variance.  *Munoz-Nava*, 524 F.3d at 1137.

## 2.   Powell's mental health status

A downward variance may be justified by a defendant's mental health status.  *United States v. Burroughs*, 613 F.3d 233, 239 (D.C. Cir. 2010); *United States v. Sweet*, 2007 U.S. Dist. LEXIS 3914, at *4 (D.D.C. Jan. 15, 2007) ("Defendant's psychiatric history . . . argue[s] in favor of a variance.").

As discussed, a neuropsychological evaluation assessed that trauma inflicted on Powell in her early developmental years has contributed to diagnoses of posttraumatic stress disorder; paranoid, schizoid and negativistic personality traits; and major depressive disorder.  Exh. 3. The very crime at issue is powerfully corroborative of that assessment.  These conditions have rendered Powell vulnerable to the "manipulat[ion] [which] eventually led her to Washington D.C. for the January 6th event." Exh. 3, p. 26.

To the extent Powell's crimes were attributable in part to these untreated neurological conditions out of her control, a variance is warranted.

## 3.   Leniency is warranted on the novel § 1512(c)(2) charge

Along with most judges in this district, this Court has declined to dismiss the government's novel § 1512(c)(2) charge.  However, it would probably agree that, at the least, the

question is a close one.  At least three judges in this circuit—including two on the court of

appeals—have found that the government's evidence-free interpretation of the obstruction-of-

justice offense is "breathtakingly" overbroad.  *United States v. Fischer*, 64 F.4th 329 (D.C. Cir.

2023); *United States v. Miller*, 589 F. Supp. 3d 60 (D.D.C. 2022).  Even the panelist who

authored *Fischer*'s lead opinion acknowledged that before January 6 no court had applied §

1512(c)(2) to acts of protest not intended to affect the integrity or availability of evidence.

*Fischer*, 64 F.4th at 338.

  The Court has heard argument that applying a novel construction of a criminal statute to

conduct that occurred before any court's adoption of the new interpretation can amount to a due

process violation akin to an ex post facto law.  *United States v. Lanier*, 520 U.S. 259, 264 (1997)

(citing *Bouie v. City of Columbia*, 378 U.S. 347, 353-54 (1964)).  A fortiori, then, if such a novel

charge is still permitted, leniency is certainly appropriate.  Even if she had reviewed the relevant

statute on the morning of January 6, Powell could not have known that what appeared to be a

trespass in the Capitol that day would constitute a novel obstruction-of-justice offense, the first

in Chapter 73 that does not entail evidence or an investigation.  The point is not that ignorance of

the law is an excuse.  The point is that even if we posit a public that is aware of Section 1512(c),

it could not have been fairly notified of a future interpretation of the statute that decouples the

crime from evidence and investigations for the first time in its 20-year history.

  Leniency becomes even more appropriate if the court determines that, notwithstanding

the ordinary meaning of "the administration of justice," a special meaning applies for January 6

defendants.  In that case, up to eleven extra levels are added to Powell's total offense level.  Just

as with the novel crime itself, even if Powell had read the Guidelines on her way toward the

Capitol, she could not have known that Congress's proceeding that day would be later regarded as "the administration of justice," something that happens in courts, not a legislature.

### 4.     First-time offender and atypical conduct

The fact that Powell is a first-time offender, and that the offense conduct is atypical for her, is an appropriate basis for a downward variance. *United States v. Huckins*, 529 F.3d 1312, 1317 (10th Cir. 2008) (affirming that district court's downward variance from 60-to-79-month range to below the calculated Guidelines range was reasonable and permissibly took into account the defendant's lack of a criminal record); *Munoz-Nava*, 524 F.3d at 1143 (downward variance to one year imprisonment and one year home confinement from recommended Guidelines range of 65-78 months imprisonment supported by district court's finding of several factors including that defendant had no felony criminal record and his offense was "highly out of character"); *United States v. Tomko*, 562 F.3d 558, 560 (3d Cir. 2009) (affirming probationary sentence based partly on defendant's "negligible criminal history").

That the Guidelines already take into account Powell's lack of criminal history does not mean that it is inappropriate for the Court to vary downward on the same basis. *See United States v. Ransom*, 756 F.3d 770, 775 (D.C. Cir. 2014) ("[I]t is not error for a district court to enter sentencing variances based on factors already taken into account by the Advisory Guidelines . . . when a district court applies broader § 3553(a) considerations in granting [a sentencing] variance.").

The many letters submitted on Powell's behalf clearly demonstrate that her conduct on January 6 was atypical.  Exh. 2.

