## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-179-RCL** |
| **RACHEL MARIE POWELL,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For her conduct on January 6, 2021, including her violent altercations with law enforcement at the West Plaza, her smashing of a window at the Lower West Terrace with an ice axe and a cardboard pole, her encouragement and instructions to other rioters on how to "take" the U.S. Capitol, and for her utter lack of remorse, the government requests that this Court sentence Rachel Marie Powell to 96 months of imprisonment, a mid-range sentence within the sentencing range of 87-108 months, three years of supervised release, $2,753 in restitution, and $555 in special assessment fees.

## I.      INTRODUCTION

The defendant, Rachel Powell, was an active and enthusiastic participant in the January 6, 2021 ("January 6") attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and

resulted in more than 2.9 million dollars in losses.[1]

Powell was one of the first rioters to break through onto Capitol grounds near the Peace Circle. At the West Plaza, Powell pushed against barricades and encouraged other rioters to attack the police line. After the West Plaza was breached, Powell climbed up to the Lower West Terrace ("LWT"), and eventually entered the Capitol itself through a broken window. Powell later used an ice axe and a battering ram in an effort to break through a different window and breach the Capitol at a different location, encouraging other rioters to enter the Capitol. After the riot, instead of remorse, Powell continued to call for political violence.

The government recommends that the Court sentence Powell to 96 months of incarceration, which is within the advisory Guidelines' range of 87 to 108 months, which the government submits is the correct Guidelines calculation. A 96-month sentence reflects the gravity of Powell's conduct, her complete lack of remorse, and the need to deter Powell and others from ever again using violence in pursuit of their political goals.

## II.   FACTUAL BACKGROUND

### A.   The January 6 Attack on the Capitol

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police ("USCP"). The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

The government refers to the Court's own short summary of the January 6 attack on the Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election, in its <u>Findings of Fact and Conclusions of Law</u>, ECF No. 110.

### B.      Powell's Social Media Presence Prior to January 6

In the months leading up to January 6, Powell repeatedly claimed that the election had been stolen, described how she carried weapons to an election protest in Washington, D.C., and actively sought to keep former President Trump in power.  *See* Trial Exhibit 55C.  On November 4, 2020, the day after Election Day, Powell encouraged others to "actively do something" about the election results:

> And now so many of you are complaining on social media about probable fraud in the voting system? You can't complain! Not even one of you that has been complacent should open your mouths! Hang your head in shame and shut your face unless you are going to actively do something. The government knows exactly how far you can be pushed because the population has been successfully tested. They know 99.9% of the people will roll over, belly up, like a bunch of cowards.

Trial Ex. 55C at 5.

On November 12, 2020, Powell repeated her assertion about the election, "For Biden to have won PA he would have had to get at least 80% of the mail in ballots. That's impossible." *Id.* at 8.  On November 12, 2020, in a private Facebook chat, Powell told another individual that she was "[h]eaded to dc." *Id.* at 10.  When asked if she was going for "[e]lection stuff or vacation," Powell responded, "The caravan.[2]  I wish we were dragging the political fuckers out of office."

---

[2] Powell referenced and posted multiple times in her Facebook account about the "caravan", which was an election protest for former President Trump scheduled for November 13, 2020, and

*Id.* at 10-11.  In a Facebook voice message on the same day, she stated, "I'm actually headed towards Lancaster right now, and in the morning, I will be leaving with some people that have an office in D.C. . . .  The people that I'm going with, they rented a house there, so I'm just staying overnight ... Saturday morning I'm going to meet some other patriots, Three Percenter type people."  Trial Ex. 55D (unified_message_767661643787930).

On November 13 and 14, 2020, Powell attended the "caravan" protests in Washington, D.C.  Multiple newspapers reported the violence in Washington, D.C. during these election protests, *see, e.g.,* "After thousands of Trump supporters rally in D.C., violence erupts when night falls,"  *https://www.washingtonpost.com/dc-md-va/2020/11/14/million-maga-march-dc-protests/* (last visited August 28, 2023).

On November 15, 2020, Powell left a Facebook voice message outlining her obsession with keeping former President Trump in power, and her willingness to intimidate legislators who did not adequately support former President Trump by going to their homes:

> So, I'm still in D.C., but last night I met with some people, and I think we have a reasonably good plan: if Trump concedes--or does not concede, I'm sorry-then if it gets through the courts and the courts agree with him, then it'll have to go to the House to be voted on, to see whether or not he gets to stay President. So, if we can simply determine who those people are, that would cast their vote for him, and call them and talk to them, the ones that are not making the correct decision for the people, instead of having protests in Washington, D.C., we'll take it to their homes.

