```
                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA


    UNITED STATES OF AMERICA,       .
                                    .
              Plaintiff,            .  CR No. 21-0179 (RCL)
                                    .
        v.                          .
                                    .
    RACHEL MARIE POWELL,            .  Washington, D.C.
                                    .  Tuesday, October 17, 2023
              Defendant.            .  12:46 p.m.
    . . . . . . . . . . . . . . . . .
```

```
                  TRANSCRIPT OF SENTENCING HEARING
              BEFORE THE HONORABLE ROYCE C. LAMBERTH
                  UNITED STATES DISTRICT JUDGE
```

APPEARANCES:

For the Government:          LUCY SUN, AUSA
                             U.S. Attorney's Office
                             595 Main Street
                             Worcester, MA 01608

For Defendant:               NICHOLAS D. SMITH, ESQ.
                             David B. Smith PLLC
                             1123 Broadway
                             Townsend Building
                             Suite 909
                             New York, NY 10010

Court Reporter:              BRYAN A. WAYNE, RPR, CRR
                             U.S. Courthouse, Room 4704-A
                             333 Constitution Avenue NW
                             Washington, DC 20001

Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

                    P R O C E E D I N G S

         THE DEPUTY CLERK:  This is criminal case 21-179,

United States of America versus Rachel Marie Powell.  Starting

with the government, please approach the podium and state your

appearance for the record.

         MS. SUN:  Good afternoon, Your Honor.  Lucy Sun for the

United States.

         MR. SMITH:  Good afternoon, Judge.  Nick Smith for

Rachel Powell.  Fancy seeing you here.

         THE COURT:  Long time no see.

         PROBATION OFFICER:  Good afternoon, Your Honor.

Robert Walters on behalf of the probation office.

         THE COURT:  Okay.  The first step is to determine

the differences over the presentence report since I have to

resolve those before proceeding to sentencing.  So first I'll

take the defendant's objections to the enhancements as

written.  One is the enhancement for -- let me get the precise

wording here.

         MR. SMITH:  Your Honor, I think it's only two

objections to the specific offense characteristics at

2J1.2(b)(2) and 2J2 --

         THE COURT:  I'll hear whatever you want to say about

that, then.  I have the memo you filed as well.

         MR. SMITH:  Your Honor, we'll rest on the arguments

in the papers.

1          THE COURT:  Okay.  I'll adopt the report as written as

2     to those enhancements.  Although *Seefried*, the opinion by one

3     of the judges of this court, disagrees, all of the others of

4     this court have disagreed with that and do not agree with that

5     reasoning, and I will adopt that, as does the probation office,

6     in doing that enhancement.

7          And the other enhancement I have done in other cases as

8     well for the -- so that I will adhere to the rulings I have

9     made in other cases in which I would do the additional

10    enhancements.  So the report as written would come out the

11    same way.

12         Now, the government also moved for an enhancement for an

13    above-guidelines departure, and I'll decline that two-level

14    upward departure that the government seeks under application

15    note 4 to Section 3A1.4.  I think there are some departures

16    over whether imposing a departure based on application note 4

17    would even be lawful in this case because the actual text of

18    3A1.4 applies only to federal crimes of terrorism.

19         But I find there's no need to decide that issue because,

20    even if a departure were available, I would exercise my

21    discretion here not to impose it.  The reason is, Ms. Powell's

22    conduct, while certainly serious, is not sufficiently

23    egregious to warrant this departure.  Imposing it in this

24    case might create an unwarranted sentence disparity.

25         The government cites two cases in which Judge Mehta imposed

this departure.  One is *U.S. v. Rhodes,* 22-CR-15, and *U.S. v. Southard-Rumsey,* 21-CR-387.  But unlike in those cases, the defendant has not been convicted of seditious conspiracy or multiple counts of assaulting, resisting, or impeding officers.

In addition, there are many January 6 defendants whose conduct was even more serious than Ms. Powell's, but who did not receive this departure.  For example, in *U.S. v. Fairlamb*, which Mr. Smith points out, 21-CR-120, the defendant knocked over a police officer and punched him in the face.  The government did not seek that departure, and I did not impose it myself.

Therefore, in calculating the guidelines range, I will not apply that departure here.  I'm not sure there is a case where I would apply it, but in any event, I know I would not apply it here.  So I will adopt the guidelines as set forth in the report.

So under the report, then, the total offense level would be 27.  Of course, she had a spotless record in criminal history category I.  The guideline provisions, however, would be for Count 1, 60 months; for Counts 2, 5, and 6, 78 to 87 months; for Count 3, 12 months; and for Counts 7, 8, and 9, they would not be applicable.