14

### 5.      Powell's community and family support

The financial and emotional support on the outside that a defendant can be expected to receive from family and community members is another valid basis for a downward variance. *E.g.*, *United States v. Sayad*, 589 F.3d 1110, 1114-15 (10th Cir. 2009) (defendant's "supporting and loving family" a reason for downward variance); *United States v. Autery*, 555 F.3d 864, 874 (9th Cir. 2009) (family support one of several valid grounds for downward variance from 41-51 months to probation); *United States v. Martin*, 520 F.3d 87, 92 (1st Cir. 2008) (family support one of three valid reasons for 91-month downward variance).

As shown above, Powell has an extensive network of friends and family members that can provide her with the financial and emotional support she needs for successful rehabilitation. The letters submitted on her behalf demonstrate that Powell has their unequivocal support.  Exh. 2.

### 6.      Powell's remorse

A defendant's true remorse, whether exceptional or not, is a valid basis for a downward variance.  *E.g.*, *United States v. Howe*, 543 Fed. 3d 128, 138 (3d Cir. 2008).

Powell is earnestly remorseful for her misconduct on January 6.  In her allocution, she will apologize to law enforcement and members of Congress and their staff.  That Powell challenged the application of § 1512(c) here does not reveal a lack of remorse.  The Guidelines recognize the point.  U.S.S.G. §3E1.1 cmt. n. 2 (recognizing that defendants can still receive an acceptance of responsibility reduction where they go to trial to "challenge [] the applicability of a statute to [her] conduct").

### B.      Avoiding unwarranted sentence disparities (§ 3553(a)(6))

Section 3553(a) requires courts to fashion a sentence in a way that avoids "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." § 3553(a)(6).  Sentencing Powell to a lengthy term of incarceration would create unwarranted sentence disparities along several levels.

Consider the case of **Matthew Wood**. Wood was convicted of a § 1512(c) offense and several others of which Powell was found guilty.  *U.S. v. Matthew Wood*, 21-cr-223-APM (D.D.C. 2021), Gov't Sentencing Mem., ECF 55, p. 46.   Although he did not destroy property, Wood's conduct was in some ways more serious than Powell's.  Before January 6, Wood vowed to "raid Congress" and "be brave heart in that bitch." *Id.*, p. 2.  Terrifyingly, he compared his red car to "the blood I will shed" in D.C.  *Id.*, p. 60.

Wood was one of the first rioters in the building and one of the last to leave.  *Id.* In contrast to Powell's brief appearance in an empty office perched above the Lower West Terrace, Wood remained inside for 80 minutes.  *Id.*, p. 59.  Wood was constantly encouraging other rioters to enter the building and breach barricades.  *Id.*

Wood received a sentence of 36 months' probation with 12 months of home detention.  *U.S. v. Matthew Wood*, 21-cr-223-APM (D.D.C. 2021), ECF 65.  Sentencing Powell to a lengthy term of incarceration would create an unwarranted disparity with Wood.

Or consider **William Isaacs**.  Isaacs was not only a key member of the Oath Keepers militia, he was also convicted of conspiring to violate § 1512(c), as well as several other felonies of which Powell is not guilty.  *U.S. v. Isaacs*, 21-cr-28-APM (D.D.C. 2021).  Plainly, the conduct of the Oath Keepers, many of whom were found guilty of seditious conspiracy, was far more serious than Powell's.  Isaacs was sentenced to 60 months' probation, 500 hours of community

service, and 18 months of home confinement.  Sentencing Powell to a lengthy term of incarceration would create an unwarranted disparity with Isaacs.

A number of  § 1512(c) defendants have been sentenced to terms of incarceration between eight and 10 months.  *U.S. v. Morrison*, 21-cr-334-TJK (8 months); *U.S. v. Puma*, 21-cr-454-PLF (9 months); *U.S. v. Hodgkins*, 21-cr-188-RDM (8 months); *U.S. v. Michetti*, 21-cr-232-CRC (9 months); *U.S. v. Stottlemyer*, 21-cr-334-TJK (8 months); *U.S. v. Weeks*, 21-cr-247-TFH (10 months).  But, again, Powell's conduct was not more disruptive to the joint session than the conduct of these defendants:

*Morrison*:  Unlike Powell, Morrison entered sensitive areas of the Capitol, including the Speaker of the House's Suite and Senate Chamber; rifled through desks and took pictures of their documents; remained in the Capitol for an hour; and lied to FBI agents.  *U.S. v. Morrison*, 21-cr-334-TJK, ECF 106, p. 2.

*Puma*: Unlike Powell, Puma planned on "storming the House of Representatives"; scaled a wall and climbed through a broken window to enter the Capitol; entered Senator Merkley's office and smoked marijuana there; promised future violence.  *U.S. v. Puma*, 21-cr-454-PLF, ECF 55, pp. 2-3.