*Id.* (unified_message_1075981679486827). On November 16, 2020, Powell notified another individual on Facebook that she would be "back home tomorrow. I had a meeting I needed to stop

_____

November 14, 2020, in Washington, D.C.  Powell further posted the webpage for the protest on Facebook:        https://www.infowars.com/posts/support-president-trump-join-the-stop-the-steal caravan/.  *Id.*

by tonight. I think we have some really good plans coming in the future to help stop the election fraud." Trial Ex. 55C at 13.  When asked if she got "caught up in the violence" of the election protests, Powell responded, "I only mildly did. I was going around dc with a little beater bar all weekend and wasp spray and knives in my bag so I was pretty confident." *Id.*  Powell further added, "They only pick on the vulnerable." *Id.*

On November 22, 2020, Powell discussed the fact that she had conducted surveillance at a female legislator's home:

| | |
|---|---|
| Powell: | We did surveillance on an officials home. The person was not seen coming in and out. Is there a way to check and make sure she still owns this house so we KNOW we have the correct address? |
| . . . | |
| B.K. | its better to send letters to their office and leave their family and private residences alone |
| Powell: | No, it isn't. These fuckers need to start listening to the people and doing their jobs. Letters aren't working. Can I find this information at any courthouse or does it have to be from the courthouse that is near the home? |
| B.K.: | the county courthouse of the area the house is in |
| Powell: | Is there ANY way to get this without going into that courthouse? |
| . . . | |
| B.K.: | have u tried a petition or scheduling a one on one |
| Powell: | It's time to take protests to their doors. |
| . . . | |
| Powell: | Ok, here's the deal. We can still get Trump in I believe. If we do we might be ok for a few more years. So we need to really be on the people in charge of elections. |

*Id.* at 14-15.  On December 6, 2020, Powell commented on a post, "But what everyone should do, imo, is just defy the government. No game playing. Just defiance. We will do what we want and there's nothing the gov can do to stop us." *Id.* at 16.

## C.     Powell's Role in the January 6 Attack on the Capitol

Powell first attended former President Trump's "Stop the Steal" rally before joining other

rioters at the Peace Circle.  Powell was present for the breach of the Peace Circle barricades at 12:50 p.m.[3]  Trial Exs. 1.01A and 1.03.  Powell then marched to the West Plaza, passing over downed barriers as well as snow fencing with signs stating, "AREA CLOSED."  Trial Ex. 1.03.

After arriving at the West Plaza, Powell and other rioters stood before a line of USCP officers, where Powell joined other rioters in chants of "U.S.A.!"  Trial Ex. 2.01.  As seen in Trial Exhibits 2.04 through 2.06—pictures from Powell's iCloud account—officers put bike rack-barricades in place to prevent rioters from moving closer toward the Capitol building.  From her vantage point on the West Plaza, Powell saw that by approximately 1:12 p.m., MPD had joined USCP officers defending the Capitol building.  Trial Ex. 12.  Powell also saw officers deploying nonlethal force, such as oleoresin capsicum ("OC") spray, to defend against rioter attacks.  Trial Ex. 2.12.  Powell heard a blaring alarm and the recorded announcement played by the police: "This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b).  All people must leave the area immediately. This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon."  Trial Ex. 2.09.

Nevertheless, Powell repeatedly pushed against the barricades using her hands, shoulders, and back.  Trial Exs. 2.07, 2.08, 2.10A, and 2.11.  As the USCP and MPD officers attempted to lock the barricades together to form a barrier against the rioters, Powell pushed against the barricades with her hands to prevent them from locking them together.  Trial Ex. 2.07.  Powell

---

[3] Much of the facts from Sections II(B) and (C) are discussed in the Court's <u>Findings of Fact and Conclusions of Law</u>, ECF No. 110.  Although Powell's Facebook messages after January 6 in Section II(D) were presented at trial, Powell's Twitter account is additional information for the Court, presented for the first time in connection with sentencing.

further pushed against barricades with her body as she encouraged other rioters to join her.  Powell

waved rioters forward while shouting, "Come on up people, don't be shy!"  Trial Ex. 2.08.



**Image 1: Trial Ex. 2.08 at :20.**

Powell pushed against the barricades with her back as officers attempted to prevent the

barricades from falling over, ignoring the officers' yells of "Get off the fence!" Trial Ex. 2.10A.



**Image 2: Trial Exhibit 2.11 at :12**

At approximately 2:28 p.m., rioters breached the police line at the West Plaza and pushed forward towards the Capitol, violently assaulting law enforcement officers along the way. Powell participated in this breach by shoving a barricade against an officer as the police line broke.



**Image 3: Trial Exhibit 2.13 at :18**

Immediately thereafter, Powell and other rioters collectively shoved retreating officers into a semi-circle near the corner of the West Plaza while yelling "Push!"  Trial Ex. 2.15.  Powell looked on from the front of the mob as rioters assaulted the retreating officers with fists, makeshift weapons, and various chemical sprays.



**Image 4: Trial Exhibit 2:15 at :02**

When officers finally retreated from the area by climbing up to the LWT, Powell cheered with other rioters, shouting, "Whose house? Our house!"  Trial Ex. 2.19.

At 2:40 p.m., Powell followed the retreating police and climbed a narrow stairwell to the LWT.  Trial Ex. 103.  Powell joined other rioters in the "tunnel" entrance at the LWT.  Trial Exs. 3.02, 3.03, and 3.04A.  While inside the tunnel, Powell saw rioters smash the glass doors in an effort to gain entrance to the Capitol.  Trial Ex. 3.02.  When rioters failed to break through the line of police officers in the tunnel, Powell exited and repositioned herself immediately outside.  Trial Exs. 3.05 and 3.06B.  Powell watched from the tunnel entrance as rioters thrashed against law

enforcement; she was within arm's reach of an officer being violently pulled out of the tunnel and assaulted by the crowd.  Trial Ex. 3.06B.  For over an hour, Powell watched the chaos and heard the screams of her fellow rioters.  *Id.*



**Image 5: Trial Exhibit 3.08 at :48**

At approximately 4:25 p.m., Powell moved to the window left of the tunnel, which led to room "ST-2."  Trial Exs. 3.08 to 3.10.  Powell entered this room by crawling through the already-broken window.  *Id.*   Upon entering, Powell again joined her fellow rioters in chants of "Whose house? Our house!"  Trial Ex. 3.11.  At some point, Powell left through the same window she entered before pushing her way to another window to the right of the tunnel leading to "HT-2." Powell repeatedly struck the window with an ice axe in her attempt to create an entryway to HT-2. Trial Ex. 3.13.