The statutory limit, of course, on 7, 8, and 9 is six months; the statutory limit on 4, 5, and 6 is ten years; the statutory limit on 3 is one year; the statutory limit

1    on Count 2 is 20 years; and the statutory limit on Count 1

2    is five years.

3        Supervised release, maximum would be three years on Counts 1,

4    2, 4, 5, and 6.  One to three years would be the guideline

5    provision of one year on Count 3, and of course it's not

6    applicable to 7, 8, and 9.

7        The fine range would be 25,000 to 250,000 on Counts 1, 2, 4,

8    5 and 6, and 25,000 to 100,000 on Count 3, and not applicable to

9    Counts 7, 8, and 9.  The amount of restitution would be $2,753.

10   The special assessment required to be imposed by statute would

11   be $525 total.  Well, it's a hundred dollars -- that's not

12   right.  Yeah, a hundred dollars for Counts 1, 2, 4, 5, and 6,

13   and $25 for Count 3.

14            MR. SMITH:  Your Honor?

15            THE COURT:  And $10 for 7, 8, and 9.  Yeah, those are

16   the local ones I have to impose.

17            MR. SMITH:  Did Your Honor say the total offense level

18   was calculated at 27 or 25?

19            THE COURT:  I said 27.  I think it's 2,000 plus the 753

20   damages they receive for the window.

21            MR. SMITH:  Your Honor, I was referring to the --

22   to Your Honor adopted the presentence report's calculation

23   of the total --

24            THE COURT:  Restitution, which has the 2,000 plus the

25   753 for the windows is what they had in the report.

1          MR. SMITH:  Your Honor, I apologize.  I'm going
2     one step back, because Your Honor went right through the
3     guidelines calculation in the presentence --
4          THE COURT:  I thought the guidelines said 25,000 to
5     250,000 was the guideline.
6          MR. SMITH:  Your Honor, I'm just referring right now
7     to the total offense level, not any restitution calculation.
8          THE COURT:  The offense level, I thought, was 27.
9          MR. SMITH:  Yes, Your Honor.  Your Honor adopted the
10    presentence report, so it would be 25.  The base offense level
11    for 2J1.2 is 14 plus 8 for the specific --
12         THE COURT:  I'm sorry?
13         MR. SMITH:  The base offense level, Your Honor, for
14    §2J1.2 is 14.  Then we add eight levels for the specific
15    offense characteristic at 2J1.2(b)(1)(B).  Then we add three
16    levels for the special offense characteristics at 2J1.2(b)(2).
17    And when we sum those, the total offense level is 25.
18         PROBATION OFFICER:  I think the discrepancy comes in --
19    looking on page 17, there's also a two-level adjustment for
20    obstruction of justice, to bring it to 27.
21         MR. SMITH:  I don't --
22         PROBATION OFFICER:  That was in the final presentence
23    report filed on 10/10/23.
24         MR. SMITH:  Oh.  Your Honor, we would ask to be heard
25    on the two-point obstruction of justice.

1        THE COURT:  Okay.

2        MR. SMITH:  Ms. Powell, as Your Honor knows, did not

3   testify, so I'm not clear on what the argument is here.

4        MS. SUN:  Your Honor, I can answer that question.  We

5   would move for the obstruction enhancement under -- I believe

6   it was note (D), which is destroying or concealing or

7   directing or preparing another person to destroy or conceal

8   evidence that is material to an official investigation or a

9   judicial proceeding.

10        THE COURT:  This is in paragraph 56.  The actual basis

11   is set forth in paragraph 56.

12        MR. SMITH:  Yes, I -- I guess.  So we'll make our

13   argument now, Your Honor, that the reason to preponderance

14   of the evidence that was shown at trial with Your Honor,

15   demonstrating that Ms. Powell destroyed evidence in this case,

16   destroyed documents, records with the intent to obstruct the

17   proceeding, and Your Honor might recall at trial there was no

18   argument or suggestion that Ms. Powell did that.

19        MS. SUN:  That is correct.  But this would be

20   considered relevant conduct, which the government referenced

21   its sentencing memo.

22        THE COURT:  Well, I don't think it has to be shown at

23   trial for the Court to apply it at sentencing.  Paragraph 56

24   states the facts on which the government relies, and I did not

25   see an objection to paragraph 56 in the defendant's

1    objections.  Am I wrong?

2         MR. SMITH:  That's because, Your Honor, the initial

3    presentence report, as Officer Walters just indicated, did not

4    have any section on this.  That's why I'm a little bit puzzled

5    right now.  She did not have an opportunity to object to this.