*Hodgkins:* Unlike Powell, Hodgkins "entered the Capitol wearing a backpack containing protective eye goggles, rope, and white latex gloves. . ." He entered the Senate chamber and took celebratory photographs.  He remained in the building over three times as long as Powell.  *U.S. v. Hodgkins*, 21-cr-188-RDM, ECF 32, p. 4.

*Michetti:* Unlike Powell, Michetti explicitly stated that his goal in entering the Capitol was to "stop the vote." Michetti confronted law enforcement officers in the building.  He refused to leave the building until he was tear gassed multiple times.  *U.S. v. Michetti*, 21-cr-231-CRC,

ECF 46, p. 1.

   ***Stottlemyer:*** Unlike Powell, Stottlemyer entered sensitive areas of the Capitol, including the Speaker of the House's Suite and Senate Chamber; rifled through desks and took pictures of their documents; remained in the Capitol for an hour.  *U.S. v. Stottlemyer*, 21-cr-334-TJK, ECF 105, p. 2.

   ***Weeks***: Unlike Powell, Weeks planned on invading the Capitol.  Weeks climbed a wall and personally overturned bike racks to breach the Capitol.  He waved other rioters into the building.  *U.S. v. Weeks*, 21-cr-247-JDB, ECF 96, p. 2.

   And, of course, unlike all those defendants, Powell is the primary caregiver to three minor children.  Thus, Powell's sentence should be milder than the sentences of these defendants.

   Finally, a term of incarceration would create unwarranted disparities between Powell's sentence and sentences imposed on parading/demonstrating misdemeanants in January 6 cases. The distinction between the novel § 1512(c) offense and a Class B parading misdemeanor is one without material legal significance.  If one "demonstrates" or "parades" in the Capitol (40 U.S.C. § 5104(e)(2)(G)) during an "official proceeding," one cannot avoid "influenc[ing]" that proceeding in some manner, or at least that is one's attempted object. § 1512(c)(2).  But those charged under Section 1512(c)(2) and who therefore allegedly acted with an "unlawful purpose" (the government's definition of "corruptly," satisfied by any trespass or parading charge, according to the government) shared that purpose with the misdemeanants who "demonstrated" or "paraded" against electoral vote certification in the Capitol.  In many instances, the conduct of these probationary misdemeanants was more disruptive than Powell's.  Department of Justice

January 6 Sentencing Chart, dated Aug. 15, 2023, available at:

https://www.justice.gov/file/1593211/download.  Here are some examples:

| 1/6 Def. & Case No. | Charge | Sentence | Offense Conduct |
|---|---|---|---|
| Josh & Jessica Bustle, 21cr238 | Parading in Capitol | 24 mos. probation and 24 mos. supervised release | Entered Capitol Building, remained for 20 minutes. Posted on Facebook, "Pence is a traitor. We stormed the capital (sic). . . We need a revolution!" |
| Bryan Ivey, 21cr267 | Parading in Capitol | 36 mos. probation | Entered Capitol Building through a breached window, waving additional rioters into the building, spending 30 minutes inside. |
| Valerie Ehrke, 21cr97 | Parading in Capitol | 36 mos. probation | Entered Capitol Building. |
| Andrew Bennett, 21cr227 | Parading in Capitol | 3 mos. home confinement, 24 mos. probation | Entered the Capitol Building, livestreaming the event on his Facebook page for over an hour. |
| Lori, Thomas Vinson, 21cr355 | Parading in Capitol | 5 years probation, 120 hours of community service | Entered the Capitol Building, later telling news outlet that her actions were "justified" and that she would "do this all over again." |
| Jordan Stotts, 21cr272 | Parading in Capitol | 24 mos. probation | Entered the Capitol Building, remained inside for an hour, celebrating with others and taking videos with his cell phone. |
| Douglas Sweet, Cindy Fitchett, 21cr41 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, Fitchett filming herself saying, "We are |

| | | | |
|---|---|---|---|
| | | | storming the Capitol. We have broken in." |
| Rasha Abdual-Ragheb, 21cr42 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, desiring to demonstrate against Congress. |
| Jonathan Sanders, 21cr384 | Parading in the Capitol | 36 mos. probation, 60 hours community service | Entered the Capitol Building, intending to protest presidential election |
| Michael Orangias, 21cr265 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, taking pictures inside. |
| John Wilkerson, 21cr302 | Parading in the Capitol | 36 mos. probation, 60 hours of community service | Entered the Capitol Building, posting on social media, "today was a good day, we got inside the Capitol." |
| Brandon Nelson, 21cr344 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, co-defendant texting, "We stormed the Capitol and shut it down. Currently still inside" and "Patriots won't go down without a fight." |
| Andrew Wrigley, 21cr42 | Parading in the Capitol | 18 mos. probation | Entered the Capitol Building, taking pictures of himself inside |
| Jacob Hiles, 21cr155 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, taking pictures showing him smoking "an unknown substance" inside. |
| Bruce Harrison, 21cr365 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, taking pictures of himself inside. |
| Terry Brown, 21cr41 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, disobeyed police order to leave. |