**Image 6: Trial Exhibit 3.13 at :03**

When her attacks on the window failed, Powell changed tactics, taking hold of a large cardboard tube.  Powell then adjusted the strap of her backpack, nodded to a fellow rioter on the other side of the tube, adjusted her hat, and grabbed the tube with both hands.  Trial Ex. 3.12. Powell then used the tube as a battering ram on the window.  Trial Ex. 3.12. Both the ice axe and the cardboard tube were dangerous weapons, capable of inflicting serious bodily injury.  *See* ECF 110, at 20-21.



**Image 7: Trial Exhibit 3.12 at :12**

According to the testimony of Jason McIntyre, from the Architect of Capitol, the window that Powell smashed with the ice axe and the cardboard tube cost approximately $753. Though unsuccessful in destroying the window completely, during her destructive efforts, Powell observed that immediately inside HT- 2 was a glass floor and underneath that floor was another set of rooms.

At approximately 5:01 p.m., Powell returned to the left side of the tunnel as part of an effort to coordinate a breakthrough into the Capitol building. Trial Ex. 3.15. Using a bullhorn, Powell described what she had learned about HT-2, and encouraged other rioters to enter HT-2, break the glass floor, and enter further into the Capitol building:

> Hey guys, I've been in the other room, listen to me. In the other room, on the other side of this door, right here where these feet are standing, there is a glass, that if somebody, if it's broken, you can drop down into a room underneath it. There's also two doors in the other room, one in the rear and one to the right when you go in, so people should probably coordinate together if you're going to take the building ...

12

Trial Ex. 3.15



**Image 8: Trial Ex. 3.16 at :24**

After providing those instructions, Powell returned to the right side of the tunnel entrance. But for the officers emerging from the tunnel and dispersing the rioters from the area at 5:05 p.m., shortly after her speech to the rioters, Powell's plan with the other rioters may have succeeded.

### D.     Powell's Social Media Presence After January 6 and Lack of Remorse

Powell felt no remorse for her actions on January 6; to the contrary, she was proud of her actions and eager for more violence.  On January 7, she posted: "we have given you all a chance to help us settle this peacefully. We have been patient. The time is up."  Trial Ex. 55C at 17.  In another post, Powell made clear that she had no concern about breaking the law: "we have been patient and tried to go the legal route. It isn't working and the government isn't hearing us. It's time

to rise." *Id.* at 19.  On January 9, 2021, Powell again expressed her dissatisfaction with obeying

the law and her desire for further violence:

> What I want to know is what men like [PA State Senator] Mastriano expect
> Americans to do. We tried legal routes to ensure a fair election. When there wasn't
> going to be one, and legal routes were found to be a dead end, the people took/tried
> to take the Capitol back. What are Americans suppose to do? Sit back and do
> nothing? Why don't we just start calling the president king? This makes no sense
> to me. Please, Mastriano, explain WHEN it's ok for the people to fight back?

*Id.* at 20.

In the wake of the riot, Powell repeatedly bragged about the aggressive behavior of rioters,

their violence towards law enforcement, and the eventual retreat of officers.  For example, on

January 7, Powell wrote: "IT WAS FUCKING WAR TO GET IN.  IF YOU WERE NOT HERE

THEN STFU."  *Id.* at 17.  In another post, Powell wrote: "we weren't fucking welcomed in you

fucking idiot.  You weren't even here so shut up and stop spouting facts like you know."  *Id.*  In

another, she wrote: "there were lots of security.  They had to retreat into the building and fight

back because patriots were relentless."  *Id.*  In another, Powell replied, "they didn't open the gates.

The people trampled them.  It was war."  *Id.*  Powell also admitted having witnessed the violence

on January 6: "the police fought back well. I did see them retreat before people were on the second

floor but that was a fight to get them to retreat. They had their barricades removed from them and

were pushed back. Some police showed fear. Some of them were patriots and you could see it in

their face. Many of them stood their ground."  *Id.* at 19.  While she relished her participation in

the battle against police, at no time did Powell demonstrate any remorse for her actions.

Since her arrest in this case, Powell has tried to portray herself as a victim and tried to shift

the narrative from "war" to "police brutality."  Indeed, despite her conviction, Powell has taken no

personal responsibility and instead blames the police for her conduct on January 6[4]:



---

[4] Powell verified to the Probation Office that "Iamrachelpowell" is her Twitter account. PSR ¶105. However, Powell did not notify the Probation Office about her Signal application, which is an encrypted messaging application. *Id.* Powell had an active Signal account and would move conversations from Facebook to Signal. For example, on August 3, 2020, Powell told another individual that she was on group chats on the Signal application. Powell used the application as recently as on January 7, 2021. *See* Trial Ex. 55C at 19.