6         THE COURT:  Is that correct?

7         PROBATION OFFICER:  Yes, Your Honor.

8         THE COURT:  Well, I think it's late in the day to

9    add it.  If we redid the calculations without the obstruction

10   count, then it's a level 25.

11        PROBATION OFFICER:  Yes, sir.

12        THE COURT:  And tell me what the guidelines would turn

13   out to be then.

14        MS. SUN:  57 to 71.

15        THE COURT:  No, I was asking Probation.

16        MS. SUN:  Oh.  I'm sorry.

17        PROBATION OFFICER:  It would be 57 months to 71 months,

18   and then that would make the fine range 20,000 to 200,000.

19        THE COURT:  That's the only thing that changes.

20        PROBATION OFFICER:  Yes, sir.

21        THE COURT:  All right.  I'll do it that way.

22        MR. SMITH:  Thank you, Your Honor.

23        THE COURT:  I'll delete the two points from the final

24   report for the obstruction, and the total offense level will

25   be 25, criminal history category I.

1    All right.  With that final determination, with the two

2 points deleted from the final report for obstruction under --

3         MS. SUN:  Your Honor, could the government be heard

4 briefly on the plus-two?

5         THE COURT:  On?

6         MS. SUN:  On the obstruction enhancement?

7         THE COURT:  No.  It's too late.

8    On the question, then, of -- well, I'll give you the

9 chance, yeah.  Go ahead.

10        MS. SUN:  Your Honor, I'm going to make this very

11 quick.  The government did provide the factual basis for the

12 obstruction enhancement after the Pretrial released their

13 initial pretrial sentence -- I'm sorry -- prior to the

14 government releasing their pretrial sentence report.

15    That information, the factual basis, was not in the initial

16 pretrial sentence report despite the letter from the

17 government, and so after the initial pretrial sentence report,

18 in the objections which the government did file on ECF, the

19 government objected to the fact that the factual basis was not

20 added in the initial pretrial sentence report.  So this was

21 not something that the government had given to Pretrial too

22 late, and I just wanted to note that for the record.

23        THE COURT:  Okay.  And I recognize that, but I failed

24 to identify the issue myself.  And not having considered it,

25 I don't want to get into the whole -- I don't want to redecide

1   the issue.  So I'm going to leave it where it is.  If the

2   court of appeals thinks I gotta do it all over, I will, but

3   I'm not willing to do it myself now at this stage.

4      All right.  Then pursuant to the determination that

5   I've made, under the law, the advisory guidelines I have to

6   consider, but of course I have to consider the factors under

7   3553 as well as the guidelines, and determine what the

8   appropriate sentence is in the case.  So I'll allow the

9   government to allocute first, and then the defendant may

10   allocute before I decide and announce the sentence.

11      Government may proceed.

12         MS. SUN:  Thank you, Your Honor.

13         THE COURT:  Come to the podium, if you would.

14         MS. SUN:  Yes, Your Honor.

15         THE COURT:  I did read both of your sentencing memos,

16   which were very helpful, and I also did review the video which

17   Mr. Smith provided.  I read all of the letters as well that

18   were submitted on behalf of the defendant, which also shows

19   that the defendant's background, until this unfortunate

20   occurrence, has been an outstanding life.  And it's what makes

21   for the Court, all of these cases, so sad, because these are

22   all basically good people who fell into a horrible circumstance

23   that has affected our whole country.

24      And I am not someone who sits here happy to hand out

25   sentences in these cases because I recognize that -- I sit

1    here day in, day out, on the normal days, sentencing drug

2    dealers and people selling and trafficking in guns and people

3    that I have no hesitation in putting in jail, and these cases

4    are very difficult for the Court to deal with because you have

5    good, upstanding citizens in their normal life that something

6    snapped and went haywire.  And these are not easy for the

7    Court either, but I want to hear both of your allocutions.

8            MS. SUN:  Thank you, Your Honor.

9        Your Honor, can you hear me?

10            THE COURT:  Yes.

11            MS. SUN:  Thank you.  In light of the fact that

12    the Court has reviewed the government's sentencing memo and

13    the Court has sat through the bench trial in this case, the

14    government doesn't plan to rehash all of the defendant's

15    actions on January 6.  The government does want to point to

16    three aggravating factors which the government believes is

17    important for the Court's consideration.

18        The first factor is the breadth of the defendant's conduct

19    on January 6, which truly is astounding.  The defendant was at

20    the Capitol for over four hours; and everywhere that she went,

21    she was at the front of the violence, and she was an aggressor.