| Felipe Marquez, 21cr136 | Disorderly conduct in the Capitol | 18 mos. probation | Entered the "hideaway" office of Senator Merkley, saying, "We only broke a couple windows." |
|---|---|---|---|
| Michael Rusyn, 21cr303 | Parading in the Capitol | 24 mos. probation | Among the first to enter the Capitol through a certain door, part of a group of people who shouted, "Tell Pelosi we're coming for that b****," called police traitors, and shouted "Stop the steal." |
| Andrew Hatley, 21cr98 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, taking pictures with various historical statues. |
| Nicholas Reimler, 21cr239 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, taking pictures of himself and friends. |
| Caleb Jones, 21cr321 | Parading in the Capitol | 2 mos. home confinement, 24 mos. probation | Entered the Capitol Building, "walking down numerous hallways and into the Capitol Rotunda." |
| Anthony R. Mariotto, 21cr94 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, posting on Facebook, "This is our house" under selfie photograph. |
| Michael Stepakoff, 21cr96 | Parading in the Capitol | 12 mos. probation | Entered the Capitol Building, posting on social media after, "The Capitol is OUR house, not theirs." |
| Tanner Sells, 21cr549 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building. |
| Gary Edwards, 21cr366 | Parading in the Capitol | 12 mos. probation | Entered the Capitol Building, including Senate office S140. |
| Zachary, Kelsey Wilson, 21cr578 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, penetrating |

| | | | all the way to the Speaker's personal office |
|---|---|---|---|
| Jennifer Parks, Esther Schwemmer, 21cr363 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, taking pictures inside |
| Jackson Kostolsky, 21cr197 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building |
| Eduardo Gonzalez, 21cr115 | Parading in the Capitol | 24 mos. probation | Entered the Capitol, smoking marijuana inside "multiple times." |
| Israel Tutrow, 21cr310 | Parading in Capitol | 36 mos. probation | Entered the Capitol Building with a knife |

In short, sentencing Powell to a lengthy term of incarceration would create dozens or even hundreds of unwarranted sentence disparities.

### C.     The seriousness of the offense and deterrence (§ 3553(a)(2))

The Court must consider "the need for the sentence imposed . . . to reflect the seriousness of the offense" and to "afford adequate deterrence to criminal conduct" and to "protect the public from further crimes of the defendant." § 3553(a)(2).

Powell is a mother and grandmother to 12 children with no criminal history.  Those biographical facts alone imply she is highly unlikely to recidivate.  Prior to January 6, demonstrators at the Capitol who violated relevant law were typically penalized under a process called "post and forfeit": they paid to have their demonstration-related case dropped for approximately $25-100.  ACLU, District of Columbia, Demonstrations in D.C., available at: https://www.acludc.org/en/know-your-rights/know-your-rights-demonstrations-dc.  That was deemed sufficient deterrence.  In contrast, Powell was charged with multiple felony offenses in federal court.  FBI agents came to her home.  A lengthy sentence of incarceration—along with its destabilizing effect on her family—is not needed to deter Powell from demonstrating at the Capitol again without authorization.  Together with scathing media criticism and social

ostracization, a federal conviction— as well as a sentence of lengthy probation, home detention, and significant fine—will well and truly deter Powell.  The heavy shame Powell has experienced is itself a guarantee of deterrence.  *See*, *e.g.*, *United States v. Polizzi*, 549 F. Supp. 2d 308, 449 (E.D.N.Y. 2008) (specific deterrence satisfied by "intense shame created by the convictions"); *United States v. Maynard*, 2020 U.S. Dist. LEXIS 179542, at *5 (E.D.N.Y. Dec. 17, 2012) (Weinstein, J.) (same).

**Conclusion**

For all the foregoing reasons, Powell respectfully requests a sentence of 36 months' probation, 24 months' home detention, 200 hours' community service, and $2,000 in restitution.

Dated: October 11, 2023                     Respectfully submitted,

*/s/ Nicholas D. Smith*
Nicholas D. Smith (D.C. Bar No. 1029802)
1123 Broadway, Suite 909
New York, NY 10010
Phone: (917) 902-3869
nds@davidbsmithpllc.com


*Attorney for Rachel Powell*

<u>**Certificate of Service**</u>

I hereby certify that on the 11th day of October, 2023, I filed the foregoing submission with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s): Counsel of record.

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

*/s/ Nicholas D. Smith*
Nicholas D. Smith (D.C. Bar No. 1029802)
1123 Broadway, Suite 909
New York, NY 10010
Phone: (917) 902-3869
nds@davidbsmithpllc.com


*Attorney for Rachel Powell*

24