As recently as September 20, 2023, while ignoring her own aggressive actions, such as pushing bike rack-barricades against officers, smashing a window, and directing rioters to "take the building," Powell blamed the riot on the overwhelmed and outnumbered police for not having arrested each of the thousands of rioters:



**Rachel Powell** 🎗 @Iamrachelpowell · 16h
In the beginning when it was getting hot- police abusing us with bullets, spray, and gas, I kept thinking they would just arrest us if they didn't want us there. That's what happens at DC protests. Arrest them & let them go the next day. But that didn't happen & things escalated.

The evidence shows Powell did not directly encounter law enforcement until she was well within the restricted grounds of the Capitol, after having passed over downed barriers as well as snow fencing with signs stating, "AREA CLOSED." Nevertheless, Powell continued to perpetuate the false narrative that her actions on January 6 were defensible because she was on a "public sidewalk":



**BBsMom2003** 🇺🇸🎣🐪🐾☕🏈 @terriehorton304 · Sep 21
So with the bullets, the spray and the gas, you just thought that it wasn't nothing big so you continued on? Didn't you think of the consequences? My son wanted to march in a BLM march. I told him it was his right to protest LEGALLY!

💬 1          🔁          ♡ 7          ᴗᴗ 94          ⬆

**Rachel Powell** 🎗 @Iamrachelpowell · Sep 21
When those things started I was on a public sidewalk and I knew I had a right to be there. So no, I did not think about leaving but I was shocked. I did not expect it to escalate even more like it did turning into what it did.

💬 1          🔁          ♡          ᴗᴗ 79          ⬆

In addition to her Twitter postings, on September 1, 2023, Powell promoted herself in an article in which she gave a detailed interview of January 6.



In the article, Powell claims that she feels "dumb, set up, duped, and terrible for what I have put my family through" but expresses no remorse for the victims of January 6. Powell further claims she went to "D.C. with friends to protest peacefully," and "never imaged the protest would become violent" but conspicuously fails to mention the fact that the last time she went to D.C. for an election protest, in November 2020, she brought a beater bar, wasp spray, and knives.

While Powell claims in the article to have been "scared" at the West Plaza, that claim is contradicted by her failure to leave when she had the chance, like her companion did. It is also contradicted by her aggressive and violent conduct at the West Plaza.

In the interview, Powell further asserts she broke the windows at the LWT in order to assist other rioters "so that people had somewhere to go." This claim ignores the video recordings in which she laid out her observations to other rioters specifically so the rioters could "take the building." Powell also attempted to minimize her actions, asking, "Should I go to prison for years over a broken window because of a protest that got out of control?"

Powell's Twitter account also promotes a website dedicated to gathering donations for her legal fees, based on a false narrative about January 6 and its origins:[5]

> Rachel, a hard-working, tax-paying American citizen with no criminal record, is now an American political prisoner, falsely accused by the Democrats and the media of being part of a "long-planned and well-funded insurrection," intended to undermine the democracy of the United States, which is total lunacy.
> . . .
> She was exercising her constitutional right to peacefully demand that the government investigate the allegations of election fraud. Instead, she was beaten by police, tear gassed, pepper sprayed, shot at with rubber bullets (the guy next to her was shot in the face), and assaulted with stun grenades. The actions of the police turned a peaceful[] demonstration into a riot, much of which seemed to have been orchestrated by the FBI.

In addition, Powell's children have set up a GiveSendGo account for her, which has a goal of $50,000.  So far, the website has raised $14,231.  The website minimizes Powell's actions on January 6 as "attend[ing] the Capitol protest and [getting] caught up in the moment."

## E.     Obstructive Behavior

Powell carried her iPhone 11 with her at the Capitol on January 6.  This was confirmed by Powell's cellular records as well as her iCloud account, which contained her GPS coordinates from that day.[6]  *See, e.g.,* Sentencing Ex. 1 at 2.  Numerous open-source videos and photographs from January 6 depicted Powell at the Capitol holding a phone in the air in a manner consistent with filming a video or taking a photograph.  For example, in Trial Exhibit 2.19, at 33 seconds, Powell held her phone in the air as she cheered with other rioters.  In Trial Exhibit 3.02, at 20 seconds, one can see Powell raising her iPhone in the air while filming the scene before her at the LWT.

---

[5] Powell's website was updated after July 18, 2023, to reflect her convictions.

[6] The government is attaching relevant pages reporting data extracted from Powell's iCloud account, but all 82 pages containing Powell's movements on January 6 are available for the Court.



**Image 9: Trial Exhibit 3.02 at :20**

Though Powell used her phone to record video and/or photographs at the LWT (where she arrived at 2:40 p.m.), Powell's iCloud account only contained videos and photographs from prior to 1:39 p.m. on January 6, while Powell was still at the West Plaza.[7]  Thus, it is clear that Powell

---

[7] Powell used an iPhone 11 on January 6.  Although Sentencing Exhibit 1 contains photographs from Powell's iCloud account after 1:39 p.m., the photographs were taken by a different phone, an iPhone XR.  Law enforcement believe that another individual took those photographs, which were in Powell's iCloud library.  Not only were these photographs taken from a different phone, but the photographs also depicted a different location of Capitol grounds from where Powell was located at that same time.  It is believed that the photographs were taken by Powell's companion, who did not enter the U.S. Capitol. Notably, these post-1:39 p.m. photographs remained in Powell's iCloud account, further suggesting that she took affirmative actions to delete the incriminating photographs.

intentionally deleted evidence of her (and others') criminal conduct in the tunnel.