22    The defendant encouraged others to come to the front of the

23    line to push against bike racks.  As she was pushing herself

24    against the bike racks, the defendant smashed a window with an

25    ice axe and a cardboard pole and gave other rioters further

1    instructions on how to take the Capitol.

2       The second aggravating factor that the government wants

3    to put forth in front of the Court is the lack of remorse the

4    defendant has shown throughout this entire period, from the

5    time that she was charged to even postconviction.

6       The defendant has repeatedly downplayed her actions on

7    January 6, even after her conviction.  As recently as

8    yesterday evening, the defendant went on Steve Bannon's show

9    *War Room* and gave an interview where she referred to her

10   conduct on January 6 as "a misdemeanor."

11      On September 11th of 2023, which was approximately one

12   month ago, the defendant asked on Twitter, "Why should I

13   go to jail?"  And then later in a tweet said, "Over what?

14   A broken window?  A misdemeanor?"

15      Despite so much video evidence of her conduct on January 6,

16   the premeditation before January 6, the defendant is still

17   minimizing her actions and referring to it as a misdemeanor and

18   a breaking of a window, which really demonstrates why in this

19   specific case there is a need for specific deterrence.

20      The defendant's still repeatedly painting herself as a victim

21   and blaming her conduct on officers that day, tweeting on

22   Twitter to a public audience that she was on a public sidewalk

23   and that officers attacked her first.

24      In the past three years, the defendant has not changed.

25   She's had the same beliefs as she held on January 6.  And while

her beliefs are not the issue here, her violent conduct is for that day.  The defendant has held the beliefs, however, so deeply that, even before January 6, she was attending protests with weapons, she bragged about conducting surveillance on local officials in order to intimidate them, and then she went to the Capitol on January 6 and she committed violence.  And then since January 6, she's continued to spread falsehoods about what happened on January 6, defending her actions and the actions of other January 6 rioters.

And the Court has heard throughout the entire trial the defendant truly believed her political beliefs.  But millions of Americans shared those same political beliefs after the November 2020 election, and even amongst the thousands of rioters that went to the Capitol on January 6, only a select few were as aggressive and violent as the defendant.  And regardless of what her political beliefs are, the defendant doesn't get to use her political beliefs as a shield to defend her actions on January 6.

And the third aggravating factor that the government would like to draw the Court to is the fact that January 6 was not an isolated event for Rachel Powell.  It was a continuation of the defendant's intent to keep former President Trump in power.

And there's several points that the government would like to draw the Court's attention to, some of which the Court mentioned.  The defendant had attended meetings in D.C. with

1   other, what she referred to as, "Three Percenter-like people"

2   in order to formulate a plan to keep Trump in power.

3      The government just mentioned that she'd conducted

4   surveillance on local officials.  In a Facebook conversation,

5   she had told another individual that she had previously done

6   surveillance, and one of the other individuals stated: "It's

7   better to send letters to their office and leave their family

8   and private residences alone."

9      The defendant responded: "No, it's not.  These fuckers

10  need to start listening to the people and doing their jobs.

11  Letters aren't working."

12     The defendant later stated in that same conversation: "Okay,

13  here's the deal.  We can still get Trump in, I believe.  If we

14  do, it might be okay for a few more years.  So we really need

15  to be on the people in charge of elections."  The defendant

16  also brought weapons to a violent election fraud rally less than

17  two months prior to January 6, in late November.

18     The government understands the Court is not inclined to apply

19  Section 3A1.4  I'm going to skip over that.  Despite that,

20  however, the government is asking for an upward variance in

21  this case, considering the 3553(a) factors.  And the reason why

22  is because there are very few defendants that engaged in conduct

23  like the defendant's conduct on January 6, committing violent

24  actions in multiple areas of the Capitol, assuming a leadership

25  role.  And when you take into consideration the fact that the

1    defendant was already engaging in actions before January 6 to

2    influence government action by intimidation, you begin to see

3    that January 6 was not an outlier incident for the defendant,

4    and this was just part of her continuation, her obsession of

5    keeping former President Trump in power.

6        I would also submit to the Court that this is not like a

7    standard 1512 case where, you know, there might be a few

8    messages or social media prior about election fraud, the

9    defendant might formulate intent while the defendant is at the

10   rally or when the defendant sees the violence that's happening

11   at the Capitol, there might be some threats made to law

12   enforcement officers, even a smashing of a window, and then

13   that person leaves.