In addition to deleting evidence, Powell took affirmative steps to prevent law enforcement from obtaining her iPhone.  For example, a Federal Bureau of Investigation ("FBI") BOLO ("Be On The Lookout") issued for Powell on January 16, 2021.[8]  Just eight days later, Powell switched phones.

On February 4, 2021, the FBI executed a search warrant at Powell's residence.  Powell was not at her residence and turned herself in at the FBI Field Office that night at approximately 6:45 p.m.  In fact, phone records show that Powell's cellphone was on during the day on February 4 until sometime after 4:37 p.m.  According to the testimony of FBI Special Agent Thomas Jordan, prior to turning herself in, Powell contacted him from a third party's phone number to ask for directions to the FBI Field Office.  When Powell arrived at the FBI office that night, Special Agent Jordan's name and phone number were scribbled on her arms.  Powell did not have her phone on her while she arrived at the FBI office.  Though an empty box for Powell's phone was found in her car, no phone was found on Powell's person, in her residence, or in her vehicle.  After Powell was released from custody, she began using the phone again.

---

[8] Notably in the article Powell promotes on her Twitter account, Powell acknowledges that she had been alerted to the BOLO and housed her kids with others to allegedly seek legal aid prior to February 4.  *See* "J6: Mother of 8 Fears Years in Prison," at https://uncoverdc.com/2023/09/01/j6-mother-of-8-fears-years-in-prison (last visited September 25, 2023).  Furthermore, according to the article, on February 4, Powell was "at the other end of the state looking for a lawyer with help from patriots who had legally stayed open during COVID."  Despite being on the other side of the state, as noted above, Powell managed to hand off her cellular phone before turning herself in to FBI.  Powell picked up her phone again after her release from detention.

## III.     THE CHARGES AND PLEA AGREEMENT

On April 5, 2023, a federal grand jury returned a Superseding Indictment charging Powell with 9 counts, including: (1) 18 U.S.C. § 231(a)(3) (civil disorder); (2) 18 U.S.C. §§ 1512(c)(2) and 2 (obstruction of an official proceeding and aiding and abetting); (3) 18 U.S.C. § 1361 (destruction of government property); (4) 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A) (entering or remaining in a restricted building or grounds with a deadly or dangerous weapon); (5) 18 U.S.C. §§ 1752(a)(2) and (b)(1)(A) (disruptive and disorderly conduct in a restricted building or grounds with a deadly or dangerous weapon); (6) 18 U.S.C. §§ 1752(a)(4) and (b)(1)(A) (engaging in physical violence in a restricted building or grounds with a deadly or dangerous weapon); (7) 40 U.S.C. § 5104(e)(2)(D) (disruptive or disorderly conduct in any Capitol building or grounds); (8) 40 U.S.C. § 5104(e)(2)(F) (committing an act of physical violence in the Capitol grounds or building); and (9) 40 U.S.C. § 5104(e)(2)(G) (parading, picketing, or demonstrating in any Capitol building).  On, July 18, 2023, following a bench trial, Powell was convicted of those offenses.[9]

## IV.     STATUTORY PENALTIES

Powell now faces sentencing on all 9 counts.

As noted by the Final Presentence Report ("PSR") issued by the U.S. Probation Office, for count one (civil disorder), the defendant faces up to five years imprisonment and a fine up to $250,000.  For count two (obstruction of an official proceeding and aiding and abetting), the defendant faces up to 20 years imprisonment and a fine up to $250,000. For count three

---

[9] Powell was convicted of the lesser-included misdemeanor offense of Count 3, destruction of government property worth less than $1,000, in violation of 18 U.S.C. § 1361.

(destruction of government property), the defendant faces up to one year imprisonment and a fine up to $100,000.  For counts four (entering or remaining in a restricted building or grounds with a deadly or dangerous weapon), five (disruptive and disorderly conduct in a restricted building or grounds with a deadly or dangerous weapon), and six (engaging in physical violence in a restricted building or grounds with a deadly or dangerous weapon), the defendant is facing up to 10 years imprisonment and a fine up to $250,000.  For counts seven (disruptive or disorderly conduct in any Capitol building or grounds), eight (committing an act of physical violence in the Capitol grounds or building), and nine (parading, picketing, or demonstrating in any Capitol building), the defendant is facing up to six months imprisonment and a fine up to $5,000.

## V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).  The government calculates the defendant's guidelines' total offense level prior to the application of §3A1.4 to be a level 27, which is a guidelines range of 70 to 87 months.  The government agrees with the Probation Office that Counts One through Six group together, with Count Two having the highest offense level.[10],[11]  PSR ¶ 72.

---

[10] Counts 7, 8, and 9 are Class B misdemeanors to which the Sentencing Guidelines do not apply. *See* 40 U.S.C. § 5109(b); 18 U.S.C. § 3559(a)(7); U.S.S.G. § 1B1.9.