14       When you look at the conduct that Rachel Powell committed on

15   January 6, before January 6, and even after January 6, there are

16   so many aggravating factors and very little mitigating factors.

17   And so what was January 6 to the defendant, then?  It was simply

18   engaging in violent acts as part of a continued effort to

19   influence the government to stop the election.

20       The government would suggest that, given the gravity of the

21   defendant's actions, the danger she represents, the breadth of

22   the conduct and the fact the defendant committed her violent

23   actions during a violent insurrection, an upward departure is

24   necessary in this case.

25       The last thing I just want to mention is the defendant has

put forth a psychology assessment and discussed it in her

sentencing memo.  There are some major discrepancies in what

the defendant told the psychologist and what the defendant told

the probation office.

The only reason I mention that is because the defendant

did refer to the assessment and some of the findings in the

assessment in the sentencing memo.  The defendant, in the

psychological assessment, which I believe the sentencing memo

refers to, mentions that she was sexually assaulted when she

was 12, a lot of negative interactions with law enforcement

officers.  The negative interactions are not mentioned in the

interview to the probation office.

In fact, in paragraph 96: "During the presentence interview,

the defendant opined it was a 'blessing' that she suffered no

abuse or neglect.  Her aunts cared for her and provided her what

she needed.  She further noted no abuse at the hands of her

brother or mother."

The conclusion of the psychological assessment was that

the defendant could be easily manipulated and that she was

manipulated to go on January 6, but the government would

suggest that the defendant's actions on January 6 show the

contrary.  According to an article the defendant posted on

her Twitter account, by the time she arrived at the West Plaza,

she was with a friend that had come with her to D.C. for January

6, and once the defendant's friend arrived at the West Plaza,

1    took a look around, the defendant's friend left.

2      And so if the defendant was so easily manipulated by those

3    around her, why didn't she leave with her friend?  And so she

4    alone engaged in that violence at the West Plaza.  She alone

5    engaged in that violence at the Lower West Terrace.  She alone

6    was there to assume a leadership role and no one manipulated

7    her.  Her actions were her actions alone.

8      And so if the Court is inclined to grant an upward variance,

9    the government is asking for a two-level upward variance that

10   would bring the defendant's term of imprisonment to 87 months,

11   which is what the government's requesting, three years of

12   supervised release, $2,753 in restitution, and $553 in special

13   assessment fees.  Thank you.

14       THE COURT:  Thank you.

15     All right.  Mr. Smith.

16       MR. SMITH:  Judge, I know the Court has reviewed our

17   papers carefully and the sentencing video we submitted, so

18   I'm just going to emphasize a couple of points here.  One is

19   Ms. Powell's background.

20       THE COURT:  Talk a little more in the mic, would you?

21       MR. SMITH:  Ms. Powell's background and the

22   neuropsychological report that we submitted that the

23   government just referenced, she had a tragic upbringing.

24   She grew up poor.  Her family fought.  There was a lot of

25   domestic violence in the home.  Ms. Powell was abused, and she

1    didn't have a real nuclear family.  The report we've submitted

2    shows that that's had a lingering effect on her.

3       And that's not an excuse for any conduct, Your Honor.  But it

4    does make a little bit more remarkable and noteworthy that she

5    hasn't had any criminal run-ins with the law up until January 6,

6    and I think you'll hear from Ms. Powell when she allocutes why

7    things got out of control with her that day.

8          THE COURT:  Well, she's raised a remarkable family.

9    I mean, I saw them on video.

10          MR. SMITH:  And, Your Honor, that's another point I

11    want to touch on here.  And it goes to the difficulty that the

12    Court faces here because Your Honor knows that, in any felony

13    federal case, there's going to be collateral damage, that if

14    a defendant has a family, they're going to be affected.

15       But there's a little bit of a difference here because this

16    is a very big family.  There are minor children involved.  And

17    Ms. Powell is divorced, and I think Your Honor can get a sense

18    from that sentencing video that her ex-husband is not in a

19    position to make this right.

20       So Ms. Powell is going to explain to you what this means,

21    and it means that her 15-year-old son will be taking care of

22    her family.  And that is just -- it's impossible.  And the

23    Court is -- is only sentencing Ms. Powell today, but the

24    lodestar it's following is a sentence that is no greater than

25    necessary to serve the purposes of Section 3533: deterrence,

1    seriousness of the offense, avoiding unwarranted disparities.

2        And, Your Honor, the government says 87 months is the right

3    sentence here.  There are many -- whatever sentence the Court

4    ends up at, there are many sentences short of that that deter

5    this woman from engaging in this behavior again.  I mean, if

6    we just look at recidivism statistics for folks in her position

7    that have no criminal history who are her age, a woman, she

8    has all of these children, it's highly unlikely.