[11] Sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3. The PSR does not follow these steps. It concludes (*see*

**Count Two: 18 U.S.C. §§ 1512(c)(2) and 2—Obstruction of an Official Proceeding Before Congress, Aiding and Attempting**

| Base Offense Level: | 14 | U.S.S.G. §2J1.2(a) |
|---|---|---|
| Special Offense Characteristic | +8 | U.S.S.G. §2J1.2(b)(1)(B): "the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice. For purposes of this enhancement, the "administration of justice" is synonymous with "official proceeding" as defined in 18 U.S.C. § 1515(a)(1)(B). *First*, where a defendant directly caused injury, threatened injury, or damaged property, this enhancement applies based upon the defendant's own acts under § 1B1.3(a)(1)(A). |
|  |  | First, Powell caused property damage. Powell used an ice axe and a cardboard tube to smash the window of HT-2. |
|  |  | Second, Powell caused and threatened to cause physical injury to a person. Powell made indirect and direct physical contact with officers holding the line as she pushed against them and the bike barricades in front of them. |
|  |  | Powell and other rioters also collectively shoved retreating officers into a semi-circle near the corner of the West Plaza, all while other rioters assaulted the officers with fists, makeshift weapons, and various chemical sprays. The collective actions of the rioters, including Powell, involved violence and the threat of further violence as rioters sought to enclose and corner the officers. U.S.S.G. § 1B1.3(a)(1)(A) encompasses both the defendant's own acts or omissions and those whom the defendant aided, abetted, counseled, commanded, induced, procured, or willfully caused. Powell's actions above aided and abetted those rioters immediately around her who assaulted and threatened officers. |

PSR ¶ 72) that Counts One through Six group—a conclusion with which the government agrees—but does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4).

| | | Powell is responsible for "all acts … of others involved in jointly undertaken criminal activity" with Powell if those acts were "(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). That provision does not require evidence of pre-planning or conspiracy; its plain terms apply to persons who acted in unison to achieve a common goal. Powell is responsible for the "jointly undertaken criminal activity" of the crowd of rioters she joined, who pushed against and assaulted officers defending the West Plaza and the Lower West Terrace, in furtherance of the goal to disrupt, delay, and prevent the certification vote, all of which was reasonably foreseeable in connection with that joint criminal activity. |
|---|---|---|
| Special Offense Characteristic | +3 | U.S.S.G. §2J1.2(b)(2): "the offense resulted in substantial interference with the administration of justice." For purposes of this enhancement, the "administration of justice" is synonymous with "official proceeding" as defined in 18 U.S.C. §1515(a)(1)(B).<br><br>The official proceeding of Congress's Joint Session, which was required by the Constitution and federal statute, had to be halted while legislators were physically evacuated for their own safety. |
| Adjustment | +2 | U.S.S.G. §3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense."<br><br>*See* Section II(E). |
| Total | 27 | |

This Court has previously applied the section 2J1.2(b)(1)(B) (causing or threatening injury or property damage to obstruct the administration of justice) enhancement, which references the "administration of justice," to Congress's Joint Session on January 6. *See, e.g., United States v.*

24

*Bingert, Sturgeon,* 21-cr-91; *United States v. Wilson*, No. 21-cr-345; *United States v. Fairlamb*, No. 21-cr-120; *United States v. Chansley*, No. 21-cr-003.  The chart above sets forth the factual basis for concluding that Powell's obstructive conduct involved causing or threatening injury; the defendant does not object to any of the facts supporting the enhancement.  Likewise, the Court has previously also applied the enhancement under Section 2J1.2(b)(2) (substantial interference with administration of justice).  *See, e.g., United States v. Bingert, Sturgeon,* 21-cr-91; *United States v. Wilson*, No. 21-cr-345; *United States v. Fairlamb*, No. 21-cr-120; *United States v. Chansley*, No. 21-cr-003.  The government incorporates the reasonings set forth in the government's sentencing briefings in *Bingert, Wilson, Fairlamb, and Chansley,* as well as in *United States v. Worrell,* No. 21-cr-292.

Further, Powell should receive a two-level enhancement for obstruction of justice under U.S.S.G. §3C1.1 for her pattern of intentionally destroying and concealing material evidence.  Not only did Powell remove incriminating videos and photographs of herself from January 6, including at least one video from the LWT, Powell purposely hid her iPhone from law enforcement on the date of her arrest.  The information on her iPhone was material, as it would confirm her involvement in the riot and shed further light as to her criminal conduct, as well as the crimes of other rioters.

The Probation Office calculated the defendant's criminal history as category I, which is not disputed.  PSR ¶ 86.  Accordingly, based on the government's calculation of the defendant's total adjusted offense level, at 27, Powell's guidelines imprisonment range is 70 to 87 months of imprisonment.

25

## VI.     SECTION 3A1.4 UPWARD DEPARTURE

The government requests that the Court depart upward by two levels under Note 4 to Section 3A1.4.  Note 4 to Section 3A1.4 states that an "upward departure" is "warranted" for a felony offense that is not a federal crime of terrorism (as defined by 18 U.S.C. § 2332(g)(5)(B)) if "the offense was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."  When seeking an upward departure, "the government has the burden of proof by a preponderance of the evidence."  *United States v. Walls*, 80 F.3d 238, 241 (7th Cir. 1996); *accord United States v. Okane*, 52 F.3d 828, 835 (10th Cir. 1995).  The government thus bears the burden to prove that note 4(A) is applicable with reference to Powell's convictions and "relevant conduct."  *United States v. Abu Khatallah*, 314 F. Supp. 3d 179, 190 (D.D.C. 2018).

As the Court found in its <u>Findings of Fact and Conclusions of Law</u>, "On January 6, Powell stayed at the Capitol for over four hours, during which time she pushed against bike racks, pushed against law enforcement officers, smashed a window with an ice axe and cardboard pole, and provided instructions to other rioters on how to push deeper into the Capitol Building to 'take the building.' Her actions contributed to a significant security risk that required Congress to cease the certification proceedings until the riot was over."  ECF No. 110 at 14.  In finding her guilty of the 18 U.S.C. § 1512 charge, the Court concluded, "Powell's statements on and shortly after January 6 demonstrate that she breached the Capitol on January 6 to carry out her plan to keep former President Trump in office, specifically by disrupting the Electoral College certification vote." *Id.* at 15.