9        So does she need to be -- does her family need to be

10   wrecked to deter her from engaging in this conduct again?

11   Absolutely not.  And I'm learning about some of the things

12   the government just mentioned about Ms. Powell talking in

13   the media, and I don't like that.  I don't think it's good

14   for her.  But I also don't think it means she's going to be

15   committing crimes.  She has political views.

16       Another point, Judge -- I'm going to let Ms. Powell talk

17   about her family, but another point I want to emphasize here

18   is sort of what the prosecutor was talking about, about the

19   property destruction.  I think that is the most egregious

20   crime here.  I think going to the Capitol and smashing windows

21   is very, very bad conduct, and yet that thing that we're

22   focusing on the most here, that makes the case more outstanding

23   from others, it is true that this is a misdemeanor offense.

24       That's not to excuse Ms. Powell.  I don't think she should

25   be going on the media and saying this is "only a misdemeanor,"

1    like it's not serious.  I mean it in a different way.  I mean

2    the Sentencing Commission has decided, Congress has decided,

3    that this is an offense punishable by up to one year of

4    incarceration.  It's terrible.  Ms. Powell owes Congress.

5    She needs to reimburse Congress for that.  But to take the

6    most serious offense here in many ways, which is property

7    destruction, and then to take that one-year max and then turn

8    it into a sentencing eight times, nine times higher, that

9    doesn't seem fair.

10       And I want to emphasize, I don't mean it in a sense that

11   Ms. Powell said when she said it was a misdemeanor.  I mean

12   Congress has decided this is the right punishment.  So,

13   Your Honor, I think the sentence should be more based on that

14   crime, the crime we watched over and over again at trial,

15   breaking the window.

16       On the 1512, the last point, Your Honor, is we gave the Court

17   some examples of sentences between 8 and 14 months for the 1512

18   offense.  And it's about six or seven of these cases, and they

19   all involve defendants who were in the building for a lot longer

20   than Ms. Powell.

21       Granted, they did not smash windows spectacularly like

22   Ms. Powell did.  There's a difference there.  But they were

23   in the building for longer, and a lot of their conduct for

24   encouraging more people to come in was more egregious than

25   Ms. Powell.  Those are 8-to-14 sentences.  Even on the higher

 1    end, Your Honor, there's a couple of cases that are 36 to 48.

 2    I think more than 48 months -- I think Your Honor has a couple

 3    of those with the Jacob Chansley.

 4        Think about that, Your Honor.  Jacob Chansley's sentence

 5    is half of what the government's asking for for Rachel Powell.

 6    He's the symbol of January 6.  He went into the Senate Chamber.

 7    If you ask anyone in the world right now who consumes the news

 8    what's January 6, they point to him.  That's half the sentence

 9    they're asking for for Rachel Powell.  Jacob Chansley didn't

10    have any kids, I don't think.  He's not the sole caregiver for

11    three minors.  That makes all the difference in the world,

12    Your Honor.

13        So I think the Court's heard enough from me.  I'll let

14    Ms. Powell speak.

15            THE COURT:  Okay.  Ms. Powell, I know you'd be nervous

16    at a time like this, but whatever you'd like to say, I'm

17    certainly interested in hearing, if you would come up to the

18    podium.

19            THE DEFENDANT:  Okay.  Judge Lamberth, thank you for

20    letting me address the Court.  I don't want there to be any

21    doubt about this point.  I am deeply ashamed of my conduct on

22    January 6.  I regret it, and it will never happen again.  If

23    I could go back, things would be different, but I can't.  My

24    remorse and my feelings of guilt are deeper than anybody in

25    this court could ever imagine.

1           There are two things I want to address.  Number one is

2    why I think I did what I did, and number two is my family.

3    I struggle with that day.  I broke a window.  I pushed on

4    police barricades.  I encouraged others to enter the building.

5    My conduct was disgraceful.  I apologize to members of the

6    congress, their staff, to law enforcement, and to the people

7    of this country whose opinions and thoughts I trampled.  And I

8    apologize to my family for the hell they have endured because

9    of me...

10          THE COURT:  Just take it slow.

11          THE DEFENDANT:  I look forward to paying Congress back

12   for that window.  How do I explain something like this so out

13   of character for me?  I thought about it often, Judge, and

14   what I came up with was this:  Politics has taken a very dark

15   turn in this country.  The partisan divide has become toxic

16   and violence has resulted.  I succumbed to those feelings, and

17   it led to disaster.  But even that doesn't excuse my behavior.