Indeed, Powell's actions before, during, and after January 6 reflected her desire to use intimidation against the government keep former President Trump in power.  Before January 6, Powell conducted surveillance on local legislators in order to intimidate them into voting for former President Trump.  Powell traveled to D.C. with weapons to attend election protests and met with paramilitary "Three Percenter type people" to formulate a "reasonably good plan" to keep the former in power.  As this Court noted:

> As time progressed, Powell's statements became more aggressive and violent. On November 22, 2020, Powell stated, "These fuckers need to start listening to the people and doing their jobs." GX 55C at 13. And then: "Letters aren't working." *Id.* She further stated, "We can still get Trump in I believe. If we do we might be ok for a few more years. So we need to really be on the people in charge of elections." *Id.* at 14. A month before January 6, Powell wrote, "what everyone should do, imo, is just defy the government. No game playing. Just defiance. We will do what we want and there's nothing the gov can do to stop us." *Id.* at 15.

ECF. No. 110 at 15.

Powell's conduct on January 6 further strengthens the basis for the departure.  At each location Powell occupied, Powell stood in the front of the crowd of rioters, challenging law enforcement officers directly and using force to push deeper onto Capitol grounds with the clear goal of accessing the Capitol and directly confronting lawmakers.  Powell remained at the West Plaza for over 90 minutes.  During that period, she pushed against bike rack-barricades, even after officers sprayed her with OC spray and repeatedly instructed her to back away.  As Powell admitted in her September 2023 interview, even after her friend (whom she traveled to D.C. with) turned around at the West Plaza and left, she did not.  Instead, she chose to put herself in the midst of the violence and she incited others to join her, yelling for others to "come on up, don't be shy."

Powell was at the LWT for over 2 hours.  When Powell observed that rioters could not push past the tunnel, Powell again did not leave; she picked up an ice axe and cardboard pole and smashed a window in an effort to gain entry to the Capitol so the rioters could directly confront lawmakers.  When Powell realized that behind the smashed window was a room with a glass floor, Powell immediately relayed that information to rioters inside the Capitol on the other side of the tunnel entrance, instructing them on how to "take the building."  Only one conclusion can be drawn from Powell's conduct that day: that her sole purpose was "calculated to influence or affect the conduct of government by intimidation or coercion" or to "retaliate against government conduct"—that being, to stop the certification of the November 2020 or to tilt the certification in former President Trump's favor.

Even after January 6, Powell's egregious conduct did not end; she advocated for additional violence and even after this Court convicted Powell for her actions, she did not express remorse. Powell painted herself and other rioters as the victim of January 6, promoting falsehoods about her conduct on that day.  An upward departure is appropriate to capture the full range of Powell's actions, including her inciting violence before and after January 6, her effort to assume leadership of the mob and her persistent violence on January 6, her obstruction of justice, and her complete lack of remorse for her actions.

District courts have previously applied this departure in the context of rioters associated with conspiratorial groups, *see United States v. Rhodes,* No. 22-cr-15-APM, as well as individual rioters with particularly egregious January 6 conduct, *see United States v. Southard-Rumsey,* No.

21-cr-387-APM.[12]  Like *Southard-Rumsey,* the Court should apply the enhancement in this case, given the escalation of Powell's pre-January 6 behavior, her continued, four-hour long commitment to violence on January 6, her efforts to lead and incite others in the crowd to commit violence, and her expressed continued desire to commit more violence afterwards, all of this violence having  the specific goal of influencing government action.

The government seeks only a modest, two-level departure under Note 4 here. That would bring the total offense level to 29, resulting in a Guidelines range of 87-108 months. To the extent the Court declines to apply Note 4, we would respectfully request an upward variance to reflect the defendant's aggravated intent, under the factors set forth in 18 U.S.C. § 3553(a).

## VII.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.   Nature and Circumstances of the Offense

As explained in Section II(C) of this memorandum, Powell's felonious conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and threateninging the United States with a Constitutional crisis.  The nature and circumstances of Powell's offenses were

---

[12] Judge Mehta previously declined to apply the enhancement in *United States v. Gardner,* 21-cr-622 (APM).  Judge Friedrich in *United States v. Reffitt*, No. 21-cr-32, Judge Kollar-Kotelly in *United States v. Wright*, No. 21-cr-341, and Judge McFadden, originally in *United States v. Judd*, 21-cr-40 (TNM), have also declined to apply Note 4(a) enhancements. Judge Berman Jackson also declined to apply n.4 in the January 6 context, finding that Note 4 unlawfully enhanced a sentence without proper U.S.S.C. authorization. *See United States v. Daniel Rodriguez*, 21-cr-246-1-ABJ.

of the utmost seriousness, and fully support the government's recommended sentence of 96 months of imprisonment.

**B.      The History and Characteristics of the Defendant**

As noted above, Powell's conduct prior to January 6 demonstrated an increased propensity towards violent conduct.  Powell's crimes on January 6 were not an isolated instance of violence. Rather, Powell increasingly sought to overturn the 2020 elections through all means necessary. Since her arrest, Powell has demonstrated nothing but contempt for this Court and the legal system.