18   I have failed everyone around me.

19          Moving on to my family, my 12-year-old son Nick has been

20   unable to play sports, perform in music recitals, or have

21   field trips for almost three years.  I have a seven-year-old

22   daughter Tessa, who was born to be a performer, and the only

23   thing I've been able to provide her is music lessons, and only

24   because her teacher is willing to come to my home.

25          My 15-year-old son Gabriel has to walk over a mile to play

sports at a little church.  If incarcerated, my children are going to lose the little bit I've been able to give them over the last couple of years.  And my 15-year-old son Gabriel, he's the only one that's going to be able to take my place.

My 93 year-old grandmother, an accomplished artist, now has severe vision issues, and she had a stroke.  She shouldn't be driving.  I've not been able to visit her on house arrest, and I'm the only adult available to help her.  I used to visit her often and help with cleaning and projects, and I'm ashamed of myself for putting us in a position that I can't be there for her like I should be.  I should be taking care of her.

Your Honor, I'm terrified about what will happen to my family.  I'm the sole caregiver for three minors.  My ex-husband simply cannot handle the job.  Right now our plan is for the 15-year-old son to head the family, and that's impossible.

Your Honor, I realize I've made terrible mistakes, but you can count on my word: I will never cross the wall again. And how do you know that?  Because the experience I've been through the last three years has been hell.  I have learned from my mistake.  I hate how this feels, like I threw my family right in the garbage.  All I want to do is guide my children and provide them a loving home.  I will never put my family at risk again.  They're the only thing that matters to me.

Judge, I'm really sorry.  Thank you for hearing me, and

1    please have mercy.

2        THE COURT:  As I said, these are not easy cases for

3    the Court.  You said everything right today.  I wish it had

4    been sooner and that you hadn't said some of the other things

5    you have said.

6        But, in any event, the Court has to look beyond what you've

7    said, because not only were your actions that day hard to

8    swallow, the Court has to look at the impact on the nation and

9    the impact and the deterrent need that the Court has about

10   making sure this kind of thing never happens again.  So it's

11   not only specific deterrence, but it's general deterrence that

12   the impact of what happened that day to the entire country

13   cannot be condoned by this court or by any judge of this court.

14       The serious nature of what occurred that day cannot be

15   overstated.  I know that a lot of commentators think that this

16   court and other judges of this court have been unduly harsh.

17   I didn't have Black Lives Matter cases before me.  I thought

18   -- all my life I thought, in the tradition of Martin Luther

19   King and others, that demonstrators that demonstrated expected

20   to pay a penalty.

21       For some reason, Forrest Tucker, or whatever his name is,

22   believes that Chansley got a raw deal.  Chansley got a good

23   deal.  But Chansley pled guilty, unlike you.  And Chansley got

24   41 months, and was lucky to get that, because he was a leader

25   of the pack.  But he said all the right things pretty early

1    on.  He wasn't going on programs saying the opposite even up

2    to the day of sentencing.

3        You said all the right things today, but you didn't say

4    the right things when you were wearing that mask with holes

5    in them, which really almost put you in jail that day when I

6    learned you were mocking the Court.  You have skated along for

7    a long time now.

8        And I know you think it's been harsh, but I'm going to give

9    you the minimum under the guidelines.  I do not think that I

10   can justify, in light of the serious nature of what happened

11   here, a departure from the guidelines.  I will give you the

12   minimum of the guidelines, but that's as far as I'm willing

13   to go.

14       Pursuant to the Sentencing Reform Act of 1984, and in

15   consideration of the provisions of 18 U.S.C. § 3553, as well

16   as the advisory sentencing guidelines, it's the judgment of

17   the Court that you, Rachel Marie Powell, are hereby committed

18   to the custody of the Bureau of Prisons for a term of 57

19   months as to Count 1; 57 months as to each of Counts 2, 4, 5,

20   and 6; 12 months as to Count 3; and six months as to Counts 7,

21   8, and 9, all counts to be served concurrently, for a total of

22   57 months.

23       You're further sentenced to serve a 36-month term of

24   supervised release as to Counts 1, 2, 4, 5, and 6 and a

25   12-month term of supervised release as to Count 3, with all

counts to be served concurrently, for a total of 36 months'
supervised release.