In April 2021, Powell mocked the Court's pre-trial release conditions by participating in a Facebook livestream wearing a mesh mask attached together by strings.

Powell violated her conditions of release on another two occasions.  On July 25, 2022, Powell violated her location monitoring rules by joining her employer/boyfriend for a lunch date at a brewery.  On September 6, 2022, Powell again violated her location monitoring rules by exiting her residence during her curfew hours.  Due to Powell's violations, the Court had to place Powell on home detention.

**C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration.  Powell's criminal conduct on January 6 was the epitome of disrespect for the law and an affront to American democracy.  *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of

power."). Since January 6, Powell has continued to display disrespect for the law, both through her conduct and her social media statements.

### D.      The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[13] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

In addition to her actions before and during January 6, Powell has expressed no remorse for her actions after January 6.  Immediately after January 6, Powell proudly bragged on Facebook about the actions of rioters; for example, on January 7, Powell remarked, "the police fought back well. I did see them retreat before people were on the second floor but that was a fight to get them to retreat. They had their barricades removed from them and were pushed back."  In another comment, Powell stated, "nobody was let the fuck in.  It was war."

As this case has progressed, Powell has shifted her narrative by primarily accusing the officers on January 6 of police brutality and casting herself and other rioters as victims.  She has

---

[13] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

minimized her actions by referring to her January 6 conduct as breaking a window "during a protest that got out of control."   Powell has not accepted responsibility for her actions, instead blaming the law enforcement officers on January 6, the FBI, the government, and the Probation Office for her pending case and home detention:



Powell is free to cast herself as a victim and refuse to accept responsibility for her actions on January 6.  But the fact that Powell sees nothing wrong with engaging in criminal conduct in pursuit of her political goals should give this Court concern that she will continue to do so unless

she is deterred by a significant sentence.

### E.        The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.        Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-

disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier

'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[14]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[15]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

This Court should consider *United States v. Southard-Rumsey,* 21-cr-387-APM.   Like Powell, Southard-Rumsey advocated for violence prior to January 6 and on that day, Southard-Rumsey was at the forefront of the violence.   While Southard-Rumsey's conduct included directly attacking police, both Powell and Southard-Ramsey participated in multiple pushes against police

---

[14] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct.   *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[15] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

lines. Southard-Rumsey was also as vocal as Powell and encouraged rioters to push forward to take the Capitol. For her conduct on January 6, the Court applied a 1-point enhancement under Section 3A1.4. Despite the stipulated trial, the Court refused to subtract 2-points for acceptance of responsibility, given the defendant's lack of remorse. Judge Mehta sentenced Southard-Rumsey to 72 months of imprisonment.

This Court should consider *United States v. Thomas Robertson,* 21-cr-34-CRC. Like Powell, prior to January 6, Robertson advocated for overturning the 2020 presidential election through violence and on January 6, deliberately blocked officers from performing their duties at the West Plaza. After officers retreated from the West Plaza, Robertson was one of the first rioters to climb to the Upper West Terrace and enter the Capitol. After January 6, Robertson bragged about his conduct on social media and then destroyed his and his co-defendant's phones prior to self-surrendering to the FBI. Like Powell, Robertson refused to accept responsibility for his actions. Judge Contreras imposed a sentence of 87 months of imprisonment.

While Robertson involved some additional factors not present in Powell's case, such as being a law enforcement officer who recruited others to join him in D.C., and carrying a gas mask and wooden stick, Powell's conduct on January 6 was arguably more egregious than Robertson's. Powell not only prevented officers from performing their duties at the West Plaza by pushing against bike rack-barricades and encouraging others to do the same, she also obtained two dangerous weapons and used both to smash a window of the Capitol.

Finally, this Court should consider *United States v. Bingert, Sturgeon,* 21-cr-91-RCL. Both Bingert and Sturgeon, alongside other rioters pushed a bike rack-barricade against officers at the

Upper West Terrace so forcefully that they injured an officer.  Thereafter, both defendants watched additional violence, at the Upper West Terrace and at the LWT.  Although the men caused injury to an officer, Powell's conduct—before, during, and after January 6--- was worse than both Bingert's and Sturgeon's.  This Court sentenced Bingert to 96 months of imprisonment and Sturgeon to 72 months of imprisonment.

## VIII.  RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).  First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C.  § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C.  § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted).  Because Powell was

convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[16]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and her criminal conduct was a "proximate

---

[16] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for her individual contribution to the victims' total losses.  *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses").  *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Powell to pay $2,000 in restitution for her convictions on Counts 1, 2, 4-9. This amount fairly reflects Powell's role in the offense and the damages resulting from her conduct.  Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court.  Accordingly, such a restitution order avoids sentencing disparity.

In addition, the Court should require Powell to pay $753 in restitution for Count Three. This amount reflects the damage to the window that Powell smashed while at the LWT.  At trial, the government elicited testimony that the specific windowpane cost $753 to repair.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 96 months of imprisonment, three years of supervised release, $2,753 in restitution, and a $555 special assessment. Notwithstanding the guidelines analysis above, we request that the Court's sentence reflect its consideration of the factors set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:      /s/ Lucy Sun
Lucy Sun
Adam Dreher
Assistant United States Attorneys
601 D St. NW
Washington, D.C. 20530
lucy.sun@usdoj.gov
adam.dreher@usdoj.gov