In addition, you are ordered to pay a special assessment of
$555 in accordance with 18 U.S.C. 3013.  While on supervision,
you shall abide by the following mandatory conditions as well
as all discretionary conditions recommended by the probation
office in Part D, Sentencing Options of the Presentence
Report, which are imposed to establish the basic expectations
of your conduct while on supervision.  Mandatory conditions
include:

(1) you must not commit another federal, state, or local crime;

(2) you must not unlawfully possess a controlled substance;

(3) you must refrain from any unlawful use of a controlled
substance.  You must submit to one drug test within 15 days of
placement on supervision, at least two periodic drug tests
thereafter as determined by the Court;

(4) you must cooperate in the collection of DNA as directed
by the probation officer; and

(5) you must make restitution in accordance with 18 U.S.C.
Section 3663 and 3663A or any other statute authorizing a
sentence of restitution.  You're ordered to pay a fine of
$5,000.  You are to make restitution to the Architect of the
Capitol in the amount of $2,753.

You shall also comply with the following special conditions:
You must provide the probation office access to any requested

financial information, authorize the release of any financial information.  Probation office may share financial information with the U.S. Attorney's Office.  You must not incur new credit charges or open additional lines of credit without the approval of the probation office.

Within 45 days of release from incarceration, you will appear before the Court for a reentry progress hearing.  The probation office in the district in which you are supervised will submit a progress report to the Court within 30 days of the commencement of supervision.  Upon receipt of the progress report, the Court will determine if your personal appearance is required.

Restitution payments shall be made to the Clerk of the Court of the U.S. District Court, District of Columbia, for disbursement to the following victim:  Architect of the Capitol, Office of the Chief Financial Officer, Ford House Office Building, Room H2-205B, Washington, D.C. 20515, in the amount of $2,753.

Financial obligations are payable to the Clerk of the Court, U.S. District Court, 333 Constitution Avenue NW, Washington, D.C. 20001.  Within 30 days of any change of address, you shall notify the Clerk of the Court of the change until such time as the financial obligation is paid in full.

Probation office shall release the presentence investigation report to all appropriate agencies, which

includes the probation office in the approved district of

residence, in order to execute the sentence of the Court.

Treatment agencies shall return the presentence report to

the probation office upon the defendant's completion or

termination from treatment.

     You have the right to appeal your conviction of guilt

to the U.S. Court of Appeals of the D.C. Circuit.  Pursuant

to 18 U.S.C. § 3742(a), you may also have the right to appeal

your sentence to the D.C. Circuit under certain circumstances

including if you think the sentence was imposed in violation

of law or as a result of an incorrect application of the

sentencing guidelines or is more severe than the maximum

established in the guideline range.  You may also appeal your

sentence if you believe you received ineffective assistance

of counsel at sentencing.

     Pursuant to 18 U.S.C. § 2255, you also have the right to

challenge the conviction entered or sentence imposed to the

extent permitted by that statute.  Any notice of appeal must

be filed within 14 days of the entry of judgment or within 14

days of the filing of a notice of appeal by the government.

I do deny the government's motion for an upward departure or

a variance.  If you're unable to afford the cost of an appeal,

you may request permission from the court to file an appeal

without cost to you.  On appeal, you may also apply for

court-appointed counsel.

1      I have to ask each side, are there any objections to the

2      sentence as imposed that have not already been noted on the

3      record under *U.S. v. Hunter*?

4           MS. SUN:  I don't believe so, Your Honor.

5           MR. SMITH:  No, Your Honor.

6      We had a question about surrender.

7           THE COURT:  Okay.  Let me ask the government:  Is there

8      a request regarding her status pending sentence?

9           MS. SUN:  Yes, Your Honor.  The government would be

10     requesting surrender for the same reasons the government

11     articulated in July.

12          THE COURT:  Okay.  Detention you're talking about.

13          MS. SUN:  Yes.  We'd ask for a remand.

14          MR. SMITH:  So, Judge, this goes to the family-related

15     issues we talked about.  Your Honor, Ms. Powell needs a little

16     bit of time to tie up loose ends with her family, find

17     arrangements to take care of her young minor children.

18     Typically, the BOP gives about a month for surrender, but we

19     would ask if two months is possible, Your Honor.

20          THE COURT:  What is the -- what do you want me to do

21     about recommending a facility?

22          MR. SMITH:  Judge, Ms. Powell doesn't have a request

23     there, but her only request is on the surrender date, to give

24     her a little bit of time.

25          THE COURT:  All right.  I'll allow self-surrender.

1          We'll say after January 5.

2               MR. SMITH:  Thank you, Judge.

3               THE COURT:  Court will be in recess.

4          (Proceedings adjourned at 1:39 p.m.)

* * * * * *

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Bryan A. Wayne*
Bryan A. Wayne